## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW MEXICO; STATE OF ARIZONA; PEOPLE OF THE STATE OF MICHIGAN; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF HAWAI'I;  STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON, | C.A. No. 1:25-cv-00429 **REQUEST FOR EMERGENCY TEMPORARY RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(B)** |
| Plaintiffs, | |
| v. | |
| ELON MUSK, in his official capacity; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES, | |
| Defendants. | |

## PLAINTIFF STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER

COME NOW the Plaintiffs, State of New Mexico; State of Arizona; People of The State Of Michigan; State of California; State of Connecticut; State of Hawai'i; State of Maryland; State of Massachusetts; State of Minnesota; State of Nevada; State of Oregon; State of Vermont; and State of Washington (collectively "Plaintiff States"), and respectfully move this Honorable Court for a Temporary Restraining Order against Defendants.

As set forth more fully in the Plaintiff States' Memorandum of Points and Authorities in Support of Motion for a Temporary Restraining Order, Defendant Elon Musk, an unelected, unconfirmed government official, is exercising unprecedented executive authority in violation of

1

the Appointments Clause of the Constitution. Mr. Musk has inserted himself into the highest levels of over a dozen federal agencies and begun directing the agencies' actions in ways that exceed even the authority of those agencies' Senate-confirmed leaders. Evidence suggests that he has, and continues to, cut billions of dollars from agency budgets, fired agency personnel, and, in his words, "delete[d]" entire agencies. He has canceled government contracts, announced plans to sell government property, and promised to withdraw a multitude of regulations across different agencies. He has installed his own teams into agencies and given them access to the agencies' most sensitive data. In other words, an individual accountable only to the President—if he answers to anyone at all—is exercising apparently limitless power within the Executive Branch. Mr. Musk's conduct has wreaked havoc on the federal government and caused mass chaos and confusion for state and local governments, federal employees, the American public, and people around the world who depend on the United States for leadership and support.

All of this is unconstitutional. This Court should enter a temporary restraining order to prevent further damage to the Plaintiff States a temporary restraining order is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). As set forth in the Plaintiff States' Memorandum of Points and Authorities in Support of Motion for a Temporary Restraining Order, Plaintiff States have established each of these elements and are entitled to a temporary restraining order.

Accordingly, Plaintiff States respectfully request that the Court grant this Motion for Temporary Restraining Order and order the following immediate and temporary relief to remain in place until such time as a forthcoming motion for preliminary injunction may be heard:

An Order that Mr. Musk, U.S. DOGE Service; U.S. DOGE Service Temporary Organization, along with personnel associated with these entities, identify all ways in which any data obtained through unlawful agency access was used, including whether it was used to train any algorithmic models or create/obtain derivative data, and destroy any copies or any derivative data in Defendants' possession, custody, or control, and that they are temporarily enjoined from:

(a) ordering any change in the disbursement of public funds by agencies;

(b) extending offers on behalf of the United States that would bind the government to an appropriation that has not been authorized by law;

(c) cancelling government contracts;

(d) disposing of government property;

(e) ordering the rescission or amendment of regulations;

(f) making personnel decisions for agency employees;

(g) taking steps to dismantle agencies created by law or otherwise asserting control over such agencies, including, e.g., placing employees on administrative leave;

(h) accessing sensitive and confidential agency data, using agency data for other than its authorized purpose;

(i) altering agency data systems without authorization by law and without taking all appropriate protections against cybersecurity risks; or

(j) engaging in any other conduct that violates the Appointments Clause or exceeds statutory authority.

(k) and such other and further relief as the Court finds just and proper.

Dated: Santa Fe, New Mexico
      February 14, 2025

Respectfully submitted,

**RAÚL TORREZ**
Attorney General of the State of New Mexico

By: /s/ Anjana Samant
Anjana Samant (D.D.C. Bar No. 4267019)
*Deputy Counsel*

James Grayson*
*Chief Deputy Attorney General*
Steven Perfrement
*Assistant Attorney General*
Malina Simard-Halm*
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
SPerfrement@nmdoj.gov
(505) 270-4332

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

By: /s/ Jason Evans
Jason Evans*
*Assistant Attorney General*
Joseph Potchen*
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Jason Evans*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
*Solicitor General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov

*Attorneys for the State of Arizona*
**ROB BONTA**
Attorney General for the State of California

By: */s/ Nicholas R. Green*
Nicholas R. Green*
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
*Supervising Deputy Attorneys General*
Maria F. Buxton*
Michael E. Cohen*
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
Nicholas.Green@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020

5

Michael.Skold@ct.gov

*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: /s/ Kaliko'onālani D. Fernandes
Kaliko'onālani D. Fernandes*
Solicitor General
David D. Day*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts
David C. Kravitz
State Solicitor

By: /s/ *Gerard J. Cedrone*
Gerard J. Cedrone (D.D.C. Bar No. MA0019)
Deputy State Solicitor
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-8828

gerard.cedrone@mass.gov


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us


*Attorneys for the State of Minnesota*


**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.j.chang@dog.oregon.gov


*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Jeff Kidd*
Jeff Kidd*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov


*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

7

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
Attorney General for the State of Washington
By: */s/ Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Andrew.Hughes@atg.wa.gov

*Attorneys for the State of Washington*

*\* Pro Hac Vice Forthcoming*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW MEXICO; STATE OF ARIZONA; PEOPLE OF THE STATE OF MICHIGAN; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF HAWAI'I; STATE OF MARYLAND; STATE OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>ELON MUSK, in his official capacity; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES,<br><br>Defendants. | C.A. No. 1:25-cv-00429<br><br>**REQUEST FOR EMERGENCY TEMPORARY RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(B)** |

**PLAINTIFF STATES' STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................... iii

**INTRODUCTION** ................................................................................................................. 1

**BACKGROUND** .................................................................................................................. 2

    I.    Constitutional Framework ........................................................................... 2

    II.   Factual Background ..................................................................................... 4

**ARGUMENT** ....................................................................................................................... 6

    I.    THE STATES HAVE STANDING ............................................................... 6

        A.   Financial and Programmatic Harm Comprise an Injury in Fact. ........................ 7

        B.   The Plaintiff States Have Suffered an Injury in Fact from the Unauthorized Access to and Disclosure of the States' Private Data. ..................................... 10

        C.   Plaintiff States Have Pleaded the Second and Third Elements of Standing, *i.e.*, Causation and Redressability......................................................................... 12

    II.   PLAINTIFF STATES ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER ......................................................................................................... 14

        A.   The States are Likely to Succeed on the Merits............................................. 15

        B.   The States Face Irreparable Harm.................................................................. 29

        C.   The Equities and Public Interest Strongly Favor Plaintiff States .................... 31

RELIEF REQUESTED .......................................................................................................... 33

CONCLUSION ..................................................................................................................... 34

# TABLE OF AUTHORITIES

CASES

*A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548
  (D.D.C. Aug. 31, 2020) ...................................................................15

*Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ........................................................32

*Ass'n of Am. Railroads v. Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016) ................................20

*Auffmordt v. Hedden,* 137 U.S. 310 (1890) ...........................................24

*Biden v. Nebraska*, 600 U.S. ____, 143 S. Ct. 2355 (2023) ..........................8

*Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276 (2d Cir. 2023) .........................10

*Bowsher v. Synar*, 478 U.S. 714 (1986) ...............................................13

*\*Buckley v. Valeo,* 424 U.S 1 (1976)...........................................Passim

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .......................................9

*California v. Trump*, 963 F.3d 926 (2020) ...............................................8

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................8

*Clinton v. City of New York*, 524 U.S. 417 (1998)......................................8

*Collins v. Yellen*, 594 U.S. 220 (2021) ...............................................13

*Commonwealth v. Evans*, 74 Pa. 124 (1873).............................................17

