UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


STATE OF NEW MEXICO, et al.,    .
                                .
          Plaintiffs,           .    CA No. 25-0429 (TSC)
                                .
     v.                         .
                                .
ELON MUSK, et al.,              .    Washington, D.C.
                                .    Monday, February 17, 2025
          Defendants.           .    11:06 a.m.
. . . . . . . . . . . . . . .   .


TRANSCRIPT OF TRO MOTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiffs:            ANJANA SAMANT, ESQ.
                           New Mexico Department of Justice
                           408 Galisteo Street
                           Santa Fe, NM 87501


For Defendants:            HARRY C. GRAVER, ESQ.
                           U.S. Department of Justice
                           1100 L Street NW
                           Washington, DC 20005


Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                           U.S. Courthouse, Room 4704-A
                           333 Constitution Avenue NW
                           Washington, DC 20001
                           (202) 354-3186




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                    P R O C E E D I N G S

2                    (Via Videoconference)

3            THE DEPUTY CLERK:  We're on the record in civil case

4    25-429, State of New Mexico, et al., versus Musk, et al.

5    Starting with plaintiff's counsel, please introduce yourselves

6    for the record.

7            MS. SAMANT:  Good morning, Your Honor.  My name is

8    Anjana Samant, I'm deputy counsel for impact litigation with

9    the State of New Mexico on behalf of plaintiffs.

10           THE COURT:  Good morning.

11      For the government?  Or, I'm sorry.  Ms. Samant, is

12   somebody else going to be speaking for plaintiffs today as

13   well?

14           MS. SAMANT:  Sorry, Your Honor.  No.  I think folks

15   were just trying to make sure they identified themselves.

16           THE COURT:  Okay.  Mr. Kirschner, is that you?

17           MR. KIRSCHNER:  Yes, Your Honor.  How are you?

18           THE COURT:  Good morning.  Anyone else on the record

19   for plaintiffs this morning?

20      All right.  For the government?

21           MR. GRAVER:  Good morning, Your Honor.  This is Harry

22   Graver for the United States.  We're having some meaningful

23   tech difficulties over here.  So I've called in, and I think

24   my video might pop in here and there in a various lag manner,

25   so I apologize for that.

1    THE COURT:  That's fine.  We're having some over here

2    as well.  Yeah, I'm in chambers but I know we've been having

3    some problem with the call-in line, and I apologize.  But

4    obviously we're moving very quickly here, and trying to get

5    everyone up is challenging at best, but today when people are

6    working remotely on a holiday, it's difficult.  So thank you

7    all for making the time to do this.  But you're asking for

8    very rapid relief so we need to address these issues quickly.

9    Who else is -- Mr. Graver, who else is going to be

10    appearing for the government?

11    MR. GRAVER:  I think just me this morning.

12    THE COURT:  All right.  So we're here on the record for

13    a hearing on plaintiff's motion for a temporary restraining

14    order.  We had a hearing on Friday because the plaintiffs had

15    moved for a temporary restraining order, and then we -- I

16    asked the plaintiffs to file a proposed order narrowing --

17    since they had agreed that they would narrow the scope of the

18    relief they sought, they filed a proposed order narrowing the

19    scope of their relief on Saturday at four o'clock.

20    At the hearing that I had on Friday, it was my -- from what

21    I was discussing with you all, that I found that the harms

22    that plaintiff identified were extremely serious and that they

23    did raise a colorable claim regarding the Appointments Clause.

24    But the TRO that they asked wasn't sufficiently tailored to

25    imminent conduct by the government, so that's why I asked for

1    the revised proposed order after the government said at the

2    hearing that they were really just focusing in two specific

3    areas with regard to a select number of agencies.

4        So the revised TRO that the plaintiffs filed on Saturday

5    narrowed plaintiff's request from 11 government-wide

6    restrictions to two department-specific requests.  And the

7    revised -- well, the proposed order and revised TRO asks the

8    court to enjoin Mr. Musk and the DOGE defendants from, 1,

9    accessing, copying or transferring any data systems in seven

10    specific agencies, and 2, terminating or otherwise placing on

11    leave any officers or employees within those same agencies.

12        The seven agencies identified are the Office of Personnel

13    Management and the Departments of Education, Labor, Health and

14    Human Services, Energy, Transportation, and Commerce.  And

15    plaintiffs ask for the TRO to remain in effect for 14 days.

16    In support of that they cite to the complaint, the accompanying

17    declarations and several recent news reports of mass

18    terminations and data access at federal agencies.

19        The government responded to plaintiffs' revised proposed

20    TRO and argued that it remained too broad and was not

21    sufficiently tied to plaintiff's Appointments Clause claims.

22    The government has asked the Court to proceed on a typical

23    schedule for a preliminary injunction and to set a briefing

24    schedule.

25        Last night, or 1:30 this morning, around that time,

1    plaintiffs filed a reply, which is ECF No. 21.  They argued

2    that the threat of data disclosure and the dismantling of

3    federal agencies will cause irreparable harm, and they also

4    state their opposition to converting the TRO motion to a

5    preliminary injunction, and they intend to seek leave for

6    discovery.

7        I guess my first question to the plaintiffs is -- well,

8    let me just very briefly go over what I said on Friday, which

9    is that TROs are an extraordinary -- they are -- both TROs

10    and preliminary injunctions are extraordinary remedies.  But

11    the procedures and purposes are different.  Under Rule 65(a)

12    I can issue a preliminary injunction only after notice to the

13    parties, and under the local rules that typically involves

14    briefing and a hearing.

