IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ELON MUSK, in his official capacity, *et al.*, <br><br> Defendants. | Civil Docket No. 1:25-cv-00429-TSC |

**DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

I.      THIS COURT SHOULD NOT ORDER DISCOVERY BEFORE RESOLVING THE GOVERNMENT'S MOTION TO DISMISS. ................................................................ 2

II.     ORDERING DISCOVERY OF THE WHITE HOUSE IS AN EXTRAORDINARY MEASURE. ............................................................................................ 4

III.    THE DISCOVERY SOUGHT IS NEITHER MATERIAL NOR NECESSARY. ................. 6

IV.   IF THIS COURT ORDERS EXPEDITED DISCOVERY, DEFENDANTS REQUEST A STAY OF THAT ORDER. .................................................................................. 13

CONCLUSION .............................................................................................................................. 14

**INTRODUCTION**

The States' motion for expedited discovery into the Executive Branch, including the White House, seeks extraordinary relief. The material the States seek is not relevant to their claims; nor should the Court require such discovery on an expedited timeframe before it has even had a chance to adjudicate the Government's motion to dismiss. In addition, federal courts have held litigants to an extremely high standard before ordering discovery into the White House; at a minimum, the States must demonstrate a real need for such material and make a clear effort at strictly limiting any request. Nowhere is that apparent in the States's motion—indeed, they do not even *acknowledge* the burden that they bear. The Court should deny the motion and allow this case to continue on the ordinary course. And if the Court concludes otherwise, the Government respectfully requests a stay of the order to allow it to consider appellate relief.

The States request discovery directly from the sitting President of the United States—one of the named defendants here, not carved out from the motion's scope. It seeks even more from one of his Senior Advisors—Elon Musk. And, as to the U.S. DOGE Service ("USDS")—a component of the Executive Office of the President itself—the States ask for virtually everything the component has planned or will plan in connection with personnel, contracting, data management, and more. At no turn do the States try to shape their request around *their* legal claims (which fail as a matter of law) or *their* supposed harms (which they have never been able to demonstrate). The States seek information about everything USDS has done—in hopes of finding something, anything, to justify this suit or, if not, to develop new claims.

That does not work. The States cannot seek discovery to figure out what they are suing about. Especially on this posture, where the State's leading argument is they need discovery to show irreparable harm—an odd claim, given that those harmed usually know about it before they sue.

As detailed below, these are by no means the only defects with the States's request. It is also premature, seeking to leapfrog the Government's motion to dismiss, which will highlight the threshold defects with the States's complaint that warrant dismissing it in full. And it is grossly overbroad, despite this Court's caution that any request for discovery "must be limited and narrowly tailored." ECF 36, at 1. One way or another, the point is clear, and so is the required outcome: This Court should deny the States's extraordinary motion for expedited discovery.

## ARGUMENT

Expedited discovery is not the norm. *See Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97 (D.D.C. 2014). All the more so where that discovery reaches into the inner workings of a separate branch of government—and more still when it reaches the White House itself. *See Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 388 (2004). The upshot is that to justify such an extraordinary measure, a plaintiff must—at bare minimum—demonstrate a real and legitimate need for the material sought and make an effort to closely tailor any request accordingly. On both fronts, the States have not come close to doing so here.

## I. THIS COURT SHOULD NOT ORDER DISCOVERY BEFORE RESOLVING THE GOVERNMENT'S MOTION TO DISMISS.

Before turning to its content, the States' motion is premature. Courts typically wait to order discovery until resolving any motions to dismiss. *See, e.g. Attkisson v. Holder*, 113 F. Supp. 3d 156, 165 (D.D.C. 2015); *True the Vote, Inc. v. IRS*, No. 13-734, 2014 WL 4347197, at *8 (D.D.C. Aug. 7, 2014); *In re Quinteros*, No. 19-cv-195-BR, 2021 WL 3674727, at *13 (D.D.C. Aug. 13, 2021). Rightly so: A party should not be able to engage in intrusive discovery to prove up a complaint that suffers from fatal defects if taken as true.

