<pre>
1                    IN THE UNITED STATES DISTRICT COURT
                           DISTRICT OF COLUMBIA
2

3    STATE OF NEW MEXICO, et al.,  ) CIVIL NO.:
                                    ) 25-0429-TSC
4              Plaintiff,           )
          vs.                       )
5                                   )
     ELON MUSK, et al.,             )
6                                   ) February 14, 2025
               Defendant.           ) Washington, D.C.
7    _____) 4:06 p.m.

8

9                    Transcript of Motions Hearing
                  Before the Honorable Tanya S. Chutkan
10                   United States District Judge

11   APPEARANCES:

12

13   For the State of New Mexico:

14        Anjana Samant, Esquire
          New Mexico Department of Justice
15        408 Galisteo St
          Santa Fe, NM 87501
16
          Joshua Bendor, Esquire
17        Arizona Attorney General's Office
          2005 N Central Ave
18        Phoenix, AZ 85004

19

20   For the State of Maryland:

21        Adam Kirschner, Esquire
          Maryland Office of the Attorney General
22        200 Saint Paul Place
          Baltimore, MD 21202

23

24

25
</pre>

1    <u>APPEARANCES</u>: (Cont'd)

2

3    For the Defendants:

4        Harry Graver
         U.S. Department of Justice
5        950 Pennsylvania Avenue NW
         Washington, DC 20530
6
         Joshua E. Gardner, Esquire
7        United States Department of Justice
         1100 L Street, N.W.
8        Washington, DC 20005

9

10

11

12

13

14

15

16

17

18

19

20

21    Reported by:    Christine T. Asif, RPR, FCRR
                      Federal Official Court Reporter
22                    333 Constitution Avenue, NW
                      Washington, D.C. 20001
23                    (202) 354-3247

24

25    Proceedings recorded by machine shorthand; transcript produced
      by computer-aided transcription

```
                      P R O C E E D I N G S

          THE CLERK:  Good afternoon, Your Honor.  This is

civil action 25-429, State of New Mexico, et al. versus Musk,

et al.  This matter is set for a TRO.

          Parties, please introduce yourselves for the record

starting with the plaintiff.

          MR. KIRSCHNER:  Good afternoon, Your Honor.  Adam

Kirschner for the state of Maryland and on behalf of the

plaintiff states.

          THE COURT:  Good afternoon.

          MS. SAMANT:  And via Zoom, good afternoon, Your

Honor, Anjana Samant, state of New Mexico on behalf of

plaintiffs.

          THE COURT:  Good afternoon, Ms. Samant.

          Defense, government?

          MR. GARDNER:  Good afternoon, Your Honor.  Josh

Gardner with the United States Department of Justice on behalf

of the defendants.  And with me is my colleague Harry Graver.

Mr. Graver will be entering a notice of appearance, we just

had an ECF snafu.

          THE COURT:  Is that Graver with a G?

          MR. GARDNER:  Yes.

          THE COURT:  All right.  Good afternoon.

          All right.  Since we're here and there's no jury,

you -- if I have short questions, administerial questions, you
```

1    can take them at counsel table.  Just make sure the microphone

2    is on and you're speaking nice and clearly.

3           All right.  We're here for a motion for temporary

4    restraining order brought by the state of New Mexico and

5    several other states in this matter.  Yesterday plaintiffs,

6    who comprised 14 states, filed a complaint against Elon Musk

7    in his official capacity United States Government -- United

8    States Department of Government Efficiency Service also

9    referred to as DOGE, United States Department of Government

10   Efficiency Service Temporary Organization, and President Trump

11   in his official capacity.  That's ECF No. 1.

12          Plaintiffs then filed a corrected complaint this

13   morning to address some errors in the caption, signature

14   block, and counsel's name.  That's ECF 10-1, tab 3.

15          The complaint contains two causes of action.  First,

16   that Defendant Musk's appointment violates the Appointment

17   Clause in Article II, Section 2, Clause 2 of the United States

18   Constitution, which plaintiffs assert against all defendants.

19   Second, that DOGE's conduct is in excessive -- exceeds its

20   statutory authority, which is brought against defendant Musk

21   and the DOGE defendants.  Summons were issued electronically

22   today and counsel for both sides have entered appearances.

23          Now, this morning -- plaintiffs yesterday that was a

24   motion for preliminary injunction, today the plaintiffs moved

25   for a temporary restraining order instructing Defendant Musk

1   and the DOGE defendants to identify and destroy any data

2   obtained from, in plaintiff's words, unlawful agency access,

3   and enjoining the defendants from taking certain actions on

4   behalf of the government.  That's ECF 6.

5           And the order that plaintiffs seek is quite lengthy.

6   It has subsections A through K, which I don't need to go over

7   because they're contained in the motion.  In support,

8   plaintiffs argue that they have standing; that they satisfy

9   the standard for a TRO, meaning they're likely to succeed on

10  the merits; they will suffer imminent irreparable harm absent

11  a TRO; and the balance of equities tips in their favor; and an

12  injunction is in the public interest.

13          In support of their motion plaintiffs also filed 11

14  declarations from various personnel in plaintiff's state

15  departments and agencies.

16          So I am also aware that there's a related case --

17  there was a related case filed in the District of Maryland by

18  a number of John Doe plaintiffs, and that is case No.

19  25-CV-00462, that is seeking similar relief asking to enjoin

20  Mr. Musk and DOGE from operating in violation of the U.S.

21  Constitution.  My understanding is that I think that was --

22  was that stricken or dismissed for failure to follow local

23  rules and instruction to refile, can someone update me on

24  that?

25          MR. GARDNER:  Thank you, Your Honor.  This is --

1          THE COURT:  You can come on up.  Yeah, come on up.

2          MR. GARDNER:  Thank you, Your Honor.  This is Josh

3     Gardner for the United States.  I can't speak to exactly

4     what's happening on that docket.  I know the parties were

5     having discussions, I'm part of those discussions but I had to

6     come here.  So I do understand they were correcting some

7     things is my best understanding.

8          THE COURT:  Is there any -- do you know if there's

9     any discussion about consolidating it or moving to

10    consolidate?

11         MR. GARDNER:  No, not yet, Your Honor.  As far as we

12    have gotten with them is they were proposing a schedule and we

13    were going back and forth about a potential schedule, but we

14    had not reached resolution by the time I came here.

15         THE COURT:  All right.  And I want to say thank you

16    all for making yourselves available on such short notice, but

17    with TROs on a Friday before a long weekend, which is when I

18    seem to get them, that's what happens.

19         All right.  Do you have anything to add to that?

20         MR. KIRSCHNER:  No.

21         THE COURT:  All right.  I guess the first thing I

22    will bring up, because I must, although with not a lot of

23    optimism is whether the parties have reached any accommodation

24    to stop anything while I consider this motion?

25         MR. KIRSCHNER:  No, Your Honor.

1          THE COURT:  Have you tried?

2          You have to speak into the microphone or come on

3   up.

4          MR. KIRSCHNER:  To be candid, Your Honor, spent the

5   time trying to get to the courthouse.  And we had some

6   communications about briefing schedules, but I think that this

7   is one of those matters that there's just --

8          THE COURT:  The relief is so broad that it would

9   be -- I would be un -- I would be surprised.  I guess is that

10  also true, Mr. Gardner, there's not going to be any

11  accommodation here?

12          MR. GARDNER:  Your Honor, I think you put your

13  finger right on it.

14          THE COURT:  Okay.

15          MR. GARDNER:  I think the challenge is it is such

16  broad relief they're seeking that I wouldn't even know how to

17  go about discussing --

18          THE COURT:  We'll get to that.  Okay.

19          So I've read the papers.  And I -- I think, you

20  know, both the TRO and the motion for preliminary injunction

21  ask for equitable relief, injunctive relief, which is

22  extraordinary relief.  But it's not the same standard.  A TRO

23  is not just a more serious PI, it is -- it has -- there are

24  different criteria that have been met -- have to be met.

25  Especially, for a TRO that has to be literally imminent harm.

1    I use the example of the wrecking ball that's going to knock

2    down the building this afternoon if I don't order it not to.

3    That's the kind of emergency situation that a TRO is designed

4    for.

5            And so that's what I am concerned about after

6    reading the papers is, while this may be an -- and I'm not

7    making any kind of, you know, early ruling or this is not

8    meant to say what I believe the merits of the case are, but

9    while this may be a case for a preliminary injunction, I'm

10   trying -- I'm failing to see or having a hard time seeing

11   where you've met the imminent harm that warrants such

12   extraordinary relief.  Where's the -- in other words, if I

13   don't grant a TRO today, what's going to happen tomorrow that

14   you can't get through a motion for preliminary injunction in

15   the regular course?

16           MR. KIRSCHNER:  If you may, Your Honor, may I

17   address that?

18           THE COURT:  Yes.

19           MR. KIRSCHNER:  Two initial responses and then I can

20   elaborate.

21           THE COURT:  Okay.

22           MR. KIRSCHNER:  One is Elon Musk says the other team

23   does not work on the weekends.  We are about to enter a

24   weekend and he is a little wrecking ball of the Constitution

25   of federal government --

1          THE COURT:  Well, let's keep the rhetoric down and,

2    you know, the facts.

3          MR. KIRSCHNER:  But on -- but Your Honor --

4          THE COURT:  I work on the weekend and I'm sure you

5    work on the weekend.

6          MR. KIRSCHNER:  Yes.  But the reason I start with

7    those quotes is because what he does on the weekends is to get

8    into -- to take control of federal agencies and federal

9    processes.  And one of the things is access to important

10   databases.  One of the declarations we talked about is the New

11   Mexico Department of Workforce Solutions, the Nair

12   declaration, where there are approximately 85 contracts where

13   New Mexico provides bank account and other information.  We

14   don't know what's going on with the Department of Labor and

15   all these other agencies as he goes one by one by one.

16         And so the irreparable harm is the idea that --

17   what's urgent is that every minute, every day that goes by,

18   Elon Musk gets access to sensitive databases and he brags

19   about cutting government contracts and so forth.  And so when

20   I start with the quote about him working the weekends, is that

21   he is -- his rhetoric is pointing out the fact that he is

22   going to wreak havoc on the federal government in a way that

23   has a direct implication to the states.

24         THE COURT:  But the standard for a TRO is not bad

25   things could happen.  We don't know what's going to happen,

1    but some things could happen if we don't act immediately.

2    That's not the standard, am right?  Don't you have to point to

3    particular factual scenarios that will occur absent relief.

4    Not just it's bad, it's going to get worse, and it could get

5    bad even over the weekend.  I mean, that's -- is that the

6    level -- are there cases that allow that level of vagueness?

7         MR. KIRSCHNER:  Well, I wouldn't call it vague, Your

8    Honor.  I think that the idea of what we put in great detail

9    throughout the complaint is that agency by agency and the

10    action by action that he is doing.

11         THE COURT:  But in those dec- -- do any of those

12    declarations say tomorrow, this is going to happen tomorrow.

13    What I'm reading from the declarations is it's going to

14    happen.  It's bad.  And it's going to happen soon because

15    they're moving fast and, you know, they work weekends,

16    whatever.  But what I'm not hearing is, in the cases in which

17    I have issued temporary restraining orders, and I have in the

18    past, is literally we have hours, we have 24 hours before a

19    window is going to close or some irreversible action is going

20    to take place or something very bad is going to happen.  And

21    simply saying this is an urgent situation because these people

22    are, you know -- this is not my phrase, yours -- are just

23    running through the government, causing havoc wherever they

24    go, and we have to stop them now.  That's not really the TRO

25    standard; is it?

1        MR. KIRSCHNER:  Well, I'll give you one example,

2   Your Honor.

3        THE COURT:  Okay.

4        MR. KIRSCHNER:  Is there's another action involving

5   the Treasury.

6        THE COURT:  And I will say, let me interrupt you for

7   a minute, because my very, very efficient staff prepared me a

8   helpful chart.  And a lot of the things you are -- a lot of

9   the harms that you're talking about and the consequences of

10  these actions, quite a few of them have already been halted by

11  injunctive relief in different courts.  I mean, maybe not the

12  specific state agency in New Mexico that you're talking about

13  or in one of the specific plaintiff states, but there are TROs

14  in effect for USAID, for changes in the disbursement of public

15  funds by agencies.  There are TROs against accessing sensitive

16  and confidential agency data.  And there's a TRO pending

17  before Judge Moss on the same thing, on the data -- so there

18  are a lot of TROs partly pending or in effect that actually

19  provide at least some of the relief that -- for what you're

20  alleging.

21        MR. KIRSCHNER:  If I may, Your Honor -- sorry --

22        THE COURT:  It does sound like there's an echo

23  there, but -- it appears to be from our public line, which

24  appears to not be working.  So apologies to people who are

25  trying to hear this, but I think we're going to have to --

1    let's hang it up.

