# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF NEW MEXICO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ELON MUSK, in his official capacity, *et al.*,<br><br>Defendants. | Civil Docket No. 1:25-cv-00429 |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants hereby move to dismiss Plaintiffs' complaint. Defendants rely on the accompanying memorandum of law and the pleadings in this action.

Dated: March 7, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

/s/ *Joshua E. Gardner*
JOSHUA E. GARDNER (FL Bar No. 302820)
Special Counsel
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
(202) 305-7583
joshua.e.gardner@usdoj.gov

HARRY GRAVER (DC Bar No. 1779585)
Counsel to the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave, NW
Washington, DC 20530
Tel: (202) 514-2000
harry.graver@usdoj.gov

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Docket No. 1:25-cv-00429 |
| ELON MUSK, in his official capacity, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

I.     The United States DOGE Service ...........................................................................2

       A.     Executive Order 14,158 ...............................................................................2

       B.     Executive Order 14,210 ...............................................................................3

       C.     Elon Musk ...................................................................................................4

II.    This Litigation .......................................................................................................5

LEGAL STANDARD ........................................................................................................6

ARGUMENT .....................................................................................................................6

I.     The States Lack Article III Standing .....................................................................6

       A.     The States Must Comply With the Case-or-Controversy Requirement of Article III ....................................................................................................7

       B.     Alleged Financial and Programmatic Harm ................................................8

       C.     Alleged Unauthorized Access to and Disclosure of the States' Private Data ..............12

II.    The Complaint Should Be Dismissed under Rule 12(b)(6) ...................................17

       A.     The States' Appointment Clause Count Fails to State A Claim ..................17

              1.     The States Fail to Allege Mr. Musk Occupies an Office Established By Law ..........................................................................................18

              2.     Even if Mr. Musk Functionally "Directed" the Complained-of Actions, the States' Appointments Clause Claim Fails ...................22

              3.     An Advisor Is Not an Officer Merely Because He Is Effective ...........26

              4.     Mr. Musk Does Not Occupy a "Continuing" Office ........................29

       B.     The States' Derivative Statutory Claim Fails Too .......................................31

III.   The States' Appointments Claim Should Be Dismissed Against the President ........35

CONCLUSION ..................................................................................................................37

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Labor,*
No. 1:25-cv-339, 2025 WL 542825 (D.D.C. Feb. 14, 2025) ........................................................ 14, 15

*Anderson v. Obama,*
No. Civ. PJM 10-17, 2010 WL 3000765 (D. Md. July 28, 2010) ........................................................ 36

*Andrade v. Lauer,*
729 F.2d 1475 (D.C. Cir. 1984) ........................................................................................................ 7

*\*Andrade v. Regnery,*
824 F.2d 1253 (D.C. Cir. 1987) ................................................................................................ 22, 23, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................................ 6, 11, 23

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993) ........................................................................................................ 27, 28

*Auffmordt v. Hedden,*
137 U.S. 310 (1890) ........................................................................................................ 29

*Axon Enterprise, Inc. v. FTC,*
598 U.S. 175 (2023) ........................................................................................................ 8

*Barclift v. Keystone Credit Servs., LLC,*
93 F.4th 136 (3d Cir. 2024) ........................................................................................................ 15

*Barclift v. Keystone Credit Servs., LLC,*
585 F. Supp. 3d 748 (E.D. Pa. 2022) ................................................................................................ 14, 15

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................................ 6

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ........................................................................................................ 12

*Bohnak v. Marsh & McLennan Cos.,*
79 F.4th 276 (2d Cir. 2023) ........................................................................................................ 15

*Carlson v. Bush,*
No. 6:07-cv-1129-Orl-19UAM, 2007 WL 3047138 (M.D. Fla. Oct. 18, 2007) ................................ 36

*Chamber of Com. v. EPA,*
642 F.3d 192 (D.C. Cir. 2011) ........................................................................................................ 9

*Changji Esquel Textile Co. Ltd. v. Raimondo,*
  40 F.4th 716 (D.C. Cir. 2022) .................................................................. 31, 32, 34, 35

*Cirko ex rel. Cirko v. Comm'r of Soc. Sec.,*
  948 F.3d 148 (3rd Cir. 2020) ............................................................................ 8

*City & Cnty. of S.F. v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ......................................................................... 12

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................... 6, 7, 10, 16

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ...................................................................................... 12

*Cnty. of Santa Clara v. Trump,*
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .............................................................. 36

*Comm. to Establish the Gold Standard v. United States,*
  392 F. Supp. 504 (S.D.N.Y. 1975) .................................................................... 36

*Common Purpose USA, Inc. v. Obama,*
  227 F. Supp. 3d 21 (D.D.C. 2016) ...................................................................... 6

*Ctr. for Biological Diversity v. Dep't of Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ......................................................................... 16

*Day v. Obama,*
  No. 1:15-cv-00671, 2015 WL 2122289 (D.D.C. May 1, 2015) .............................. 36

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ...................................................................................... 27

*Farst v. AutoZone, Inc.,*
  700 F. Supp. 3d 222 (M.D. Pa. 2023) ............................................................... 14

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ..................................................................................... 6, 7

*Fed. Express Corp. v. U.S. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) ..................................................................... 32, 34

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ...................................................................................... 35

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ...................................................................................... 17

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ............................................................................ 17, 18, 19, 21

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir.), *vacated and remanded on other grounds,* 583 U.S. 941 (2017) ............................ 36

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.,*
    48 F.4th 1236 (11th Cir. 2022) ................................................................ 14

*Int'l Refugee Assistance Project v. Trump,*
    265 F. Supp. 3d 570 (D. Md. 2017) ......................................................... 36

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 557 (4th Cir. 2017) ................................................................... 36

*Jerome Stevens Pharms., Inc. v. Food & Drug Admin.,*
    402 F.3d 1249 (D.C. Cir. 2005) ................................................................. 9

*La. Envtl. Action Network v. Browner,*
    87 F.3d 1379 (D.C. Cir. 1996) ................................................................... 9

*Landry v. FDIC,*
    204 F.3d 1125 (D.C. Cir. 2000) ............................................................ 8, 18

*Lofstad v. Raimondo,*
    117 F.4th 493 (3rd Cir. 2024) ................................................................ 7, 8

*Lucia v. SEC,*
    585 U.S. 237 (2018) ....................................................................... *passim*

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................. 7

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ............................................................................... 16

*Mayor & City Council of Baltimore v. ATF,*
    738 F. Supp. 3d 1 (D.D.C. 2024) .............................................................. 9

*McMeans v. Obama,*
    No. 11-891, 2011 WL 6046634 (D. Del. Dec. 1, 2011) ............................ 36

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ................................................................... 35

*Morrison v. Olson,*
    487 U.S. 654 (1988) ............................................................................... 30

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ................................................................................................ 6, 7, 13

*Nat'l Ass'n of Internal Revenue Emps. v. Nixon,*
    349 F. Supp. 18 (D.D.C. 1972) ................................................................................ 36

*New Mexico v. Musk,*
    No. 25-cv-429, 2025 WL 520583 (D.D.C. Feb. 18, 2025) .................................... 5, 21

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) ......................................................................... 36

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................................... 36

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ................................................................................. 31

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
    795 F.3d 956 (9th Cir. 2015) .................................................................................... 12

*Physicians Comm. for Responsible Med. v. Dep't of Agric.,*
    656 F. Supp. 3d 158 (D.D.C. 2023) ......................................................................... 6, 9

*Reese v. Nixon,*
    347 F. Supp. 314 (C.D. Cal. 1972) ........................................................................... 36

*Ruffin v. Gray,*
    443 F. App'x 562 (D.C. Cir. 2011) ........................................................................... 20

*S.F. Redevelopment Agency v. Nixon,*
    329 F. Supp. 672 (N.D. Cal. 1971) ........................................................................... 36

*Save Jobs USA v. U.S. Dep't of Homeland Sec., Off. of Gen. Couns.,*
    111 F.4th 76 (D.C. Cir. 2024) ................................................................................... 34

*Schroer v. Billington,*
    525 F. Supp. 2d 58 (D.D.C. 2007) ........................................................................... 31

*Settle v. Obama,*
    No. 3:15-cv-365, 2015 WL 7283105 (E.D. Tenn. Nov. 17, 2015) ........................... 36

*Shreeve v. Obama,*
    No. 1:10-cv-71, 2010 WL 4628177 (E.D. Tenn. Nov. 4, 2010) .............................. 36

*Suskin v. Nixon,*
    304 F. Supp. 71 (N.D. Ill. 1969) .............................................................................. 36

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996) ..................................................................................................35

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007) ....................................................................................................................6

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................................................7, 8, 11, 14

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020) ..................................................................................................................33

*Trump v. United States,*
   603 U.S. 593 (2024) ..................................................................................................................19

*United States v. Castillo,*
   772 F. App'x 11 (3rd Cir. 2019) ..............................................................................................25

*United States v. Donziger,*
   38 F.4th 290 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023) ..........................................30

*United States v. Germaine,*
   99 U.S. 508 (1878) .............................................................................................................29, 30

*United States v. Hartwell,*
   73 U.S. (6 Wall.) 385 (1867) ...................................................................................................29

*United States v. Maurice,*
   26 F. Cas. 1211 (C.C.D. Va. 1823) .........................................................................................30

*United States v. Smith,*
   962 F.3d 755 (4th Cir. 2020) ...................................................................................................25

*United States v. Texas,*
   599 U.S. 670 (2023) ...........................................................................................................7, 11

*Univ. of Cal. Student Ass'n v. Carter,*
   2025 WL 542586 (D.D.C. Feb. 17, 2025) ..............................................................................16