*Confederated Tribes of Chehalis Reservation v. Mnuchin*,
  456 F. Supp. 3d 152 (D.D.C. 2020) ........................................... 14-15

*Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288 (D.C. Cir. 2009)........................14

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998) ......................29

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ................................................................8, 12, 28

*District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ........................... 15, 28

*Edmond v. United States*, 520 U.S. 651 (1997) ......................................................................Passim

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ......................................................................................28

*Ex parte Hennen*, 38 U.S. 225, 13 Pet. 230 (1839)....................................................................2, 26

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003) ...............................................14

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477 (2010) .......13

*Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367 (2024) ....................................13

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ........................................................... 3, 19, 20, 24

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013).....................................................28-30, 31, 32

*Gundy v. United States*, 588 U.S. 128 (2019) ...............................................................................28

*In re Corliss*, 11 R.I. 638 (1876)....................................................................................................17

*In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019)..............................................20-21

*In re NTE Conn., LLC*, 26 F.4th 980 (D.C. Cir. 2022).....................................................................29

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017)...........................................................32

*Landry v. F.D.I.C.*, 204 F.3d 1125 (D.C. Cir. 2000)..........................................................................7

*League of Women Voters of U.S. v. Newby These (League of Women Voters I)*,
    838 F.3d 1 (D.C. Cir. 2016)......................................................................................Passim

*League of Women Voters of U.S. v. Newby These (League of Women Voters II)*,
    963 F.3d 130 (D.C. Cir. 2020) ...........................................................................................15

*Lofstad v. Raimondo*, 117 F.4th 493 (3rd Cir. 2024)........................................................................7

*Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237 (2018).............................................................Passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................ .................................. ... 7

*\*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................8

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991).................................................................................................. 13

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ...................................28-29

*Morrison v. Olson*, 487 U.S. 654 (1988) ...........................................................................23

*Myers v. United States*, 272 U.S. 52 (1926) .....................................................................19

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
    595 U.S. 109 (2022)..............................................................................................27, 28

*New York v. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020)..................................... ......... 29

*New York v. Dep't of Treasury*, 25-1144(JAV), 25-1144(JAV),
    ECF No. 28 (S.D.N.Y. Feb. 11, 2025) .....................................................................12

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................ 14, 31

*Oklahoma v. Biden*, 577 F. Supp. 3d 1245 (W.D. Okla. 2021) ..........................................7

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ...............................8

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ..........................................15, 31

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)..................................................31

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ......................................................32

*Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) ..................................13

*Shelby v. Alcorn*, 36 Miss. 273 (1858) ..............................................................................18

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)......................................................................7

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ..................................13

*State ex rel. Atty. Gen. v. Kennon*, 7 Ohio St. 546 (1857) .......................................................... 17, 24

*\*United States v. Arthrex*, 594 U.S. 1 (2021) .................................................................. 2, 4, 21

*State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) ................................. 7

*TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021) ....................................................... 10, 11, 12

*United States v. Tingey*, 30 U.S. 115 (1831)................................................. ..................17, 18

*Trump v. United States*, 603 U.S. 593 (2024) ................................................................26

*United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022)............................................... 23

*United States v. Eaton*, 169 U.S. 331 (1898) ..............................................................20, 22, 24

*United States v. Germaine*, 99 U.S. 508 (1878)........................................................... 16, 24

*\*United States v. Maurice*, 26 F. Cas. 1211 (1823) ..................................................... 17-18, 24

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994)........................................................31

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977)........ 14

*\*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)................................................14, 15, 28

## U.S. CODE

3 U.S.C. § 105 ..................................................................................................................21

*\*5 U.S.C. § 3161 ....................................................................................................... 16, 26-29

12 U.S.C. § 5491 ..............................................................................................................20

18 U.S.C. § 202 ................................................................................................................23

20 U.S.C. 3401 ..................................................................................................................20

22 U.S.C. § 6563 ......................................................................................................... 5, 20

## U.S. CONSTITUTION

Declaration of Independence .................................................................................. 2

U.S. Const., art. I, § 9, cl. 7 ................................................................................ 20

*U.S. Const., Art. II, § 2, cl. 2 .................................................................... 2, 16, 26

## OTHER AUTHORITIES

*Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ................................ 4, 23

1 ANNALS OF CONG. 581 (1789) ........................................................................ 20

3 Story § 1530 ................................................................................... fn. 17

The Federalist No. 72 ........................................................................... fn. 17

*Officers of the United States Within the Meaning of the Appointments Clause,
   31 Op. O.L.C. 73 (2007) .................................................................. fn. 23

The President's Committee on Administrative Management,
   Administrative Management in the United States 5 (1937) ............................ fn. 21

Madison's Observations on Jefferson's Draft of a Constitution for Virginia (178),
   reprinted in 6 Papers of Thomas Jefferson 308 (J Boyd ed., 1952).................... fn. 19

E. Garrett West, Clarifying the Employee-Officer Distinction in
   Appointments Clause Jurisprudence, 127 Yale L.J. Forum 41 (2017) ............... fn. 24

Jennifer L. Mascott, Who Are "Officers of the United States,"
   70 Stan. L. Rev. 43 (2018) ............................................................ fn 16, 23

## INTRODUCTION

Until late January 2025, Elon Musk was an extremely wealthy private individual with significant influence but no actual role in government. That changed on January 20, 2025, when President Trump created the quasi-governmental "Department of Government Efficiency" ("DOGE") and made Mr. Musk its sole leader.

Since then, he has run rampant through the federal government, personally directing a wide range of executive actions, cutting billions of dollars in federal funding, orchestrating the liquidation of large swaths of the federal workforce, and in his own words, "deleting" entire federal agencies. There is no need to speculate about Mr. Musk's direct influence over the federal government; he has made it clear in his own social media posts. And if there were any doubt about the reach of Mr. Musk's *de facto* power over Executive-Branch operations, his remarks delivered from the Oval Office on February 11, 2025—with the President sitting in silence at the Resolute as Mr. Musk held the floor—should dispel it. In short, Mr. Musk has asserted powers that push the limits of those vested in even very senior government officers—indeed, in some instances, beyond those of the President himself.

But Mr. Musk is not a principal officer of the United States within the meaning of the Appointments Clause of the Constitution; he occupies a role the President made up, not one Congress created. And nobody disputes that he has never been confirmed by the Senate. Whatever powers a principal officer may exercise, Mr. Musk is not entitled to wield them.

Yet, over and over again, he has vastly exceeded the permissible boundaries of authority for a "special government employee" who lacks status as a constitutionally appointed principal officer. This expansive, unchecked power is unconstitutional, anti-democratic, and unheard of in

American history. If left unchecked, it would set a dangerous precedent. Urgent judicial intervention is required to put a stop to Mr. Musk's brazen violations of the law. This Court should enter a temporary restraining order to prevent further damage to the Plaintiff States and our constitutional order.

## BACKGROUND

### I.    Constitutional Framework

As one of the "injuries and usurpations" listed in the Declaration of Independence, the Founders submitted that the King "has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance." The Declaration of Independence ¶ 12 (U.S. 1776). The Framers of the Constitution did not fail to address this aspect of the King's tyranny. The Appointments Clause of the Constitution gives the President the authority to appoint officers of the United States, but only within certain guardrails. Precedent interpreting the Appointments Clause distinguishes between two types of "officers": "inferior" officers and what have become known as "principal" or "noninferior" officers. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021). Principal officers must always be nominated by the President and confirmed by the Senate. Inferior officers must be nominated by the President and confirmed by the Senate unless Congress creates an exception and "by Law vest[s] the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2 ("The Exceptions Clause"). In other words, when there is no law addressing the appointment of an inferior officer, the principal-officer procedure applies;

meaning only the President can nominate the officer, and appointment requires the advice and consent of the Senate.