15        I can issue a TRO *ex parte* if the harm is sufficiently

16    imminent.  And the purpose of the TRO is to preserve the

17    status quo and prevent irreparable harm until a preliminary

18    injunction motion can be ruled on.

19        The same four-part test applies to both temporary

20    restraining orders and preliminary injunctions.  But for an

21    emergency TRO, however, the harm should be of such imminence

22    that a court order is necessary to preserve the status quo

23    while expedited briefing on the PI happens.

24        So I have a few preliminary questions.  The plaintiffs have

25    asked that if I deny the motion for temporary restraining

1      order that they be allowed to conduct discovery on their

2      preliminary injunction motion if it's converted to a

3      preliminary injunction motion.

4          So my question is for you, Ms. Samant: Doesn't that

5      undercut your request for a TRO?  If you're saying you need

6      more discovery to beef up your preliminary injunction motion,

7      how can I issue the extraordinary remedy of a TRO on a record

8      that sort of concededly you think you need more information

9      on?  I'm a little puzzled by that.

10          MS. SAMANT:  Apologies for that, Your Honor, but we are

11      confident that we have established the necessary evidentiary

12      basis for issuing a TRO.  And to clarify that, I want to just

13      maybe encapsulate that really quickly with some of the

14      examples, including both information that's in our complaint,

15      our motion, our declarations, but also in conjunction with

16      some of the authorities or at least public reporting that we

17      cited in our supplemental notice.

18          THE COURT:  I'm going to stop you there.  Because while

19      I can take judicial notice of news reports and so on, it's an

20      understatement to say there's a lot of news reports out there,

21      and there are a lot of things happening that are being

22      covered.  And at what point -- I mean, the Court can't act

23      based on media reports.  We can't do that.  We can certainly

24      take judicial notice of them.  But they can't form the basis,

25      I don't think, of me finding that a TRO is warranted because

1    of imminent harm because the news reports say these things are

2    going to happen soon.

3           MS. SAMANT:  So I can actually point to -- the

4    reporting in particular that I'm about to talk about is stuff

5    that's already happened.

6           THE COURT:  Okay.

7           MS. SAMANT:  So I'm tying that impact to what we've

8    talked about.  So one of the examples that I wanted to cite

9    to was the Department of Education.  And to -- I should back

10   up and say our revised TRO really was meant to be read in

11   conjunction I think with our original.

12       We were absolutely narrowing the request, but to that

13   extent our concern of course is with the way in which

14   defendants are using the data to which they have access,

15   right?  It's for purposes other than which it was collected,

16   and more importantly, it's for purposes of inflicting

17   precisely the harm we're seeking to enjoin.

18          THE COURT:  And can you, in making your argument,

19   tie it to the harm suffered by the states?  Because this is

20   a little different.  These aren't employees; they're unions

21   bringing claims on behalf of their employees.

22          MS. SAMANT:  Right.  So, you know, and this is made

23   clear in again statements from Mr. Musk himself, from the

24   administration, tweets, and I would also point Your Honor at

25   least to the DOGE website which, you know, the three sections

1    that it has are -- basically fall under the categories of

2    workforce, regulation, and finances.  And I think this lays

3    out exactly how they're operating, which is they're using the

4    data which they have access to, specifically personnel and

5    financial data of the agencies, to decide how to make spending

6    or programmatic cuts or staff cuts.

7        So the tie to the direct impact to the states, one example

8    would be in the context of the Department of Education.  So

9    New Mexico unfortunately has some of the poorest educational

10   outcomes for our young people.  We also have a shortage of

11   educators and primary school administrators in our state.

12       As noted in our declaration, Exhibit B, the Padilla

13   Declaration, in addition to just the money that we receive

14   through the Department of Education, we also rely on the

15   agency for operational and technical support.

16       THE COURT:  Okay.  So let me stop you right there.

17   What of those things, what has been threatened for New Mexico

18   of DOGE's proposed actions or actions that have already

19   happened?

20       MS. SAMANT:  So -- and this I concede is definitely

21   partly from the news reports, but we know that DOGE has

22   effected funding cuts across the Department of Education, and

23   also cut contracts specifically in the context of research

24   programs that Education does.  One of the research arms of Ed.

25   is the Institute of Education Science, and they do empirical

1    research on educational practices and outcomes.  They have in

2    the past studied programs that are used in New Mexico,

3    compared them to other states, and reached conclusions about

4    their efficacy, right?

5            THE COURT:  Let me stop you again.  If I don't issue a

6    TRO and instead convert this to a -- we have a preliminary

7    injunction and address the merits, and you win, what's your --

8    in other words, they haven't done this yet.  This is a program

9    that -- has this program been cut yet?

10           MS. SAMANT:  We are waiting confirmation.

11           THE COURT:  All right.  So assume the program gets

12   slashed as part of their efficiency assessment or whatever.

13   What's to stop me or another judge from saying after briefing

14   and preliminary injunction, restore the contract, start the

15   program again?  What's the irreparable harm here?

16           MS. SAMANT:  So the irreparable harm -- we're going

17   to feel the -- restaffing the branches of -- or the divisions

18   within these agencies that are actually responsible for the

19   programming is not something that's going to happen overnight.

20   We already see that happening as the Department of Energy

21   scrambles to try to rehire individuals who were given

22   termination notices within the National Nuclear Security

23   Administration, and this -- sidebar -- the work that they

24   do directly ties to an impact on New Mexico's environmental

25   department.