*First*, as the Government will argue in detail shortly, the States have not established Article III standing. As this Court recognized when denying the States' request for a TRO, their alleged harms are exclusively based on contingencies—a series of "attestations that *if* Musk and DOGE" do

2

something later, that *might* then have downstream effects upon the States. ECF 29, at 6. That is not the stuff of Article III. Indeed, if the States have standing here, it is hard to see how states would not have universal standing to challenge every prospective federal policy: If *possible* harm from a *possible* policy is enough, then what holds for DOGE would be so for EPA, SEC, DHS, and more. But that is, for good reason, very much not the law. *United States v. Texas*, 599 U.S. 670, 681 (2023) ("If the Court green-lighted this suit, we could anticipate complaints in future years about alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like. We decline to start the Federal Judiciary down that uncharted path."). Because there are substantial doubts as to standing, this Court should not order discovery until it has assured itself of jurisdiction. *See Guttenberg*, F. Supp. 3d at 99; *Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338, 346 (D.D.C. 2011) ("It is well settled that discovery is generally considered inappropriate while a motion that would be thoroughly dispositive of the claims in the Complaint is pending."); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.") (cleaned up); *Flores v. Jaddou*, No. 1:23-CV-02004-JMC, 2023 WL 7282897, at *2 (D. Md. Nov. 3, 2023) (rejecting proposal to "permit this case to proceed, direct the parties to engage in discovery, and expend resources adjudicating potential discovery disputes and/or dispositive motions just for the Fourth Circuit to conclude that this Court had no subject matter jurisdiction to decide the merits of the case in the first place.").

*Second*, as the Government will also soon argue, the States' theory of the Appointments Clause is foreclosed under binding precedent, even taking its many allegations as true. In *Andrade v. Regnery*, the D.C. Circuit rejected a materially similar Appointments Clause challenge—where a set of present or former government employees challenged their demotion or termination under a "RIF," on the

3

ground that the policy was designed and directed by persons wielding power without appointment. 824 F.2d 1253, 1256–57 (D.C. Cir. 1987). Writing for the unanimous panel, Judge Mikva explained that what matters for purposes of the Appointments Clause is exclusively whether the person taking the challenged action itself is a "duly appointed official." *Id.* at 1257. So much so here. The States's entire case is premised on the notion that Elon Musk or those affiliated with DOGE are wielding "authoritative influence" across the Executive, designing and directing acts of others. ECF 6, at 22. But even taking those accusations as true, they do not give rise to an Appointments Clause claim, which focuses entirely on whether the *actual action*—*e.g.*, a termination, cancellation, sale of property, or whatever acts supposedly harm the States—was done by someone lacking the authority to do so. 824 F.2d at 1257. Nowhere do the States identify an example of *that*.

Put another way, the States concede away their case by alleging that Elon Musk "does not occupy an office of the United States." Compl. ¶ 6. If he does not occupy an office, then he is not an officer. *See Landry v. Federal Deposit Ins. Corp.*, 204 F.3d 1125, 245 (D.C. Cir. 2000) (holding that the "threshold trigger for the Appointments Clause" is that an office must be "established by Law"). And if he is not an officer, he is not subject to the Appointments Clause. Political influence is not the same thing as *de jure* power, and the Appointments Clause speaks only to the latter. Since Mr. Musk holds none, as the States do not dispute, their claim is a legal dead-end.

In short, there are serious threshold problems with the States's constitutional theory. This Court should resolve those issues before considering ordering discovery—especially given its target.

## II.    ORDERING DISCOVERY OF THE WHITE HOUSE IS AN EXTRAORDINARY MEASURE.

The States's complaint is trained almost exclusively on the conduct of Elon Musk. *See* Compl. ¶¶ 200–28. But as the Government has explained, Mr. Musk is a Senior Advisor to the President who works in the White House Office. Fisher Decl., ECF 24-1, ¶¶ 2–4. As a result, the States seek reaching discovery not only into the inner workings of the Executive Branch, but into the White House itself.