2            MR. KIRSCHNER:  So, Your Honor, two things, one is

3    to -- I want to address the other actions, but I also wanted

4    to, if I may, have the opportunity to use the example of one

5    of the -- one of those items, the factual illustration of what

6    can be happening over the weekend, the imminence of the harm.

7    On the other actions, there's two responses to that, one is

8    temporary restraining orders can be lifted at any time.  There

9    is -- it's common for courts to jump in in the middle of

10   multiple actions --

11           THE COURT:  But not without specific good cause.  I

12   mean, again, I've litigated some of these, I've presided over

13   some of these and they get -- you can't just do it as a -- to

14   keep something in -- to preserve the status quo with the

15   notion that, well, I can lift this at any time.  It's an

16   extraordinary remedy.

17           MR. KIRSCHNER:  Well, I know, but what I would say

18   is that both that there's not necessarily assurance with those

19   ones where there are overlap.  But as you mentioned yourself,

20   it's not a complete overlap.  There are other -- that Elon

21   Musk is going from agency to agency, and not all of his

22   actions are covered by those other actions.

23           THE COURT:  I mean, what you're essentially asking

24   me to do is to temporarily halt the workings of the

25   government, because it does appear right now that what you

1    allege in your complaint, that DOGE is carrying out, you know,

2    widespread agent -- you know, they're sort of going to agency

3    by agency and carrying out widespread actions that effect the

4    functioning of those agencies, you're asking me to kind of

5    shut down the government.

6         MR. KIRSCHNER:  Well, Your Honor, I would say, and I

7    apologize for the rhetoric, but I think that it what I'm

8    asking you to shut down is what I think is a constitutional

9    crisis of going back to the founders of a person who does not

10   have -- been properly appointed, has not proper

11   accountability.  And I'll get to the irreparable harm in a

12   moment, but on the merits, that we're asking you to shut down

13   what is a constitutional -- a wide constitutional violation

14   that we've not seen in this country.

15        THE COURT:  But and the relief that you're asking

16   for is extraordinary in itself.  And so I have to push you

17   here, because, you know, you may have -- you may have a, you

18   know, you may have -- your argument may be strong on the

19   merits, maybe.  But what you're asking me to do before I can

20   get there is extraordinary in itself, not just because it's

21   extraordinary as defined, you know, as a TRO always is, but

22   because you're asking -- I mean, if you just look at the order

23   that you're requesting, it's incredibly broad.  It would -- I

24   mean, it would bring government to a halt.  And so before I

25   can consider doing something like that, that may be a valid

1    request for preliminary injunction.  You're going to have to

2    tell me what's going to happen if I don't, like tomorrow.

3              MR. KIRSCHNER:  So, Your Honor, on the irreparable

4    harm and I want to get to the relief in a moment, is an

5    example from one of the other cases, and this shows kind of --

6    we found out from one of the declarations that was put forward

7    in the Treasury case, that one of Elon Musk's associates from

8    DOGE had access to the Treasury payment system and it was not

9    only limited to read only, that that person had ability to

10   change coding within the Treasury payment system for a

11   temporary period of time, which illustrates that these access

12   to the payment systems, using the example of New Mexico, is

13   that every minute, every day that they have access to it is a

14   threat of the integrity.  And going to the question of

15   relief --

16             THE COURT:  Let me stop you.  What -- so why

17   couldn't the state of New Mexico bring a motion for a TRO to

18   stop that from happening?  That is -- and would be required to

19   say it's going to happen in 24 hours or 48 hours or 72 hours

20   if you don't act.  That's more specific.  But I'm not sure you

21   can bootstrap certain isolated things that you might know that

22   are imminently -- you know, that are likely to happen

23   imminently and say because of those actions there are more

24   like them and you need to shut the whole thing down

25   immediately.  I mean, that's what you're asking me to do.

1          MR. KIRSCHNER:  Well, so that's what I was going to

2     get to, the relief, obviously, for the preliminary injunction

3     we seek all the parts in the restrain -- that we include in

4     our proposed order, but two items for purposes of immediacy,

5     for the TRO, that we think are more limited is to prevent,

6     enjoin Elon Musk's DOGE team, under the control of Elon Musk

7     having access to data systems within the federal government.

8          THE COURT:  That's -- I mean, that's just one of 11

9     things you've asked me to do.

10          MS. SAMANT:  Your Honor --

11          THE COURT:  -- making personnel decisions for agency

12     employees, for example, I mean --

13          MR. KIRSCHNER:  So that was the other thing.  So,

14     Your Honor, what I would say is we, obviously, for purposes of

15     the preliminary injunction seek the entire proposed order, but

16     for purposes to address the concerns that you've expressed

17     today, we would be -- we think that a more narrow purpose for

18     just purposes of the temporary restraining are two of these

19     items.

20          THE COURT:  Okay, because that's not what's in your

21     motion.

22          MR. KIRSCHNER:  No, I understand.  I understand but

23     I'm saying that what we would -- we believe all this would

24     be -- we think that we have support for everything that's in

25     our motion.  But to try to address in real time your concerns

1    expressed --

2            THE COURT:  What are the two?

3            MR. KIRSCHNER:  One is the access to the --

4            THE COURT:  I'm sorry it looks -- Ms. Samant --

5            MS. SAMANT:  Samant, my apologies, Your Honor.

6            THE COURT:  Do you -- you all are on the same side,

7    do you want the yield?

8            MS. SAMANT:  With due respect to my colleague, I

9    want to -- I apologize for the Zoom interruption challenge,

10   but --

11           THE COURT:  Uh-oh, looks like you're frozen, like

12   what you're asking me to do.

13           I don't know if the parties can hear me -- oh no,

14   now we've lost the video feed.  Why don't you try -- do you

15   want to consult with your co-counsel before we go on further,

16   since I think she is about to tackle you.

17           All right.  Let's pass this for five minutes.

18   Tiffany, see if you can get her on the phone and then we can

19   resume.  Bear with us, we've been having internet issues all

20   morning.

21           (A recess was taken from 4:27 p.m. to 4:42 p.m.)

22           THE COURT:  All right.  Back on the record.  And we

23   have connection.  Ms. Samant.

24           MS. SAMANT:  Thank you, Your Honor.  So you had

25   asked prior to the break for some examples of imminent

1    concrete harm.  And I wanted to point out a few things that

2    are addressed in our order -- rather in our motion.  No. 1, I

3    wanted to point out that the executive order issued earlier

4    this week authorizes DOGE to essentially have veto power over

5    hiring decisions when it comes to -- hiring decisions that

6    could be -- that would be made by principal officers,

7    individuals who are higher up in the agency.  This is an

8    authority that they just should not and do not have in their

9    current position, whether it's DOGE the entity or Mr. Musk.

10            I recognize you're also asking about imminent harm.

11   I did just want to quickly address this piece.  You know, on

12   the standing to even address the nature of that harm, the D.C.

13   Court of Appeals has also noted that, you know, just the --

14   that we have a much lighter burden when it comes to alleged

15   violation of the separation of -- I'm sorry, when an alleged

16   violation of the Appointments Clause.

17            But separately, to your other point -- question is,

18   I wanted to point out, give you the example of the Department

19   of Labor.  We already know that DOGE and Musk have gone into

20   the Department, have been granted, or at least obtained access

21   I should say, to HR files as well as contract information.  We

22   know, and they have made public, that one of the ways that

23   Musk and DOGE intend to identify how to down size is by

24   looking at exactly this kind of data.

25            I would also argue that to the extent that the

1    defendants have not clearly identified what this person who's

2    exercising, again, authority unlike anyone else, unlike

3    someone who is an advisor to the White House, the fact that

4    they haven't actually explained the scope of this person's

5    authority really shouldn't be -- go to their benefit.  Right.

6            But coming back, again, to the Department of Labor.

7    We know they have access to this information.  We know that

8    they've made clear that accessing that information, running it

9    through perhaps an algorithm is how they're going to identify

10   how to make staff cuts and where to cut budgets.  New Mexico's

11   Workforce Solutions, we have contracts outstanding with

12   Department of Labor.  And in her declaration Ms. Nair also

13   talks about how not just funding cuts, but staffing cuts in

14   the Department of Labor would cause us immediate harm in the

15   sense of we get regulatory advice from them.  We get advice on

16   how to run programs, and then also just the administration of

17   these programs, you know, we don't do this by ourselves.  Any

18   cuts that are made there will be felt immediately.

19           The problem, of course, is, and I understand your

20   question about what is the immediate nature of the harm.  And

21   we -- it is a challenge for us to point out, but I mean as my

22   colleague pointed out, you know, changes are happening by the

23   hour.  I think shortly before this hearing started we received

24   public reports of, No. 1, on the data point that on the DOGE

25   website there's been classified information about a U.S.

1    intelligence agency, regarding the size of its staff and

2    identities that's been posted publicly, right --

3         THE COURT:  Well, see, Ms. Samant, let me just stop

4    you for a minute.  And that is what a TRO is here for.  In

5    other words, I have had TROs, a TRO you run into court or get

6    on the phone at whatever their time and say this is about to

7    happen and if the Court doesn't grant -- doesn't enjoin it,

8    it's going to happen, we won't be able to reverse it, bad

9    things are going to happen, people's identities are going to

10   be revealed and lives are at stake.  That's what you do.

11   That's what you show for a TRO.  That's why we're here.

12        This situation you're describing so far sounds like

13   a situation that may be appropriate for either a preliminary

14   injunction or generalized request for injunctive relief,

15   because when you start using words like "perhaps" or "may,"

16   you're coming out of imminent harm and going to issues of

17   foreseeability.  And that's -- in other words, I don't doubt

18   that there are -- that your position that there are agencies

19   that, you know, may be in your state that are going to be

20   affected.

21        My question is what is the nature of the harm, how

22   imminent it is, how realistic it is that it's going to happen,

23   you know, within the next 72 hours.  And even the Department

24   of Labor situation that you're talking about, again, we don't

25   know.  I mean, the other thing I noted during the break is

1    that for some of the relief -- and I don't know the two things

2    you were going to get into before Ms. Samant started

3    speaking -- but for quite a few of the things that you're

4    asking for, they're already being dealt with in other matters.

5              It seems like if I were to grant you the relief

6    you're asking for in your motion, all 11 requests, not only

7    would it functionally grind the workings of government to a

8    halt is what it seems, but it would be, there are several

9    other actions that are pending in other courts that are

10   already addressing these things.  Is this just an umbrella

11   case, I mean --

12             MS. SAMANT:  To address that point, you mentioned

13   the order that's been issued with respect to access to the

14   Treasury Department's finance system.  The order that has been

15   entered there is limited to No. 1, BFS, accessing BFS within

16   Department of Treasury, right.  It is not about another

17   agency -- any other agency.  And also I would clarify that,

18   you know, we're not -- absolutely not seeking to grind the

19   government to a halt.  We're specifically trying to stop the

20   conduct of DOGE and Mr. Musk, right.  Stopping them from going

21   in and actually disrupting the daily functioning of our

22   federal agencies is a very different thing.

23             THE COURT:  Yes.

24             MS. SAMANT:  They're going in -- and also I did want

25   to address the other point with the case regarding the

1    Department of Treasury.  To the extent that that order is also

2    directed towards protecting classified -- or rather I should

3    say, sensitive information, state's proprietary data, that

4    type of -- first of all, that order is not in place with

5    respect to other agencies.  And Department of Labor, this is

6    in our affidavit, has access -- or has our state's bank

7    account information, financial information.  So that TRO will

8    not impact their ability to take action or they may already

9    have access to, which is part of the problem, which is why

10   part of what we're seeking is an explanation of exactly what

11   they've done with the confidential or at least data that they

12   do not have authorized access to.

13          THE COURT:  See that's the problem, a TRO does not

14   generally ask for an explanation.  A TRO literally says stop.

15   Stop right now.  Give us a minute to breathe and get-- you

16   know, to gather, figure out what's going on here and preserve

17   the status quo and examine -- you know, that's what a TRO

18   says.  A TRO is not intended to say, tell us what is it you're

19   doing here, give us the contours of your authority and tell us

20   what you're planning to do and when.  That's not a TRO.

21          MS. SAMANT:  And we're absolutely open to, you know,

22   modifying our TRO request as the judge deems appropriate.

23          I would also just flag, in terms of irreparable

24   harm, and this is something we also talk about in our motion

25   this morning and memorandum of law, is that as you mentioned,

1    you know, contracts, contracts might be broken.  Right.  One

2    of the issues there is that this is also irreparable harm.  We

3    can't sue the federal government to get that money back,

4    anyone -- any of the state --

5            THE COURT:  But you can bring an action for a TRO

6    when they say we're going to break this contract.  You can

7    come in here and say, the federal government says they're not

8    going to honor the contract they have with us and that

9    contract is up tomorrow and services aren't going to be

10    delivered, please stop.  That might be, just saying

11    hypothetically speaking, that might be appropriate for a TRO.