*Willis v. U.S. Dep't of Health & Hum. Servs.,*
   38 F. Supp. 3d 1274 (W.D. Okla. 2014) .................................................................................36

**STATUTES**

5 U.S.C. § 552a ...................................................................................................................................14

5 U.S.C. § 3161 ..............................................................................................................................2, 31

18 U.S.C. § 202 ..............................................................................................................................4, 29

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6 ..................................................................................................................28

U.S. Const. art. II, § 2 .......................................................................................................1, 17, 24

## RULES

Fed. R. Civ. P. 12 ................................................................................................................ 17, 20

## REGULATIONS

5 C.F.R. § 731.202..........................................................................................................................4

*Establishment of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq*,
    Exec. Order No. 13,431, 72 Fed. Reg. 26,709 (May 8, 2007) ...........................................33

*Establishing & Implementing the President's "Department of Government Efficiency,"*
    Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025).....................................*passim*

*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*,
    Exec. Order. No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025).....................................*passim*

## OTHER AUTHORITIES

*Administration of the Ronald Reagan Centennial Commission*,
    34 Op. O.L.C. 174 (2010) .................................................................................................29

*Appointments to the Commission on the Bicentennial of the Constitution*,
    8 Op. O.L.C. 200 (1984)...............................................................................................28, 29

Margaret MacMillan, *Paris 1919* (2001) .................................................................................27

Merriam-Webster.com,
    https://www.merriam-webster.com.....................................................................................34

Restatement (Second) of Torts § 652D ......................................................................................14

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
    40 Op. O.L.C. 1 (2016).....................................................................................................30

## INTRODUCTION

By the Complaint's own terms, the States agree that Elon Musk "does not occupy an office of the United States"; they allege only that he wields "*de facto* power." Compl. ¶¶ 6, 75. That should be the end of this ill-conceived challenge. The Appointments Clause is concerned with one thing: the actual exercise of formal government authority. It is designed to ensure that, when Congress creates an office with certain legal power, the person holding that office and exercising that power has been selected and approved in an appropriate and politically accountable manner. Where a person neither holds an office nor wields its *de jure* authority, the Appointments Clause has nothing to say. Any objections to that person's actions are simply not constitutional in nature.

The States' contrary view rests on conflating *influence* and *authority*. They say, in effect, that others in the Executive Branch *listen to* Mr. Musk and his allies. But treating that as triggering a constitutional need for Senate confirmation would constitute a remarkable and untenable change in law. The White House has long been populated by aides and advisors who wield tremendous *de facto* sway over government. Hillary Clinton was charged with reforming the nation's healthcare system; Karl Rove designed much of the Bush Administration's domestic policy. Rahm Emanuel, Don McGahn, and John Podesta were no wallflowers. Chiefs of Staff, White House Counsels, and other senior advisors are often declared the "most influential" people in D.C., based solely on their soft power. But that has never given rise to an Appointments Clause problem, because none of those persons held any legal office or authority.

Here is no different. Again, on the States's own telling, Elon Musk has massive (perhaps even decisive) influence over the DOGE-related portfolio of domestic policy. But the one thing he lacks is the one thing that the Appointments Clause requires: an office, "established by Law," and vested with formal power to act as an "Officer[] of the United States." U.S. Const. art. II, § 2, cl. 2. That

dooms the States' constitutional claim. And their derivative statutory claim fails for many of the same reasons.

That said, while the merits are straightforward, this Court should not reach them, because the States lack standing. The States marshal many grievances about both Mr. Musk and DOGE's broader initiatives; but absent from these general objections is a single allegation showing an actual or imminent injury suffered by the States. Instead, at every turn, the States complain about *possible* injuries that *might* happen in the event the Defendants take certain *contemplated* actions at a chorus of federal agencies (each of which is led by its own officers, many of whom *have been* nominated by the President and confirmed by the Senate). That highly speculative chain of events is not the stuff of Article III. If a State ends up being actually harmed by an identifiable governmental act, it is free to challenge the legality of that act or its provenance in court. But the States cannot—consistent with the federal courts' traditional role, and constitutional limits—shoehorn their policy broadside into a justiciable controversy.

## BACKGROUND

### I.  The United States DOGE Service

#### A.  Executive Order 14,158

On January 20, 2025, President Trump signed Executive Order 14,158, which directed changes to the United States Digital Service to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology ('IT') systems." *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("USDS E.O."). The USDS E.O. redesignated the United States Digital Service as the United States DOGE Service ("USDS") and established that entity in the Executive Office of the President. *Id.* § 3(a). And under 5 U.S.C. § 3161, it established a "U.S. DOGE Service Temporary Organization" within USDS to terminate on July 4,

2026. *Id.* § 3(b). The DOGE Service Temporary Organization "shall be dedicated to advancing the President's 18-month DOGE agenda," and shall be headed by the USDS Administrator. *Id.* The USDS Administrator reports to the White House Chief of Staff. *Id.* The USDS E.O. also requires agency heads to establish DOGE Teams within their agencies composed of agency employees, which may include Special Government Employees ("SGEs"). *Id.* § 3(c).

The USDS E.O. directed USDS to collaborate with Executive agencies to modernize the government's technology and software infrastructure to increase efficiency and productivity and ensure data integrity. *Id.* § 4. To do so, the USDS E.O. directed USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructed, USDS must "adhere to rigorous data protection standards." *Id.*

### B.  Executive Order 14,210

On February 11, 2025, President Trump signed Executive Order 14,210, which "commences a critical transformation of the Federal bureaucracy" to "restore accountability to the American public" by "eliminating waste, bloat and insularity." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order. No. 14,210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce E.O."). The Workforce E.O. directed the Director of the Office of Management and Budget ("OMB") to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* § 3. The Workforce E.O. further required that new career appointment hiring decisions shall be made "in consultation with the agency's DOGE Team Lead, consistent with applicable law," and that the agency shall not fill vacancies for career appointments that the DOGE Team Lead assesses should not be filled, "unless the Agency Head determines the positions should be filled." *Id.* § 3(b)(i)–(ii).

The Workforce E.O. directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). The Workforce E.O. also directed the Director of the Office of Personnel Management to initiate a rulemaking by March 11, 2025 that proposes to revise 5 C.F.R. § 731.202(b) to include additional suitability criteria. *Id.* § 3(e). In addition, by March 11, 2025, agency heads must submit to the Director of OMB a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities, and discuss whether the agency or any of its subcomponents should be eliminated or consolidated. *Id.* Pursuant to the Workforce E.O., the USDS Administrator must submit a report to the President within 240 days of the date of the E.O. "regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified or terminated." *Id.* § 3(f).

### C.    Elon Musk

Elon Musk is an SGE. *See* Compl. ¶ 25, ECF No. 2 (citing 18 U.S.C. § 202(a)). An SGE is "an officer or employee of the executive or legislative branch of the United States Government" who "is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis." 18 U.S.C. § 202(a). Mr. Musk "does not occupy an office of the United States," and has no authority to exercise the powers of an officer. Compl. ¶¶ 6, 257. Indeed, the States do not allege that Mr. Musk has any formal authority at all; the States instead contend that Mr. Musk holds "*de facto*" power over Executive Branch operations. *Id.* ¶ 75.

## II.    This Litigation

Plaintiffs, fourteen States, filed this suit on February 13, 2025.  *See* Compl.  The complaint names Elon Musk, in his official capacity, the USDS, the U.S. DOGE Service Temporary Organization, and Donald J. Trump, in his official capacity, as defendants.  *Id.* ¶¶ 25–28.  Raising a claim under the Appointments Clause and contending that Mr. Musk, the USDS, and the U.S. DOGE Service Temporary Organization have acted "in excess of statutory authority," Defendants seek wide ranging injunctive and declaratory relief.  *Id.* ¶¶ 273–277 (Prayer for Relief).  The Complaint seeks an injunction ordering "Mr. Musk to identify all ways in which any data obtained through unlawful agency access was used, including whether it was used to train any algorithmic models or create or obtain derivative data, orders Mr. Musk to destroy any copies or any derivative data from such unauthorized access in his or DOGE's possession, custody, or control, and bars Mr. Musk and DOGE" from engaging in a wide swath of activities.  *Id.* ¶ 273.  The Complaint also seeks a declaration targeting broad classes of unidentified conduct: (1) "that Mr. Musk's officer-level government actions to date, including those of his subordinates and designees, are *ultra vires* and shall have no legal effect; and (2) . . . any future orders or directions by Mr. Musk or DOGE in the categories outlined in the Injunctive Relief section of this Prayer for Relief above are *ultra vires* and of no legal effect."  *Id.* ¶ 275.

On February 18, 2025, the Court denied the States' motion for a temporary restraining order based on their failure to show irreparable harm.  *See New Mexico v. Musk*, No. 25-cv-429, 2025 WL 520583, at *3 (D.D.C. Feb. 18, 2025).  The Court observed, based on the record before it, that the States could not meet their burden to show irreparable injury because their declarations "are replete with attestations that *if* Musk and DOGE Defendants cancel, pause or significantly reduce federal funding or eliminate federal-state contracts, Plaintiff States will suffer extreme financial and programmatic harm[.]"  *Id.* (emphasis in original).  The Court emphasized that the "possibility" that Defendants may take actions that irreparably harm the States "is not enough."  *Id.* (citation omitted)

**LEGAL STANDARD**

To survive a Rule 12(b)(1) motion a plaintiff must prove that the court has subject matter jurisdiction. *Physicians Comm. for Responsible Med. v. Dep't of Agric.*, 656 F. Supp. 3d 158, 162 (D.D.C. 2023). While the Court will accept factual allegations in the Complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 25 (D.D.C. 2016) (cleaned up).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The court accepts the factual allegations as true, but "bare assertions" and "conclusory" allegations are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. The Complaint must allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).