Officers of the United States, whether principal or inferior, are those that exercise "significant authority pursuant to the laws of the United States." *Arthrex*, 594 U.S. at 13 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 & n.162 (per curiam) (1976)). This includes the exercise of sovereign authority in executing or interpreting the laws. The President can only appoint officers to offices that are "established by Law" and only with the advice and consent of the Senate. The only exception to that advice-and-consent requirement is for "inferior officers," and only if Congress has vested the power of appointment in the President alone. The Clause thus establishes two classes of officers within the Executive branch that the President may nominate and appoint—principal officers and inferior officers, and appointments of both require the participation of Congress, either through Senate confirmation or an express statutory delegation to the President to appoint inferior officers.

The Appointments Clause plays a vital role in "curb[ing] Executive abuses." *Edmond v. United States*, 520 U.S. 651, 659 (1997). It is also an "excellent check upon a spirit of favoritism in the President" and "tend[s] to greatly prevent the appointment of unfit characters." Federalist Papers No. 76. The Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659−60 (citing *Buckley*, 424 U.S. at 125). "'Assigning the nomination power to the President guarantees accountability for the appointees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'" *Arthrex,* 594 U.S. at 12 (quoting The Federalist No. 77, p. 517 (J. Cooke ed. 1961)

3

(A. Hamilton)). It also incorporates accountability for the Senate, "which shares in the public blame 'for both the making of a bad appointment and the rejection of a good one.'" *Id.* (quoting *Edmond*, 520 U.S. at 660).

## II.    Factual Background

Shortly after he was elected, President Trump announced that he would establish a "Department of Governmental Efficiency" (or "DOGE") to "dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies."

On January 20, 2025, President Trump issued an Executive Order creating the United States DOGE Service, located in the Executive Office of the President. *See* Establishing and Implementing the Presidents Department of Government Efficiency, Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). The Executive Order provides for a DOGE Administrator and for DOGE Teams to be embedded in every agency, through consultation between the relevant agency head and the DOGE Administrator. The White House later confirmed that Mr. Musk was the head of DOGE. ECF No. 2 (Compl.), ¶ 60. DOGE quickly gained access to sensitive material in dozens of federal agencies, reportedly without the necessary security clearances. Compl. ¶¶ 61, 94, 137. Mr. Musk announced his intent to use DOGE to take control of public expenditures and reduce federal spending by $2 trillion. Compl. ¶¶ 201-202.

The available public record regarding Mr. Musk and DOGE—consisting of newspaper reports, tweets, and press conferences—likely reflects only a small part of DOGE's conduct, and admittedly does not always clearly distinguish whether certain actions were taken by Mr. Musk or agency officials. Yet even without discovery, the public record shows that Mr. Musk (a) has

unprecedented and seemingly limitless access across the federal government and reports solely to President Trump, (b) has exercised significant and sweeping authority across a broad swath of federal agencies, and (c) has engaged in a constellation of powers and activities that have been historically associated with an officer of the United States, including powers over spending and disbursements, contracts, government property, regulations, and agency viability.

For example, USAID is created by statute and funded by Congressional appropriations. 22 U.S.C. § 6563. Until a few weeks ago, it was one of the foremost development agencies in the world. Mr. Musk, however, declared that it was "a criminal organization" and that it was "Time for it to die." In the short span of a week, Mr. Musk effectively shut down USAID. He took down its website, closed its headquarters, and placed senior officials and the great bulk of its staff on administrative leave. Mr. Musk publicly stated that he was responsible for demolishing USAID and did so answering only to President Trump. *See* Compl. ¶ 98 ("We spent the weekend feeding USAID into the woodchipper.), *id.* ¶ 100 ("I went over it with him [President Trump] in detail, and he agreed that we should shut it down. And I actually checked with him a few times [and] said 'are you sure?' The answer was yes. And so we're shutting it down.").

Mr. Musk has indicated that he intends to take similar action at the Department of Education. The Department operates programs providing funding for low-income schools, special education, and financial aid for college students. On February 7, 2025, Mr. Musk tweeted, "What is this 'Department of Education' you keep talking about?  I just checked and it doesn't exist." DOGE staffers have gained access to the Department's student loan database and obtained administrator-level electronic accounts, allowing them to access sensitive information and the back

end of the Department's website. DOGE then announced that the Agency had terminated over a hundred grants and contracts worth nearly $1 billion.

DOGE has also purported to cancel numerous other governmental contracts at other agencies; exercised control over the Office of Personnel Management to offer severance packages to federal employees; accessed sensitive data at numerous agencies; and threatened to "delete" the Consumer Financial Protection Bureau.

On February 11, 2025, President Trump issued an executive order purporting to give DOGE legal authority over certain hiring decisions at all federal agencies. Compl. ¶¶ 75-76. Specifically, the DOGE Team at the agency can veto hiring decisions at the agency, and that veto can only be overridden by the head of the agency. In other words, DOGE personnel can veto hiring decisions made by officers nominated by the President and confirmed by the Senate, such as Deputy Secretaries, Undersecretaries, and Assistant Secretaries.

Since President Trump's inauguration, Mr. Musk has taken the helm of the federal government. Mr. Musk's authority extends across all agencies in the Executive Branch in an unprecedented manner. Compl. ¶¶ 77-199.  No Executive position, other than the President, wields as much power over the operations of the Executive Branch

## ARGUMENT

## I.    THE STATES HAVE STANDING

"[J]udicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated." *Landry v. F.D.I.C.*, 204 F.3d 1125, 1131 (D.C. Cir. 2000). "A litigant need not show direct harm or prejudice caused by an Appointments Clause violation . . .

Such harm is presumed." *Lofstad v. Raimondo*, 117 F.4th 493, 497 (3rd Cir. 2024). Indeed, the Supreme Court has sought to incentivize this separation of powers litigation. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 252, n.5 (2018) ("Appointments Clause remedies are designed not only to advance [the Appointment Clause's structural] purposes directly, but also to create incentives to raise Appointments Clause challenges."); *see also State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.) ("There is no doubt that the Bank is regulated by the Bureau. Under *Lujan*, the Bank therefore has standing to challenge the constitutionality of the Bureau.").

Here, Mr. Musk's unlawful assault on the federal government has directly harmed the Plaintiff States. Mr. Musk has interfered with funding that goes directly to the Plaintiff States and stated his intent to continue interfering with such funding. That amounts to a classic pocketbook injury. Defendants have also unlawfully accessed financial data, including of the Plaintiff States, and exposed that data to cybersecurity risks. The Court can redress these injuries by declaring Mr. Musk's actions *ultra vires* and enjoining him from engaging in similar conduct in the future. Thus, the states meet the familiar standing requirements of injury, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### A. Financial and Programmatic Harm Comprise an Injury in Fact.

A state's loss of federal funding suffices to create an injury in fact. *See Biden v. Nebraska*, 600 U.S. ___, 143 S.Ct. 2355, 2364–65 (2023); *Clinton v. City of New York*, 524 U.S. 417, 430–31 (1998); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("[L]oss of funds promised under federal law[ ]satisfies Article III's standing requirement." (quoting

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). Additionally, an injury in fact can arise when there is evidence that a defendant's action hinders a state's operation, programs, or policy goals. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (holding that "concrete and imminent injury" to the state comprised "expectation that reinstating a citizenship question will depress the census response rate and lead to an inaccurate population count"); *Massachusetts v. EPA*, 549 U.S. 497, 520–23 (2007); *California v. Trump*, 963 F.3d 926, 940 (2020).