1          THE COURT:  And isn't that being addressed by another

2     case?

3          MS. SAMANT:  Not the -- no.  And I can tell you, in

4     the context of the Department of Energy, there is a cross-

5     agency TRO submission, but a hearing has not been held on

6     that.  So they are not bound at this point beyond another

7     general lifting of the funding freeze TRO.

8          THE COURT:  Okay.

9          MS. SAMANT:  So that's one example, right?  And again,

10    speaking to the imminent harm, another example of something

11    that has happened this weekend, or at least that we're getting

12    reports about, is pursuant to DOGE direction and based on

13    their use of the data that they accessed through agencies,

14    they called for cuts to be made to CDC staff, which included

15    cuts to Indian Health Services staff.

16         THE COURT:  Do you have a declaration on this?

17         MS. SAMANT:  This is information that just -- we

18    can provide one, but this is information in terms of the

19    cuts that were made that was just made public this weekend.

20    The new secretary is now scrambling to rehire and refill

21    those positions.  New Mexico is home to the fourth largest

22    population of Native Americans and Indian tribes in the

23    country.  So you're right.  We don't have that.  We are happy

24    to provide information, yeah.

25         THE COURT:  I guess my problem, Ms. Samant, is these

1    are all harms that will flow to the state if these things

2    happen, which we don't have confirmation that they've happened

3    yet.  Again, I use the wrecking ball analogy not because I

4    think it necessarily applies to DOGE, but because of the

5    extreme nature of the imminent harm that has to be threatened.

6    It has to be something that if I don't say stop, it's going to

7    happen tomorrow, or within a day or two, and it's definitely

8    going to happen and it's going to have an immediate effect.

9    The building will be demolished.  Or the window for the

10   medical procedure that the plaintiff seeks will have closed.

11   Or, you know, there will be something that can't be undone.

12       What you're saying in terms of well, we're going to have to

13   scramble to retire, I mean, all those are things that it'll be

14   difficult, it'll be challenging, but in other words -- again,

15   a TRO is somebody's not going to get the surgery tomorrow that

16   they need, some life-saving -- you know, it has to be so

17   serious to warrant such extraordinary relief.

18       And the things that I'm hearing are concerning indeed, and

19   troubling indeed, but I have to have a record and I have to

20   make findings of fact before I issue something.  And what

21   you're telling me is we hear that this is going to happen,

22   it's probably going to happen soon, it's going to have

23   downstream effects on us.

24       And look, one of the problems that we're having is that

25   DOGE appears to be moving in no sort of predictable and

1    orderly fashion, and plaintiffs are obviously scrambling to

2    find out what's next.  And I don't know if that's deliberate

3    or not, but I will concede that it is difficult to see what's

4    happening next and to predict that and come in with a concrete

5    harm because of what actually is happening.  But a

6    generalized -- I'm not going to say a concern, a generalized

7    fear that this is going to happen, even if it looks like it's

8    likely to happen, absent some immediate harm to the

9    plaintiffs, is -- I'm not seeing it so far.  But I'm going to

10   let you finish.

11          MS. SAMANT:  Okay.  You know, on the wrecking ball

12   analogy also -- and to the imminence, again, we would welcome

13   defendants, if they have evidence to refute this, but again,

14   taking into account the concerns you've raised about media

15   reporting, I am going to again point you to -- Your Honor, to

16   *The Washington Post* review of DOGE memos that was released

17   this weekend where they talked about their plan to do the

18   staffing and funding cuts, again, which is accomplished

19   through their use of agency data that is impermissible, that

20   they plan to do it in three phases.  First one was 60 days,

21   second one was another time period.  Phase 3, according to

22   those documents, is scheduled to start on Wednesday.  Right?

23   And precisely to your wrecking ball analogy --

24          THE COURT:  Start on Wednesday with regard to what?

25   I'm sorry.

1          MS. SAMANT:  I'm sorry.  With regard to continued

2     staffing cuts.

3          THE COURT:  Which agencies?

4          MS. SAMANT:  So the memo, at least to the extent it was

5     disclosed, was not described.  However, again, I see your

6     frustration and I understand.  The way we've put this together

7     in our complaint and our motion for the TRO is citing to

8     exactly Mr. Musk's and the DOGE entities -- again, individual

9     tweets saying, like, Education is next.

10         Do they give us a firm date?  No.  But the way we identify

11    the agencies with respect to -- that -- where we would like

12    you to issue a TRO is those are agencies that have been

13    identified as targets and that whose relationship with the

14    plaintiff states if -- let me back up.  Their relationship

15    with the plaintiff states, we have a connect tie and a direct

16    harm.

17         THE COURT:  So we -- several of my colleagues have

18    issued TROs in similar -- we haven't had any Appointments

19    Clause challenges here, so obviously that's a different legal

20    theory.  But in those cases, the harm has been -- it's not

21    ongoing, you know, immediate.  And at least one of my

22    colleagues has denied a TRO -- there was standing issues

23    obviously, but it's also attenuated damages.

24         So this case is not the same as those, and obviously it's

25    an Appointments Clause issue so it doesn't necessarily have to

1    be, but why can't plaintiffs get a TRO if they need one based

2    on that -- in other words, if I deny the TRO and place this on

3    a preliminary injunction schedule, why can't you then come

4    back in two days or three days or four days and say it's

5    actually happening tomorrow, it's actually happening today, we

6    need the TRO, and ask for a TRO to preserve the status quo?