4

The States do not acknowledge this at all, treating their discovery motion as wholly routine. But that is the fundamentally wrong analytical framework under the Constitution and precedent.

Litigation against the Executive—including the President, who is a named defendant here—is different from garden variety litigation. The separation of powers "should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Cheney*, 542 U.S. at 385. Among other things, what this means is that before a litigant demands materials of the White House, it must "satisfy his burden of showing the propriety of the requests"—*e.g.*, that there is a compelling "need" for such material, that "other avenues" are unavailable to obtain relevant material, and that no alternatives are "available." *Id.* at 389–90; *see e.g.*, *Lardner v. U.S. Dep't of Justice*, No. 03-0180, 2005 WL 758267, at *9 (D.D.C. Mar. 31, 2005) ("[A] court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings"). More, it is not the Executive who "shall bear the burden" of showing that a discovery request is too broad; there is an effective presumption against such discovery, which falls to a plaintiff to shoulder with particularity. *Id.* at 388. This principle holds even greater force with respect to depositions—which the States also request. It is well-settled that "top executive department officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985). This is because the "duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere." *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008). That of course includes not only the President, but his senior advisors. *See Cheney*, 542 U.S. at 383; *see also, e.g.*, *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 182 (D.D.C. 2005). And it includes USDS, which is "established in the Executive Office of the President." Exec. Order 14,158, 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025).

The D.C. Circuit, in particular, has closely guarded these constitutional lines, and has regularly granted mandamus relief for far-reaching discovery requests like this one, as well as where the plaintiffs have failed to exhaust other sources or establish a clear need for the specific information sought. *See, e.g.*, *Cheney*, 544 F.3d 311; *Clinton*, 973 F.3d at 121; Order, *In re United States*, No. 14-5146 (D.C. Cir. July 24, 2014) (*per curiam*) (Secretary of Agriculture) (Vilsack Order); *U.S. Department of Education*, 25 F.4th at 701 ("Although district courts have occasionally ordered such depositions, circuit courts have issued writs of mandamus to stop them when asked to, generally finding that the circumstances before them were not extraordinary.") (collecting cases); *cf. In re Department of Commerce*, 139 S.Ct. 360 (2018) (No. 18A375) (staying deposition of Commerce Secretary). And the Supreme Court has ordered relief in cases where lower courts did not police the principle with sufficient vigor. *See, e.g.*, *In re Department of Commerce*, 139 S. Ct. 360 (2018) (No. 18A375) (staying deposition of Commerce Secretary); *In re Department of Commerce*, 139 S. Ct. 566 (2018) (No. 18-557) (treating petition for writ of mandamus as petition for writ of certiorari, and granting petition).

## III. THE DISCOVERY SOUGHT IS NEITHER MATERIAL NOR NECESSARY.

The States do not come close to shouldering their burden in justifying intrusive discovery on the Executive Branch, in primary part because the States never identify any genuine need for their (many) requested materials, in order to prove up the actual legal claims that they have chosen to press. Courts consider carefully a litigant's purported reasons for seeking expedited discovery. *See Attkisson*, 113 F. Supp. 3d at 164 ("In considering whether good cause exists to grant a motion for expedited discovery, the Court also assesses the purpose of the motion."); *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 143 (D.D.C. 2005) (noting that federal courts should consider "the purpose for requesting the expedited discovery") (citation omitted); 8A Wright & Miller, *Federal Practice and Procedure* § 2046.1, at 290–91 (3d ed. 2010) ("In general, decisions whether to grant or deny leave for early discovery depend on the specific justifications offered in support of the application."). Across their motion, the

6

States essentially cite two bases for justifying discovery—(1) to support their Appointments Clause claim, and (2) to better demonstrate irreparable harm. ECF 45, at 5–6. Neither works.