12    But this broad relief that you're asking for, I just don't see

13    it.  Yes?

14            MR. KIRSCHNER:  Your Honor, if I may?

15            THE COURT:  You may.

16            MR. KIRSCHNER:  Thank you.  So I wanted to come back

17    to the two items to address for relief, for purposes of the

18    urgency and what you have talked about today, about what is

19    narrow and also what can get to what is imminent.  And the two

20    items, and I can explain each of them, is to not have the DOGE

21    personnel under the auspices of Elon Musk to have access to

22    the computer data systems.  And the second one is to not make

23    personnel decisions as referenced about the executive order

24    during just the immediate few days, couple weeks, whatever it

25    is to brief the preliminary injunction motion.

1           And this is very limited, because the computer

2    systems is that like through time immemorial that there's been

3    a process for accessing these systems.  So there isn't

4    anything that there isn't -- it's not grinding the government

5    to a halt.

6           THE COURT:  Are you asking -- I'm sorry, are you

7    asking for that with regard to every federal agency.

8           MR. KIRSCHNER:  For Elon Musk, because of his

9    violation of the Appointment Clause, for the DOGE team in

10   violation of the statute, for Elon Musk and the DOGE team to

11   not have access during the TRO to federal government data

12   systems.  The -- still the regular personnel in the

13   different -- the Department of Labor, the folks who have had

14   access for it, the political appointees, to the extent that's

15   appropriate, that we're saying that the DOGE personnel, the

16   people who are under the power of Elon Musk do not have access

17   to the systems.  And this goes back to the imminence of the

18   harm.

19          THE COURT:  But the problem is, and look, I -- in my

20   questioning I don't intend to communicate how I feel one way

21   or the other about the merits of your position, but there are

22   rules --

23          MR. KIRSCHNER:  Yeah.

24          THE COURT:  -- and standards.  And don't you have to

25   be able to proffer to me that absent a TRO, tomorrow or Sunday

1    or Monday, DOGE officials are going to walk into every single

2    agency -- because you're asking me to do with regard to every

3    single agency -- gain access to the data, to the Agency's

4    data, and in a way that is going to cause irreparable harm,

5    not just that you're going to gain the access but their

6    gaining the access is going to be -- why can't I say if you

7    get access to data you can't use it?  Why isn't there a more

8    tailored remedy here?

9              MR. KIRSCHNER:  For a couple reasons.  First of all,

10    the injunction is not against all federal agencies, the

11    injunction is against Musk and the DOGE team.

12              THE COURT:  Right.  But from access -- from going

13    into, I mean, my understanding is by the allegations in your

14    complaint that they're going to do this government-wide.

15    You're asking me to say DOGE officials, you cannot go into any

16    federal agency and access the data that they have for right

17    now.

18              MR. KIRSCHNER:  For just the immediate future of

19    this -- for purposes of the TRO to have then briefing on the

20    preliminary injunction because --

21              THE COURT:  You're using those terms interchangeably

22    and that's a problem.

23              MR. KIRSCHNER:  I didn't mean -- sorry, Your Honor,

24    I did not mean --

25              THE COURT:  Instead of TRO you're saying

preliminary --

MR. KIRSCHNER:  I meant for purposes in anticipation of a preliminary --

THE COURT:  But if I grant a TRO for purposes of assessing the preliminary injunction, again, I'm saying stop.

MR. KIRSCHNER:  Yeah.

THE COURT:  What am I saying stop to?  I'm saying -- what you're asking me to say is don't even think about it and that's different from saying stop.

MR. KIRSCHNER:  I'm saying don't access the stuff because we know, the example of folks being on websites, we know from the example in Treasury that individuals who were supposed to have read-only ended up having broader than read-only.  We know from the declaration that New Mexico has given to the Department of Labor, proprietary information that is at risk.  The point is that the integrity of these data systems are at risk, under our theory, that they are at risk every moment Elon Musk's folks have access to them.  Because they don't understand these -- they don't understand these systems.  They don't necessarily have all the security personnel for those systems.

So all we're saying is you use -- you said a minute to take a breath.  And we're asking can we take a breath, a moment to take a breath, for us to go forward in this action,

1   for them to not have access to a computer systems just for

2   temporary period so that you can consider the weighty issues

3   that are in our brief.

4           THE COURT:  Isn't that what Judge Moss has already

5   been asked to do today?  His case involves the data system.

6           MR. KIRSCHNER:  I think -- I apologize, I do not

7   know.

8           THE COURT:  There's so many.

9           MR. KIRSCHNER:  I thought that was just the

10  Department of Education.  I'm not entirely sure that that was

11  the -- was other systems.  And that the Wall Street Journal

12  reported that Elon Musk has access to CMS --

13          THE COURT:  But I can't -- you can't come in here

14  and ask me for incredibly serious and extraordinary relief

15  based on what the Wall Street Journal or any other media

16  organization is representing, because, you know, the rhetoric

17  is out there.

18          MR. KIRSCHNER:  That's my point.  Well, first of

19  all, Elon Musk has said it himself.  So we don't have to rely

20  on the news reports.  Our point is that this is very limited

21  relief to just say -- it's aimed at Musk and DOGE, that the

22  integrity of the federal data systems are at risk and in a way

23  that causes us irreparable harm, because the integrity is at

24  risk and if there's any mistake we can't get that back.  If

25  all of our -- if our proprietary information for New Mexico,

1    for the Department of Labor, gets compromised, it is

2    compromised.

3            THE COURT:  But why isn't it -- but what you're

4    saying is that I should tell DOGE and its officials to stop

5    doing what they're doing, because we don't know what they're

6    doing.  And that is not quite what you're -- because what

7    they're doing could be bad.  It could result in the access to

8    data.  It could result in the dissemination of data.  And that

9    is not specific enough, as I see it, based on what I'm seeing,

10   to grant a TRO.  It may be specific enough to warrant

11   injunctive relief down the line.  But to say it has to stop

12   right now because we don't know enough about what they're

13   doing with it and we hear they're doing bad things with it.

14           MR. KIRSCHNER:  Well, we know that the integrity of

15   the system is -- based on --

16           THE COURT:  So why wouldn't your request for a TRO

17   simply just need to say you can't disclose this data, you have

18   to keep it safe, you have to, you know, not disclose it.  If

19   you don't there's sanctions and there are consequences.  But

20   isn't it too broad to simply say you can't access it at all?

21   I mean, I don't know if there are legitimate reasons for doing

22   it, based on your constitutional argument they're not supposed

23   to be doing it at all, it's in excess of their authority.

24           MR. KIRSCHNER:  So we would -- I mean, obviously, if

25   you think it's better to craft it to say they can't disclose

```
 1    it or --
 2              THE COURT:  My problem is I'm having a hard time
 3    envisioning what an order would look like here.
 4              MR. KIRSCHNER:  An order is that --
 5              THE COURT:  It wouldn't be these 11 --
 6              MR. KIRSCHNER:  No, I understand.  The order would
 7    be that Elon Musk and the personnel who work in DOGE cannot
 8    have access -- are enjoined from access to federal data
 9    systems outside of DOGE during the pendency of the TRO.
10              THE COURT:  There are no federal data systems inside
11    of DOGE.
12              MR. KIRSCHNER:  I was just -- I mean, I was doing --
13    they do not have -- that Elon Musk and the personnel
14    associated with DOGE do not have access to federal data
15    systems pending -- during the TRO.  That to me is concrete.
16    It's narrow.  And it's about the integrity of the system that
17    causes irreparable harm if any of that integrity is
18    compromised.  To me that is a more narrow injunction than to
19    say not to disclose it and so forth, because then you're
20    starting to police the questions vis-a-vis how they're using
21    the systems.  One of the points of the status quo, as you said
22    is to take a breath, but it's to preserve the status quo.  And
23    to preserve the status quo is to ensure the integrity of these
24    important federal data systems that are at risk for the states
25    and for the residents of our states.
```

1          THE COURT:  Well, Judge Moss's case is specific to

2    the Department of Education.  Judge Bates's case is specific

3    to the Department of Labor.  But what you're asking for is

4    something much broader.  And for example -- what state do you

5    represent?

6          MR. KIRSCHNER:  Maryland.

7          THE COURT:  Okay.  There's a case in Maryland

8    already on this.  But in the case of Maryland, what can

9    Maryland point to -- which federal agency specifically

10   would -- if DOGE has access to its data would affect the state

11   of Maryland?

12         MR. KIRSCHNER:  The NIH, which is within Maryland

13   and there's federal grants that are managed by NIH.

14         THE COURT:  What information do you have that in the

15   next 72 hours DOGE is going to be accessing NIH data, other

16   than, you know, they want to move fast and they work on

17   weekends.

18         MR. KIRSCHNER:  Your Honor, I hesitate to -- that

19   I've not been able to verify whistle blower information, but

20   we have reasons -- so I say this with a massive caveat.  I do

21   not want to make representations, but that there are reasons

22   to believe of having access to the NIH system.  Now, I say

23   that with a massive caveat, I don't want to --

24         THE COURT:  Right.  I'm not going to hold you to it.

25   So, I mean, I guess why is this not a preliminary injunction

1   case?  Why is it a TRO and not a preliminary injunction,

2   because your burden is a lot lower?

3           MR. KIRSCHNER:  Yes, Your Honor, it's both.  It's

4   both.

5           THE COURT:  You want a TRO in support of your

6   preliminary injunction, but why aren't you just coming in here

7   asking for a preliminary injunction without the extraordinary

8   step of a TRO?

9           MR. KIRSCHNER:  To preserve the integrity of the

10  federal data systems.  To preserve the integrity.  And then

11  the other thing, if I may, Your Honor, the second item I was

12  going to say is to enjoin DOGE from using their powers of

13  the -- a violation of the Appointment Clause to make personnel

14  decisions pursuant to the Executive Order.  That we don't have

15  to guess what's going on.  That's already in an executive

16  order.  And one of the things about that Executive Order is

17  the only one who could overrule the DOGE team in the Executive

18  Order is the Agency head, which means that a deputy secretary

19  confirmed by the Senate, principal officer, with the DOGE team

20  above those individuals.

21          Both I guess as to the constitutional violation and

22  we deal with a lot of federal state partnerships.  One of the

23  things we're finding in the states is that we are having

24  trouble coordinating and communicating on certain things with

25  the federal government.  And to enjoin the, again, the

1  constitutional -- because of the constitutional violation to

2  enjoin DOGE, Musk and the DOGE team, from being involved in

3  federal -- making federal personnel decisions for agency

4  employees which is Subsection F in all prayerful relief.

5          THE COURT:  For every federal agency.

6          MR. KIRSCHNER:  But the injunction is running

7  against Musk and DOGE.

8          THE COURT:  I understand, but you're asking me to

9  enjoin them from this action, personnel action and the data

10 access to every federal agency.

11         MR. KIRSCHNER:  Yes, because that is his operation

12 as a principal officer going around from agency to agency.

13 Now if he's not touching certain agencies, then the TRO won't

14 matter.

15         THE COURT:  That's -- I can't give prophylactic

16 TROs.

17         MR. KIRSCHNER:  It's not prophylactic.  This goes

18 back -- and I understand the rhetoric, but goes back to his

19 point about working every -- about working the weekends.

20 Because the reason is that the injury is any minute now and

21 it's happening already.  It's already happening because

22 they've already compromised the federal data systems and

23 they're already grinding -- talking about grinding the

24 government to a halt, they've already grinded the government

25 to a halt with federal personnel decisions.

1          Now, if there are principle officers in those

2    agencies making decisions about personnel or the principal

3    officers in those agencies who are involved in the data

4    systems, our complaint does not go to that.

5          THE COURT:  How does it -- how do the personnel

6    decisions establish irreparable harm?  The personnel decisions

7    can be challenged in court, as they are in this court, several

8    of them.  And people can be reinstated, back pay can be

9    ordered.  These aren't irreversible things.  We have class

10   action in front of one of my colleagues now for certain

11   employees who were fired.  They can get their jobs back if the

12   Court determines that they were illegally fired.  How is

13   that -- how does that merit injunctive relief if it's not

14   irreparable.

15         MR. KIRSCHNER:  Because the coordination of

16   federal-state relationships.  So when an entire agency is put

17   on administrative leave, we cannot do the coordination, we

18   cannot get our money, we cannot do our contracts, because we

19   do not have a partner on the other end of the phone.  So --

20         THE COURT:  That's only happened in, with regard to

21   maybe USAID.  That's not happening agency-wide, is it?  I'm

22   just saying accord is not going to get you there.