**ARGUMENT**

I.    **The States Lack Article III Standing**

To invoke the jurisdiction of this Court, the States "must show" that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The alleged injury-in-fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA*

*v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).  If the injury has not materialized, it must be "certainly impending," and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted).  In addition, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

The States fail to satisfy these fundamental principles.  Initially, the States' assertion that they need not show Article III injury to support an alleged Appointments Clause violation is wrong.  As with all "Cases" and "Controversies" arising under Article III, an Appointments Clause claim requires a cognizable injury.  Here, the States' standing is premised solely upon alleged (1) financial and programmatic harm; and (2) unauthorized access to and disclosure of the States' private data.  *See* Compl. ¶ 229–52; Pl. States' Mot. for a TRO at 6–12, ECF No. 6.  But the States fail to show any judicially cognizable injury at all, let alone one that is traceable to Defendants or redressable by an order of this Court.

## A.    The States Must Comply With the Case-or-Controversy Requirement of Article III

For starters, the States posit that there is an Appointments Clause exception to the case-or-controversy requirement of Article III.  That is so, they assert, because "harm is presumed" when a plaintiff alleges an Appointments Clause violation.  Compl. ¶ 226 (quoting *Lofstad v. Raimondo*, 117 F.4th 493, 497 (3rd Cir. 2024)); *see also* ECF No. 6 at 7.  There is no such exception.  The "specific standing requirements constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'"  *All. for Hippocratic Med.*, 602 U.S. at 380 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The Supreme Court has applied the "bedrock constitutional requirement" of Article III standing "to all manner of important disputes."  *United States v. Texas*, 599 U.S. 670, 675 (2023).  And the D.C. Circuit has applied the traditional injury requirement in the context of an Appointments Clause claim.  *Andrade v. Lauer*, 729 F.2d 1475, 1494 (D.C. Cir. 1984) (concluding that

the plaintiffs had "suffered a classic direct, concrete, and particularized injury: they lost their job" (cleaned up)).  Thus, the States must show they suffered an Article III injury—*i.e.*, a "concrete harm." *TransUnion*, 594 U.S. at 417.

None of the cases the States cite support an exception to Article III for an Appointments Clause claim.  *See* Compl. ¶ 226.  Two of those cases did not even address standing.  *See Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) (discussing harmless error); *Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 154 (3rd Cir. 2020) (discussing administrative exhaustion).  At most, the States invoke a line of cases where entities were subject to some process administered by an unlawfully appointed officer.  But even there, the party suffered a *direct injury*, because as the Supreme Court has explained, that unlawful process itself inflicts a "here-and-now injury" on its participants.  *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191–92 (2023); *see also Lofstad v. Raimondo*, 117 F.4th 493, 496–98 (3rd Cir. 2024).

So across the board—whatever the legal claim—Article III applies in full measure.  Here as elsewhere, the States must satisfy its dictates, including by identifying a concrete, attributable harm.

### B.    Alleged Financial and Programmatic Harm

Turning to the States' alleged injuries, it becomes apparent why they try to avoid Article III in the first place.  Foremost, they point out that the federal government disburses "billions of dollars directly to the States to support law enforcement, health care, education, and many other programs," and that Defendants "have attempted to use their unlawful control of federal agencies to stop many such payments, and . . . have expressed their intent to continue and expand those efforts."  Compl. ¶¶ 229–30.  The States contend that "if" the federal government were to cease to fulfill its obligations under agreements with the States, they will incur greater financial costs and strain on personnel and other resources to compensate for the lost federal funding and staffing needed to administer and operate those programs or perhaps cut those programs altogether.  *Id.* ¶ 238; *see also id.* ¶ 235 (alleging

that the States will be harmed "*if*" certain agencies halt operations (emphasis added)).  The States further suggest that federal hiring freezes, workforce reductions and the cessation of expected or vested federal funding streams will cause delays and inefficiencies in program implementation.  *Id.* ¶ 239.

These speculative assertions of harm, contingent on future action by unnamed actors, are plainly insufficient.  Allegations that a plaintiff may or even will be injured "*if*" certain events occur are traditionally "far too speculative to constitute the type of 'imminent' harm necessary to constitute an injury-in-fact for Article III standing purposes." *Mayor & City Council of Baltimore v. ATF*, 738 F. Supp. 3d 1, 8–9 (D.D.C. 2024) (quoting *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996)); *see Chamber of Com. v. EPA*, 642 F.3d 192, 204 (D.C. Cir. 2011) (finding declarations that stated merely that harm "could" or "may" occur too equivocal to demonstrate an injury-in-fact).  And there is no basis for departing from that rule here.

Indeed, the purported injuries in the declarations the States have submitted are definitionally contingent and speculative, not actual or imminent.  Take the Declaration of Wayne Propst, the Cabinet Secretary for the New Mexico Department of Finance and Administration.  *See* ECF No. 6-11.[1]  Secretary Propst states that he "expect[s]" that the actions of the DOGE will "adversely impact the operations of the Department of Finance and Administration," because the "cancellation of federal-state contracts or a significant reduction in federal personnel and/or funding for partner federal agencies will impact the state's Department of Workforce Solutions" if they occur.  *Id.* ¶¶ 10-11; *see also id.* ¶ 14 ("*[I]f* DOGE causes any disruption or delay in Federal financial assistance . . ."

---

[1]     Some of the States' declarations were attached to the Complaint, and some others were attached only to Plaintiffs' Motion for a Temporary Restraining Order.  *See* ECF No. 6-11, ECF No. 6-12.  In either case, "a 'court may consider materials outside the pleadings' to decide a [Rule 12(b)(1)] motion." *Physicians Comm. for Responsible Med.*, 656 F. Supp. 3d at 162 (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

(emphasis added)); *id.* ¶ 15 ("*If* existing programs are canceled or federal workers administering these programs are terminated . . ." (emphasis added)); ¶ 17 ("*If* the federal government fails to provide its current obligation for FY25 . . ." (emphasis added)).  The other declarations from the States are similarly conditional and speculative:

- Declaration of Katherine "K.D." Chapman-See, ECF No. 2-1, ¶ 5 ("*If* the actions of [DOGE] . . . cancel federal-state contracts or significantly reduce federal funding for/from partner federal agencies, it will impact Washington State's ability to adequately serve and uphold its own legal commitments to its residents.") (emphasis added).

- Declaration of Jeffrey Beckham, ECF No. 6-12, ¶¶ 3, 5, 6, 9, 10 (Exhibit K) (noting "potential adverse impacts" that "may" occur, including the "potential" impact on federal funding).

- Decl. of Mariana D. Padilla, ECF No. 2-2, ¶ 5 ("I *expect* the actions of" USDS "to adversely impact" State education operations).

- Decl. of Sarita Nair, ECF No. 2-3 ¶¶ 5, 19 (similar).

- Decl. of Danielle Gilliam, ECF No. 2-4, ¶¶ 9–12 (listing various harms the declarant believes could arise "*[i]f* the" USDS "dramatically reduces the federal workforce," if there is "[a]ny disruption in federal resources," of "*[i]f*" a regulatory "approach were adopted"

(emphases added).  Like the allegations of injury in the Complaint, all of these purported injuries are contingent on future possibilities that may not occur.  *See Clapper*, 568 U.S. at 409.

Taking a different tack, the States contend that they are harmed when federal agencies decide to reduce their enforcement activities or cease providing educational resources to the public.  *See* Compl. ¶¶ 233–36 (discussing CFPB enforcement of consumer protection laws and Department of Education's Office of Civil Rights enforcement of civil rights laws); *see also id.* ¶ 149 (alleging that less enforcement activity by the CFPB will require states "to invest far greater resources and personnel to protect their citizens" including because the CFPB is a co-plaintiff in two lawsuits).  But those allegations fare even worse.  For one, they are even *more* indirect and *more* speculative—for instance, turning on a *possible* failure to enforce that *may* someday affect the States.  Moreover, the States' theory

of injury "run[s] up against the Executive's Article II authority to enforce federal law." *Texas*, 599 U.S. at 678. States "lack[] standing to contest the policies of the prosecuting authority" when they are "neither prosecuted nor threatened with prosecution." *Id.* at 677 (citation omitted). It is up to the *federal* Executive Branch "to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Id.* at 678 (quoting *TransUnion*, 594 U.S. at 429). Doubtless, these decisions "frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3. But those indirect effects are not Article III injuries—lest every state have standing to challenge virtually every discretionary federal act. *Id.*

The States' only allegation of financial or programmatic harm that has already occurred is a single statement that "Defendants have halted payments from USAID to public universities, including in the Plaintiff States." *See* Compl. ¶ 231.[2] To be sure, a financial harm of that type could support Article III standing. But the States offer nothing more than an "unadorned, the-defendant-unlawfully-harmed-me accusation" as to the allegedly halted payments. *Iqbal*, 556 U.S. at 678. In fact, not even that much. The basis for this statement—the Declaration of Leslie Anne Brunelli from Washington, ECF No. 6-8—makes clear that the suspension/stop work orders came from either USAID or the prime award recipients, *not Defendants*. *See* Brunelli Decl. ¶ 6 ("Our USAID grantees have all received Suspension/Stop Work Orders from either USAID or the prime award recipients."). Accordingly, even if the States suffered some harm from losing USAID funds, that harm—by their own account— is not traceable to the actions of Defendants, as opposed to the independent acts of those at USAID.