The federal government disburses billions of dollars directly to the States to support law enforcement, health care, education, and many other programs.  In fiscal year 2022, 36.4% of state revenue came from federal dollars. Compl. ¶¶ 229-239; *see also* Exh. B ¶ 8(a)-(e) (outlining $1,879,210,362 in federal education grants received by New Mexico); Exh. G ¶¶ 3-5 (describing grants received by Washington State University through USAID); Exh. E ¶¶ 8-18 (describing grants from the Department of the Interior to New Mexico and the state's inability to draw those funds in February 2025); Exh. D ¶ 7 (42% of the New Mexico Environment Department is derived from federal funding); Exh. F ¶¶ 3-16 (describing $30 billion in federal funding received by Arizona and the adverse effects of a reduction); Exh. A ¶¶ 8-16 (describing the $20,218,375,913 in federal funding Washington receives through a number of federal agencies); Exh. K ¶¶ 5-10 (discussing the adverse impacts on Connecticut of losing billions of dollars in federal funding).

Defendants have attempted to use their unlawful control of federal agencies to stop many such payments, and they have expressed their intent to continue and expand those efforts.[1] *See, e.g.* Exh. G ¶¶ 6-8 (identifying Suspension/Stop Work Orders received related to USAID grants and the adverse effects on the State). Mr. Musk has also stated that he intends to "delete" the CFPB and radically limit the funding and function of other federal agencies, like the U.S. Department of Education. Compl. ¶ 232. The dismantling of these agencies will place unanticipated financial and resource constraints on Plaintiff States, which comprises an injury in fact.[2] *See* Exh. B ¶¶ 9-13; Exh. G ¶¶ 8-11; Exh. E ¶¶ 15-19, 17-22; Exh. D ¶¶ 10-11; Exh. F ¶¶ 10-16; Exh. K ¶¶ 5-11. This constitutes injury in fact. *See California v. Azar*, 911 F.3d 558, 573-574 (9th Cir. 2018) (determining that a reasonably probable threat to states' economic interest established standing and rejecting an argument of self-inflicted harm).

Likewise, if the federal government ceases to fulfill its obligations under these agreements, Plaintiff States will incur greater financial costs and strain on personnel and other resources to compensate for the lost federal funding and staffing needed to administer and operate these programs, or else cut them entirely. *See* Exh. K ¶¶ 5-10; Exh. A. ¶¶ 17-20; Exh. D ¶¶ 8-12; Exh. F

---

[1] For example, Defendants have halted payments from USAID to public universities, including in the Plaintiff States, Exh. G ¶¶ 3-8; stated that they intend to use Treasury's BFS system to halt payments to innumerable recipients, including the Plaintiff States; and stated that they intend to destroy the U.S. Department of Education, which provides billions of dollars in funding to the Plaintiff States. Compl. ¶¶ 92, 170, 172-175.

[2] For example, CFPB's investigations into and enforcement of consumer protection laws benefits residents of Plaintiff States. With the cessation of CFPB operations, state consumer protection agencies and other enforcement authorities will likely face an increase in complaints and requests for assistance, resulting in the need to invest greater resources and personnel to protect their citizens. Compl. ¶ 149.

¶¶ 10-16; Exh. E ¶¶ 16-17. And aside from cooperatively administered programs, many federal programs are overseen and operated entirely by states at the local level. Federal hiring freezes, workforce reductions, or the abrupt cessation of expected or vested federal funding streams will lead to understaffed federal, state, and local agencies, causing delays and inefficiencies in program implementation. *See id.* Plaintiff States anticipate needing to allocate additional resources to manage these programs effectively, adding to their logistical and financial burdens, and in some cases requiring initiatives and policy goals to be abandoned. *Id.*

### B. The Plaintiff States Have Suffered an Injury in Fact from the Unauthorized Access to and Disclosure of the States' Private Data.

Plaintiff States' bank account information and other sensitive financial data, such as taxpayer identification numbers and financial account numbers, are stored in the Bureau of the Fiscal Service ("BFS") payment systems within the Treasury Department. *See* Exh. J ¶¶ 19-20; Exh. C ¶¶ 25-26. Unauthorized access to state financial data jeopardizes the privacy and security of the States' data to a degree sufficient to establish an injury in fact.

Plaintiff States have a proprietary interest in maintaining the privacy and security of their financial and banking information that they have transmitted to federal agencies. *See TransUnion LLC v. Ramirez,* 594 U.S. 413, 425 (2021) (holding that "disclosure of private information" is a concrete harm "traditionally recognized as providing a basis for lawsuits in American courts"). Recently, in *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276 (2d Cir. 2023), the Second Circuit articulated the "substantial risk of future harm" standing test in data breach cases. It explained that a party "exposed to a risk of future harm may pursue forward-looking, injunctive

10

relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 285. The court further held that "'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts,'" such that "an injury arising from such disclosure" is "'concrete' for purposes of the Article III analysis." *Id.* (quoting *TransUnion*, 594 U.S. at 425).

Under that test, the Plaintiff States have suffered a cognizable injury from Mr. Musk and DOGE's unlawful conduct. The Federal Government is under constant threat of cyberattacks. The rushed and reckless manipulation of federal agency data management and storage systems at the directive of Mr. Musk—an unvetted, unconfirmed individual who lacks familiarity with federal data systems and privacy controls—exacerbates opportunities for hacking and other cybersecurity risks, jeopardizing national security and infrastructure controlled by agencies like DOT, DOD, and DOE. Compl. ¶¶ 151-152, 181-187, 134-141. Similarly, expanding the number of people with access to secure systems, and allowing those same individuals to direct the rewriting of basic programs undergirding those systems, presents grave cybersecurity risks to those agencies and the Plaintiff States who interact with them.[3] Further, allowing overbroad access to this information enables those with newly-gained access to block or impede critical funding payments to the States under their federal grants—which Defendants have expressed as their principal objective.

---

[3] Indeed, the federal government has itself previously acknowledged that strict controls on access to sensitive information are critical to reducing the risk of breaches and data leaks. Cybersecurity & Infrastructure Security Agency, *Weak Controls and Practices Routinely Exploited for Initial Access* (Dec. 8, 2022), https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-137a.

Defendants also have defied the strict cybersecurity controls for accessing federal networks, including by reportedly connecting personal devices to sensitive government systems, and ignoring information-security protocols. Compl. ¶ 245. Agency employees have attempted to raise the alarm about this reckless conduct. Treasury's security contractor even flagged DOGE's conduct as an "insider threat." Compl. ¶ 87. Mr. Musk and DOGE have already gained access to and altered IT networks for numerous agencies that are responsible for maintaining and protecting critical infrastructure and national safety, including the Department of Energy.

Other courts have already recognized these harms: DOGE's access to sensitive Treasury data is currently enjoined by a temporary restraining order entered in the United States District Court for the Southern District of New York. *See New York v. Dep't of the Treasury*, 25-1144(JAV), ECF No. 28 (S.D.N.Y. Feb. 11, 2025) (affirming TRO as modified). That order, however, is not a final order and Plaintiff States remain under threat of DOGE access to their sensitive data.

All these harms are caused by Defendants' violation of the Appointments Clause, giving an unvetted, unconfirmed individual unprecedented power over federal agencies, their spending, and their sensitive data. Any one of these myriad harms suffices to establish an injury in fact. *See TransUnion*, 594 U.S. at 425; *Dep't of Com.*, 588 U.S. at 767. Taken together, these allegations plainly suffice to establish an injury in fact at the TRO stage.

### C.  Plaintiff States Have Pleaded the Second and Third Elements of Standing, *i.e.*, Causation and Redressability.

"The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs.*, *Inc.*, 554 U.S. 269 (2008)). If a defendant's action causes an injury, enjoining the action will typically redress that injury. *See Food & Drug Admin.,* 602 U.S. at 380–81.