7    Again, I said this on Friday and I don't mean to be

8    dismissive, but it's sort of like a prophylactic TRO, and

9    that's not allowed.

10    MS. SAMANT:  Right.  No, I hear what you're saying.

11    Going back to, again, *The Washington Post* article is reviewing

12    DOGE memos, right?  And they've actually photographed and

13    provided the actual text of these memos.  The agencies -- that

14    memo itself said that all agencies would be targeted in phases

15    1 and 2.  Right?  And we are now approaching phase 3.

16    So between the DOGE memos, the tweets, the statements that

17    have been made, that is our basis for identifying the, like,

18    Wednesday we're going to start to see a new wave of cuts that

19    are going to impact us.  That's how we've identified the

20    agencies.

21    To your question about how is this different from the

22    other TROs that have been issued, No. 1, exactly.  As you say,

23    this is an Appointments Clause case which also, by case law,

24    indicates that the evaluation of the immediacy and the nature

25    of the harm is slightly different in the sense that in

1    Appointments Clause claims structural violations to the

2    constitutional structure.  The constitutional structure of the

3    government is of a different nature.

4        Setting that aside for a moment, the other way in which our

5    request for relief drastically differs from what's already

6    been issued is that we are not seeking to enjoin the agencies.

7    We are not asking anyone to cease operations that are

8    ordinarily taking place by duly appointed officers, by

9    properly cleared employees.

10        Our restraining order is targeted towards Mr. Musk and

11    DOGE, and to make sure that they are not using the information

12    in ways that is unconstitutional, to the extent that they

13    shouldn't have it at all, No. 2, unconstitutional to the

14    extent that that is the means by which they are engaging in

15    this sweeping authority over federal agencies that is purely

16    and clearly impermissible absent compliance with the

17    Appointments Clause.

18        THE COURT:  Okay.  Let me drill down a little bit on

19    your requested relief.  If I accept that DOGE will obtain

20    access to information systems at the identified agencies that

21    you've mentioned, what is the actual harm resulting from that

22    access at this time?  In other words, as defendant noted, you

23    didn't raise a Privacy Act claim.  So how is the access alone

24    harmful under your claim?

25        MS. SAMANT:  So exactly.  It's the use, right?  It is

1      the use of the data.

2              THE COURT:  But how is it harmful to New Mexico or to

3      the 15 states?  That's what I'm not getting.  It may be as a

4      general matter nobody wants their information accessed by a

5      government agency which is acting outside of its authority on

6      the Appointments Clause.  So let's put that merits argument

7      aside, but how is it directed to the harm that you're

8      suffering, the access?

9              MS. SAMANT:  Yes.  The way in which DOGE and Mr. Musk

10     have identified how to make cuts is through use and analysis

11     of the agency data.  That, I don't see how defendants can

12     dispute that.  There is plenty of statements made by

13     defendants themselves on this point.  For instance, feeding

14     data from CMS into an algorithm offsite to exactly analyze

15     areas of spending and programs that they are then going to

16     cut.

17             THE COURT:  But let me ask you, isn't that kind of --

18     that's within their remit.  You know, DOGE was enacted or

19     created to -- according to the government -- to cut waste, to

20     cut inefficiencies, to target government waste and efficiency.

21     So your Appointments Clause argument is that they're acting

22     outside of their authority under the Appointments Clause.

23     But it sounds like the things you're talking about are within

24     their authority.

25         And I just want to digress for a moment.  The memo that you

1   referenced that was issued by DOGE was sent to all 50 states

2   and it was threatening to cut funding unless DEI programming

3   was remanded in 14 days.  Is that the memo you were talking

4   about?

5           MS. SAMANT:  The memo regarding the cuts is --

6           THE COURT:  Yeah, I'm looking at -- it's from the

7   assistant secretary.  It's dated February 14.  And it looks

8   like -- it looks like it had to do with funding for DEI

9   programs, not the CDC.

10          MS. SAMANT:  No.  I'm sorry.  So the use of CMS data

11  has already happened and happened some time ago.  Right?  To

12  your question --

13          THE COURT:  When did that happen?

14          MS. SAMANT:  Your Honor, I'll have to look up the exact

15  date.

16          THE COURT:  All right.  So but you understand that if

17  it happened -- you know, it's not imminent if it happened two

18  weeks ago and, you know, the harm hasn't happened and the

19  argument for the TRO is undercut.  If you bring a TRO asking

20  for something to be stopped that happened two weeks ago, it --

21          MS. SAMANT:  Right.  To be clear, I'm providing this as

22  an example.

23          THE COURT:  Okay.

24          MS. SAMANT:  You were asking how is their access or use

25  unlawful and I'm using this as an illustration.

1          THE COURT:  Okay.

2          MS. SAMANT:  You asked weren't they charged with

3    rooting out fraud, waste.  Absolutely.  Now, first of all, if

4    this entity, if these people had been properly appointed to do

5    work to actually direct -- right, at this point, again, this

6    is not an adviser, this is not someone coming in giving

7    recommendations to the agency, CMS or whatever.

8      Based on, again, personal statements and everything that

9    we have in the public domain, it is clear that at least with

10   respect to -- definitely certainly with respect to CMS, the

11   directions that were given about where to cut came from

12   Mr. Musk and DOGE.  The only way they were able to do that

13   was through their analysis of data.