*First*, the States do not explain (nor could they) how discovery is needed for an Appointments Clause challenge, and indeed do not cite a single example of a court ever taking this extraordinary step. Looking at the States's discovery motion, the lion's share (if not all) of the requested material involves internal papers or communications that contemplate or plan for certain governmental actions. But as touched on above, none of that is material to an Appointments Clause claim, which does not care at all about what *went into* a decision, or who may have *influenced* it as a practical or political matter, but instead cares exclusively about whether the *decisionmaker*—*i.e.*, the governmental actor who actually took the challenged action under his or her legal authority—had the power to do so. *Andrade*, 824 F.2d at 1257. "[I]t is an everyday occurrence in the operation of government for staff members to conceive and even carry out policies for which duly appointed or elected officials take official responsibility." *Id.* Yet none of that bears on an Appointments Clause challenge, which is why even the most powerful Chief of Staff never gets a Senate hearing. Instead, all that matters is whether the governmental act at issue "came at the hands of a duly appointed official." *Id.* And here the States never allege that the discrete actions they complain about were formally taken by someone other than the officials who hold legal authority by virtue of their offices to take those actions.

Accordingly, the States do not need any inner workings of government to support their claim, because their claim turns entirely on the authority for certain outward-facing acts. The States complain about a collection of discrete governmental decisions—again, terminations, cancellations, sales, and the like—all of which are executed through discrete legal instruments, effectuated by identifiable governmental actors. An Appointments Clause challenge rests on whether the name at the bottom of those instruments had the legal authority to take those actions. And for that, there is absolutely no basis for exploring what went into the decision, because it is irrelevant to the analysis.

7

*Second*, the States do not explain why discovery is needed to support their claims of irreparable harm. Intuitively so: If a party is facing actual or imminent concrete harm, he knows about it; when a party needs discovery to learn whether or not he might be possibly injured, that almost by definition defeats any claim of need. It also admits of no limiting principle. It is always conceivably *possible* that some government actor may be considering an action that would harm someone. That hypothetical is not license for sweeping discovery, on an expedited basis, into all governmental deliberations.

Moreover, it is unclear whether an Appointments Clause violation can ever give rise to the sort of irreparable harm warranting preliminary relief (and in turn, expedited discovery). ECF 29, at 6 n.4. Indeed, as the D.C. Circuit recently observed, "being investigated by, or participating in a proceeding before, an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief." *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024). And the States offer no reason why this case would be any different. If anything, the States' claim is further removed. When a party is forced to engage in an unconstitutional proceeding, he is *directly* suffering the here-and-now injury of that unlawful process. But the States' theory is a degree removed, challenging certain actions taken by lawful actors, yet done (allegedly) at the behest of someone without proper appointment. Of course, that theory is defective on its own terms. *See United States v. Smith*, 962 F.3d 755, 765–66 (4th Cir. 2020) (rejecting challenge to federal prosecution, even assuming Matt Whitaker was unlawfully appointed as Attorney General). But for purposes of irreparable harm, it is nonetheless a constitutional injury further afield.

The real thrust of the States's motion is they need discovery on virtually everything DOGE-affiliated persons have done or will plan, because "DOGE" moves quickly, and the States might not be able to obtain preliminary relief before they are harmed. ECF 45, at 8. But that is no more a basis for expedited discovery than it is a TRO. ECF 29, at 6–7 (rejecting this argument). Notably, other plaintiffs in related litigation have sometimes succeeded in obtaining temporary relief—and they were

8

able to make showings that convinced district courts *without* threshold discovery. *See, e.g.*, *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352, 2025 WL 435415 (D.D.C. Feb. 7, 2025); *State v. Trump*, No. 25-CV-01144 (JAV), 2025 WL 573771, at *1 (S.D.N.Y. Feb. 21, 2025); *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at *1 (D. Md. Feb. 24, 2025).

Finally, the States' theory, if accepted, would be boundless: On their view, it is impossible to see how any regulated party could not obtain far-reaching, proactive discovery from their regulator, on the ground that it *might* take decisive action that could *possibly* hurt them in the future. The Chamber of Commerce could obtain running discovery of what the SEC was planning; immigration groups could get an open window into DHS's enforcement priorities; energy companies can obtain a perch atop the EPA. None of that is the law, and none of that makes sense—again, *especially* when it comes to satisfying the heightened standard for discovery that applies to the Executive Branch and White House. A party cannot file a lawsuit and obtain discovery to figure out what it is about; and it surely cannot pry open the workings of the Executive Branch to survey its considered policies, on the hope that it might find something that would give it jurisdictional standing to sue.