23         MR. KIRSCHNER:  Well, there's discussions of USAID,

24   there's discussions of CFPB, there's discussions of cutting of

25   contracts with Department of Education, but beyond the

1    personnel question.  And so there are -- it is more than just

2    USAID when it comes -- all we're -- what we're asking for, I

3    think, is quite narrow, in the sense that the injunction is

4    only running against Musk and the DOGE team, it's not running

5    against the federal government.  It's not grinding the federal

6    government to a halt.  It's asking for two things, for a very

7    limited time of the TRO for them to not access data systems

8    that they can compromise, and for them not to be involved in

9    personnel decisions that can compromise our ability in our

10   very important federal-state relationships that we have

11   billions of dollars, each state, at risk with coordinating

12   these relationships.

13          THE COURT:  I want you to file a proposed -- a

14   proposed order by 5:00 o'clock tomorrow, because I'd like to

15   see how this -- I mean, I'm still sitting here pondering the

16   parameters of such an order and the language, you know, what

17   specifically you're asking me to do.  But just so I can see

18   it.

19          I'll hear from the government.  Thank you.

20          MR. GRAVER:  Thank you, Your Honor.  Harry Graver

21   for the United States.  I don't have, I think, much to add,

22   except I want to pause a little bit on the irreparable harm,

23   imminent harm piece.  The only thing I add is not just unique

24   imminent harm to get a TRO, you need imminent harm linked to

25   your legal theory.  And I think the point you're emphasizing

1    what do we do about these other cases reveals a more

2    fundamental and important point.  The data access cases a lot

3    of your colleagues have, they're in different circuits as

4    well, the states are also litigating that in SDNY, I think it

5    shows that when you have specific imminent, concretized

6    concerns, TROs are available to address certain problems.  So

7    for instance there are data access TROs, there are personnel

8    related TROs.

9            THE COURT:  I mean, and my colleagues in other

10   districts have granted TROs with regard to access to certain

11   data.  So there has been, you know, imminent harm --

12   irreparable imminent harm shown to warrant those TROs.  So

13   it's not all theoretical here.

14           MR. GRAVER:  I think what the basic point is it's a

15   very different kettle of fish in that it's not an Appointments

16   Clause challenge, need irreparable tracing from the legal

17   violation that you've identified.  In all of those cases,

18   again, including the ones that my friends filed in SDNY, no

19   one's talking about the appointment --

20           THE COURT:  I mean, at least in the preliminary

21   injunction context there's case law that says that a

22   constitutional violation can -- in certain contexts can

23   constitute irreparable harm.  So it's a different posture than

24   those cases.

25           MR. GRAVER:  I think so.  Our friend, I think,

1    mentions sort of that there's a looser standard, can have an

2    attenuated harm when it comes to Appointments Clause.  I think

3    that's not exactly what we're talking about here.

4             THE COURT:  Well, they made a constitutional

5    argument.

6             MR. GRAVER:  I understand.  I think what that means

7    in those cases is that, for instance, an improperly insulated

8    ALJ.  When an ALJ makes a decision, the rationale there is

9    yes, maybe the president of the United States wasn't going to

10   remove you, wasn't going to supervise that.  But the harm from

11   that here and now injury that comes from the separation of

12   powers thing --

13            THE COURT:  That's a little bit different.

14            MR. GRAVER:  No, but I'm just saying from your

15   talking about --

16            THE COURT:  In other words, what the plaintiffs are

17   asserting is, you know, if they're correct, and if Mr. Musk

18   has been -- if they have a valid Appointments Clause argument,

19   and Mr. Musk and DOGE, this agency are operating outside of

20   their authority in a very wide ranging fashion.  Then, you

21   know, they certainly may establish some irreparable harm.  And

22   certainly that constitute -- that level of constitutional

23   violation, if it is continuing, cases have said is sufficient

24   to establish irreparable harm.  My focus here is the -- you

25   requested a TRO.  But I'm in no way intend to, you know, to

1    suggest that they don't have an Appointments Clause argument.

2    Just we're here on a hearing on a TRO.

3         MR. GRAVER:  I take no issue with any part of that.

4    I think the basic question you asked before is why is this not

5    a PI case and I don't have a good answer to that.

6         THE COURT:  Well, let me, since I have you up here,

7    though, let me ask you, the concern that plaintiffs have hit

8    upon is sort of the -- how shall I put it, the sort of

9    lightning strike aspect to DOGE's activities, and that they

10   sort of -- I think what plaintiffs are saying they sort of

11   roll up on an agency and start accessing data and firing

12   people and canceling contracts left and right in a way that is

13   random, unprecedented, and likely to cause a serious

14   dislocation and problems for states that have contracts with

15   these agencies.  And one of the reasons that I guess the

16   broadness is because there's no predicting how this agency's

17   going to act.  And it could happen on a Saturday night or a

18   Sunday morning or a federal holiday.

19        So why shouldn't I take seriously their request to

20   just say, stop, at least with regard to these two particular

21   areas, personnel and access to data, just don't do anything

22   until we brief the request for preliminary injunction.

23        MR. GRAVER:  Right.  I think that the --

24        THE COURT:  And tell me how the government would be

25   prejudiced by that.

1    MR. GRAVER:  Well, I think it's prejudiced because

2  it's the proper workings of the government being allowed --

3  it's shifting of the burden --

4    THE COURT:  No, to say it's the proper workings of

5  the government effected, what plaintiffs have said is these

6  are not proper workings of the government.

7    MR. GRAVER:  But I think the point of stop

8  everything until we figure out what's going on, as you picked

9  up in your question with my friend, that's going to sweep in a

10  tremendous amount of, even on their theory, lawful conduct.

11  So I think that's the key part is when we're sort of figuring

12  this out a little bit on the fly, it's inevitably exceeding --

13    THE COURT:  Well, except, you know, the conduct

14  they're talking about does not go to the functioning of the

15  agencies, it goes to things like accessing the data, deciding

16  to end contracts.  I mean, a federal agency can continue

17  carrying out its functions, even with a TRO in place, because

18  it would be limited to DOGE's ability to make certain changes

19  within those agencies, but that order would not go to the

20  functioning of the agency.  It would still be able to carry

21  out its contracts, deal with -- you know, continue with what

22  it's supposed to do in it's charter for Congress.  All it

23  would say is that this particular -- it's not even, DOGE isn't

24  even an agency --

25    MR. GRAVER:  Right.

1          THE COURT:  -- but this particular entity can't come

2     in and start making changes right now till I, you know, till I

3     address the question of the constitutionality of the entity.

4          MR. GRAVER:  Right.  So I think that --

5          THE COURT:  How would the government be prejudiced

6     by that, other than we're not getting to do what we want to do

7     as fast as we want to do it?

8          MR. GRAVER:  Right.  Well, I think that the

9     prejudice would come from striking too broadly.  What I want

10    to say with the data access point I think it's important to

11    sort of concretize it.  And maybe I can point the Court to at

12    least one of the declarations that was filed recently.

13         THE COURT:  Sure.

14         MR. GRAVER:  This in a related case before, I think,

15    Judge Boasberg, the AFL-CIO 1:25-CV-339.  And it's a

16    declaration explaining how this data access and the like is

17    working.

18         THE COURT:  Is this one of the cases -- it's not a

19    TRO case, it's not involving DOGE, is it?

20         MR. GRAVER:  Admittedly -- it is involving DOGE.

21         THE COURT:  But it's not an injunctive relief case,

22    because last time I checked I don't think Judge Boasberg had

23    one, but that changes by the hour in this courthouse.

24         MR. GRAVER:  I will double check on that, because at

25    a minimum there was a declaration filed last night walking

1    this through.  What I think is the key point there is just

2    much of the work that's happening with data access and, again,

3    this is the difficult part of sort of doing this on the fly, a

4    lot of the data access instances flow nothing from DOGE,

5    involves detailed federal employees who are operating pursuant

6    to a executive order from the president himself.  And I think

7    when you're talking about prejudice, where do we get into an

8    issue here, I think when it's --

9            THE COURT:  But that wouldn't be affected.  In other

10   words, if federal officials within the Agency are accessing

11   data as part of the functioning of the agency and not under

12   the direction or order of DOGE, it doesn't run afoul of an

13   order.  It's not encompassed by it.  What the plaintiffs are

14   asking for is preventing DOGE officials from accessing those

15   federal agencies.

16           MR. GRAVER:  So I think then we get to the more

17   fundamental point, the question is does the prospect of

18   unauthorized access, standing alone, render you imminent harm

19   that justifies --

20           THE COURT:  Well, I don't know, because the -- it's

21   Judge Bates, not Judge Boasberg.  Judge Boasberg is my chief

22   judge so I'm not going to mix them up.

23           That's the problem, you know, the once personal --

24   or once financial and other confidential data is made public,

25   you can't unring that bell.  You can't get it back.  There is

1    a world of dangerousness in that sort of information being

2    taken and, you know, and made public or used in improper ways.

3    And so the use of private data, and confidential data and

4    agency data.  I mean, some of the Department of Labor, as you

5    might imagine, Department of Education, as you might imagine,

6    has a large amount of data that is incredibly confidential and

7    should not be in the public domain, and should not be in the

8    hands of people who may or may not be legally entitled to

9    access it.  So I think that is a big problem.  And that's one

10   of the reasons TROs have been issued in these cases.  My

11   problem is this one is a little broad.

12        MR. GRAVER:  Yeah, I think, for at least immediate

13   purposes I think the breadth is the key point.  In all of

14   those cases you have concretized disputes.  You know the

15   agencies you're dealing with.  You know their relationship

16   with DOGE.  You know the state's actual concrete harm that

17   might flow from any unauthorized access and the like.  Here,

18   again, we're sort of just figuring that out on the fly for

19   every single conceivable agency and whatever relationship they

20   might have with DOGE.

21        The prejudice to the government, again, is that each

22   relationship with an agency may well be different, there might

23   be different statutory schemes implicated.  Sometimes the

24   states may be involved, sometimes not.  But when you paint

25   with a broad brush like this and you pull DOGE back from

1  agencies --

2           THE COURT:  One of the reasons plaintiffs are

3  painting with a broad brush, as I mentioned before, is the

4  simple unpredictability with which we are dealing with right

5  now.  That there's not an organized, as far as plaintiffs have

6  asserted, or readily predictable schedule for what is going

7  on.  And what -- so, therefore, what they're asking is don't

8  do anything till our Appointments Clause argument has been

9  heard and ruled on, because if you start coming in and

10 accessing data and doing God knows what with it, we can't

11 unring that bell.  Personnel decisions, you know, is a

12 different category.  But when it comes to access for data, I

13 think the concern is really that once you start accessing that

14 material and disclosing that material, you can't get it

15 back.

16          MR. GRAVER:  Right.

17          THE COURT:  And the harm is irreparable.

18          MR. GRAVER:  I understand the intuition, I think

19 it's just a very hard fit with a TRO that requires specific

20 imminent harm.  The rationale of, hey, you've been doing a lot

21 so let's shut down it all.

22          THE COURT:  Well, what about the rationale of you've

23 been doing it and you've been stopped from doing it in all of

24 these agencies, stop doing it, you know, government-wide, so

25 we can determine whether you're legally allowed to do it.

1          MR. GRAVER:  Because I think for every single time a

2     Federal Court enjoins the executive branch from doing X, you

3     need a legal, at least, line that you've crossed.  And I think

4     just saying, hey, I'm worried about these things over here so

5     stop it everywhere, that's I think too heavy a lift,

6     especially on a TRO posture.

7          THE COURT:  All right.  Anything else?  You're the

8     movant, you get a rebuttal.

9          MR. KIRSCHNER:  Okay.  Thank you, Your Honor.  I was

10    a little concerned to take up too much of your time.

11         THE COURT:  Oh, it's Friday on the romance

12    industrial complex day, so we don't have anywhere else to

13    go.

14         MR. KIRSCHNER:  Your Honor, I just wanted to pick up

15    on a couple things that you said, which one is the kind of --

16    we're playing kind of whack-a-mole here.  And that's the

17    imminent -- that's the irreparable harm.  We don't know where

18    we're next whack -- where we're going to try to --

19         THE COURT:  See, again, every time you say we don't

20    know, you're walking right into the government's argument,

21    which is you don't get a TRO for we don't -- bad things could

22    happen, we just don't know.  That's the problem.

23         MR. KIRSCHNER:  We do know bad things have

24    happened.

25         THE COURT:  Yes.

1          MR. KIRSCHNER:  That's what I'm trying to say.  We

2     know bad things are happening and --

3          THE COURT:  And you've been able to -- your other

4     lawyers, other plaintiffs have been able to come into court

5     and get it stopped.  So what I'm -- my position to you is why

6     can't you continue -- why can't you do that as a

7     representative of the Attorney General's Office for the state

8     of Maryland, why can't you come in and say NIH -- you know,

9     DOGE agents are about to access NIH data, we need a temporary

10    restraining order to stop that.  That's much more specific

11    and, you know, clear cut and possibly irreparable and imminent

12    if you tell me it's going to happen with this one agency.  But

13    if you just tell me all over the country it's happening

14    Department of Defense, I mean, Department of the Interior, I

15    don't know.