---

[2]      The States also allege that "Defendants have attempted to use their unlawful control of federal agencies to stop many such payments, and they have expressed their intent to continue and expand those efforts." Compl. ¶ 230. An unsuccessful "attempt" to stop payments causes no injury, however. And to the extent that the States allege that unspecified individuals may undertake future efforts to stop payments, those allegations are insufficient to state a certainly impending harm for the reasons explained *supra*.

None of those allegations provides factual support for the claim that Defendants—as opposed to USAID itself—were responsible for the decision to stop the specific payment pauses at issue.

In their motion for a temporary restraining order, the States relied on several cases holding that a loss of federal funding is sufficient to create an Article III injury. ECF No. 6 at 7. That reliance is misplaced, as each case involved a nonspeculative, direct impact to a state or city's receipt of federal funds. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365–66 (2023) (holding that the Education Secretary's waiver of borrowers' student loan payments directly harmed a state-created organization that owned over $1 billion in loans); *Clinton v. City of New York*, 524 U.S. 417, 430 (1998) (noting that harm to the state had already occurred because the "State now has a multibillion dollar contingent liability that had been eliminated by § 4722(c) of the Balanced Budget Act of 1997"); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235–36 (9th Cir. 2018) (holding that cities with sanctuary city policies had demonstrated a likely loss of federal funds, and therefore standing, to challenge an Executive Order that would have barred funds to sanctuary cities); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (holding that state had standing where reinstatement of rule would reduce state's "statutory entitlement to fractional receipts"). Here, however, none of the statements in the States' Complaint are sufficient to plausibly allege that any loss of federal funding was caused by the actions of any Defendant.

### C.     Alleged Unauthorized Access to and Disclosure of the States' Private Data

The States' other alleged injury—Defendants' alleged access to State data housed in the information technology systems of certain federal agencies—is also insufficient to create an injury-in-fact. As an initial matter, of the five States that submitted declarations, two of those States—Connecticut and Arizona—do not claim any data-related harms at all. *See* Decl. of Jeffrey R. Beckham, ECF No. 6-12 (Connecticut); Decl. of Ben Henderson, ECF No. 2-6 (Arizona). In addition, Michigan and Washington's claimed data-related harms stem solely from concerns expressed by their residents

rather than harm directly to those states. *See, e.g.* Decl. of Kimberly Bush-Koleszar ¶¶ 4–9, ECF No. 2-8 (Michigan); Decl. of Laura K. Clinton ¶¶ 7–12, ECF No. 2-9 (Washington). But States do not have "'standing as *parens patriae* to bring an action against the Federal Government.'" *Murthy*, 603 U.S. at 76 (citation omitted).

So that leaves New Mexico, which states that it provides data to Treasury, Labor and Transportation. *See* Decl. of Sarita Nair ¶ 20, ECF No. 2-3 (discussing DOGE's alleged access to Treasury records); *id.* ¶ 25 (discussing New Mexico's provision of proprietary information to Department of Labor); Decl. of Wayne Propst ¶ 19, ECF No. 6-11 (stating that New Mexico provides proprietary data to Departments of Treasury and Transportation). The States label this access as "[u]nauthorized" and also include headings suggesting there was some form of "[d]isclosure" of data. Compl. ¶ 242. The States' factual allegations, however, fail to support these labels. As to access, the States' own allegations support that the data access decisions were authorized by relevant agency officials. *See* Compl. ¶ 85 ("Secretary Bessent granted . . . full access to" Department of Treasury "payment systems"); *id.* ¶ 95 (explaining that "personnel were . . . given access" by "agency personnel"); *id.* ¶ 111 ("high-level access to OPM computer systems" granted by "OPM staff"); *id.* ¶ 128 ("'Agency veterans' were leading the collaboration with DOGE, including ensuring appropriate access to CMS systems and technology."); *id.* ¶¶ 137–38 (access to Department of Energy granted by recently appointed chief information officer); *id.* ¶ 178 (explaining that Department of Labor "leadership told employees" to "provide access to" agency systems); *id.* ¶ 192 (access to NOAA systems granted by acting Commerce Secretary); *id.* ¶ 194 (Homeland Security Secretary acknowledging access to Federal Emergency Management Agency data); *see also* USDS E.O. § 4(b) (directing agency heads to "take all necessary steps" to "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems" to "the maximum extent consistent with law").

As to disclosure, the States nowhere allege that any non-public data has been transferred to third parties outside the government or otherwise been made public.  Instead, the States appear to mean that individuals associated with USDS, the U.S. DOGE Service Temporary Organization, or the DOGE Teams at relevant agencies have been granted access.  As another court in this district recognized, however, "DOGE Team members are federal government employees who have a need for the" data they have been granted access to "in the performance of their duties."  *AFL-CIO v. Dep't of Labor*, No. 1:25-cv-339, 2025 WL 542825, at *2 (D.D.C. Feb. 14, 2025) (quoting 5 U.S.C. § 552a(b)(1)) (denying a TRO due to Plaintiff's failure to establish a likelihood of success on the merits or a substantial likelihood of standing).  The States' argument, therefore, is that this access and disclosure to other government employees somehow causes them injury.

The type of access the States allege does not alone give rise to an actual, concrete harm sufficient to establish standing.  To be sure, "disclosure of private information" may cause cognizable harms.  *TransUnion*, 594 U.S. at 425.  But for the States to establish some concrete harm related to their data, they would need to show not just *access* to their information, but that the information had been disclosed in a way that causes them harm, such as a public disclosure.  *Id.* at 427; *see Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public); *id.* at 1246 (citing cases); *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 231-32 (M.D. Pa. 2023); Restatement (Second) of Torts § 652D ("Publicity Given to Private Life"); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.").

The States do not allege that there has been public disclosure here; instead, they allege that there has been (at most) an exchange internal to the federal government.  *Barclift v. Keystone Credit Servs.,*

*LLC*, 585 F. Supp. 3d 748, 758–59 (E.D. Pa. 2022) ("Even assuming that the employees of the mailing vendor read Barclift's personal information, sharing her personal information with 'a small group of persons is not publicity.'" (citation omitted)); *see also Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 146 (3d Cir. 2024) ("Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones."), *cert. denied*, 145 S. Ct. 169 (2024).  Again, the States do not allege that anyone affiliated with Mr. Musk, the USDS, the Temporary Organization, or the agencies' DOGE Teams have disclosed any information in a way that causes tangible harm, such a public disclosure.  Indeed, New Mexico acknowledges there has been no public disclosure of its data.  *See* Propst Decl. ¶ 20 ("*If* this sensitive data is compromised . . .") (emphasis added); Nair Decl. ¶ 26 ("Upon information and belief, *if* this sensitive data is compromised, the State of New Mexico would be vulnerable to embezzlement, cyber theft, ransom attacks, and other financial crimes.") (emphasis added).  There is thus no cognizable injury from this access.  *See AFL-CIO*, 2025 WL 542825, at *1 n.1 ("[I]f the information wasn't disclosed, or if it was disclosed lawfully, plaintiffs have no injury[.]").

    In their motion for a temporary restraining order, the States analogized their claim of data access injury to that of a data breach.  *See* ECF No. 6 at 10 (citing *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276 (2d Cir. 2023)).  But the case the States cite involved a "targeted hack," not an "intra-company disclosure."  *Bohnak*, 79 F.4th at 289.  The single "most important factor in determining whether a plaintiff whose [personal information] has been exposed has alleged an injury in fact is whether the data was compromised as the result of a targeted attack intended to get" that information.  *Id.* at 288.  That factor is lacking here.

    Aside from mere access to sensitive data, the States offer three other theories of injury flowing from Defendants' data activity, but all three are insufficient.  First, the States allege that "increasing the number of people with access to secure systems" and allowing changes by "people unfamiliar with

agency systems" both "create[] opportunities for cyberhacking." Compl. ¶¶ 243–44. But the States' speculative fear that their data *might* be hacked in the future does not suffice for Article III standing because that harm is not certainly impending. *Clapper*, 568 U.S. at 416; *see Univ. of Cal. Student Ass'n v. Carter*, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025) (rejecting argument that access to personal data given to purportedly unauthorized government employee increases risk of identity theft as "entirely conjectural" and did not establish irreparable harm for a temporary restraining order).

Second, the States allege that their "citizens have contacted officials . . . to voice their fears about Mr. Musk's . . . unprecedented access" to "sensitive data." Compl. ¶ 249. As already stated, however, States lack *parens patriae* standing to bring such a claim. *See supra* p. 13.

Third, the States proffer that their sovereign interests are harmed through "increased risks to nuclear safety" and public health due to certain individuals gaining access to Department of Energy and Centers for Disease Control and Prevention IT systems. Compl. ¶¶ 133, 140. It is unclear, however, why the States believe that mere data access increases those risks, which in any event are entirely speculative. The States instead invoke the "special solicitude" the Supreme Court has sometimes granted to States in the standing analysis. *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007)). Yet, the D.C. Circuit has explained that that doctrine is quite narrow. It "stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm." *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 476–77 (D.C. Cir. 2009). And the States' speculative assertion here that data access to government IT systems raises the risk of disease outbreaks or nuclear harms does not establish that the States have "suffered [their] own individual harm apart from the general harm caused by" those risks. *Id.* at 477.

## II.    The Complaint Should Be Dismissed under Rule 12(b)(6)

Because this Court lacks jurisdiction, it need go no further.  If the Court does reach the merits, however, it should dismiss for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).