Notably, Plaintiffs have no obligation to plead or prove "that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020) (citing *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010)). Rather, it is "sufficient that the challenger 'sustains injury' from an executive act that allegedly exceeds the official's authority" due to an Appointments Clause violation. *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)) (brackets omitted).

The Plaintiff States' injuries are indisputably caused by Defendants' violation of the Appointments Clause; but for the unconstitutional "appointment" of Mr. Musk and his assertion of authority exceeding his position, Mr. Musk would be unable to effectuate the harms explained above. *Collins v. Yellen*, 594 U.S. 220, 243–44 (2021). Those injuries are ongoing; Mr. Musk and DOGE continue to cut more funding upon which Plaintiff States rely. Necessarily, it follows that enjoining Defendants' unconstitutional conduct will redress the States' ongoing injury and prevent further injury. *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 (1991) ("Because invalidation of the veto power will prevent the enactment of the master plan, . . . the relief respondents have requested is likely to redress their alleged injury.").

13

## II.     PLAINTIFF STATES ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER

When courts review a request for preliminary injunctive relief, "[t]he same standards apply for both temporary restraining orders and preliminary injunctions." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  A temporary restraining order is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). However, when the federal government is the opposing party, these last two factors merge. *Nken v. Holder*, 556 U.S. 418 (2009) (third factor described as "harm to the opposing party").

These factors are evaluated on a sliding scale. If a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). While the Supreme Court's decision in *Winter* "raised doubts over whether the 'sliding scale' framework continues to apply," "[i]n the absence of a D.C. Circuit decision overruling it, the sliding scale framework remains binding precedent that this court must follow." *Confederated Tribes of Chehalis Reservation v. Mnuchin*, 456 F. Supp. 3d 152 (D.D.C. 2020). Thus, a court in this Circuit evaluates whether the "four factors, taken together, warrant relief." *League of Women Voters of U.S. v. Newby These (League of Women Voters I)*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting

14

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) and citing *Winter*, 555 U.S. at 20-22).

### A.  The States are Likely to Succeed on the Merits.

Plaintiff States are likely to succeed on the merits of both their Appointments Clause claim (Count I), and their claim that DOGE's actions are *ultra vires* (Count II). "Plaintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek." *A.B.-B. v. Morgan*, No. 20-CV-846 (RJL), 2020 WL 5107548, at *6 (D.D.C. Aug. 31, 2020) (citing *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 21 (D.D.C. 2020)); *see also League of Women Voters of U.S. v. Newby*, 963 F.3d 130, 134 (D.C. Cir. 2020).

Mr. Musk's *de facto* position—i.e., the position commensurate with the authority the evidence strongly suggests he is in fact exercising—is subject to the Appointments Clause, because he is acting with at least officer-level authority, in a continuing position.  Without Congressional creation of that position and Senate confirmation, his actions violate the Appointments Clause for two reasons: **first**, his authority is at least as broad as a principal officer's, because he reports to no one but the President; therefore, his position requires Congressional creation and Senate confirmation. **Second**, even if he could be considered an "inferior officer," his position was not created by Congress under the Exceptions Clause and he has not been confirmed by the Senate.

Plaintiffs are also likely to succeed on Count II, the *ultra vires* claim.  Mr. Musk and DOGE's actions are not authorized by any statute. The temporary organization statute, 5 U.S.C. § 3161, cited in the President's Executive Order creating DOGE, does not provide Mr. Musk or DOGE with the authority it purports to exercise.

15

## Count I | Violation of the Appointments Clause

The Appointments Clause provides as follows:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.

To qualify as an "officer" subject to the Appointments Clause, an individual must "exercis[e] significant authority pursuant to the laws of the United States" and "occupy a 'continuing' position" that is part of the federal government. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879) and *Buckley*, 424 U.S. at 126 (per curiam)).  Mr. Musk meets both criteria.

1. **Mr. Musk Exercises "Significant Authority" Pursuant to the Laws of the United States.**

Many of Mr. Musk's actions exceed any authority ever exercised by a principal officer, let alone an unconfirmed government employee. An individual exercises "significant authority" by carrying out the sovereign functions of government.[4] The term "Officers of the United States," has been historically understood to "embrace all appointed officials exercising responsibility under the

---

[4] The officer term likely expands even more broadly. *See* Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 STAN. L. REV. 443, 534 (2018) ("[H]istorical evidence suggests that the most likely eighteenth century meaning of 'officer' was significantly broader than the modern 'significant authority' test implies."). Because Mr. Musk clearly exercised executive authority, it is unnecessary for the Court to determine the full scope of the term.

public laws of the Nation." *Buckley*, 424 U.S. at 131; *see also United States v. Maurice*, 26 F. Cas. 1211, 1214 (1823) (stating that anyone in "a public charge or employment" who performed a "continuing" duty was an officer); *State ex rel. Atty. Gen. v. Kennon*, 7 Ohio St. 546, 562−63 (1857) (an officer is created when exercising "continuously, and as a part of the regular and permanent administration of the government, *important public powers, trusts, and duties*." (emphasis added)).

The exercise of significant authority associated with officers of the United States includes, *inter alia*: The **power to receive, oversee, or disburse public funds**, *see Buckley*, 424 U.S. at 140 ("[D]eterminations of eligibility for funds" constitute duties implicating Appointments Clause); *In re Corliss*, 11 R.I. 638, 643 (1876) (Officer duty includes "handling of public money or property"); *Commonwealth v. Evans*, 74 Pa. 124, 139 (1873); *United States v. Tingey*, 30 U.S. 115, 126−28 (1831) (referencing the "official duties of a receiver" and "disburser" of public moneys); *Maurice*, 26 F. Cas. at 1214 (acknowledging the "important" duty of "disbursement of the money placed in their hands");[5] the power to make **binding commitments and contracting decisions on behalf of the federal government**, *see Tingey*, 30 U.S. (5 Pet.) at 126 (discussing officers "for the purpose of making contracts, or for the purchase of supplies"); *Shelby v. Alcorn*, 36 Miss. 273, 291−92 (1858) (holding that the authority to set terms for and enter into contracts constituted an exercise of sovereign power");[6] the power to **terminate employment of individuals other than his**

---

[5] 3 Story § 1530, at 387 (civil officers have authority over the "expenditures of the nation"); The Federalist No. 72, at 486–87 (including within the "administration of government," which ought to be managed by properly appointed officers, "the application and disbursement of the public monies.").

[6] 3 Story § 1530, at 387 (persons with such authority are among the "most important civil officers").

**subordinates**, *see* Maurice, 26 F. Cas. at 1214 ("important duties" included the power to "provide the materials and workmen deemed necessary," and to "pay the labourers employed"); and the **power to issue or control regulations**, *see Buckley*, 424 U.S. at 140 ("[R]ulemaking … represents the performance of a significant government duty exercised pursuant to public law" and may only be "exercised" by officers).

Mr. Musk has exercised or has promised to exercise every one of these powers since joining the Trump Administration. As detailed in Section II.B., Mr. Musk has announced his intent to use DOGE to take control of federal spending and reduce it by $2 trillion and to drastically downsize the federal government, Compl. ¶¶ 201-202; has canceled hundreds of federal contracts, Compl. ¶¶ 203-211; promised to terminate employees and effect policy and programmatic changes within agencies, *see generally* Compl. ¶¶ 78-199; and has exercised significant discretion and power over agencies, Compl. ¶¶ 218-223.

In addition to looking at whether individuals have exercised these specific powers, courts have long reasoned by analogy to determine whether a person is an officer subject to the Appointments Clause or an ordinary employee. *See, e.g.*, *Buckley*, 424 U.S. at 126 (comparing the commissioner role to other inferior officers); *Edmond*, 520 U.S. at 661. Mr. Musk's mandate, as described by him and President Trump, as well as his actual authority is that of a principal officer; it is much broader in scope than the responsibilities of any comparable inferior officer. This Court need not dive deep into the officer pool to find a suitable comparison to a position that exerts as much authority as Mr. Musk has asserted; he has exercised no less than the powers of a department head, but across a number of different departments. Indeed, Mr. Musk's influence and authority

exceeds that of every other Article II officer except the President.  He has thus exercised the powers of a principal officer.