14     Now, they are not -- and so I would say the conduct in

15   which they are engaging -- and I recognize it's a functional

16   analysis, right?  So to the extent that, you know, making

17   decisions and giving agencies directives on how to change

18   their spending or otherwise change the way in which maybe

19   allocations have been made by Congress, they are stepping well

20   beyond the authority and the four corners of the executive

21   order to the extent that it said you're charged with rooting

22   out waste and fraud.

23          THE COURT:  That may be so.  That may be so.  But

24   again, we're here for a hearing on a TRO.  The other thing you

25   asked in your revised proposed order and TRO, you want me to

1    stop all personnel decisions at the seven agencies.  If I

2    accept your premise that there are going to be mass firings --

3    and I'm not making light of any of this.  This is all very

4    serious, and like I said, you may have a colorable

5    Appointments Clause claim; we're just not there yet.

6        But accepting that DOGE will do these firings, how does

7    that equate to financial or programmatic harm to the states?

8    How will the terminations immediately create a loss of funding

9    or other programmatic harm?

10        MS. SAMANT:  So this again goes to the technical

11   expertise.  I can also point you to -- you know, we talk about

12   in -- aside from the New Mexico Department of Education

13   declaration, we've also talked about how -- this is the

14   declaration by -- the Gilliam Declaration, Exhibit D, where

15   they talk about New Mexico is home to, among other things, as

16   folks know, Los Alamos labs.

17        We are the only deep geological repository for the safe

18   disposal of a certain type of nuclear waste, right?  And this

19   was, again, over last week, the -- pursuant to DOGE,

20   Mr. Musk's orders, Department of Energy fired or issued

21   notices to terminate the employment of a bunch of personnel.

22        THE COURT:  At Alamo labs in New Mexico?

23        MS. SAMANT:  No.  This is the National Nuclear Security

24   Administration.  Personnel who are within that department

25   include staff who either oversee or provide guidance on the

1    disposal of nuclear wastes.

2        THE COURT:  But wouldn't the action that -- the

3    appropriate TRO in that case be brought on behalf of those

4    employees?

5        MS. SAMANT:  We're not seeking to reinstate -- you

6    know, it's not an employment claim.  That's something for them

7    to bring.  Our harm, again, is -- exactly, the impact that it

8    has on our ability to carry out state functions, programs that

9    serve the public, and safety.

10        I mean, also, you know, the loss of administrative

11    personnel, right, like when we can't figure out why funds

12    aren't being disbursed or being released pursuant to

13    contracts, there's no one there to pick up the phone.  Right?

14    There's no one there to write the checks.  In addition to the

15    technical and actually substantive programmatic work that we

16    rely on these partners for.

17        THE COURT:  With regard to the Office of Personnel

18    Management, there are TRO motions pending to enjoin DOGE

19    access to OPM data in the Southern District of New York and

20    the District of Maryland.  And those cases have been brought

21    by labor organizations based on APA and Privacy Act

22    violations.

23        Why would that not give you the relief you seek?  I realize

24    they're not -- they haven't been brought -- at least --

25    there's one in Maryland on an Appointments Clause, but they

1    haven't been brought on Appointments Clause grounds.  But if

2    what you're seeking is relief from certain imminent harm that

3    you've described, why wouldn't those cases give you that

4    relief, at least on a temporary basis?

5         MS. SAMANT:  So I think, you know, we're also looking

6    for limiting -- again, this -- and again, we probably could

7    have done a better job of maybe melding some of our original

8    TRO request with our narrowed one, but again, it's about the

9    use of the data to make decisions that -- in addition to the

10   personnel.

11        THE COURT:  So on Saturday, labor unions and

12   organizations filed a TRO request enjoining mass firings by

13   the heads of various agencies in a case that's been assigned

14   to Judge Cooper on this court.  And Judge Bates of this court

15   denied labor unions' request for a TRO restricting DOGE's

16   access to Department of Labor data, and set a preliminary

17   injunction schedule instead.

18     Why wouldn't those two cases cover a great deal of what

19   you're asking for?

20        MS. SAMANT:  So again, with respect to certainly the --

21   Judge Bates's ruling in that case, those were again Privacy

22   Act claims.  Whether, you know -- we want to make sure that

23   DOGE and Mr. Musk are not using data inappropriately and

24   beyond whatever authority they may arguably have.

25        THE COURT:  Right.  And so that's why you have an

Appointments Clause claim.  But the harm you're alleging, that

you're seeking to curtail or forestall, is apparently being

considered in many, many other cases.  So you want me to issue

this extraordinary remedy -- it's still pretty broad.  We're

talking about seven agencies, no firings, no access to data at

seven large agencies.  You want me to do that notwithstanding

that there are a number of cases that are already doing that,

or contemplating doing that.

MS. SAMANT:  Exactly, Your Honor.  I think in those

cases, with the exception of Judge Bates's ruling, relief has

not been issued as yet, and with respect to -- I think again

there is a difference between enjoining agency personnel from

disclosing, sharing data and enjoining Mr. Musk and DOGE from

using or -- using this data.  I think those are two different

types of restraints.  And I think that is a significant

distinction between the relief that we are seeking and the

harms that we are trying to address versus ones that current

employees, former employees, unions are seeking.