## IV. THE STATES' REQUEST IS GROSSLY OVERBROAD AND BURDENSOME.

Even setting aside all of the above, the States' request is an utter dragnet. *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 143 (D.D.C. 2005) ("[D]iscovery requests made by Plaintiff Kellmer appear to be a thinly veiled attempt to circumvent the normal litigation process. Considering the totality of the circumstances presented, the Court finds that the requests made by Plaintiff Kellmer are unreasonable."); *see, e.g.*, *Attkisson*, 113 F. Supp. 3d at 163 (explaining that expedited discovery is "inappropriate" to prove ultimate merits of the case, but instead should be narrowly tailored to issue of preliminary relief).

This Court specifically directed the States to submit a deliberately cabined discovery request. But the States flouted that command—pitching far-reaching discovery pegged at every turn to sheer

9

curiosity, over need. The proper course is instead to deny any request for expedited discovery—and at most, let plaintiffs try again in the ordinary course, if the Court denies the motion to dismiss that is forthcoming.

**1.** Illustrative of broader failings, the States seek discovery of the sitting President of the United States in connection with his work in office. The States's discovery proposal runs against all of the defendants, including President Trump, and including materials that may have been directly prepared for him. That is constitutionally intolerable. "The President occupies a unique position in the constitutional scheme"; one that "distinguishes him from other executive officials." *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). In light of the "special nature of the President's constitutional office and functions" and "the singular importance of [his] duties," separation-of-powers principles require particular "deference and restraint" in the conduct of litigation involving the President. *Id.* at 751–56; *see Cheney*, 542 U.S. at 382–88. And at minimum, what those principles preclude is expedited discovery reaching a sitting President concerning his official duties. *See Trump v. United States*, 603 U.S. 593, 617–19 (2024). So too the work immediately surrounding him, involving those senior advisors and aides who are necessary for the President to be able to execute his office with dispatch. *See Cheney*, 542 U.S. at 369–70 ("[T]he Judiciary must afford Presidential confidentiality the greatest possible protection, recognizing the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.").

**2.** Related, the States make no effort at all to tailor their discovery request to account for the various governmental privileges that circumscribe discovery requests that involve the Executive Branch. In fact, the States do not even *acknowledge* these doctrines; and instead press a proposal that runs headlong into them at virtually every turn. This too is reason enough to reject their motion. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any *nonprivileged matter* that is relevant to any party's claim or defense and proportional to the needs of the case[.]" (emphasis added)); *see also*

10

*United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 34–35 (D.D.C. 2012) ("KBR should not be allowed to engage in a fishing expedition, requiring the United States to produce vast amounts of potentially sensitive information with little chance of obtaining relevant, admissible evidence.").

Start with the fact that the States' request is primarily trained on one of the President's Senior Advisors—Elon Musk. The States broadly request, in essence, all "planning, implementation, and operational documents" involving DOGE-adjacent initiatives. ECF 45-1, at 5. But much of that is squarely covered by the presidential communications privilege, which is a "presumptive privilege for [p]residential communications, [and] preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). Simply put, a plaintiff cannot demand—especially in the sort of categorical, reaching fashion that the States do here—all of the paper prepared by one of the President's Senior Advisors with respect to a given policy initiative (let alone many or all of them). *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997). And the States did not even *attempt* to condition their discovery request in light of this settled doctrine.

The States generally ask for all DOGE-related material that has either culminated in a decision the States dislike, or perhaps may well soon. *See, e.g.*, ECF 45-1, at 5 (asking for range of "planning" materials). But that sort of inquiry is almost definitionally in the teeth of the deliberative process privilege, which "protects documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *Loving*, 550 F.3d at 38. The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); *see Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d

11

1429, 1435 (D.C. Cir. 1992) ("To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented judgment."). Here too, the States do not even *mention* this privilege, let alone try to explain how their open-ended inquiries would not run afoul of it.