16         MR. KIRSCHNER:  Because once it's compromised, we

17    can't go back.

18         THE COURT:  I don't disagree, especially in terms of

19    the data access.

20         MR. KIRSCHNER:  And that's the point.  The point is

21    picking up on the other point, agency personnel can access the

22    data, there's nothing -- this isn't grinding it to a halt,

23    we're just asking for a -- and, again, I keep on emphasizing

24    the time limitation of a TRO.  A TRO is time limited, that's

25    one of the most critical features of a TRO.  We're just asking

1    for the time limitation of a TRO to put a stop order on the

2    access to this data for us to then be able to have you fully

3    consider a preliminary injunction.

4              THE COURT:  All right.  And you will file that

5    proposed order by 5:00 p.m. tomorrow?

6              MR. KIRSCHNER:  Yes, Your Honor.

7              THE COURT:  All right.  Thank you.

8              Thank you all.  I didn't mean to be flip, I do

9    appreciate you all being here, you know, on a Friday before a

10   long weekend, but that's what happens when these things get

11   filed on a Friday before a long weekend.

12             Thank you all.  I will rule in due course.

13             (The proceedings were concluded at 5:20 p.m.)

14

15             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
16   record of proceedings in the above-entitled matter.

                      _____/s/_____
17                            Christine T. Asif
                         Official Court Reporter
18

19

20

21

22

23

24

25

< 0 >.
00 33:14,
  44:5.
.
.
< 1 >.
1 4:11, 17:2,
  18:24,
  20:15.
10-1 4:14.
11 5:13, 15:8,
  20:6, 28:5.
1100 2:9.
14 4:6.
1: 38:15.
.
.
< 2 >.
2 4:17.
20 44:13.
200 1:43.
20001 2:44.
20005 2:10.
2005 1:34.
202 2:45.
2025 1:11.
21202 1:44.
24 10:18,
  14:19.
25-0429-TSC
  1:6.
25-429 3:3.
25-CV-00462
  5:19.
25-CV-339
  38:15.
27 16:21.
.
.
< 3 >.
3 4:14.
333 2:43.
354-3247
  2:45.
.
.

< 4 >.
4 16:21.
408 1:29.
42 16:21.
48 14:19.
4:06 p.m.
  1:13.
.
.
.
< 5 >.
5 33:14, 44:5,
  44:13.
.
.
< 6 >.
6 5:4.
.
.
< 7 >.
72 14:19,
  19:23,
  29:15.
.
.
< 8 >.
85 9:12.
85004 1:35.
87501 1:30.
_____/s/____
_____
  44:19.
.
.
< A >.
ability 14:9,
  21:8, 33:9,
  37:18.
able 19:8,
  23:25, 29:19,
  37:20, 43:3,
  43:4, 44:2.
above 30:20.
above-entitled
  44:17.
absent 5:10,
  10:3,
  23:25.
absolutely
  20:18,
  21:21.

accessing
  11:15, 18:8,
  20:15, 23:3,
  29:15, 36:11,
  37:15, 39:10,
  39:14, 41:10,
  41:13.
accommodation
  6:23, 7:11.
accord 32:22.
account 9:13,
  21:7.
accountability
  13:11.
act 10:1,
  14:20,
  36:17.
action 3:3,
  4:15, 10:10,
  10:19, 11:4,
  21:8, 22:5,
  25:25, 31:9,
  32:10.
actions 5:3,
  11:10, 12:3,
  12:7, 12:10,
  12:22, 13:3,
  14:23,
  20:9.
activities
  36:9.
actual 40:16.
actually 11:18,
  18:4,
  20:21.
Adam 1:41,
  3:7.
add 6:19,
  33:21,
  33:23.
address 4:13,
  8:17, 12:3,
  15:16, 15:25,
  17:11, 17:12,
  20:12, 20:25,
  22:17, 34:6,
  38:3.
addressed
  17:2.
addressing

20:10.
administerial
  3:25.
administration
  18:16.
administrative
  32:17.
Admittedly
  38:20.
advice 18:15.
advisor 18:3.
affect 29:10.
affected 19:20,
  39:9.
affidavit
  21:6.
AFL-CIO
  38:15.
afoul 39:12.
afternoon 3:2,
  3:7, 3:10,
  3:11, 3:14,
  3:16, 3:23,
  8:2.
agencies 5:15,
  9:8, 9:15,
  11:15, 13:4,
  19:18, 20:22,
  21:5, 24:10,
  31:13, 32:2,
  32:3, 36:15,
  37:15, 37:19,
  39:15, 40:15,
  41:1,
  41:24.
agency-wide
  32:21.
agent 13:2.
agents 43:9.
aimed 26:21.
al 1:5, 3:3,
  3:4.
algorithm
  18:9.
ALJ 35:8.
allegations
  24:13.
allege 13:1.
alleged 17:14,
  17:15.

alleging
  11:20.
allow 10:6.
allowed 37:2,
  41:25.
alone 39:18.
already 11:10,
  17:19, 20:4,
  20:10, 21:8,
  26:4, 29:8,
  30:15, 31:21,
  31:22, 31:23,
  31:24.
although
  6:22.
amount 37:10,
  40:6.
Anjana 1:27,
  3:12.
answer 36:5.
anticipation
  25:2.
apologies
  11:24,
  16:5.
apologize 13:7,
  16:9, 26:6.
Appeals
  17:13.
appear 12:25.
appearance
  3:19.
APPEARANCES
  1:21, 2:1,
  4:22.
appears 11:23,
  11:24.
appointed
  13:10.
appointees
  23:14.
Appointment
  4:16, 23:9,
  30:13,
  34:19.
Appointments
  17:16, 34:15,
  35:2, 35:18,
  36:1, 41:8.
appreciate

44:9.
appropriate
  19:13, 21:22,
  22:11,
  23:15.
approximately
  9:12.
areas 36:21.
argue 5:8,
  17:25.
argument 13:18,
  27:22, 35:5,
  35:18, 36:1,
  41:8,
  42:20.
Arizona 1:33.
around 31:12.
Article 4:17.
Asif 2:41,
  44:15,
  44:20.
aspect 36:9.
assert 4:18.
asserted
  41:6.
asserting
  35:17.
assessing
  25:5.
associated
  28:14.
associates
  14:7.
assurance
  12:18.
attenuated
  35:2.
Attorney 1:33,
  1:42, 43:7.
auspices
  22:21.
authority 4:20,
  17:8, 18:2,
  18:5, 21:19,
  27:23,
  35:20.
authorized
  21:12.
authorizes
  17:4.

available 6:16,
  34:6.
Ave 1:34.
Avenue 2:43.
aware 5:16.
AZ 1:35.
.
.
< B >.
Back 6:13,
  13:9, 16:22,
  18:6, 22:3,
  22:16, 23:17,
  26:24, 31:18,
  32:8, 32:11,
  39:25, 40:25,
  41:15,
  43:17.
bad 9:24, 10:4,
  10:5, 10:14,
  10:20, 19:8,
  27:7, 27:13,
  42:21, 42:23,
  43:2.
balance 5:11.
ball 8:1,
  8:24.
Baltimore
  1:44.
bank 9:13,
  21:6.
based 26:15,
  27:9, 27:15,
  27:22.
basic 34:14,
  36:4.
Bates 29:2,
  39:21.
Bear 16:19.
behalf 3:8,
  3:12, 3:17,
  5:4.
believe 8:8,
  15:23,
  29:22.
bell 39:25,
  41:11.
Bendor 1:32.
benefit 18:5.
best 6:7.

better 27:25.
beyond 32:25.
BFS 20:15.
big 40:9.
billions
  33:11.
bit 33:22,
  35:13,
  37:12.
block 4:14.
blower 29:19.
Boasberg 38:15,
  38:22,
  39:21.
bootstrap
  14:21.
brags 9:18.
branch 42:2.
breadth
  40:13.
break 16:25,
  19:25,
  22:6.
breath 25:24,
  25:25,
  28:22.
breathe
  21:15.
brief 22:25,
  26:3,
  36:22.
briefing 7:6,
  24:19.
bring 6:22,
  13:24, 14:17,
  22:5.
broad 7:8,
  7:16, 13:23,
  22:12, 27:20,
  40:11, 40:25,
  41:3.
broader 25:14,
  29:4.
broadly 38:9.
broadness
  36:16.
broken 22:1.
brought 4:4,
  4:20.
brush 40:25,

41:3.
budgets
  18:10.
building 8:2.
burden 17:14,
  30:2, 37:3.
.
< C >.
C. 1:12, 2:44,
  17:12.
call 10:7.
canceling
  36:12.
candid 7:4.
capacity 4:7,
  4:11.
caption 4:13.
carry 37:20.
carrying 13:1,
  13:3,
  37:17.
case 5:16,
  5:17, 5:18,
  8:8, 8:9,
  14:7, 20:11,
  20:25, 26:5,
  29:1, 29:2,
  29:7, 29:8,
  30:1, 34:21,
  36:5, 38:14,
  38:19,
  38:21.
cases 10:6,
  10:16, 14:5,
  34:1, 34:2,
  34:17, 34:24,
  35:7, 35:23,
  38:18, 40:10,
  40:14.
category
  41:12.
cause 12:11,
  18:14, 24:4,
  36:13.
causes 4:15,
  26:23,
  28:17.
causing
  10:23.

caveat 29:20,
  29:23.
Central 1:34.
certain 5:3,
  14:21, 30:24,
  31:13, 32:10,
  34:6, 34:10,
  34:22,
  37:18.
certainly
  35:21,
  35:22.
certify
  44:15.
CFPB 32:24.
challenge 7:15,
  16:9, 18:21,
  34:16.
challenged
  32:7.
change 14:10.
changes 11:14,
  18:22, 37:18,
  38:2,
  38:23.
chart 11:8.
charter
  37:22.
check 38:24.
checked
  38:22.
chief 39:21.
Christine 2:41,
  44:15,
  44:20.
circuits
  34:3.
CIVIL 1:5,
  3:3.
clarify
  20:17.
class 32:9.
classified
  18:25,
  21:2.
Clause 4:17,
  17:16, 23:9,
  30:13, 34:16,
  35:2, 35:18,
  36:1, 41:8.

clear 18:8,
  43:11.
clearly 4:2,
  18:1.
close 10:19.
CMS 26:12.
co-counsel
  16:15.
coding 14:10.
colleague 3:18,
  16:8,
  18:22.
colleagues
  32:10, 34:3,
  34:9.
COLUMBIA 1:2.
comes 17:5,
  17:14, 33:2,
  35:2, 35:11,
  41:12.
coming 18:6,
  19:16, 30:6,
  41:9.
common 12:9.
communicate
  23:20.
communicating
  30:24.
communications
  7:6.
complaint 4:6,
  4:12, 4:15,
  10:9, 13:1,
  24:14,
  32:4.
complete
  12:20.
complex
  42:12.
comprised
  4:6.
compromise
  33:8, 33:9.
compromised
  27:1, 27:2,
  28:18, 31:22,
  43:16.
computer 22:22,
  23:1, 26:1.
computer-aided

2:49.
conceivable
  40:19.
concern 36:7,
  41:13.
concerned 8:5,
  42:10.
concerns 15:16,
  15:25,
  34:6.
concluded
  44:13.
concrete 17:1,
  28:15,
  40:16.
concretize
  38:11.
concretized
  34:5,
  40:14.
conduct 4:19,
  20:20, 37:10,
  37:13.
confidential
  11:16, 21:11,
  39:24, 40:3,
  40:6.
confirmed
  30:19.
Congress
  37:22.
connection
  16:23.
consequences
  11:9,
  27:19.
consider 6:24,
  13:25, 26:2,
  44:3.
consolidate
  6:10.
consolidating
  6:9.
constitute
  34:23,
  35:22.
Constitution
  2:43, 4:18,
  5:21, 8:24.
constitutional

13:8, 13:13,
27:22, 30:21,
31:1, 34:22,
35:4,
35:22.
constitutionali
ty 38:3.
consult
16:15.
Cont'd 2:1.
contained
5:7.
contains
4:15.
context
34:21.
contexts
34:22.
continue 37:16,
37:21,
43:6.
continuing
35:23.
contours
21:19.
contract 17:21,
22:6, 22:8,
22:9.
contracts 9:12,
9:19, 18:11,
22:1, 32:18,
32:25, 36:12,
36:14, 37:16,
37:21.
control 9:8,
15:6.
coordinating
30:24,
33:11.
coordination
32:15,
32:17.
correct 35:17,
44:16.
corrected
4:12.
correcting
6:6.
counsel 4:1,
4:14, 4:22.