### A.    The States' Appointment Clause Count Fails to State A Claim

The Appointments Clause of the Constitution prescribes the method for appointing officers of the United States.  U.S. Const. art. II, § 2, cl. 2.  Principal officers must be appointed by the President with Senate confirmation, while inferior officers may be appointed by the President alone, the courts of law, or the heads of Executive departments.  *Id.*  Individuals are officers, and thus must receive a constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercis[e] significant authority pursuant to the laws of the United States."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010) (citation omitted).  Federal employees who do not meet these criteria "need not be selected in compliance with the strict requirements of Article II."  *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

Here, the States' Complaint does not plausibly allege an Appointments Clause violation because they nowhere identify any "office" whose authority Mr. Musk allegedly wields without proper appointment.  As their own allegations establish, Mr. Musk is a Special Government Employee who "does not occupy an office of the United States."  Compl. ¶¶ 6, 25.  Those concessions end this case.  The States' remaining allegations are entirely consistent with the idea that Mr. Musk influenced other governmental officials—whose authority is not challenged in this lawsuit—to take certain decisions with which the States disagree.  But even if Mr. Musk could be said to have "directed" these decisions in some functional sense, as the States allege, that would not establish an Appointments Clause violation.  So long as a duly authorized agency official takes formal responsibility for those decisions, the Appointments Clause is satisfied.

At bottom, the Appointments Clause governs formal, not colloquial, power; and where someone does not occupy an office equipped with actual authority, he cannot be an "officer" of the United States. An advisor does not become an officer simply because the officer listens to his advice. Once that premise is removed, the States' constitutional claim collapses. This claim should be dismissed.

### 1. The States Fail to Allege Mr. Musk Occupies an Office Established By Law

For there to be an Appointments Clause challenge, there needs to be an office—*i.e.*, a continuing position vested with "significant authority pursuant to the laws of the United States." *Freytag*, 501 U.S. at 881 (citation omitted). To state an Appointments Clause violation, then, the "threshold trigger" is a governmental position that is "'established by Law.'" *Landry*, 204 F.3d at 1133. Once the position is identified, courts analyze whether the authority imbued in that position is significant by reference to the position's duties and powers as reflected in that position's organic law. *See, e.g.*, *Lucia v. SEC*, 585 U.S. 237, 248–49 (2018) (analyzing whether administrative law judges are officers solely by reference to their duties set forth in statute and regulation); *Freytag*, 501 U.S. at 881; *Landry*, 204 F.3d at 1133. Where the office identified does not reflect a continuing position that exercises significant authority pursuant to the laws of the United States, "the Appointments Clause cares not a whit about who named" a person to that post. *Lucia*, 585 U.S. at 245. As these cases reflect, this is a formalist inquiry: It turns exclusively on the *de jure*—not *de facto*—authority that a person wields as a matter of law.

The States here identify no "office" whose authority Mr. Musk allegedly wields. Quite to the contrary, the States' Complaint affirmatively alleges that Mr. Musk "does not occupy an office of the United States." Compl. ¶¶ 6, 25. That allegation alone ends their Appointments Clause challenge. The Appointments Clause is concerned with the formal powers vested in an office by law, not an individual's perceived informal influence. *See, e.g.*, *Freytag*, 501 U.S. at 881 (looking to statute for

office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute"). Yet, the States concede that Mr. Musk does not occupy an office with any such formal powers. Compl. ¶ 257 ("Mr. Musk does not occupy an office created by law and has no authority to exercise the powers of a principal officer, or any other officer.").

The States' argument fundamentally misunderstands the Appointments Clause. On their view, the Court's focus should be not on the powers imbued in the *office* a person occupies but on whether the particular *person* has wielded significant power. *See* ECF No. 51 at 8–9. But that conflates formal authority and informal influence, hard power and soft. Nobody thinks, for instance, that the White House Chief of Staff or White House Counsel are *officers* in any fashion, despite the fact they exercise *tremendous* influence across the government. This is because they do not occupy a position that is equipped with any formal authority. And without *that*, there is nothing that implicates the Appointments Clause.

Unsurprisingly, the States cite no case even suggesting that the Appointments Clause turns on a functional analysis of how a particular government official wielded his power. *See* ECF No. 6; ECF No. 51. In fact, every case they cite establishes just the opposite—that the constitutional analysis turns on the formal authority imbued in the position. *See, e.g.*, *Lucia*, 585 U.S. at 246–47; *Freytag*, 501 U.S. at 881; *cf. Trump v. United States*, 603 U.S. 593, 649 (2024) (Thomas, J., concurring) (analyzing question whether Special Counsel was properly appointed only after considering whether the Special Counsel "ha[d] a valid office"). And even the States acknowledge that what matters is whether "a *position* . . . constitutes an office" under the Constitution, ECF No. 51 at 8 (emphasis added), a determination that is made based on the extent of power an individual in that position formally wields, *see Lucia*, 585 U.S. at 245.

Besides having no basis in law, there is also nothing to recommend the States' functional approach as a practical matter. As the States would have it, the constitutional analysis here would turn on how much "de facto" power an individual person wields—as determined, of course, by an Article III court. But it cannot be, for instance, that a Chief of Staff is an officer in some administrations (when she effectively marshals her agenda), but a mere advisor in others (when people ignore her advice). Yet, that is precisely the type of analysis the States contemplate. *See* ECF No. 51 at 8–9.

If the States seek to rely on the duties of the USDS Administrator as the predicate office for their Appointments Clause challenge, *see* Compl. ¶¶ 52–58, that claim also fails. Notably, the States do not allege that Mr. Musk is the USDS Administrator. Regardless, the actual duties of the USDS Administrator do not make it an office subject to the Appointments Clause.[3] *See* USDS E.O., 90 Fed. Reg. 8441 (Jan. 20, 2025). The Executive Orders creating that position delegate no significant formal authority to the USDS Administrator. *See id.*; Workforce E.O., 90 Fed. Reg. 9669 (Feb. 11, 2025). Most of the duties those Executive Orders assign to the USDS Administrator are purely consultative; final authority resides with the relevant Agency Head. *See* USDS E.O. § 3(c) (requiring Agency Heads to "consult[]" with the USDS Administrator in the selection of agency employees selected to DOGE Teams); *id.* § 4(b) (requiring Agency Heads to "take all necessary steps, in coordination with the USDS Administrator . . . to ensure USDS has full and prompt access to" certain agency records); Workforce E.O. § 3(b)(3) (requiring agency DOGE Team Leads to "provide" the USDS Administrator "with a monthly hiring report"). The only formal duty the Executive Orders assign to the USDS

---

[3] The Fisher Declaration filed in opposition to the State's motion for a temporary restraining order stated that Mr. Musk is not the USDS Administrator. *See* ECF No. 24-1. Since the filing of that declaration, another person, not named in this lawsuit, has been announced as the Acting USDS Administrator. For purposes of their Rule 12(b)(6) motion, Defendants assume the truth of the States' well-pleaded allegations. Because the facts provided by the Fisher Declaration are unnecessary to resolve this motion, the Court need not convert the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Ruffin v. Gray*, 443 F. App'x 562, 563–64 (D.C. Cir. 2011).

Administrator is to "commence a Software Modernization Initiative" to improve "governmentwide software, network infrastructure, and information technology (IT) systems" and "work with Agency Heads to promote" efficient data integrity and sharing.  USDS E.O. § 4(a).  But even that duty does not include any formal authority over others.  In short, the Administrator's largely administrative duties are a far cry from the types of significant authority that other courts have found create an office subject to the Appointments Clause.  *Lucia*, 585 U.S. at 246–47; *Freytag*, 501 U.S. at 881.

Among the various consulting duties established by executive order, the Workforce E.O. directs agency heads to consult with the agencies' DOGE Team Lead to "develop a data-driven plan . . . to ensure new career appointment hires are in highest-need areas."  Workforce E.O. § 3(b).  That "hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law" and requires the DOGE Team Lead to provide hiring reports to the USDS Administrator.  *Id.* § (3)(b)(iii).  But that Executive Order does not give Mr. Musk or anyone at USDS "authority to direct and veto the staffing decisions of agencies."  Compl. ¶ 76.  Nor does it contemplate giving Mr. Musk or anyone at USDS the final authority to direct specific personnel decisions:  Rather, the Executive Order expressly permits agencies to fill positions over the objection of the DOGE Team Lead where "the Agency Head determines the positions should be filled."  Workforce E.O. § 3(b)(ii).[4]  And in any case, the DOGE

---

[4]    The Court expressed concern in its Order denying Plaintiffs' motion for a temporary restraining order that Defendants' Notice and Declaration by Joshua Fisher conflicted with the language in the Workforce E.O. that provides that "new career appointment hiring decisions" at each federal agency "shall be made in consultation with the agency's DOGE Team Lead" and agencies "shall not fill any vacancies for career appointments that the DOGE Team Lead accesses should not be filled, unless the Agency Head determines the positions should be filled."  *See State of New Mexico v. Musk*, No. 25-cv-429, 2025 WL 520583, *1 n.1 (D.D.C. Feb. 18, 2025) (quoting Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025)).  Defendants do not believe there is any inconsistency between the notice accompanying the Fisher Declaration and the Workforce E.O. and certainly had no intention to misstate the facts.  The notice accompanying the Fisher declaration stated that neither of the Executive Orders contemplated or authorized the USDS or the U.S. DOGE Service Temporary

Team Lead is an employee of the agency, not USDS or Mr. Musk.  *See id.* § 3(a); USDS E.O. § 3(c) (requiring Agency Heads to establish a DOGE Team of at least four *employees* including one DOGE Team Lead).  As such, the States nowhere cite any source of law granting Mr. Musk, the USDS Administrator, or anyone affiliated with USDS final authority over any personnel decision.  And because they do not otherwise identify an office Mr. Musk supposedly holds without proper appointment, their claim fails.