The values animating the Appointments Clause—namely separation of powers —must also inform the meaning of "significant authority." *Freytag*, 501 U.S. at 882 ("The principle of separation of powers is embedded in the Appointments Clause."). At its core, the Appointments Clause prevents one branch from "aggrandizing its power at the expense of another branch" or "dispensing it too freely . . . to inappropriate members of the Executive Branch." *Id.* at 878, 80. The Court has said,

> If there is a principle in our Constitution, indeed in any free Constitution more sacred than another, it is that which separates the legislative, executive and judicial powers. If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices.

*Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 ANNALS OF CONG. 581 (1789)). The Appointments Clause thus provides "[o]ne of the best securities against the creation of unnecessary offices or tyrannical powers."[7]

In the past several weeks alone, Mr. Musk has "aggrandize[ed] … power at the expense of another branch," and upended the constitutional order. *Freytag,* 501 U.S at 878, 880. Beyond accruing unprecedented power in the Executive Branch, Mr. Musk's actions have even intruded on core powers reserved to Congress. He has bound the government to future financial commitments. U.S. Const., art. I, § 9, cl. 7 (vesting Article I with the "power of the purse," the

---

[7] Madison's Observations on Jefferson's Draft of a Constitution for Virginia (1788), reprinted in 6 Papers of Thomas Jefferson 308, 311 (J. Boyd ed., 1952).

ability to tax and spend public money for the national government). He has threatened the elimination of entire federal entities created by law, such as CFPB, USAID, and the Department of Education. *See* 22 U.S.C. § 6563; 12 U.S.C. § 5491; 20 U.S.C. 3401. And he has done so without public reporting or accountability to a principal officer − much less the citizens. The Appointments Clause was designed by the Founders precisely to prevent this kind of threat and consolidation of power. *See Freytag*, 501 U.S. at 878, 880.

Even if the Court concluded that Mr. Musk is not a principal officer—and the facts show that he is acting as one—he is unquestionably acting as an inferior officer in a role that Congress has not authorized. The Supreme Court has made clear that government actors with even more limited duties and narrower jurisdiction than those displayed by Mr. Musk are substantial enough to qualify them as inferior officers subject to the Appointments Clause:

> Among the offices that we have found to be inferior are that of a district court clerk, *Ex parte Hennen*, 38 U.S. (13 Pet.) 225, 229 (1839), an election supervisor, *Ex parte Siebold*, 100 U.S. 371, 397–398 (1880), a vice consul charged temporarily with the duties of the consul, *United States v. Eaton*, 169 U.S. 331, 343 (1898), and a "United States commissioner" in district court proceedings, *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 352–354 (1931). Most recently, in *Morrison v. Olson*, 487 U.S. 654 (1988), we held that the independent counsel created by provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599, was an inferior officer.

*Edmond*, 520 U.S. at 661; *see also Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016) (arbitrators as officers); *In re Grand Jury Investigation*, 916 F.3d 1047, 1052–53 (D.C. Cir. 2019) (special counsel as an inferior officer). Indeed, the Executive Branch currently employs "thousands of officers [who] wield executive power on behalf of the President in the name of the United States." *Arthrex*, 594 U.S. at 11. The Supreme Court in *Buckley* reasoned that, "[i]f

a postmaster first class and the clerk of a district court are inferior officers of the United States within the meaning of the Appointments Clause, as they are, surely the Commissioners [on the Federal Election Commission] before us are at the very least 'inferior Officers' within the meaning of that Clause." *Buckley*, 424 U.S. at 126. The same is true here.

It is true that the President has the authority to appoint "employees in the White House Office" and assign them "such official duties as the President may prescribe." 3 U.S.C. § 105. Congress has granted the President the power to hire what were then called "administrative assistants" that "have no power to make decisions or issue instructions in their own right" and "would not be interposed between the President and the heads of his departments."[8] These advisers "remain in the background, issue no orders, make no decisions, and emit no public statements."[9] Although these individuals are now called "employees" or "advisors" instead of "administrative assistants," Congress's understanding of their advisory role has not changed. It is the advisory nature of White House staff positions that excludes them from the Appointments Clause; White House employees might communicate the President's agenda and policies to the different agencies, but they do not supplant the heads of agencies in execution of the laws.

Mr. Musk is far more than an adviser to the President. He has *executed* the President's agenda by exercising virtually unchecked power across the entire Executive branch, making decisions about expenditures, contracts, government property, regulations, and the very existence

---

[8] The President's Committee on Administrative Management, Administrative Management in the United States 5 (1937).

[9] *Id.*

of federal agencies. No Executive position wields as much inter-agency power. DOGE staff, who act at Mr. Musk's direction, have been placed within dozens of federal agencies, where they exert authoritative influence. Compl. ¶¶ 218-225. Indeed, the DOGE Executive Order directs "Agency Heads [to] take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *See* Compl. ¶¶ 52-55.

### 2. Mr. Musk Occupies a "Continuing" Position.

The "continuity" requirement of the Appointments Clause analysis is satisfied here as well. To the extent Mr. Musk is acting as the *de facto* DOGE Administrator, he is exempt from the sunset provision in the DOGE Executive Order. Furthermore, his SGE designation does not place him beyond the purview of the Appointments Clause given the application of the plain text of the statute to officers.

***First***, the DOGE Executive Order creates the DOGE Temporary Service as an entity housed within the United States DOGE Service. The DOGE Administrator is "established in the Executive Office of the President." DOGE Executive Order at § 3(b). The plain text of the DOGE Executive Order makes clear that the only entity with a termination date is the DOGE Temporary Service: "The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026. The termination of the U.S. DOGE Service Temporary Organization shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id.* Thus, the DOGE Administrator is a continuing position.

**Second,** even if Mr. Musk is not serving as the DOGE Administrator, an SGE designation does not exempt him from being an officer for Appointments Clause purposes. 18 U.S.C. § 202(a) defines Special Government Employee to include "an officer or employee of the executive or legislative branch of the United States Government . . . who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties." 18 U.S.C. § 202(a). Congress expressly contemplated that an SGE could be an officer for purposes of the Appointments Clause.

Mr. Musk is an officer subject to the Appointments Clause regardless of whether his tenure is in fact finite. While "an individual must occupy a 'continuing' position established by law to qualify as an officer," *Lucia*, 585 U.S. at 245, a nonpermanent position may still qualify as "continuing." *See, e.g.*, *Morrison*, 487 U.S. at 671−72, 671 n.12 (holding that an "independent counsel" was clearly "an 'officer' of the United States" even though she served for a finite period, was empowered only to perform "certain, limited duties," and was "limited in jurisdiction"); *United States v. Eaton*, 169 U.S. 331, 343 (1898).[10]

The "continuity" of an office depends on both on the length of tenure *and* the breadth of power wielded. *See United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (considering

---

[10] *See The Test for Determining 'Officer' Status Under The Appointments Clause*, 49 Op. O.L.C. at 3 (Jan 16, 2025), https://www.justice.gov/olc/media/1385406/dl; *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 112–13 (2007); Mascott, *supra*, at 534 (explaining that although the historical meaning of "officer" included the idea of "ongoing duties," "one did not necessarily need to be continuously employed or remunerated to qualify as an officer."); 49 Op. O.L.C. at 5.

whether the position is substantively "more than incidental" to the operations of government in assessing continuity).[11] This consideration is critical because it guards against the deliberate "evasion of the Appointments Clause."[12] Indeed, "[t]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag*, 501 U.S. at 883 (quoting *Buckley*, 424 U.S. at 143) (internal citations omitted). Accordingly, there is a limit to "[h]ow far [the Executive] may go in constituting temporary agencies and commissioners for temporary, incidental, transient, or occasional purposes . . . without thereby creating an office." *Kennon*, 7 Ohio St. at 559. The delegation of authority to Mr. Musk exceeds that limit.