THE COURT:  Let me ask you -- and that was with regard

to Judge Cooper and Judge Bates.  I was sort of going to the

Department of Education, Labor, Health and Human Services and

Energy.  With regard to, for example, the Department of

Transportation which is one of the agencies you list, I

understand that disruptions to DOT systems could cause immense

harm generally, but what would be the imminent harm to the

1      plaintiff states in access to data at the Department of

2      Transportation and the Department of Commerce?

3              MS. SAMANT:  Yeah.  No, again, the harm again is, I

4      think, going back to what we had talked about before which is

5      both the inability to carry out the programs and the

6      functions, rely on them for technical expertise.  And with

7      respect to Commerce, the specific entity that we talk about in

8      our complaint is NOAA and the access that DOGE and Mr. Musk

9      have -- and use of the data in those systems within that

10     entity, within Commerce.

11             THE COURT:  Okay.  All right.  Unless you have

12     something else, I'm going to have some questions for the

13     government.  But I'll allow you to finish your argument if you

14     have anything else you want to add.

15             MS. SAMANT:  Not at this time.  Thank you, Your Honor.

16             THE COURT:  All right.  Thank you, Ms. Samant.

17        Mr. Graver, there are reports of thousands of federal

18     employees who received termination notices on Friday.

19     Is this true?

20             MR. GRAVER:  I have not been able to look into that

21     independently or confirm any piece of it.  What I can say is

22     that --

23             THE COURT:  Wait a minute.  Let me stop you.  I mean,

24     the firing of thousands of federal employees is not a small or

25     common thing.  You haven't been able to confirm that?

1          MR. GRAVER:  What I've been looking for, Your Honor,

2     is some nexus to this case and the claims that are pressed.

3     What would be relevant I think to hear --

4          THE COURT:  No, no, no.  I think it would be very

5     relevant for me to know whether thousands of federal employees

6     were terminated on Friday.  You may not want that, but I would

7     find that relevant.

8          MR. GRAVER:  Your Honor, I am happy to track that down

9     and submit a letter this afternoon.

10          THE COURT:  Yes.  And can you also let me know whether

11     additional terminations are planned in the next 14 days?

12     Because I agree with you that I can't base my decision on such

13     extraordinary relief on news reports, but I'm finding it very

14     difficult to get information that is credible and that -- and

15     I mean, I understand.  Look, you all are dealing with a lot of

16     lawsuits.  But it seems to me that you should be able to say,

17     yes, we fired so many people at this place, and yes, we're

18     going to fire X many people within the next 14 days.  So I

19     would like for you to see if you can confirm that, please.

20          MR. GRAVER:  Yeah.  Can I make maybe one point on that

21     and then one point too just on -- trying to concretize this a

22     little bit.

23          THE COURT:  Absolutely.

24          MR. GRAVER:  There's a lot of discussion in the --

25     there's a lot of moving targets, a lot of rhetoric to it.

1    So maybe I could actually just sort of walk through at least

2    the evidence that is presently before this court and then try

3    and tie it to the data access point and try and tie it to the

4    termination point that you just touched on, Your Honor.

5                THE COURT:  Okay.

6                MR. GRAVER:  So I think starting with -- looking at the

7    states' declarations, what they've actually put before you to

8    justify imminent danger for a TRO, of the 11 declarations that

9    are submitted, by my count only five of the 13 states are

10   represented.  And for the data access concerns, of those five

11   states, only three have declarations that discuss data access

12   at all.  You have Washington, you have Michigan, you have New

13   Mexico.

14       The first two, Washington and Michigan, don't talk about

15   the states' own data, I think, at all.  Instead, what they

16   talk about is concerns they've heard from residents about

17   their data.  But as the Supreme Court confirmed last term,

18   states don't have standing as *parens patriae* to bring an

19   action against the federal government.  So I don't think those

20   concerns can justify a remedy at this time.

21       So that just leaves New Mexico.  Again, from the concrete

22   evidence that has actually been put before this court, that

23   just leaves New Mexico.  But even there, the state only says

24   that it has data at three different agencies -- Treasury,

25   Labor, and Transportation -- not the full list in their

1     supposedly narrower TRO.

2          But even among those three agencies, I don't think there's

3     any concrete evidence before you for this to work.

4          The first is, Treasury is not even a defendant here.  The

5     states are litigating Treasury separately in SDNY.  None of

6     those concerns relate to this TRO.

7          The next part is Transportation.  You know, my friend

8     mentioned Transportation in passing, but in their complaint

9     they're not talking about Transportation writ large.  As I saw

10    it, all they're talking about is possible interest from DOGE

11    and the FAA, and not even New Mexico says it's lodged

12    information there.  So then -- again, for all the rhetoric,

13    all the stuff, from the actual declarations itself, then we're

14    just talking about New Mexico information at Labor.

15         But even there, the states don't offer any specifics about

16    access to data at Labor.  And as Your Honor has noted, Judge

17    Bates recently referred a very -- reviewed detailed

18    declarations, detailed circumstances, and denied a TRO in the

19    context of Labor, I think affirming that as a practical matter

20    there is not some imminent risk of harm with respect to data

21    held there.

22         And the last thing I just would say on this is my friend

23    mentioned I think four or five different times that our

24    concern is not the access, our concern -- our legal theories

25    are not concerned with the access, and that is true, but I

1    think that gives away the game with half of their TRO, because

2    they're asking this court to enjoin access.

3        My friend emphasized again and again and again:  Our issue

4    is with the use.  But the use is what they attacked in the

5    much broader TRO that they have since abandoned.  They have

6    not identified any legal line that is crossed with respect to

7    access alone on the legal theories they've chosen to press

8    here.