It is no answer, as the States might suggest, that these problems can be solved later in the day, or that Defendants can raise objections on an item-by-item basis. That is *precisely* the argument that the Supreme Court rejected in *Cheney*. There, the Court specifically held that the Executive Branch should not have to "bear the burden" of invoking privilege to whittle down an otherwise broad request for discovery. 542 U.S. at 388. Instead, the burden is on the plaintiff to show that discovery is not only necessary, but proper, and consistent with all applicable privileges. *Id.* at 388–89. And what is plain from the States's motion is that they have not even *attempted* to make that showing.

**3.**     The States' specific requests are also exceedingly broad, and unduly burdensome, asking for a stunning amount of sensitive internal executive material in roughly seven days' time, which will by its nature (and perhaps by design) divert White House attention from urgent policy priorities—another independent basis for denying expedited discovery. *See, e.g.*, *Attkisson*, 113 F. Supp. 3d at 165.

Requests for Production: The States' document requests are nothing short of "sprawling." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 104 (D.D.C. 2018). They reach all "planning, implementation, and operational documents" affiliated with USDS—or "created" by Elon Musk—concerning at least three general initiatives: federal personnel; grant and contract policy; and IT management. That is a quintessential fishing expedition: Once more, the States are asking for *everything* DOGE (or Mr. Musk) has planned or is planning—all in hopes of possibly finding something that might affect them. That is completely improper. *See, e.g.*, *Pederson v. Preston*, 250 F.R.D. 61, 65–66 (D.D.C. 2008) ("Courts need not tolerate fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests.") (internal citation and quotation marks omitted); *Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. at 38 ("This is the definition of

12

a fishing expedition that violates the limits on discovery required by Rule 26(b)(2)(C)."). At true minimum, the States needed to make an effort to ground discovery in *their* case and *their* injuries—for instance, cabining the policies at issue to those affecting these States; or the material to consummated actions that have impacted them. Of course, such a request would have its own problems (as detailed above); but the fact the States have not even made this minimal effort just underscores the folly of this motion.

Interrogatories: The States's proposed interrogatories fare even worse. *See* ECF 45-1, at 6. They ask for everyone who has worked at USDS or part of a DOGE Team, without making any effort to explain how that is relevant to their *Appointments Clause* challenge involving *Elon Musk*. They ask for every database or data management system that DOGE-affiliated persons have accessed, without even bothering to show where the States have data stored—even after, during argument, the Government pointed out that the States's declarations only covered New Mexico's data at one or two relevant agencies. Proposed Interrogatory No. 5. And they ask for all personnel or grant actions "directed" by DOGE, without ever discussing why such material is needed via discovery—or why, as touched on above, they do not have this material *vel non* already, given they are supposedly the direct victims of these actions.

Admissions: The State's requests for admission suffer from all of the same shortcomings. At no turn do the States attempt to tailor their requests to their suit and their harms.

## V. IF THIS COURT ORDERS EXPEDITED DISCOVERY, DEFENDANTS REQUEST A STAY OF THAT ORDER.

If the Court orders expedited discovery notwithstanding all of the above, the Government respectfully requests a stay of that order for at least fourteen days, so that it may consider seeking emergency appellate relief.

## CONCLUSION

The Court should deny Plaintiffs' motion for expedited discovery.

Dated:  February 28, 2025               Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General, Civil Division

                                        DIANE KELLEHER
                                        Director, Federal Programs Branch

                                        CHRISTOPHER R. HALL
                                        Assistant Branch Director, Federal Programs Branch

                                        JOSHUA E. GARDNER (FL Bar No. 302820)
                                        Special Counsel

                                        */s/ Jacob S. Siler*
                                        JACOB S. SILER (DC Bar No. 1003383)
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L. Street, NW
                                        Washington D.C. 20005
                                        (202) 353-4556
                                        jacob.s.siler@usdoj.gov

                                        *Attorneys for Defendants*