country 13:14,
43:13.
couple 22:24,
24:9,
42:15.
course 8:15,
18:19,
44:12.
courthouse 7:5,
38:23.
courts 11:11,
12:9, 20:9.
covered
12:22.
craft 27:25.
crisis 13:9.
criteria
7:24.
critical
43:25.
crossed 42:3.
current 17:9.
cut 18:10,
43:11.
cuts 18:10,
18:13,
18:18.
cutting 9:19,
32:24.
.
.
< D >.
daily 20:21.
dangerousness
40:1.
databases 9:10,
9:18.
day 9:17,
14:13,
42:12.
days 22:24.
DC 2:10.
deal 30:22,
37:21.
dealing 40:15,
41:4.
dealt 20:4.
dec- 10:11.
deciding
37:15.

decision
35:8.
decisions
15:11, 17:5,
22:23, 30:14,
31:3, 31:25,
32:2, 32:6,
33:9,
41:11.
declaration
9:12, 18:12,
25:15, 38:16,
38:25.
declarations
5:14, 9:10,
10:12, 10:13,
14:6,
38:12.
deems 21:22.
Defendant 1:12,
4:16, 4:20,
4:25.
Defendants 2:5,
3:18, 4:18,
4:21, 5:1,
5:3, 18:1.
Defense 3:15,
43:14.
defined
13:21.
delivered
22:10.
departments
5:15.
deputy 30:18.
describing
19:12.
designed 8:3.
destroy 5:1.
detail 10:8.
detailed
39:5.
determine
41:25.
determines
32:12.
different 7:24,
11:11, 20:22,
23:13, 25:10,
34:3, 34:15,

34:23, 35:13,
40:22, 40:23,
41:12.
difficult
39:3.
direct 9:23.
directed
21:2.
direction
39:12.
disagree
43:18.
disbursement
11:14.
disclose 27:17,
27:18, 27:25,
28:19.
disclosing
41:14.
discussing
7:17.
discussion
6:9.
discussions
6:5, 32:23,
32:24.
dislocation
36:14.
dismissed
5:22.
disputes
40:14.
disrupting
20:21.
dissemination
27:8.
District 1:1,
1:2, 1:19,
5:17.
districts
34:10.
docket 6:4.
Doe 5:18.
doing 10:10,
13:25, 21:19,
27:5, 27:6,
27:7, 27:13,
27:21, 27:23,
28:12, 39:3,
41:10, 41:20,

41:23, 41:24,
 42:2.
dollars
 33:11.
domain 40:7.
done 21:11.
double 38:24.
doubt 19:17.
down 8:2, 9:1,
 13:5, 13:8,
 13:12, 14:24,
 17:23, 27:11,
 41:21.
due 16:8,
 44:12.
during 19:25,
 22:24, 23:11,
 28:9,
 28:15.
.
.
< E >.
E. 2:7.
earlier 17:3.
early 8:7.
ECF 3:20, 4:11,
 4:14, 5:4.
echo 11:22.
Education
 26:10, 29:2,
 32:25,
 40:5.
effect 11:14,
 11:18,
 13:3.
effected
 37:5.
Efficiency 4:8,
 4:10.
efficient
 11:7.
either 19:13.
elaborate
 8:20.
electronically
 4:21.
Elon 4:6, 8:22,
 9:18, 12:20,
 14:7, 15:6,
 22:21, 23:8,

23:10, 23:16,
 25:19, 26:12,
 26:19, 28:7,
 28:13.
ELON MUSK, et
 al. 1:10.
emergency
 8:3.
emphasizing
 33:25,
 43:23.
employees
 15:12, 31:4,
 32:11,
 39:5.
encompassed
 39:13.
end 32:19,
 37:16.
ended 25:14.
enjoin 5:19,
 15:6, 19:7,
 30:12, 30:25,
 31:2, 31:9.
enjoined
 28:8.
enjoining
 5:3.
enjoins 42:2.
enough 27:9,
 27:10,
 27:12.
ensure 28:23.
enter 8:23.
entered 4:22,
 20:15.
entering
 3:19.
entire 15:15,
 32:16.
entirely
 26:10.
entitled
 40:8.
entity 17:9,
 38:1, 38:3.
envisioning
 28:3.
equitable
 7:21.

equities
 5:11.
errors 4:13.
Especially
 7:25, 42:6,
 43:18.
Esquire 1:27,
 1:32, 1:41,
 2:7, 2:13.
essentially
 12:23,
 17:4.
establish 32:6,
 35:21,
 35:24.
et 1:5, 3:3,
 3:4.
everything
 15:24,
 37:8.
everywhere
 42:5.
exactly 6:3,
 17:24, 21:10,
 35:3.
examine
 21:17.
example 8:1,
 11:1, 12:4,
 14:5, 14:12,
 15:12, 17:18,
 25:12, 25:13,
 29:4.
examples
 16:25.
exceeding
 37:12.
exceeds 4:19.
except 33:22,
 37:13.
excess 27:23.
excessive
 4:19.
Executive 17:3,
 22:23, 30:14,
 30:15, 30:16,
 30:17, 39:6,
 42:2.
exercising
 18:2.

explain
 22:20.
explained
 18:4.
explaining
 38:16.
explanation
 21:10,
 21:14.
expressed
 15:16,
 16:1.
extent 17:25,
 21:1,
 23:14.
extraordinary
 7:22, 8:12,
 12:16, 13:16,
 13:20, 13:21,
 26:14,
 30:7.
.
.
< F >.
fact 9:21,
 18:3.
facts 9:2.
factual 10:3,
 12:5.
failing 8:10.
failure 5:22.
far 6:11,
 19:12,
 41:5.
fashion
 35:20.
fast 10:15,
 29:16,
 38:7.
favor 5:11.
FCRR 2:41,
 44:15.
Fe 1:30.
features
 43:25.
February 14
 1:11.
federal-state
 32:16,
 33:10.

feed 16:14.
feel 23:20.
felt 18:18.
few 11:10,
  17:1, 20:3,
  22:24.
figure 21:16,
  37:8.
figuring 37:11,
  40:18.
file 33:13,
  44:4.
filed 4:6,
  4:12, 5:13,
  5:17, 34:18,
  38:12, 38:25,
  44:11.
files 17:21.
finance
  20:14.
financial 21:7,
  39:24.
finding
  30:23.
finger 7:13.
fired 32:11,
  32:12.
firing 36:11.
First 4:15,
  6:21, 21:4,
  24:9,
  26:18.
fish 34:15.
fit 41:19.
five 16:17.
flag 21:23.
flip 44:8.
flow 39:4,
  40:17.
fly 37:12,
  39:3,
  40:18.
focus 35:24.
folks 23:13,
  25:12,
  25:19.
follow 5:22.
foregoing
  44:16.
foreseeability

19:17.
forth 6:13,
  9:19,
  28:19.
forward 14:6,
  25:25.
found 14:6.
founders
  13:9.
Friday 6:17,
  42:11, 44:9,
  44:11.
friend 34:25,
  37:9.
friends
  34:18.
front 32:10.
frozen 16:11.
fully 44:2.
functionally
  20:7.
functioning
  13:4, 20:21,
  37:14, 37:20,
  39:11.
functions
  37:17.
fundamental
  34:2,
  39:17.
funding
  18:13.
funds 11:15.
future 24:18.
.
.
< G >.
gain 24:3,
  24:5.
gaining 24:6.
Galisteo
  1:29.
GARDNER 2:7,
  3:17, 6:3,
  7:10, 7:15.
gather 21:16.
General 1:33,
  1:42, 43:7.
generalized
  19:14.

generally
  21:14.
get-- 21:15.
gets 9:18,
  27:1.
getting 38:6.
Give 11:1,
  17:18, 21:15,
  21:19,
  31:15.
given 25:16.
God 41:10.
gotten 6:12.
government-wide
  24:14,
  41:24.
grant 8:13,
  19:7, 20:5,
  25:4,
  27:10.
granted 17:20,
  34:10.
grants 29:13.
GRAVER 2:13,
  3:18, 3:19,
  3:21, 33:20,
  34:14, 34:25,
  35:6, 35:14,
  37:25.
great 10:8.
grind 20:7,
  20:18.
grinded
  31:24.
grinding 23:4,
  31:23, 33:5,
  43:22.
guess 6:21,
  7:9, 29:25,
  30:15, 30:21,
  36:15.
.
.
< H >.
halt 12:24,
  13:24, 20:8,
  20:19, 23:5,
  31:24, 31:25,
  33:6,
  43:22.

halted 11:10.
hands 40:8.
hang 12:1.
happen 8:13,
  9:25, 10:1,
  10:12, 10:14,
  10:20, 14:2,
  14:19, 14:22,
  19:7, 19:8,
  19:9, 19:22,
  36:17, 42:22,
  43:12.
happened 32:20,
  42:24.
happening 6:4,
  12:6, 14:18,
  18:22, 31:21,
  32:21, 39:2,
  43:2,
  43:13.
happens 6:18,
  44:10.
hard 8:10,
  28:2,
  41:19.
harms 11:9.
Harry 2:13,
  3:18,
  33:20.
havoc 9:22,
  10:23.
head 30:18.
hear 11:25,
  16:13, 27:13,
  33:19.
heard 41:9.
hearing 10:16,
  18:23,
  36:2.
heavy 42:5.
helpful 11:8.
hereby 44:15.
hesitate
  29:18.
higher 17:7.
hiring 17:5.
hit 36:7.
hold 29:24.
holiday
  36:18.

Honorable
  1:18.
hour 18:23,
  38:23.
hours 10:18,
  14:19, 19:23,
  29:15.
House 18:3.
HR 17:21.
hypothetically
  22:11.
.
.
< I >.
idea 9:16,
  10:8.
identified
  18:1,
  34:17.
identify 5:1,
  17:23,
  18:9.
identities
  19:2, 19:9.
II 4:17.
illegally
  32:12.
illustrates
  14:11.
illustration
  12:5.
imagine 40:5.
immediacy
  15:4.
immediate
  18:14, 18:20,
  22:24, 24:18,
  40:12.
immediately
  10:1, 14:25,
  18:18.
immemorial
  23:2.
imminence 12:6,
  23:17.
imminent 5:10,
  7:25, 8:11,
  16:25, 17:10,
  19:16, 19:22,
  22:19, 33:23,

33:24, 34:5,
  34:11, 34:12,
  39:18, 41:20,
  42:17,
  43:11.
imminently
  14:22,
  14:23.
impact 21:8.
implicated
  40:23.
implication
  9:23.
important 9:9,
  28:24, 33:10,
  34:2,
  38:10.
improper
  40:2.
improperly
  35:7.
include 15:3.
including
  34:18.
incredibly
  13:23, 26:14,
  40:6.
individuals
  17:7, 25:13,
  30:20.
industrial
  42:12.
inevitably
  37:12.
information
  9:13, 17:21,
  18:7, 18:8,
  18:25, 21:3,
  21:7, 25:16,
  26:25, 29:14,
  29:19,
  40:1.
initial 8:19.
injunction
  4:24, 5:12,
  7:20, 8:9,
  8:14, 14:1,
  15:2, 15:15,
  19:14, 22:25,
  24:10, 24:11,

24:20, 25:5,
  28:18, 29:25,
  30:1, 30:6,
  30:7, 31:6,
  33:3, 34:21,
  36:22,
  44:3.
injunctive
  7:21, 11:11,
  19:14, 27:11,
  32:13,
  38:21.
injury 31:20,
  35:11.
inside 28:10.
instance 34:7,
  35:7.
instances
  39:4.
Instead
  24:25.
instructing
  4:25.
instruction
  5:23.
insulated
  35:7.
integrity
  14:14, 25:17,
  26:22, 26:23,
  27:14, 28:16,
  28:17, 28:23,
  30:9,
  30:10.
intelligence
  19:1.
intend 17:23,
  23:20,
  35:25.
intended
  21:18.
interchangeably
  24:21.
interest
  5:12.
Interior
  43:14.
internet
  16:19.
interrupt

11:6.
interruption
  16:9.
introduce
  3:5.
intuition
  41:18.
involved 31:2,
  32:3, 33:8,
  40:24.
involves 26:5,
  39:5.
involving 11:4,
  38:19,
  38:20.
irreparable
  5:10, 9:16,
  13:11, 14:3,
  21:23, 22:2,
  24:4, 26:23,
  28:17, 32:6,
  32:14, 33:22,
  34:12, 34:16,
  34:23, 35:21,
  35:24, 41:17,
  42:17,
  43:11.
irreversible
  10:19,
  32:9.
isolated
  14:21.
issue 36:3,
  39:8.
issued 4:21,
  10:17, 17:3,
  20:13,
  40:10.
issues 16:19,
  19:16, 22:2,
  26:2.
item 30:11.
items 12:5,
  15:4, 15:19,
  22:17,
  22:20.
itself 13:16,
  13:20.
.
.