> **2.    Even if Mr. Musk Functionally "Directed" the Complained-of Actions, the States' Appointments Clause Claim Fails**

Unable to identify any *actual* authority possessed by Mr. Musk, the States' primary theory is that Mr. Musk has "directed" others to wield their power accordingly.  *See* ECF No. 6 at 21–22.  But that is flawed at every turn.

**a.**  Foremost, the States' theory is foreclosed by binding D.C. Circuit precedent.  In *Andrade v. Regnery*, the D.C. Circuit rejected an Appointments Clause challenge asserted in an employment removal action based on the same exact theory.  824 F.2d 1253, 1256–57 (D.C. Cir. 1987).  The plaintiffs argued that an official not validly appointed as an officer of the United States "had complete responsibility for crafting and executing" their terminations—*i.e.*, that someone without appointment was pulling the strings, and directing the actions that harmed them.  *Id.* at 1257.  The court explained that, even if true, that fact was irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action."  *Id.*

---

Organization to order personnel actions at any of the specified agencies.  ECF No. 24 at 2.  That is consistent with the Workforce E.O., which expressly stated that while the Agency's DOGE Team Lead has a role in assessing whether positions shall be filled, the Agency head makes the final determination.  Workforce E.O. § 3(ii).  Accordingly, while Defendants regret any concern these representations may have caused, Defendants maintain that the Workforce E.O.'s provision permitting the Agency head the final say in personnel matters necessarily means that the USDS, the U.S. DOGE Service Temporary Organization, and the DOGE Team Lead do not possess that same authority.

That principle applies here: Again, Mr. Musk does not have—and the States have cited no source showing—any independent legal authority to command anyone to do anything. Accordingly, *even if* Mr. Musk advised, recommended, or indeed "directed" certain actions across multiple agencies, the actual legal authority for such actions is not vested in Mr. Musk, but instead in the actual decisionmakers making those decisions. In other words, even assuming that Mr. Musk or USDS employees "conceive[d of] and even carr[ied] out policies" to which the States object, there is no Appointments Clause violation under *Andrade*, because duly appointed agency heads ultimately "take official responsibility" for those actions. *Id.* What is needed for an Appointments Clause challenge is a governmental action taken by someone lacking the authority to do so; because the States do not allege a *single* example of that, their Appointments Clause claim fails as a matter of law.

The States' attempt to distinguish *Andrade* is ineffective. *See* ECF No. 51 at 8. On their view, the Reduction in Force ("RIF") challenged in that case was no Appointments Clause problem because "the same officer" that had conceived of the RIF prior to his appointment "*was* duly appointed by the time the RIF was actually executed." *Id.* Yes, that is how there was no violation in that case; but the States completely ignore the reason *why* that was so. What *Andrade* held is that it is irrelevant for Appointments Clause purposes who was in the ear of the decisionmaker, or what went into his decision; instead, the only consideration was whether the *actual decisionmaker*—the person who signed at the dotted line—had the legal authority to take that action. *Andrade*, 824 F.2d at 1257. So too here. Mr. Musk does not have formal decision-making authority, and thus political accountability for those actions lies with the individuals authorized to undertake them.

**b.** Relatedly, the States nowhere plausibly allege that the complained-of actions were not formally approved by a relevant agency actor with proper authority. That is fatal to their claim.

Many of the States' allegations related to Mr. Musk are bare assertions or legal conclusions that the Court need not credit. *Compare Iqbal*, 556 U.S. at 680–81 (declining to assume the truth of

allegations that Attorney General was "the 'principal architect'" of a challenged policy), *with* Compl. ¶ 65 (asserting that Mr. Musk "has unprecedented and seemingly limitless access" and "has asserted significant and sweeping authority"); *id.* ¶ 5 (alluding to "Mr. Musk's seemingly limitless and unchecked power"); *id.* ¶ 201 ("Mr. Musk [has] assumed and exercised authority over public funds[.]"); *id.* ¶ 212 ("Mr. Musk has committed to severance packages through September."). Even with respect to agency-specific actions, the States nowhere plausibly establish that Mr. Musk was the final decisionmaker on whose authority the action was taken. For example, the States allege that "then-acting Treasury Secretary David A. Lebryk" halted foreign aid payments "because Mr. Musk believed they violated certain executive orders." Compl. ¶ 82. They similarly allege that Mr. Musk "conceived of and offered the 'deferred resignation program'" popularly known as the "Fork in the Road," which was then implemented by the Office of Personnel Management. *Id.* ¶ 118; *see id.* ¶¶ 116–17. But at most, those allegations are consistent with properly authorized agency decisions that Mr. Musk conceived. Under *Andrade*, that is no Appointments Clause violation. 824 F.2d at 1256–57.

The States' remaining allegations seeking to establish Mr. Musk's authority are simply irrelevant to their Appointments Clause claim. It is of no constitutional moment how President Trump has chosen to structure the relationship between his chief of staff and his other non-officer advisors, including Mr. Musk. *Contra* Compl. ¶¶ 73–74. Nor is it significant that Mr. Musk has addressed the public from the Oval Office or at other events. *See id.* ¶ 75. And Mr. Musk's statements about actions he would like the government to take in the future hardly establish that he is currently exercising improper authority. *See, e.g.*, *id.* ¶ 202 (allegation of Mr. Musk's "intent . . . to take control of federal spending"); *id.* ¶¶ 213–17 (describing Mr. Musk's policy proposals for deregulation and efficiencies). Indeed, those statements are no different than any other Presidential advisor explaining his policy proposals for future action. None of these statements bear on the core issue here: whether

Mr. Musk occupies a position, "established by Law," that makes him an "Officer[] of the United States." U.S. Const. art. II, § 2, cl. 2.  The States concede that he does not.  Compl. ¶ 6.

    **c.**  The States' allegations concerning USDS's supposed activities are even further afield for purposes of the Appointments Clause.  For starters, even if Mr. Musk was a principal officer wielding power in violation of the Appointments Clause, that constitutional defect would not extend to USDS.  The States do not allege that Mr. Musk even runs USDS (as discussed above).  But more fundamental, it would not matter: Even if an entity is headed by an improperly appointed officer, that does not mean everything that happens underneath him is invalid—indeed, courts have uniformly rejected that suggestion.  *See, e.g.*, *United States v. Smith*, 962 F.3d 755, 766 (4th Cir. 2020); *United States v. Castillo*, 772 F. App'x 11, 14 n.6 (3rd Cir. 2019) (collecting cases rejecting argument that acting Attorney General's allegedly improper appointment invalidated all criminal cases brought under his tenure).

    Anyway, the allegations concerning USDS are of the same defective mold as those involving Mr. Musk.  For example, the States allege that employees at the Consumer Financial Protection Bureau were told not to come into the office and not to perform any work tasks, but acknowledge that those instructions came from agency's acting Director, Russell Vought.  Compl. ¶ 148.  Similarly, the States allege that President Trump approved of certain actions at USAID, *id.* ¶ 100, but they also allege that it was the "acting leadership of the agency" that ultimately carried out those actions, *id.* ¶ 102.  And though the States allege that USDS announced that certain Department of Education contracts were terminated, they explain that it was "*the Agency*" that "had terminated" those contracts.  *Id.* ¶ 170 (emphasis added) (citation omitted).

    Nor do the data access decisions cited in the Complaint establish that any Defendant here wielded improper authority.  The legal authority for USDS and agency DOGE Teams to access that data came not from Mr. Musk, but from Executive Order 14,158.  *See* USDS E.O. § 4(b) ("Agency Heads shall take all necessary steps . . . to the maximum extent consistent with law, to ensure USDS

has full and prompt access to all unclassified agency records, software systems, and IT systems."). And even then, the States' allegations establish that relevant agency officials were responsible for granting access. *See, e.g.*, Compl. ¶ 85 (alleging that Treasury Secretary "granted DOGE personnel full access" to specific payment system); *id.* ¶ 138 (alleging that the Department of Energy's data access decisions described in the Complaint were supported by that agency's chief information officer); *id.* ¶ 178 (alleging that Department of Labor "leadership" instructed employees to grant data access); *id.* ¶ 183 (citing statement of Secretary of Transportation Sean Duffy); *id.* ¶ 192 (alleging that access was granted pursuant to an "order . . . from acting Commerce Secretary Jeremy Pelter"); *id.* ¶ 196 (citing statement of acting FEMA administrator).  Though the States allege that an access decision was "opposed" by certain agency employees, they never allege that the access was itself unauthorized by the agency. *Id.* ¶ 137; *see also id.* ¶ 198 (failing to allege that access to Small Business Administration data was unauthorized).  In any case, the States never explain how Mr. Musk or other individuals being granted *access* to the States' data is an example of Defendants exercising *authority* that is reserved for principal or inferior officers.

At bottom, the States do not plausibly allege facts to support their claim that anyone wielding improper authority was the final decisionmaker as to any action they complain of.  Of course, they insist that a number of governmental actions were done *for the wrong reasons*—*i.e.*, at the pressure or direction of Elon Musk, or some amorphous "DOGE" entity.  But even if that were true, such actions do not violate the Appointments Clause.