A continuing position stands in contrast to a transient one in which the duties are personal, contractual, or limited to a single task. *See, e.g.*, *Edmond*, 520 U.S. at 661; *Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890) ("[A non-officer] has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case"); *United States v. Germaine*, 99 U.S. 508, 512 (1878) (deeming a surgeon not to be a federal officer because he was "only to act when called on by the Commissioner

---

[11] 49 Op. O.L.C. at 5–6.

[12] *Id.* at 6 ("[T]he position of Attorney General presumably still would be an office if Congress provided for it to expire [in 130 days]."). It cannot be that Mr. Musk's march through the federal government escapes the Clause's scrutiny merely because it may occur on an accelerated basis. If anything, the shocking speed with which Mr. Musk has acted implicates the Appointments Clause more greatly.

of Pensions in some special case"); *Maurice,* 26 F. Cas. At 1214.[13] Mr. Musk is no mere contractor.

Unlike the civil surgeon in *Germaine* or the merchant appraiser in *Auffmordt,* Mr. Musk has been

granted general and enduring powers to restructure the entire federal government. *See supra*

Section A.1.

Accordingly, Mr. Musk's position and authority satisfy the continuity element.

### 3. Mr. Musk is acting as a Principal Officer Without Being Confirmed, In Violation of the Appointments Clause

Not only has Mr. Musk acted with the purported authority of an officer—he has acted with

authority exceeding even that of a principal officer of the United States. The Supreme Court has

clearly instructed that the work of inferior officers must be "directed and supervised at some level

by others who were appointed by Presidential nomination with the advice and consent of the

Senate." *Edmond,* 520 U.S. at 663. Because Mr. Musk answers to no individual subjected to the

confirmation process, his exercise of authority is principal in nature. *Id.* at 662 ("Generally

speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or

officers below the President: Whether one is an 'inferior' officer depends on whether he has a

superior."). Moreover, Mr. Musk is not subject to removal by any officer higher than himself as

DOGE Administrator—only by President Trump. *See* Compl. ¶ 224.

---

[13] E. Garrett West, *Clarifying the Employee-Officer Distinction in Appointments Clause Jurisprudence*, 127 YALE L.J. FORUM 42, 53 (2017) ("The early emphasis on continuity can be construed as errant language that illustrates the functional difference between officers and contractors").

As a principal officer, Mr. Musk is subject to the confirmation process. U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law"). Because Mr. Musk has never been confirmed by the Senate, his actions violate the Appointments Clause and must be enjoined. The legal inquiry need go no further.

### 4. Mr. Musk Does Not Occupy an Office Pursuant to the Exceptions Clause.

Even if Mr. Musk is not considered a principal officer—and he should be—his conduct would still be unconstitutional because he does not occupy an office created under the Exceptions Clause for an "inferior officer." The Appointments Clause only grants the President the power to nominate inferior officers without Senate confirmation if Congress "by Law [has] vest[ed] the Appointment of such inferior Officers, as they think proper, in the President." U.S. Const., art. II., § 2, cl. 2 ("The Exceptions Clause"). Congress has made no such exception from the Appointments Clause for Mr. Musk or his actions. *Buckley*, 424 U.S at 138 (Congress "may undoubtedly under the Necessary and Proper Clause create 'offices' in the generic sense and provide such method of appointment to those 'offices' as it chooses.").

Mr. Musk does not occupy an "office" that Congress has authorized pursuant to the Exceptions Clause. "If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office." *Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring). "By keeping the ability to create offices

out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives to determine whether new executive offices should exist." *Id.* at 646 (Thomas, J., concurring).

While President Trump's Executive Order established DOGE pursuant to 5 U.S.C. § 3161, this statute does not create "an office" by law covered by the Exceptions Clause for the head of a "temporary organization." The Statute does not expressly vest the President with the authority to appoint the head of the temporary organization. *Ex parte Hennen*, 38 U.S. (13 Pet.) 230. 243 (1839) ("[A] public office [is] created by law for a public benefit" when "its duties are defined by law; and *the mode in which the incumbent is to be appointed*, is expressly designated by law. It does not depend on usage or custom." (emphasis added)). Accordingly, 5 U.S.C § 3161 creates an employment framework – it does not create an office. Finally, even if 5 U.S.C. § 3161 did create an office, Mr. Musk's conduct has far exceeded the limited scope of authority contemplated by the statute, *see infra* Section A (Count II). Accordingly, even if his position is considered that of an inferior officer, Mr. Musk's conduct violates the Appointments Clause.

For these reasons, Plaintiff States are likely to succeed on the merits of their Appointments Clause Claim.

## Count II | Defendants Have Exceeded Their Statutory Authority

Plaintiffs are also likely to succeed on their claim that Mr. Musk and DOGE are exceeding their statutory authority (Count II). DOGE has purported to exercise authority of its own, and not merely to have acted as an adviser to the President. To do so, there must be a statutory basis for its

authority. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). But Congress has not given DOGE any authority. DOGE therefore has no authority to make decisions for the U.S. government.

The temporary organization statute, 5 U.S.C. § 3161, does not provide DOGE with the authority it purports to exercise. That statute merely defines a "temporary organization" as an organization "established by law or Executive order for a specific period not in excess of three years for the purpose of performing a specific study or other project" and authorizes such an organization to hire employees. 5 U.S.C. § 3161(a)(1) (emphasis added). There is no plausible definition of "project" that would include DOGE's attempt to remake the entire Executive Branch, as described above, or to destroy agencies, fire personnel, halt funding, or dispose of government property. Congress could never have envisioned the use of 5 U.S.C. § 3161 as a platform to effectively undo the federal government as Mr. Musk has promised to do.

That conclusion is supported by the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus.,* 595 U.S. at 117 (citation and quotation marks omitted). When the executive branch purports to exercise such powers, "the question" is whether a statute (or the Constitution) "plainly authorizes" that action. *Id.* Congress has not plainly authorized the President to create, by executive order, temporary organizations that can remake the Executive Branch without express statutory authorization. Indeed, such an interpretation of section 3161 would likely violate the nondelegation doctrine because it would use that minor statute to

provide the Executive Branch with sweeping powers without an "intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 135 (2019); *see* 5 U.S.C. § 3161 (not providing any intelligible principles to guide the performance of the "specific study or other project").

### B.  The States Face Irreparable Harm

Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22. When a Plaintiff shows a likelihood of success on the merits in a dispute involving claims of constitutional violations, "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable injury." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))).

Absent a TRO, the States will face immediate and irreparable harm. As noted above in discussing the States' injury in fact, Mr. Musk's conduct threatens immediate harm to Plaintiff States by (1) creating financial and programmatic harm, (2) violating the States' reasonable expectation that their sensitive financial information will be securely held, and (3) upsetting the constitutional order protected by the Appointments Clause. These impacts are both "imminent" and "beyond remediation." *League of Women Voters I*, 838 F.3d at 8.