9        When it comes to terminations, again, as Your Honor was

10   sort of picking up, this is the other piece of it, right now

11   we are at very, very, very early stages, and the theories that

12   are pressed at least in the declarations, and the concrete

13   evidence before this court, all involve possible actions,

14   that may involve possible employees, that may involve possible

15   compromising of agency operations, that may affect the states

16   downstream.

17           THE COURT:  But let me just interrupt you.  You make a

18   point, Mr. Graver, but one of the reasons that that is the

19   language that plaintiffs are using is that DOGE's actions in

20   this case -- in this arena have been very unpredictable and

21   scattershot.  And I have no idea whether that is by design or

22   simply by virtue of the scope of their remit.

23       But that's why I'm asking you, you know, have there been

24   terminations, will there be terminations, when are they going

25   to be and where are they going to be, so that it does allow

1    plaintiffs or others seeking to challenge those actions to

2    make a record.

3        MR. GRAVER:  So I think two brief points on that, Your

4    Honor.  The first, I think as you noted, as a general theme,

5    I do think the phrase "prophylactic TRO" describes that well.

6    And for all the issues that you're sort of getting at, it's a

7    problematic course to go down.

8        But I think there's a more fundamental point I want to

9    make, which is that, again, we're using very high-level terms

10   as sort of like "we" or "you guys" or "the defendants" or "the

11   government" as a whole.  I think it's important to ground this

12   in the actual claims before this court, both the statutory and

13   the constitutional ones.

14       Essentially as I understand my friends, their basic point

15   is this:  Is that either Elon Musk or somebody at USDS is

16   exercising sovereign power in a way without any authority.

17   And they gesture towards maybe terminations that have happened

18   in the past, maybe actions that have happened in the past.

19       What I think is lacking from this -- and I think it's

20   awfully telling -- all of the actions my friends have

21   complained about one way or another have very clear paper

22   trails.  When you fire somebody, there's a legal instrument to

23   that.  When there's a grant pause, there's a legal instrument

24   to that.  When there's a disposition of property, there's a

25   legal instrument to that.

1    In other cases, in other parallel TRO actions -- you know,

2    Judge Nichols has one of these -- what's clear in each of

3    those is you have a properly named officer exercising his own

4    authority.  There's not a single instance of Elon Musk in his

5    own name or USDS commanding any of these actions at all.  All

6    you have are instances --

7    THE COURT:  Let me interrupt you.  Mr. Musk hasn't been

8    nominated, confirmed by Congress, or appointed to anything.

9    He has been sort of tasked with this, you know, directing the

10   actions of this organization.  And that's one of the

11   challenges in plaintiffs' motion, is that this is essentially

12   a private citizen directing an organization that's not a

13   federal agency to have access to the entire workings of the

14   federal government, fire, hire, slash contracts, terminate

15   programs, all without apparently any congressional oversight.

16   And that's the crux of their claim.  He is not -- Mr. Musk is

17   not a government employee.  He is a private citizen.

18   MR. GRAVER:  Well, he's a special government employee,

19   Your Honor.

20   THE COURT:  All right.  He hasn't been nominated or

21   confirmed.

22   MR. GRAVER:  That's -- that's -- that's correct.

23   And let me make one basic point, and I think this is the

24   fundamental defect with my friend's Appointments Clause

25   challenge.  Of course none of this leads to the imminence

1    issue, but I'm putting that aside for the moment.

2       In my friends' own words -- and I think this is around page

3    22 of the TRO -- their theory of the case is that Elon Musk

4    exercises authoritative influence in the government.  That is

5    simply not the stuff of an Appointments Clause claim, because an

6    Appointments Clause claim is entirely about somebody occupying

7    an office and using the trappings of that office to wield

8    sovereign power.

9       Nowhere have my friends offered a shred of anything, nor

10   could they, to show that Elon Musk has any formal or actual

11   authority to make any government decision himself.

12           THE COURT:  Oh, Mr. Graver, I think you stretch too

13   far.  I disagree with you there, but that again goes to the

14   merits.

15           MR. GRAVER:  I agree.  I mean, we will be happy to

16   brief that point up and support it, and I feel very confident

17   in that, that he's not exercised formal authority and

18   therefore is not an officer.  But again, all that is a bit

19   collateral to I think the immediate point here, which is has

20   the states marshaled concrete evidence of imminent harm to

21   give rise to a TRO.  And I think that is just completely

22   lacking once you actually focus on what they've tried to focus

23   on at the narrow TRO and the actual evidence that they put

24   before you.

25           THE COURT:  Let me ask you, Mr. Graver, the mass

1    firings and data access at some of the agencies identified by

2    plaintiffs are subject to pending TROs or PIs in other cases.

3    Will the government agree to hold off on any further mass

4    terminations in the agencies identified here while a

5    preliminary injunction is litigated?  And if not, what is the

6    prejudice to the government by holding off?  What prejudice

7    will the government suffer if they just have to wait to fire a

8    couple thousand people?

9         MR. GRAVER:  Well, I can't make that commitment

10   obviously now, Your Honor, because again, agencies, just as

11   a general matter, of course agency heads or department heads

12   who are confirmed by the Senate have existing statutory

13   authorities to manage their own workplace.  Obviously, I

14   can't commit to no one will get fired in the next few weeks.