< J >.
jobs 32:11.
John 5:18.
Josh 3:16,
  6:2.
Joshua 1:32,
  2:7.
Journal 26:11,
  26:15.
Judge 1:19,
  11:17, 21:22,
  26:4, 29:1,
  29:2, 38:15,
  38:22, 39:21,
  39:22.
jump 12:9.
jury 3:24.
Justice 1:28,
  2:8, 3:17.
justifies
  39:19.
.
.
< K >.
keep 9:1,
  12:14, 27:18,
  43:23.
kettle 34:15.
key 37:11,
  39:1,
  40:13.
kind 8:3, 8:7,
  13:4, 14:5,
  17:24, 42:15,
  42:16.
Kirschner 1:41,
  3:8.
knock 8:1.
knows 41:10.
.
.
< L >.
Labor 9:14,
  17:19, 18:6,
  18:12, 18:14,
  19:24, 21:5,
  23:13, 25:16,
  27:1, 29:3,
  40:4.
language

33:16.
large 40:6.
last 38:22,
  38:25.
law 21:25,
  34:21.
lawful 37:10.
lawyers 43:4.
least 11:19,
  17:20, 21:11,
  34:20, 36:20,
  38:12, 40:12,
  42:3.
leave 32:17.
left 36:12.
legal 33:25,
  34:16,
  42:3.
legally 40:8,
  41:25.
legitimate
  27:21.
lengthy 5:5.
level 10:6,
  35:22.
lift 12:15,
  42:5.
lifted 12:8.
lighter
  17:14.
lightning
  36:9.
likely 5:9,
  14:22,
  36:13.
limitation
  43:24,
  44:1.
limited 14:9,
  15:5, 20:15,
  23:1, 26:20,
  33:7, 37:18,
  43:24.
line 11:23,
  27:11,
  42:3.
linked 33:24.
literally 7:25,
  10:18,
  21:14.

litigated
  12:12.
litigating
  34:4.
little 8:24,
  33:22, 35:13,
  37:12, 40:11,
  42:10.
lives 19:10.
local 5:22.
long 6:17,
  44:10,
  44:11.
look 13:22,
  23:19,
  28:3.
looking
  17:24.
looks 16:4,
  16:11.
looser 35:1.
lost 16:14.
lot 6:22, 11:8,
  11:18, 30:2,
  30:22, 34:2,
  39:4,
  41:20.
lower 30:2.
.
.
< M >.
machine 2:48.
managed
  29:13.
Maryland 1:39,
  1:42, 3:8,
  5:17, 29:6,
  29:7, 29:8,
  29:9, 29:11,
  29:12,
  43:8.
massive 29:20,
  29:23.
material
  41:14.
matter 3:4,
  4:5, 31:14,
  44:17.
matters 7:7,
  20:4.

MD 1:44.
meaning 5:9.
means 30:18,
  35:6.
meant 8:8,
  25:2.
media 26:15.
memorandum
  21:25.
mentioned
  12:19, 20:12,
  21:25,
  41:3.
mentions
  35:1.
merit 32:13.
merits 5:10,
  8:8, 13:12,
  13:19,
  23:21.
met 7:24,
  8:11.
Mexico 1:25,
  1:28, 3:3,
  3:12, 4:4,
  9:11, 9:13,
  11:12, 14:12,
  14:17, 18:10,
  25:15,
  26:25.
microphone 4:1,
  7:2.
middle 12:9.
minimum
  38:25.
minute 9:17,
  11:7, 14:13,
  19:4, 21:15,
  25:23,
  31:20.
minutes
  16:17.
mistake
  26:24.
mix 39:22.
modifying
  21:22.
moment 13:12,
  14:4, 25:19,
  25:25.

Monday 24:1.
money 22:3,
  32:18.
morning 4:13,
  4:23, 16:20,
  21:25,
  36:18.
Moss 11:17,
  26:4, 29:1.
motion 4:3,
  4:24, 5:7,
  5:13, 6:24,
  7:20, 8:14,
  14:17, 15:21,
  15:25, 17:2,
  20:6, 21:24,
  22:25.
Motions Hearing
  1:17.
movant 42:8.
move 29:16.
moved 4:24.
moving 6:9,
  10:15.
MR. GARDNER
  3:16, 3:22,
  5:25, 6:2,
  6:11, 7:12.
MR. GRAVER
  36:3, 36:23,
  37:1, 37:7,
  38:4, 38:8,
  38:14, 38:20,
  38:24, 39:16,
  40:12, 41:16,
  41:18,
  42:1.
MS 3:11, 3:14,
  15:10, 16:4,
  16:23, 18:12,
  19:3, 20:2,
  20:12.
MS. SAMANT
  16:5, 16:8,
  16:24, 20:24,
  21:21.
multiple
  12:10.
.
.

< N >.
Nair 9:11,
  18:12.
name 4:14.
narrow 15:17,
  22:19, 28:16,
  28:18,
  33:3.
nature 17:12,
  18:20,
  19:21.
necessarily
  12:18,
  25:21.
need 5:6,
  14:24, 27:17,
  33:24, 34:16,
  42:3, 43:9.
New 1:25, 1:28,
  3:3, 3:12,
  4:4, 9:10,
  9:13, 11:12,
  14:12, 14:17,
  18:10, 25:15,
  26:25.
news 26:20.
next 19:23,
  29:15,
  42:18.
nice 4:2.
night 36:17,
  38:25.
NIH 29:12,
  29:13, 29:15,
  29:22, 43:8,
  43:9.
NM 1:30.
No. 1:5, 4:11,
  5:18, 17:2,
  18:24,
  20:15.
noted 17:13,
  19:25.
nothing 39:4,
  43:22.
notice 3:19,
  6:16.
notion 12:15.
number 5:18.
NW 2:43.

.
.
< O >.
o'clock
  33:14.
obtained 5:2,
  17:20.
obviously 15:2,
  15:14,
  27:24.
occur 10:3.
Office 1:33,
  1:42, 43:7.
officer 30:19,
  31:12.
officers 17:6,
  32:1, 32:3.
Official 2:42,
  4:7, 4:11,
  44:21.
officials 24:1,
  24:15, 27:4,
  39:10,
  39:14.
Okay 7:14,
  7:18, 8:21,
  11:3, 15:20,
  29:7, 42:9.
once 39:23,
  39:24, 41:13,
  43:16.
ones 12:19,
  34:18.
open 21:21.
operating 5:20,
  35:19,
  39:5.
operation
  31:11.
opportunity
  12:4.
optimism
  6:23.
ordered 32:9.
orders 10:17,
  12:8.
Organization
  4:10,
  26:16.
organized

  41:5.
ourselves
  18:17.
outside 28:9,
  35:19.
outstanding
  18:11.
overlap 12:19,
  12:20.
overrule
  30:17.
.
.
< P >.
p.m. 16:21,
  44:5,
  44:13.
paint 40:24.
painting
  41:3.
papers 7:19,
  8:6.
parameters
  33:16.
part 6:5, 21:9,
  21:10, 36:3,
  37:11, 39:3,
  39:11.
particular
  10:3, 36:20,
  37:23,
  38:1.
Parties 3:5,
  6:4, 6:23,
  16:13.
partly 11:18.
partner
  32:19.
partnerships
  30:22.
parts 15:3.
pass 16:17.
past 10:18.
Paul 1:43.
pause 33:22.
pay 32:8.
payment 14:8,
  14:10,
  14:12,
pendency

28:9.
pending 11:16,
    11:18, 20:9,
    28:15.
people 10:21,
    11:24, 19:9,
    23:16, 32:8,
    36:12,
    40:8.
perhaps 18:9,
    19:15.
period 14:11,
    26:2.
person 13:9,
    14:9, 18:1,
    18:4.
personal
    39:23.
Personnel 5:14,
    15:11, 22:21,
    22:23, 23:12,
    23:15, 25:22,
    28:7, 28:13,
    30:13, 31:3,
    31:9, 31:25,
    32:2, 32:5,
    32:6, 33:1,
    33:9, 34:7,
    36:21, 41:11,
    43:21.
Phoenix 1:35.
phone 16:18,
    19:6,
    32:19.
phrase 10:22.
PI 7:23,
    36:5.
pick 42:14.
picked 37:8.
picking
    43:21.
piece 17:11,
    33:23.
Place 1:43,
    10:20, 21:4,
    37:17.
Plaintiff 1:7,
    3:6, 3:9,
    5:2, 5:14,
    11:13.

Plaintiffs
    3:13, 4:5,
    4:12, 4:18,
    4:23, 4:24,
    5:5, 5:8,
    5:13, 5:18,
    35:16, 36:7,
    36:10, 37:5,
    39:13, 41:2,
    41:5, 43:4.
planning
    21:20.
playing
    42:16.
please 3:5,
    22:10.
point 10:2,
    17:1, 17:3,
    17:17, 17:18,
    18:21, 18:24,
    20:12, 20:25,
    25:17, 26:18,
    26:20, 29:9,
    31:19, 33:25,
    34:2, 34:14,
    37:7, 38:10,
    38:11, 39:1,
    39:17, 40:13,
    43:20,
    43:21.
pointed
    18:22.
pointing
    9:21.
points 28:21.
police 28:20.
political
    23:14.
pondering
    33:15.
position 17:9,
    19:18, 23:21,
    43:5.
possibly
    43:11.
posted 19:2.
posture 34:23,
    42:6.
potential
    6:13.

power 17:4,
    23:16.
powers 30:12,
    35:12.
prayerful
    31:4.
predictable
    41:6.
predicting
    36:16.
prejudice 38:9,
    39:7,
    40:21.
prejudiced
    36:25, 37:1,
    38:5.
preliminary
    4:24, 7:20,
    8:9, 8:14,
    14:1, 15:2,
    15:15, 19:13,
    22:25, 24:20,
    25:1, 25:3,
    25:5, 29:25,
    30:1, 30:6,
    30:7, 34:20,
    36:22,
    44:3.
prepared
    11:7.
present 2:13.
preserve 12:14,
    21:16, 28:22,
    28:23, 30:9,
    30:10.
presided
    12:12.
President 4:10,
    35:9, 39:6.
prevent 15:5.
preventing
    39:14.
principal 17:6,
    30:19, 31:12,
    32:2.
principle
    32:1.
prior 16:25.
private 40:3.
problem 18:19,

    21:9, 21:13,
    23:19, 24:22,
    28:2, 39:23,
    40:9, 40:11,
    42:22.
problems 34:6,
    36:14.
Proceedings
    2:48, 44:13,
    44:17.
process 23:3.
processes
    9:9.
produced
    2:48.
proffer
    23:25.
programs 18:16,
    18:17.
proper 13:10,
    37:2, 37:4,
    37:6.
properly
    13:10.
prophylactic
    31:15,
    31:17.
proposed 15:4,
    15:15, 33:13,
    33:14,
    44:5.
proposing
    6:12.
proprietary
    21:3, 25:16,
    26:25.
prospect
    39:17.
protecting
    21:2.
provide
    11:19.
provides
    9:13.
public 5:12,
    11:14, 11:23,
    17:22, 18:24,
    39:24, 40:2,
    40:7.
publicly

19:2.
pull 40:25.
purpose
  15:17.
purposes 15:4,
  15:14, 15:16,
  15:18, 22:17,
  24:19, 25:2,
  25:4,
  40:13.
pursuant 30:14,
  39:5.
push 13:16.
put 7:12, 10:8,
  14:6, 32:16,
  36:8, 44:1.
.
.
< Q >.
question 14:14,
  17:17, 18:20,
  19:21, 33:1,
  36:4, 37:9,
  38:3,
  39:17.
questioning
  23:20.
questions 3:25,
  28:20.
quickly
  17:11.
quite 5:5,
  11:10, 20:3,
  27:6, 33:3.
quo 12:14,
  21:17, 28:21,
  28:22,
  28:23.
quote 9:20.
quotes 9:7.
.
.
< R >.
random 36:13.
ranging
  35:20.
rather 17:2,
  21:2.
rationale 35:8,
  41:20,

41:22.
reached 6:14,
  6:23.
read 7:19,
  14:9.
read-only
  25:14,
  25:15.
readily 41:6.
reading 8:6,
  10:13.
real 15:25.
realistic
  19:22.
really 10:24,
  18:5,
  41:13.
reason 9:6,
  31:20.
reasons 24:9,
  27:21, 29:20,
  29:21, 36:15,
  40:10,
  41:2.
rebuttal
  42:8.
received
  18:23.
recently
  38:12.
recess 16:21.
recognize
  17:10.
record 3:5,
  16:22,
  44:17.
recorded
  2:48.
referenced
  22:23.
referred 4:9.
refile 5:23.
regard 23:7,
  24:2, 32:20,
  34:10,
  36:20.
regarding 19:1,
  20:25.
regular 8:15,
  23:12.

regulatory
  18:15.
reinstated
  32:8.
related 5:16,
  5:17, 34:8,
  38:14.
relationship
  40:15, 40:19,
  40:22.
relationships
  32:16, 33:10,
  33:12.
relief 5:19,
  7:8, 7:16,
  7:21, 7:22,
  8:12, 10:3,
  11:11, 11:19,
  13:15, 14:4,
  14:15, 15:2,
  19:14, 20:1,
  20:5, 22:12,
  22:17, 26:14,
  26:21, 27:11,
  31:4, 32:13,
  38:21.
rely 26:19.
remedy 12:16,
  24:8.
remove 35:10.
render 39:18.
Reported 2:41,
  26:12.
Reporter 2:42,
  44:21.
reports 18:24,
  26:20.
represent
  29:5.
representations
  29:21.
representative
  43:7.
representing
  26:16.
request 14:1,
  19:14, 21:22,
  27:16, 36:19,
  36:22.
requested

35:25.
requesting
  13:23.
requests
  20:6.
required
  14:18.
requires
  41:19.
residents
  28:25.
resolution
  6:14.
respect 16:8,
  20:13,
  21:5.
responses 8:19,
  12:7.
restrain
  15:3.
restraining
  4:4, 4:25,
  10:17, 12:8,
  15:18,
  43:10.
result 27:7,
  27:8.
resume 16:19.
revealed
  19:10.
reveals 34:1.
reverse 19:8.
rhetoric 9:1,
  9:21, 13:7,
  26:16,
  31:18.
risk 25:17,
  25:18, 26:22,
  26:24, 28:24,
  33:11.
roll 36:11.
romance
  42:11.
RPR 2:41,
  44:15.
rule 44:12.
ruled 41:9.
rules 5:23,
  23:22.
ruling 8:7.

run 18:16,
   19:5,
   39:12.
running 10:23,
   18:8, 31:6,
   33:4.
.
< S >.
S. 5:20,
   18:25.
safe 27:18.
Saint 1:43.
SAMANT 1:27,
   3:11, 3:12,
   3:14, 15:10,
   16:4, 16:5,
   16:23, 19:3,
   20:2,
   20:12.
sanctions
   27:19.
Santa 1:30.
satisfy 5:8.
Saturday
   36:17.
saying 10:21,
   15:23, 22:10,
   23:15, 24:25,
   25:5, 25:8,
   25:10, 25:11,
   25:23, 27:4,
   32:22, 35:14,
   36:10,
   42:4.
says 8:22,
   21:14, 21:18,
   22:7,
   34:21.
scenarios
   10:3.
schedule 6:12,
   6:13, 41:6.
schedules
   7:6.
schemes
   40:23.
scope 18:4.
SDNY 34:4,
   34:18.

Second 4:19,
   22:22,
   30:11.
secretary
   30:18.
Section 4:17.
security
   25:21.
seeing 8:10,
   27:9.
seek 5:5, 15:3,
   15:15.
seeking 5:19,
   7:16, 20:18,
   21:10.
seem 6:18.
seems 20:5,
   20:8.
seen 13:14.
Senate 30:19.
sense 18:15,
   33:3.
sensitive 9:18,
   11:15,
   21:3.
separately
   17:17.
separation
   17:15,
   35:11.
serious 7:23,
   26:14,
   36:13.
seriously
   36:19.
Service 4:8,
   4:10.
services
   22:9.
set 3:4.
several 4:5,
   20:8, 32:7.
shall 36:8.
shifting
   37:3.
short 3:25,
   6:16.
shorthand
   2:48.
shortly

18:23.
shouldn't 18:5,
   36:19.
show 19:11.
shown 34:12.
shows 14:5,
   34:5.
shut 13:5,
   13:8, 13:12,
   14:24,
   41:21.
side 16:6.
sides 4:22.
signature
   4:13.
similar 5:19.
simple 41:4.
simply 10:21,
   27:17,
   27:20.
single 24:1,
   24:3, 40:19,
   42:1.
sitting
   33:15.
situation 8:3,
   10:21, 19:12,
   19:13,
   19:24.
size 17:23,
   19:1.
snafu 3:20.
Solutions 9:11,
   18:11.
someone 5:23,
   18:3.
Sometimes
   40:23,
   40:24.
soon 10:14.
sorry 11:21,
   16:4, 17:15,
   23:6,
   24:23.
sort 13:2,
   35:1, 36:8,
   36:10, 37:11,
   38:11, 39:3,
   40:1,
   40:18.

sound 11:22.
sounds 19:12.
speaking 4:2,
   20:3,
   22:11.
specific 11:12,
   11:13, 12:11,
   14:20, 27:9,
   27:10, 29:1,
   29:2, 34:5,
   41:19,
   43:10.
specifically
   20:19, 29:9,
   33:17.
spent 7:4.
St 1:29.
staff 11:7,
   18:10,
   19:1.
staffing
   18:13.
stake 19:10.
standard 5:9,
   7:22, 9:24,
   10:2, 10:25,
   35:1.
standards
   23:24.
standing 5:8,
   17:12,
   39:18.
start 9:6,
   9:20, 19:15,
   36:11, 38:2,
   41:9,
   41:13.
started 18:23,
   20:2.
starting 3:6,
   28:20.
State 1:25,
   1:39, 3:3,
   3:8, 3:12,
   4:4, 5:14,
   11:12, 14:17,
   19:19, 21:3,
   21:6, 22:4,
   29:4, 29:10,
   30:22, 33:11,

40:16,
43:7.
STATE OF NEW
  MEXICO 1:5.
States 1:1,
  1:19, 2:8,
  3:9, 3:17,
  4:5, 4:6,
  4:7, 4:8,
  4:9, 4:17,
  6:3, 9:23,
  11:13, 28:24,
  28:25, 30:23,
  33:21, 34:4,
  35:9, 36:14,
  40:24.
status 12:14,
  21:17, 28:21,
  28:22,
  28:23.
statute
  23:10.
statutory 4:20,
  40:23.
stenographic
  44:16.
step 30:8.
Stop 6:24,
  10:24, 14:16,
  14:18, 19:3,
  20:19, 21:14,
  21:15, 22:10,
  25:6, 25:8,
  25:10, 27:4,
  27:11, 36:20,
  37:7, 41:24,
  42:5, 43:10,
  44:1.
stopped 41:23,
  43:5.
Stopping
  20:20.
Street 2:9,
  26:11,
  26:15.
stricken
  5:22.
strike 36:9.
striking
  38:9.

strong 13:18.
stuff 25:11.
Subsection
  31:4.
subsections
  5:6.
succeed 5:9.
sue 22:3.
suffer 5:10.
sufficient
  35:23.
suggest 36:1.
Summons 4:21.
Sunday 23:25,
  36:18.
supervise
  35:10.
support 5:7,
  5:13, 15:24,
  30:5.
supposed 25:14,
  27:22,
  37:22.
surprised
  7:9.
sweep 37:9.
system 14:8,
  14:10, 20:14,
  26:5, 27:15,
  28:16,
  29:22.
systems 14:12,
  15:7, 22:22,
  23:2, 23:3,
  23:12, 23:17,
  25:18, 25:21,
  25:22, 26:1,
  26:11, 26:22,
  28:9, 28:10,
  28:15, 28:21,
  28:24, 30:10,
  31:22, 32:4,
  33:7.
.
.
< T >.
T. 2:41,
  44:20.
tab 4:14.
table 4:1.

tackle 16:16.
tailored
  24:8.
talked 9:10,
  22:18.
talks 18:13.
Tanya S.
  Chutkan
  1:18.
team 8:22,
  15:6, 23:9,
  23:10, 24:11,
  30:17, 30:19,
  31:2, 33:4.
temporarily
  12:24.
Temporary 4:3,
  4:10, 4:25,
  10:17, 12:8,
  14:11, 15:18,
  26:2, 43:9.
terms 21:23,
  24:21,
  43:18.
THE CLERK
  3:2.
theoretical
  34:13.
theory 25:18,
  33:25,
  37:10.
they've 18:8,
  21:11, 31:22,
  31:24.
though 36:7.
threat 14:14.
throughout
  10:9.
Tiffany
  16:18.
till 38:2,
  41:8.
tips 5:11.
today 4:22,
  4:24, 8:13,
  15:17, 22:18,
  26:5.
tomorrow 8:13,
  10:12, 14:2,
  22:9, 23:25,

33:14,
  44:5.
touching
  31:13.
towards 21:2.
tracing
  34:16.
Transcript
  1:17, 2:48,
  44:16.
transcription
  2:49.
Treasury 11:5,
  14:7, 14:8,
  14:10, 20:14,
  20:16, 21:1,
  25:13.
tremendous
  37:10.
tried 7:1.
Tros 6:17,
  11:13, 11:15,
  11:18, 19:5,
  31:16, 34:6,
  34:7, 34:8,
  34:10, 34:12,
  40:10.
trouble
  30:24.
true 7:10.
Trump 4:10.
try 15:25,
  16:14,
  42:18.
trying 7:5,
  8:10, 11:25,
  20:19,
  43:1.
Two 4:15, 8:19,
  12:2, 12:7,
  15:4, 15:18,
  16:2, 20:1,
  22:17, 22:19,
  33:6,
  36:20.
type 21:4.
.
.
< U >.
Uh-oh 16:11.

umbrella
  20:10.
un 7:9.
unauthorized
  39:18,
  40:17.
understand 6:6,
  15:22, 18:19,
  25:20, 28:6,
  31:8, 31:18,
  35:6,
  41:18.
understanding
  5:21, 6:7,
  24:13.
unique 33:23.
United 1:1,
  1:19, 2:8,
  3:17, 4:7,
  4:9, 4:17,
  6:3, 33:21,
  35:9.
unlawful 5:2.
unlike 18:2.
unprecedented
  36:13.
unpredictabilit
  y 41:4.
unring 39:25,
  41:11.
until 36:22,
  37:8.
update 5:23.
urgency
  22:18.
urgent 9:17,
  10:21.
USAID 11:14,
  32:21, 32:23,
  33:2.
using 14:12,
  19:15, 24:21,
  28:20,
  30:12.
.
.
< V >.
vague 10:7.
vagueness
  10:6.

valid 13:25,
  35:18.
various 5:14.
verify 29:19.
versus 3:3.
veto 17:4.
via 3:11.
video 16:14.
violates
  4:16.
violation 5:20,
  13:13, 17:15,
  17:16, 23:9,
  23:10, 30:13,
  30:21, 31:1,
  34:17, 34:22,
  35:23.
vis-a-vis
  28:20.
vs 1:8.
.
.
< W >.
W. 2:9.
walk 24:1.
walking 38:25,
  42:20.
Wall 26:11,
  26:15.
wanted 12:3,
  17:1, 17:3,
  17:18, 22:16,
  42:14.
warrant 27:10,
  34:12.
warrants
  8:11.
Washington
  1:12, 2:10,
  2:44.
ways 17:22,
  40:2.
website
  18:25.
websites
  25:12.
week 17:4.
weekend 6:17,
  8:24, 9:4,
  9:5, 10:5,

12:6, 44:10,
  44:11.
weekends 8:23,
  9:7, 9:20,
  10:15, 29:17,
  31:19.
weeks 22:24.
weighty 26:2.
whack 42:18.
whack-a-mole
  42:16.
whatever 10:16,
  19:6, 22:24,
  40:19.
wherever
  10:23.
whether 6:23,
  17:9,
  41:25.
whistle
  29:19.
White 18:3.
whole 14:24.
wide 13:13,
  35:20.
widespread
  13:2, 13:3.
will 3:19,
  5:10, 6:22,
  10:3, 11:6,
  18:18, 21:7,
  38:24, 44:4,
  44:12.
window 10:19.
within 14:10,
  15:7, 19:23,
  20:15, 29:12,
  37:19,
  39:10.
without 12:11,
  30:7.
words 5:2,
  8:12, 19:5,
  19:15, 19:17,
  35:16,
  39:10.
work 8:23, 9:4,
  9:5, 10:15,
  28:7, 29:16,
  39:2.

Workforce 9:11,
  18:11.
working 9:20,
  11:24, 31:19,
  38:17.
workings 12:24,
  20:7, 37:2,
  37:4, 37:6.
world 40:1.
worried 42:4.
worse 10:4.
wreak 9:22.
wrecking 8:1,
  8:24.
.
.
< Y >.
Yesterday 4:5,
  4:23.
yield 16:7.
yourself
  12:19.
yourselves 3:5,
  6:16.
.
.
< Z >.
Zoom 3:11,
  16:9.