### 3.    An Advisor Is Not an Officer Merely Because He Is Effective

As a final fallback, the States seem to suggest that when an advisor's suggestions are reliably taken, he essentially wields the power of the advised—*i.e.*, he has "*de facto* power over Executive-Branch operations."  Compl. ¶ 75.  But as explained, this is fundamentally not the stuff of an Appointments Clause challenge, which requires *de jure* authority.  Thus, even assuming the truth of

that allegation does not establish a constitutional problem. Indeed, across contexts, federal courts consistently have held that those acting in a formally advisory role—that is, those who rely on the legal authority of others to actually effectuate a given decision—do not exercise "significant authority" and do not qualify as officers, even where they have significant ability to convince, influence, or cajole others to adopt their proposed policies.

Courts have long recognized that the President is entitled to his choice of senior advisors—who can help him execute his agenda—without having to seek approval from Congress. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). The President can of course direct duly appointed officers of the United States (including Senate-confirmed Department Heads) to take all manner of actions permitted under their relevant statutory authorities. "Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). And in doing so, the President may choose to rely on a close advisor to identify actions for these officers to take. The President's choice to rely on such advice before making an ultimate decision does not transform an advisor into an officer of the United States who exercises "significant authority" in his own right. And, likewise, the President may act through his advisors and other non-officers when communicating his decisions.

This tracks longstanding historical practice. Since at least the time of President Andrew Jackson, "Presidents have created advisory groups composed of private citizens . . . to meet periodically and advise them (hence the phrase 'kitchen cabinets')." *Ass'n of Am. Physicians*, 997 F.2d at 908. President Lyndon Johnson, for instance, "often sought advice" from both private citizens and sitting Supreme Court Justice Abe Fortas "on matters concerning the Vietnam War." *Id.* at 908 n.8.

27

Similarly, Edward House served as a close advisor to President Woodrow Wilson for many years, serving as the President's right hand both before and after the First World War and—as Wilson himself stated—being "the only person in the world with whom I can discuss everything." Margaret MacMillan, *Paris 1919*, at 17–18 (2001).

Likewise, when President Bill Clinton established a task force on health care reform, the D.C. Circuit had little trouble concluding that the First Lady "[wa]s not a government official" despite her role on the task force—she was instead one of the President's "closest advisers." *Ass'n of Am. Physicians*, 997 F.2d at 910. Judge Buckley elaborated on that conclusion, explaining that the First Lady did not serve as a constitutional officer under Article II. *Id.* at 920 (Buckley, J., concurring in the judgment). Although the Presidents' spouses have provided "undoubted value" in advising the Presidents, "it cannot be said that they have occupied an office with duties," and in this case the First Lady's actions "carrie[d] none of the indicia of a federal officer." *Id.* Thus, under "any fair interpretation of the term, Mrs. Clinton [wa]s not an officer of the United States," despite her influential role as an advisor. *Id.*

More broadly, drawing on the same principles, it has long been understood that those who occupy advisory roles do not wield "authority" in a manner that could make them an officer. For instance, when Congress created the Commission on the Bicentennial of the Constitution, it allowed the President to appoint several officers to that Commission, but Congress "specifically designate[d]" two of its members to serve on the Commission as well. *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 200 (1984) ("*Bicentennial Appointments*"). That structure raised constitutional concerns, as members of Congress may not "be appointed to any civil Office under the Authority of the United States." U.S. Const. art. I, § 6, cl. 2. The Reagan Administration's Department of Justice explained that the practical solution to this concern would be to establish "an executive committee" composed of the Commission's properly appointed executive officers who could approve

"binding regulations, sign[] legal instruments," and otherwise "discharg[e] the purely executive functions of the Commission." *Bicentennial Appointments*, 8 Op. O.L.C. at 207. The congressional members of the Committee would be limited to "advisory functions" that would allow them to participate in designing "programs that would be technically approved and executed by non-congressional members." *Id.* By limiting the congressional members to a purely advisory role, they accordingly would not become "'officers' of the United States." *Id.*

The Obama Administration re-affirmed this constitutional understanding in 2010, explaining that congressional members on a similar commission could serve an advisory role to properly appointed officers, who would then "technically approve[] and execute[]" the Commission's functions. *Administration of the Ronald Reagan Centennial Commission*, 34 Op. O.L.C. 174, 175 (2010). Here, the States do not dispute that Mr. Musk formally serves in a similar capacity: The President and other executive officers may "choose to consult with and receive advice from" Mr. Musk, but the President and constitutionally appointed officers "alone would be responsible for exercising significant executive authority." *Id.* at 180.

In short, the Appointments Clause turns exclusively on hard—not soft—power. But here, across their various theories and accusations, the States do not once plausibly allege how Mr. Musk wields the sort of *actual* authority required under the Appointments Clause. Dismissal is warranted.

### 4.    Mr. Musk Does Not Occupy a "Continuing" Office

The States' claim also fails for an independent reason: They have not shown that Mr. Musk occupies any continuing office. *See Lucia*, 585 U.S. at 245 ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer."). The Supreme Court has explained that the term "office" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867); *accord United States v. Germaine*, 99 U.S. 508, 511–12 (1878); *Auffmordt v.*

*Hedden*, 137 U.S. 310, 326–27 (1890). Those factors show that Mr. Musk's position, as described in the Complaint, is not a continuing office.

On the States' own telling, Mr. Musk is a non-career SGE, Compl. ¶¶ 25, 62–63—a status that lacks the duration characteristic of an office. As defined by statute, SGEs are necessarily time-limited in their service. *See* 18 U.S.C. § 202. That stands in contrast to the administrative law judges in *Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the limited duration of Mr. Musk's SGE status indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office—in particular, 'tenure,' 'duration,' and 'continuous duties'").

To be a continuing office, the position also must not be "personal to a particular individual." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023).[5] Here, there is no allegation that Mr. Musk's role will outlast his tenure. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, Circuit Justice) (explaining that an office has "duties [that] continue, though the person be changed"). Indeed, the entire thrust of the Complaint is that Mr. Musk has achieved a special status, particular to him alone. *See* Comp. ¶ 65 (alleging Mr. Musk has "unprecedented . . . access"); *id.* ¶¶ 73–75 (alleging that Mr. Musk has atypical personal ability to brief the President as needed).

---

[5]       As discussed in *Morrison*, the role of the congressionally created independent counsel was not personal to a particular person. James C. McKay was initially appointed as the independent counsel. *Morrison*, 487 U.S. at 667. Mr. McKay later resigned and was replaced with Alexia Morrison. *Id.* Unlike the independent counsel at issue in *Morrison*, there is no allegation in the States' Complaint that Mr. Musk's position as a White House advisor is not personal to him.

This does not work.  Presidents have long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others—precisely because the President depends on those advisors' personalized advice and judgment.  *Donziger*, 38 F.4th at 297.  But those advisors—including Mr. Musk—occupy definitionally *personal*, not *permanent* positions.  *Cf. Germaine*, 99 U.S. at 512 (holding that a civil surgeon was not an officer in part because he served at his superior's pleasure "to procure information needed to aid in the performance of his own official duties," and the superior could "appoint one or a dozen persons to do the same thing").

One way or another, the States have failed to establish that Mr. Musk's position falls within the bounds of an office under the Appointments Clause.

### B.    The States' Derivative Statutory Claim Fails Too.

The States also claim that Mr. Musk, USDS, and USDS Temporary Organization have acted in excess of statutory authority.  But this fallback claim fails for many of the same reasons.

For this claim, the States invoke the temporary organization statute, 5 U.S.C. § 3161.  Section 3161 provides that a "temporary organization" is defined as an organization "established by law or Executive order for a specific period not in excess of three years for the purposes of performing a specific study or other project." 5 U.S.C. § 3161(a)(1).  While Mr. Musk and USDS are named as defendants for this claim, it is unclear how that can be—after all, neither are temporary organizations.

Regardless, whether limited to the Temporary Organization—or extended to anyone else— the States fail to state a claim.  On the States' theory, "[t]here is no plausible definition of 'project' that would include DOGE's attempt to remake the entire Executive Branch, as described above, or to destroy agencies, fire personnel, halt funding, or dispose of government property."  Compl. ¶ 268.

The States' theory is incorrect.  To begin with, § 3161 does not contain any private cause of action.  The States thus must rely on this Court's inherent equitable authority.  But *ultra vires* review is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the

equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Thus, as the D.C. Circuit has recognized, "[t]ime and again, courts have stressed that *ultra vires* review has "extremely limited scope." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citations omitted). To establish an *ultra vires* claim, the States bear the burden of establishing three things: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the [Defendants] plainly acts in excess of [their] delegated power and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co.*, 40 F.4th at 722 (citation omitted). This last factor is "especially demanding," and only applies where the error "is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute." *Id.* (citation omitted); *see Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (holding that *ultra vires* claims are confined to "extreme" agency error where the agency has "stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court" (citation omitted)).

The States cannot even make it onto the playing field, let alone prevail on this "Hail Mary" claim. At the outset, the States' claim cannot proceed past the threshold because alternative procedures for review are available. For example, instead of suing Defendants, the States could potentially direct their lawsuit at the agencies pursuant to the Administrative Procedure Act ("APA") to challenge the final agency actions implementing the President's agenda. After all, the States' Complaint is replete with allegations regarding the actions of various agencies spanning across the government. Compl. ¶¶ 78–91 (Treasury); *id.* ¶¶ 92–106 (USAID); *id.* ¶¶ 107–21 (OPM); *id.* ¶¶ 122–33 (HHS); *id.* ¶¶ 134–41 (DOE); *id.* ¶¶ 142–50 (CFPB); *id.* ¶¶ 151–53 (Defense Department); *id.* ¶¶ 154–62 (GSA); *id.* ¶¶ 163–75 (ED); *id.* ¶¶ 176–80 (DOL); *id.* ¶¶ 181–87 (DOT); *id.* ¶¶ 188–93

(NOAA); *id.* ¶¶ 194–97 (FEMA); *id.* ¶¶ 198–99 (SBA). Thus, because an alternative procedure for review under the APA is available, the States' *ultra vires* claim is precluded.

Moreover, as discussed above, the Complaint is barren of any plausible allegations of Mr. Musk, USDS, or the Temporary Organization *actually wielding* any of their own sovereign authority. *See, e.g.*, Compl. ¶ 201 ("Mr. Musk and DOGE assumed and exercised authority over public funds held by the federal government."); *id.* ¶ 209 ("Mr. Musk and DOGE have made clear that they will continue to eliminate federal contracts."); *id.* ¶ 212 ("Through the 'Fork in the Road' initiative, Mr. Musk has committed to severance packages through September."); *id.* ¶ 225 ("Mr. Musk's authority extends across all agencies in the Executive Branch in an unprecedented manner."). *id.* ¶ 202 ("Mr. Musk announced his intent to use DOGE to take control of federal spending . . ."); *id.* ¶ 213 ("Mr. Musk has made clear that he plans to embark on a massive and unprecedented deregulation project by rescinding thousands of agency regulations."); *id.* ¶ 216 ("Mr. Musk has called for the elimination of entire federal organizations, such as the CFPB and USAID."). That is fatal to their statutory claim, which is premised entirely on the Defendants wielding *actual power* in excess of their statutory authority.

Furthermore, even excusing the absence of on-point allegations, the States have also failed to show how any of the contemplated activity here would exceed Section 3161. Data access, for instance, would seem to be the first step of *every* temporary organization set up to analyze existing governmental operations—after all, the group needs to know what is happening, before it can recommend what to do next. *Cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) ("Without information, Congress would be shooting in the dark, unable to legislate wisely or effectively. The congressional power to obtain information is broad and indispensable.") (internal citations and quotation marks omitted). And as for the rest of Defendants' alleged operations, the States offer no basis for why an initiative to streamline the work of government cannot constitute a permissible "project" under Section 3161. Indeed, this statute served as the basis for facilitating the reconstruction of Iraq. *See, e.g., Establishment*

*of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq*, Executive Order No. 13,431 § 2, 72 Fed. Reg. 26,709 (May 8, 2007) (establishing a temporary organization to "to perform the specific project of supporting executive departments and agencies in concluding remaining large infrastructure projects expeditiously in Iraq, in facilitating Iraq's transition to self-sufficiency, and in maintaining an effective diplomatic presence in Iraq."). Whatever policy disagreements the States may have with the work USDS is performing, there can be no serious doubt that such work falls comfortably within section 3161's capacious "other project" language. Indeed, Mirriam Webster's dictionary defines "project" as "a specific plan or design," and "a planned undertaking; such as" "a large usually government-supported undertaking." "Project," Merriam-Webster.com, https://www.merriam-webster.com (last visited Mar. 7, 2025). Certainly, the implementation of "the President's DOGE Agenda," which includes "modernizing Federal technology and software to maximize governmental efficiency and productivity," USDS E.O. § 1, falls squarely within the broad definition of "other project."

In support of their *ultra vires* claim, the States seem to rest entirely on the major questions doctrine. Compl. ¶ 269. That invocation is misplaced. For one, it all rests on an unalleged premise: That the Defendants are in fact wielding major powers. But in all events, by resorting to the major questions doctrine—"a tool of statutory interpretation," *Save Jobs USA v. U.S. Dep't of Homeland Sec., Off. of Gen. Couns.*, 111 F.4th 76, 80 (D.C. Cir. 2024), *petition for cert. filed*, No. 24-923 (U.S. Feb. 26, 2025)—the States essentially concede that they cannot surmount the high burden of showing that Defendants transgressed "a specific and unambiguous statutory directive," as needed to obtain *ultra vires* review. *Changji Esquel Textile Co.,* 40 F.4th at 722 (citation omitted). The States plainly wish to engage in the sort of review that entails "simply applying traditional tools of textual analysis, as [a court] would in considering any agency interpretation challenged through the APA." *Id.* The D.C. Circuit, however, has repeatedly rejected that approach and recently underscored that *ultra vires* review

"requires challengers to show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review or something like it." *Id.* (citation omitted); *see Fed. Express Corp.*, 39 F.4th at 764 ("FedEx's effort to dilute *ultra vires* review to the functional equivalent of the very APA action that Congress prohibited defies precedent and logic."). And the States' insistence on engaging in a textual-analysis contest shows that their claim goes far beyond the scope of permissible *ultra vires* review. The States, therefore, facially fail to show they can satisfy the requirements to prevail on their *ultra vires* claim, including the "especially demanding" third requirement. *Changji Esquel Textile Co.,* 40 F.4th at 722. Thus, their *ultra vires* claim should be dismissed for failure to state a claim.

## III.    The States' Appointments Claim Should Be Dismissed Against the President

Finally, the States purport to bring their Appointments Clause claim against all defendants, including President Trump. *See* Compl. ¶¶ 253–60.[6] Yet, the allegations concerning the Appointments Clause claim are directed at Mr. Musk. *See id.* ¶¶ 254–59. And the remedy the States seek is for Mr. Musk's "challenged actions [to] be rendered invalid." *Id.* ¶ 260. In short, the States do not even allege that President Trump has violated the Appointments Clause, let alone seek a remedy against President Trump for any Appointments Clause violation. The States therefore have failed to establish Article III standing to sue the President for an Appointments Clause violation, or a plausible Appointments Clause violation against the President on the merits, and the claim against the President should thus be dismissed.

Even if the Court could overlook these fatal deficiencies, the States may not obtain—and the Court may not order—injunctive or declaratory relief directly against the President for his official

---

[6]     In contrast to the Appointments Clause Claim, the States' Count II (conduct in excess of statutory authority) is only against Mr. Musk, the USDS, and the U.S. DOGE Service Temporary Organization. *See* Compl. ¶¶ 261–72.

conduct.  *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (holding that the Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992).  Indeed, courts in this and other circuits have rejected plaintiffs' demands to enjoin the President in the performance of his official duties, regardless of the claim. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (holding that it was "painfully obvious" that separation of powers principles would be violated by enjoining the President); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (affirming dismissal and concluding that "[t]he only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief" against the President, but "such relief is unavailable"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 282 (D.D.C. 2005) (explaining that it would be an "extraordinary measure" to issue an injunction against the President and that it was "not aware of any" cases where "an injunction against the President [was] issued and sustained by the federal courts").[7]

It is undisputed that the States sued the President in his official capacity.  *See* Compl. ¶ 28.  It is also undisputed that the States sued Elon Musk, the USDS, and the U.S. DOGE Service Temporary

---

[7]     *See, e.g., Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded on other grounds*, 583 U.S. 941 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir.), *vacated and remanded on other grounds sub. nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 941 (2017); *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 632 (D. Md. 2017), *in subsequent determination, cert. granted, judgment vacated*, 585 U.S. 1028 (2018); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539–40 (N.D. Cal. 2017); *Settle v. Obama*, No. 3:15-cv-365, 2015 WL 7283105, at *6 (E.D. Tenn. Nov. 17, 2015); *Day v. Obama*, No. 1:15-cv-00671, 2015 WL 2122289, at *1 (D.D.C. May 1, 2015), *aff'd sub nom. Day v. Trump*, 860 F.3d 686 (D.C. Cir. 2017); *Willis v. U.S. Dep't of Health & Hum. Servs.*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014); *McMeans v. Obama*, No. 11-891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Shreeve v. Obama*, No. 1:10-cv-71, 2010 WL 4628177, at *5 (E.D. Tenn. Nov. 4, 2010); *Anderson v. Obama*, No. Civ. PJM 10-17, 2010 WL 3000765, at *2 (D. Md. July 28, 2010); *Carlson v. Bush*, No. 6:07-cv-1129-Orl-19UAM, 2007 WL 3047138, at *3 (M.D. Fla. Oct. 18, 2007); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21–22 (D.D.C. 1972); *Reese v. Nixon*, 347 F. Supp. 314, 316–17 (C.D. Cal. 1972); *S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72 (N.D. Ill. 1969).

Organization, *id.* ¶¶ 25–27, and the States could obtain full relief for their alleged injuries, if any, through injunctive and declaratory relief against those other Defendants.  Indeed, in a similar Appointments Clause challenge, the plaintiffs did not even seek to sue the President.  *See J. Doe 1-26 v. Musk*, 8:25-cv-00462-TDC (D. Md.); ECF No. 4 (naming only Mr. Musk, the USDS, and the Department of Government Efficiency).  Accordingly, because this Court cannot issue a declaratory judgment or an order enjoining the President for his official, discretionary action, the Court should grant judgment to Defendants on the States' Appointments Clause claim against the President.

## CONCLUSION

For the foregoing reasons, the States' Complaint should be dismissed.


Dated:  March 7, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         DIANE KELLEHER
                                         Director, Federal Programs Branch

                                         CHRISTOPHER R. HALL
                                         Assistant Branch Director, Federal Programs Branch

                                         /s/ *Joshua E. Gardner*
                                         JOSHUA E. GARDNER (FL Bar No. 302820)
                                         Special Counsel
                                         JACOB S. SILER (DC Bar No. 1003383)
                                         JAMES J. WEN (NY Bar No. 5422126)
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington D.C. 20005
                                         (202) 305-7583
                                         joshua.e.gardner@usdoj.gov

HARRY GRAVER (DC Bar No. 1779585)
Counsel to the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave, NW
Washington, DC 20530
Tel: (202) 514-2000
harry.graver@usdoj.gov

Attorneys for Defendants