Many of the States' programs are reliant on federal funding, contracts, and personnel.[14] As sovereign immunity bars the States from seeking monetary damages, the loss of significant financial support to state programs will be irreparable. *See District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 33–34 (D.D.C. 2020) (finding irreparable harm where States would likely lose existing federal benefits, lacked infrastructure necessary to provide alternative services, and would incur significant administrative burdens and costs as a result of the governmental action, but were barred from recovering monetary damages from United States); *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date[.]" (internal quotations omitted)); *see also supra* Section I.A (discussing the Plaintiff States' reliance on federal funds). Furthermore, if Mr. Musk follows through on his commitments, hundreds of vital state programs, including state-federal cooperatives, will be irreparably undermined. *See District of Columbia*, 444 F. Supp. 3d at 33–34; *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020); *supra* Section I.A (discussing the burdens that would be shifted to the States).[15]

---

[14] *See* Exh. B ¶ 8(a)-(e) (outlining $1,879,210,362 in federal education grants received by New Mexico); Exh. G ¶¶ 3-5 (describing millions of grants received by Washington State University through USAID); Exh. E ¶¶ 8-18 (describing grants from the Department of the Interior to New Mexico and the state's inability to draw those funds in February 2025); Exh. D ¶ (42% of the New Mexico Environment Department is derived from federal funding); Exh. F ¶¶ 3-16 (describing $30 billion in federal funding received by Arizona and the adverse effects of a reduction); Exh. A ¶¶ 8-16 (describing the $20,218,375,913 in federal funding Washington receives through a number of federal agencies); Exh. K ¶¶ 5-10 (discussing the adverse impacts on Connecticut of losing billions of dollars in federal funding).

[15] *See* Exh. B ¶¶ 9-13; Exh. G ¶¶ 8-11; Exh. E ¶¶ 15-16, 17-22; Exh. D ¶¶ 10-11; Exh. F ¶¶ 10-16; Exh. A ¶¶ 17-19; Exh. K ¶¶ 5-11.

Moreover, under the expanded access policy to several federal agencies, the Plaintiff States' confidential bank account information was disclosed to individuals who have no lawful right to access that sensitive information, compromising the cybersecurity of Plaintiff States' financial information, until the Southern District of New York enjoined the access temporarily. *See supra* Section I.B; Exh. J ¶¶ 19-20; Exh. C ¶¶ 25-26. Because the Federal Government is under constant threat of cyberattacks, Compl. ¶ 201, and because Plaintiff States' data bears on some of the most important aspects of their citizens' personal and financial lives, it is even more crucial that the protections of the Appointments Clause are enforced.

With every passing day, Mr. Musk's mission to reinvent and dismantle the federal government rapidly progresses.  In a matter of weeks, he has gutted entire agencies and disfigured others. He has forced resignations and fired those who challenge him. He has gained access to the systems that protect the most sensitive data and information central to national security. He has canceled millions of dollars in contracts and federal funding. Many of these actions have already inflicted indelible harms on Plaintiff States. The TRO is necessary to defend the States and their citizens from imminent, irreparable harms.

### C.  The Equities and Public Interest Strongly Favor Plaintiff States

Where the federal government is the opposing party, the balance of the equities and the public interest factors merge. *See Nken v. Holder,* 556 U.S. 418 (2009). Because all Defendants' ongoing actions are *ultra vires* and unconstitutional, and present imminent harms, the public interest weighs heavily in favor of the States.

"[T]here is a substantial public interest 'in having governmental agencies *abide* by the Federal laws that govern their existence and operations.'" *League of Women Voters I*, 838 F.3d at 12 (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511-12 (emphasis added)); *id.* ("[T]here is generally no public interest in the perpetuation of unlawful" executive action (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *Gordon*, 721 F.3d at 653. Moreover, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). There is no public interest served by allowing Defendants to continue acting in violation of the Appointments Clause. A TRO enjoining the exercise of such unconstitutional conduct will protect the interests of the States, their residents, and the constitutional order.

The President's ability to exercise his constitutional executive powers will not be impaired by complying with the Appointments Clause. He can use his advisers and his constitutionally appointed principal officers to advance his agenda and policies. Meanwhile, Mr. Musk, like others in the Executive Office, can serve in the role of an adviser or employee without violating the Constitution.

Lastly, because the "public interest favors the protection of constitutional rights," the "strength of the [States'] showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits. *Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018) (citing *Gordon*, 721 F.3d at 653). The States' "extremely high likelihood of success on the merits is a strong indicator that a TRO would serve the public

interest." *League of Women Voters I*, 838 F.3d at 12; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief" (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

### RELIEF REQUESTED

Accordingly, the States ask the court to issue a temporary restraining order that immediately and temporarily, until such time as the Court may hear a motion for preliminary injunction, orders Mr. Musk to identify all ways in which any data obtained through unlawful agency access was used, including whether it was used to train any algorithmic models or create or obtain derivative data, orders Mr. Musk to destroy any copies or any derivative data from such unauthorized access in his or DOGE's possession, custody, or control, and bars Mr. Musk and personnel associated with DOGE from:

(a) ordering any change in the disbursement of public funds by agencies;

(b) extending offers on behalf of the United States that would bind the government to an appropriation that has not been authorized by law;

(c) cancelling government contracts;

(d) disposing of government property;

(e) ordering the rescission or amendment of regulations;

(f) making personnel decisions for agency employees;

(g) taking steps to dismantle agencies created by law or otherwise asserting control over such agencies, including, *e.g.*, placing employees on administrative leave;

(h) accessing sensitive and confidential agency data, using agency data for other than its authorized purpose;

(i) altering agency data systems without authorization by law and without taking all appropriate protections against cybersecurity risks;

(j) engaging in any other conduct that violates the Appointments Clause or exceeds statutory authority.

## CONCLUSION

For the foregoing reasons, the States respectfully request that a TRO be entered to maintain the status quo pending adjudication of a preliminary injunction motion.

Dated: Santa Fe, New Mexico
   February 14, 2025

          Respectfully submitted,

          **RAÚL TORREZ**
          Attorney General of the State of New Mexico

          By: */s/ Anjana Samant*
          Anjana Samant (D.D.C. Bar No. 4267019)
          *Deputy Counsel*

          James Grayson*
          *Chief Deputy Attorney General*
          Steven Perfrement
          *Assistant Attorney General*
          Malina Simard-Halm*
          *Assistant Attorney General*
          New Mexico Department of Justice
          408 Galisteo Street
          Santa Fe, NM  87501

jgrayson@nmdoj.gov
asamant@nmdoj.gov
SPerfrement@nmdoj.gov
(505) 270-4332

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

By: */s/ Jason Evans*
Jason Evans*
*Assistant Attorney General*
Joseph Potchen*
*Deputy Attorney General*
Linus Banghart-Linn*
*Chief Legal Counsel*
Jason Evans*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor*
*Solicitor General*
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov

*Attorneys for the State of Arizona*

35

**ROB BONTA**
Attorney General for the State of California

By: */s/ Nicholas R. Green*
Nicholas R. Green*
*Deputy Attorney General*
Thomas S. Patterson*
*Senior Assistant Attorney General*
Mark R. Beckington*
John D. Echeverria*
*Supervising Deputy Attorneys General*
Maria F. Buxton*
Michael E. Cohen*
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
Nicholas.Green@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Attorneys for the State of Connecticut*

36

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: /s/ Kaliko'onālani D. Fernandes
Kaliko'onālani D. Fernandes*
Solicitor General
David D. Day*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts
David C. Kravitz
State Solicitor

By: */s/ Gerard J. Cedrone*
Gerard J. Cedrone (D.D.C. Bar No. MA0019)
Deputy State Solicitor
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108

37

(617) 963-8828
gerard.cedrone@mass.gov


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*


**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.j.chang@dog.oregon.gov

*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Jeff Kidd*
Jeff Kidd*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

38

jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
Attorney General for the State of Washington
By: */s/ Andrew Hughes*
Andrew Hughes*
Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Andrew.Hughes@atg.wa.gov

*Attorneys for the State of Washington*

*\* Pro Hac Vice Forthcoming*