15   If someone assaults their coworker tomorrow --

16        THE COURT:  Mr. Graver, the allegation isn't that

17   agencies can't manage their own workplace.  The allegation is

18   that DOGE is directing those terminations, not the agency

19   heads, that DOGE is coming in -- and I'm not saying I agree

20   with this, but these are the allegations, that DOGE is coming

21   in to these agencies and accessing data and firing people and

22   terminating contracts, that they're essentially running the

23   government.

24        Now, you may disagree with this, that's what plaintiffs are

25   saying, but that's the problem.  The federal agencies aren't

1    the defendants here.  DOGE is the defendant here.

2            MR. GRAVER:  Right.  I understand that the states have

3    alleged that at a very high level.  For preliminary injunctive

4    relief of any stripe, a TRO or a PI, threadbare allegations

5    obviously don't cut it.  What you need is some shred of

6    evidence to back it up.

7        And what I would point is that if the states were correct,

8    it would be awfully easy to find this.  Again, firings are

9    legal instruments.  Someone is signing that document.  Someone

10    is taking that action on behalf of the government.  Someone is

11    exercising power.  They can't identify a single example of

12    somebody who is improperly in that position actually taking

13    that action.

14        And that is the stuff of both of their claims.  Again, both

15    the constitutional and statutory claims turn on the exercise

16    of power without the authority to wield it.  And how those

17    claims work is you identify the government action, who fired

18    this guy, then you say what authority did he have to do that.

19        None of that is in anything the states have put before you.

20    All they've done instead is offer these hundred-thousand-foot

21    accusations that, oh, Elon Musk is pulling the puppet strings.

22    That is not the kind of stuff for a TRO.  It's not the kind of

23    stuff, quite frankly, for a complaint itself, but again, that

24    is all things we can fight about on a PI schedule.

25            THE COURT:  All right.  Ms. Samant, I have focused my

1    questions so far on the imminent harm factor, but I also have

2    to consider the generally applicable four-factor test here.

3    Has a court ever granted a TRO based on an Appointments Clause

4    violation?  There are a few decisions from this circuit that

5    suggest that preliminary injunctive relief is not necessary

6    for Appointments Clause violation, although there are also

7    cases say that a continuing constitutional violation

8    constitutes sufficient harm for injunctive relief.

9        But has there ever been a TRO based on an Appointments

10    Clause violation?

11        MS. SAMANT:  Your Honor, that's something I would

12    actually have to confirm and get back to you, but --

13        THE COURT:  I haven't been able to find one.

14        MS. SAMANT:  Oh, so yeah.  I don't want to

15    overrepresent.  But I think this goes to -- I want to say

16    something that also responds to counsel's claim that we

17    haven't pointed to documents or we haven't pointed to what

18    office he's held -- and this relates to your question has

19    there ever been a TRO issued before.

20        This is factually a one-of-a-kind situation.  This simply

21    hasn't happened before.  So you're right, there may not be a

22    TRO that's been issued, but that's because we've never

23    experienced, we, the states, the people, the government, have

24    not experienced this type of wielding of power in this way,

25    and therefore, I don't anticipate with additional time that I

1    will find you an Appointments Clause case where a TRO was

2    issued.

3         THE COURT:  Okay.  And did you want to respond to any

4    of Mr. Graver's arguments?

5         MS. SAMANT:  I think our papers will speak for

6    themselves, to the extent that I think he's misstated or

7    misrepresented some of the allegations in there.  You know, I

8    would also just offer just a quick point of clarification on

9    the Judge Bates's ruling.

10    You know, the initial denial of the TRO was on standing

11   grounds.  The denial of the renewed TRO was because he found

12   that plaintiffs were unlikely to succeed on their privacy

13   claims.  So I don't think that's necessarily -- dispositive

14   isn't the right word -- but relevant to the merits or

15   likelihood of success in our situation.

16    And then I think, again, I would say that -- and I believe

17   you alluded to this already, but there are ways to -- and

18   again, No. 1, we're seeking to restrain the actions of DOGE

19   and Mr. Musk, not the agencies.  In fact, if in fact DOGE and

20   Mr. Musk do not have authority over these agencies, a TRO

21   limiting their ability to access, use data, to direct

22   personnel decisions, shouldn't impact daily agency operations.

23    But I think the final point I would just add is, especially

24   in terms of phrasing the way that we've talked about the

25   relief that we seek with respect to the data in our revised

1    TRO, I would just suggest or request that Your Honor consider

2    that language in connection with sub H and I in our original

3    TRO which addresses the data issue.

4            THE COURT:  All right.

5        All right.  Thank you all for coming in and making yourself

6    available today.  I know it's a public federal holiday, but

7    obviously when you're asking for the relief you're asking for,

8    we've got to move quickly.

9        I'll rule on the motion for temporary restraining order and

10    issue -- any further scheduling I'll leave up to you all.  But

11    I hope to get that out within 24 hours.  Thank you.

12        Just a minute, I need to consult with my clerks.

13        (Court conferring.)

14        Okay.  For purposes of scheduling, because I have a

15    complicated calendar right now, if you all have to -- for a PI

16    briefing schedule, what are you all proposing?

17            MS. SAMANT:  Your Honor, I would say we need to meet

18    with Mr. Graver and work that out and we can --

19            THE COURT:  Okay.

20            MS. SAMANT:  -- in short order.

21            THE COURT:  All right.  Let's do that.  All right.

22    Thank you all.

23        (Proceedings adjourned at 11:59 a.m.)

24

25

\*  \*  \*  \*  \*  \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne