# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.,* | |
| Plaintiffs, | C.A. No. 1:25-cv-00429-TSC |
| v. | |
| ELON MUSK, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 2

STANDARD OF REVIEW ............................................................................................. 5

ARGUMENT .................................................................................................................. 7

    I.   THE PLAINTIFF STATES HAVE STANDING. ................................................... 7

        A.  The Plaintiff States Have Alleged Injury in Fact Caused by Defendants. ............... 8

           1.  Financial and programmatic harm has actually occurred. .................................. 9

           2.  Plaintiffs allege injury based on substantial risk of financial and programmatic harm. ......................................................................................................... 10

           3.  The risk of disclosure and unauthorized use of Plaintiff States' private data is an injury in fact. .................................................................................... 16

    II.  THE PLAINTIFF STATES HAVE STATED A CLAIM FOR VIOLATION OF THE APPOINTMENTS CLAUSE AND ULTRA VIRES ACTS BY DEFENDANTS. ..................................... 17

        A.  COUNT I | THE APPOINTMENTS CLAUSE. ............................................. 17

           1.  The Appointments Clause precludes the President from unilaterally delegating executive power to Mr. Musk. .................................................................. 18

           2.  *Andrade* does not foreclose Plaintiff States' Appointments Clause claim. ........ 24

           3.  Plaintiffs do not allege that Mr. Musk is acting as a mere White House adviser. ............................................................................................. 27

        B.  COUNT II | EXCESS OF AUTHORITY CLAIM. ............................................ 30

           1.  Plaintiffs have stated a claim for traditional equitable review of Defendants' conduct as ultra vires official action. .................................................... 32

           2.  The major questions doctrine further shows that Plaintiffs have state a colorable claim of ultra vires action against Defendants. ............................... 34

         C.  PRESIDENT TRUMP IS PROPERLY NAMED AS A DEFENDANT. ................... 37

CONCLUSION .............................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Labor,*
  No. 1:25-cv-339, 2025 WL 542825 (D.D.C. Feb. 14, 2025) ................................................. 14

*Aids Vaccine Advoc. Coal. v. United States Dep't of State,*
  ___ F. Supp. 3d ___, 2025 WL 752738 (D.D.C. March 10, 2025) ..................................... 33

*Am. Forest Res. Council v. United States,*
  77 F.4th 787, 796 (D.C. Cir. 2023) ..................................................................................... 33

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ....................................................................................................... 32, 33

*\*Andrade v. Regnery,*
  824 F.2d 1253 (D.C. Cir. 1987) ..................................................................................... 24-25

*Armstrong .v Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (215) ........................................................................................................ 31-32

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................................ 6, 26

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) ............................................................................................ 27

*Auffmordt v. Hedden,*
  137 U.S. 310 (1890) ............................................................................................................ 30

*Autor v. Pritzker,*
  740 F.3d 176 (D.C. Cir. 2014) .............................................................................................. 6

*Bain v. Office of Attorney General,*
  648 F.Supp.3d 19 (D.D.C. 2022) ....................................................................................... 5-6

*Banneker Ventures, LLC v. Graham,*
  798 F.3d 1119 (D.C. Cir. 2015) ............................................................................................ 6

*Biden v. Nebraska,*
  600 U.S. ___, 143 S. Ct. 2355 (2023) ....................................................................... 7, 9, 10

*Bohnak v. Marsh & McLennan Cos., Inc.,*

79 F.4th 276 (2d Cir. 2023) ............................................................... 14

*Bowman v. Iddon*,
848 F.3d 1034 (D.C. Cir. 2017) ........................................................ 6

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...................................................................... 17, 22

*Burnap v. United States*,
252 U.S. 512 (1920) ..................................................................... 20

*\*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ..................................................... 31, 33

*\*Changji Esquel Textile Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..................................................... 32, 34

*Cirko v. Comm'r of Soc. Sec.*,
948 F.3d 148 (3d Cir. 2020) ............................................................ 7

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ......................................................... 9

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...................................................................... 9

*\*Dep't. of Commerce v. New York*,
588 U.S. 752 (2019) ................................................................7, 8, 11

*Dickinson v. Indiana State Election Bd.*,
933 F.2d 497 (7th Cir. 1991) ......................................................... 38

*\*Edmond v. United States*,
520 U.S. 651 (1997) ................................................................1-2, 29

*Ellis v. Holy Comforter St. Cyprian Cmty. Action Grp.*,
153 F.Supp.3d 338 (D.D.C. 2016) ..................................................... 5

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..................................................................... 35

*Franklin v. Massachusetts*,
505 U.S. 788 (1992). .................................................................... 31

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ..................................................................... 19

*Freytag v. C.I.R.*,
   501 U.S. 868 (1991) ................................................................................................ passim

Herbert v. Nat'l Acad. of Scis.,
   974 F.2d 192 (D.C. Cir. 1992) ............................................................................................ 6

Houston v. Pavilion USA 2020, Inc.,
   No. CV 22-00383 (CKK), 2023 WL 1860961 (D.D.C. Feb. 9, 2023) ................................... 6

ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.,
   Civ. Action No. 16-54 (EGS) (DAR), 2020 WL 1905132 (D.D.C. Apr. 17, 2020) ............... 6

Jefferson v. Harris,
   285 F.Supp.3d 173 (D.D.C. 2018) ...................................................................................... 7

Landry v. F.D.I.C.
   204 F.3d 1125 (D.C. Cir. 2000) ................................................................................... 7, 23

Larson v. Domestic & Foreign Commerce Corp.,
   337 U.S. 682 (1949) .................................................................................................. 31, 33

Leedom v. Kyne,
   358 U.S. 184 (1958) ........................................................................................................ 32

Leopold v. Manger,
   102 F.4th 491 (D.C. Cir. 2024) .............................................................................. 31, 33-34

Lofstad v. Raimondo,
   117 F.4th 493 (3rd Cir. 2024) ........................................................................................... 7

Lucia v. SEC,
   585 U.S. 237 (2018) ........................................................................................................ 21

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) .............................................................................................. 8, 10, 16

Lujan v. Nat'l Wildlife Fed'n,
   497 U.S. 871 (1992) ........................................................................................................ 10

*Massachusetts v. E.P.A.,*
   549 U.S. 497 (2007) .....................................................................................................8, 11

*Morrison v. Olson,*
   487 U.S. 654 (1988) ........................................................................................................ 29

*Myers v. United States,*
 272 U.S. 52 (1926) ................................................................................. 19, 20, 24

*Nat'l Fed. of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
 595 U.S. 109 (2022) ....................................................................................... 37

*Nat'l Treasury Emps. Union v. Nixon,*
 492 F.2d 587 (D.C. Cir. 1974) ...................................................................... 38

*New Jersey v. EPA,*
 989 F. 3d 1038 (D.C. Cir. 2021) .....................................................................11

*New York v. Dep't of the Treasury,*
 No. 25-1144(JAV), (S.D.N.Y. Feb. 21, 2025) ............................................ 13, 14

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
 795 F.3d 956 (9th Cir. 2015) ........................................................................... 9

*PFLAG, Inc. v. Trump,*
 No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ..................... 32

*Ryder v. United States,*
 515 U.S. 177 (1995) ...................................................................................... 22

*Bain v. Office of Attorney General,*
 648 F.Supp.3d 19 (D.D.C. 2022) ............................................................... 5-6, 6

*Seila Law LLC v. CFPB,*
 591 U.S. 197 (2020) ...................................................................................... 19

*Starr v. Baca,*
 652 F.3d 1202 (9th Cir. 2011) ...................................................................... 6-7

*Steffel v. Thompson,*
 415 U.S. 452 (1974) ...................................................................................... 38

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ...................................................................................... 14

*Trudeau v. Fed. Trade Comm'n,*
 456 F.3d 178 (D.C. Cir. 2006) ...................................................................... 31

*Trump v. United States,*
 603 U.S. 593 (2024) ................................................................................. 23, 24

*Tucker v. C.I.R.,*
  676 F.3d 1129 (D.C. Cir. 2012) ............................................................. 21, 23

*United States v. Arthrex,*
  594 U.S. 1 (2021) ................................................................................. 19

*United States v. Donziger,*
  38 F.4th 290 (2d Cir. 2022) ................................................................ 29, 30

*United States v. Germaine,*
  99 U.S. 508 (1879) ........................................................................ 20, 29, 30

*United States v. Maurice,*
  26 F. Cas. 1211 (Cir. Ct. D. Va. 1823) ............................................ 21, 24, 29

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................................. 11, 12

*W. Virginia v. Env't Protect. Agency,*
  597 U.S. 697 (2022) ...................................................................... 34, 35, 37

*Willy v. Admin. Review Bd.,*
  423 F.3d 483 (5th Cir. 2005) ................................................................. 21

## Statutes

18 U.S.C. § 202 ...................................................................................... 29, 35

5 U.S.C. § 101 ............................................................................................ 20

5 U.S.C. § 3161 ...................................................................................... 34, 37

Foreign Affairs Reform and Restructuring Act of 1998,
  22 U.S.C. § 6563 ...................................................................................... 3

## United States Constitution

U.S. Const. art. II, § 2, cl. 2 ................................................................... 17

## Rules

Fed. R. Evid. 801 ................................................................................................... 3

Federal Rules of Civil Procedure 8 ....................................................................... 5

Federal Rules of Civil Procedure 12 .............................................................. passim

## Regulations

*Establishing & Implementing the President's "Department of Government Efficiency,"*
  Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ....................................... passim

*Implementing the President's "Department of Government Efficency" Workforce Optimization
  Initiative*, Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ................................ 4

## Other Authorities

James Madison,
  1 Annals of Cong. 581 (1789) ......................................................................... 19, 20

Jennifer L. Mascott, *Who Are "Officers of the United States"?*
  70 Stan. L. Rev. 443 (2018)................................................................................ 19

*Officers of the United States within the Meaning of the Appointments Clause*,
  31 Op. O.L.C. 73 (2007) ......................................................................... 22, 23, 29

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
  40 Op. O.L.C. 1 (Jan. 13, 2016) ..................................................................... 21-22

*The Test for Determining 'Officer' Status Under The Appointments Clause*,
  49 Op. O.L.C.  (Jan 16, 2025) ...................................................................... 29, 30

E. Garrett West, *Clarifying the Employee-Officer Distinction in Appointments Clause
  Jurisprudence*,
  127 YALE L.J. FORUM 42 (2017) ........................................................................ 29

Will Steakin, Lucien Bruggeman, and Cindy Smith, *Agency Data Shared by DOGE Online
  Sparks Concern Among Intelligence Community*, ABC News (Feb. 15, 2025) .................... 15

## INTRODUCTION

The Constitution protects against tyranny through the separation of powers. Our constitutional structure assigns the power to enact laws to the Congress. Since 1789, it has been settled that Congress's legislative power includes the creation of executive departments and executive offices for the delegation of executive authority. President Trump, however, bypassed this exclusive constitutional power of Congress and unilaterally granted massive, unchecked executive authority to Elon Musk and DOGE to destabilize the government and slash its workforce. Never before in this nation's history has an individual, unvetted and unappointed, wielded such sweeping executive power. This unprecedented executive action is an assault on the Constitution and a threat to the liberty it protects.

The Complaint, as Defendants acknowledge, alleges (1) Mr. Musk exercises significant executive authority in several specific ways, (2) Congress did not create an office with the duties assigned to Mr. Musk by President Trump, and (3) Mr. Musk has not been nominated by the President or confirmed by the Senate as an officer of the United States. The Complaint also alleges that Congress has not authorized the executive actions taken by DOGE. Finally, the Complaint alleges that Plaintiff States have suffered financial and programmatic harms and harms to their sovereign interests. Taken as true, these well-pleaded allegations create more than a reasonable inference that Defendants are liable for the misconduct alleged, establishing both Plaintiff States' standing and a plausible claim for relief as required by Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

Defendants, however, assert that the Court should end this case before it has even begun and refrain from disturbing their unconstitutional actions, claiming that the Appointments Clause "has nothing to say" about their misconduct. ECF No. 58 at 1. Defendants' arguments turn the Appointments Clause on its head and are deeply mistaken. The Appointments Clause was designed to stand as a bulwark against "Executive abuses of the appointment power," *Edmond v. United*

*States*, 520 U.S. 651, 659 (1997), and there is no greater abuse of this power than to usurp Congress's authority to create an executive office and delegate significant executive authority to an unappointed person. Defendants also assert that Plaintiffs' *ultra vires* claim fails, but they do so based on a flawed understanding of the nature of the claim and the *ultra vires* doctrine in general. The States have standing to put a halt to Defendants' unlawful conduct, and Defendants' motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after he was elected, President Trump announced that he would establish a "Department of Government Efficiency" to "dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." Compl. ¶ 50, ECF No. 10-1.

On January 20, 2025, President Trump issued Executive Order Number 14,158 creating the United States DOGE Service and, within it, the United States DOGE Service Temporary Organization (collectively, "DOGE"), located in the Executive Office of the President. *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("Exec. Order No. 14,158"). The Executive Order requires DOGE Teams to be embedded in every agency through consultation between the relevant agency head and the DOGE Administrator. *See id.* at § 3(c). The White House later confirmed that Mr. Musk was the head of DOGE. Compl. ¶ 60. DOGE quickly gained access to sensitive material in dozens of federal agencies, reportedly without the necessary security clearances. Compl. ¶¶ 61, 94, 137. Mr. Musk announced his intent to use DOGE to take control of public expenditures and reduce federal spending by $2 trillion. Compl. ¶¶ 201-202. Even without discovery, these well-pleaded allegations—many of which are independently admissible statements of party-opponents in their own right (*see* Fed. R. Evid. 801(d)(2))—illustrate that Mr.

Musk (a) has unprecedented and limitless access across the federal government and reports solely to President Trump, (b) has exercised significant and sweeping authority across a broad swath of federal agencies, and (c) has engaged in a constellation of activities, invoking a panoply of powers that have been historically associated with an officer of the United States, including exercising authority over spending and disbursements, contracts, government property, and regulations.

For example, the Complaint alleges that Mr. Musk had a central role in the effective shuttering of USAID, an agency created by Congress. *See* Foreign Affairs Reform and Restructuring Act of 1998, 22 U.S.C. § 6563. On February 2, 2025, Mr. Musk tweeted, "We spent the weekend feeding USAID into the woodchipper." Compl. ¶ 98. The next day, Mr. Musk further explained, "I went over it with him [President Trump] in detail, and he agreed that we should shut it [USAID] down. And I actually checked with him a few times [and] said 'are you sure?' The answer was yes. And so we're shutting it down." Compl. ¶ 100. The same day, when USAID contract officers reached out to agency leadership "asking for the required authorization and justification needed to cancel programs abroad," the individual who responded was not the Senior Procurement Executive but DOGE affiliate Jeremy Lewin. Compl. ¶ 101 & n.42. Later the same day, "DOGE personnel approached the agency's acting leadership and handed them a list of 58 people, almost all senior career officials, to put on administrative leave." Compl. ¶ 102.

Mr. Musk similarly stated his intent to shut down the Consumer Financial Protection Bureau (CFPB). Compl. ¶ 146. Congress created the CFPB to protect consumers residing in Plaintiff States from fraudulent and deceptive business practices. Compl. ¶ 142. Mr. Musk also threatened to shut down the Department of Education, which provides billions of dollars in funding to public schools and universities operated by Plaintiff States. Compl. ¶¶ 168-69, 172.

With respect to Mr. Musk and DOGE's assertion of control over federal funds and government spending, the Complaint alleges that, "[u]nder the banner of improving efficiency, cutting waste, and rooting out fraud, Mr. Musk and DOGE have assumed and exercised authority over public funds held by the federal government." Compl. ¶ 201. One example of this is the "Fork in the Road" email offering deferred resignation to federal employees, whereby 2.3 million federal employees and contractors were offered "continued pay and benefits through September 2025 if they resigned by February 6th." Compl. ¶ 116-117. The Complaint includes allegations, as well as some of the sources for the facts alleged, describing Mr. Musk's and DOGE's role in circulating the email and conceiving of the actual offer, including that: the email was disseminated via a "custom built email system from Mr. Musk's [DOGE] team and was sent without consultation with other advisers to the President or OMB officials," Compl. ¶ 120; the title of the email and the separation offer mirrored the message and resignation offer Mr. Musk had made to Twitter employees upon acquisition of that company, Compl. ¶ 118; "[t]he email purports to make binding spending commitments on behalf of the federal government," Compl. ¶ 119, and "[t]hrough the 'Fork in the Road' initiative, Mr. Musk has committed to severance packages through September," thereby making future financial commitments on behalf of the federal government without any actual Congressional authorization, Compl. ¶ 212.

On February 11, 2025, President Trump issued an executive order purporting to give DOGE legal authority over certain hiring decisions at all federal agencies. *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Exec. Order No. 14,210"); Compl. ¶¶ 75-76. Specifically, the Executive Order provides that the DOGE Team at an agency can veto hiring decisions, a veto that can only be overridden by the head of that agency.

Other allegations that support Plaintiffs' claims that Mr. Musk and DOGE have engaged in *ultra vires* official action in violation of the Appointments Clause include those describing Mr. Musk's and DOGE's:

- termination of federal leases, *see* Compl. ¶¶ 203-211;
- use of agency data and IT systems to identify and order changes in agency spending, *see* Compl. ¶¶ 79-83, 86; and
- engagement with federal databases and IT systems in ways that compromise system security and confidentiality of Plaintiff States' and individuals' proprietary and financial information, *see* Compl. ¶¶ 240-252.

Far from being conclusory or baseless allegations, Plaintiffs have more than satisfied the minimal pleading standard under Fed. R. Civ. P. 8. Plaintiffs have provided substantial detail about the bases for these factual assertions, citing to Defendants' own—again, independently admissible—tweets and statements, news reports, and pleadings and declarations in other litigation. The Complaint's allegations and reasonable inferences flowing from these allegations set forth more than sufficient factual matter to require the denial of Defendants' motion as a matter of law.

**STANDARD OF REVIEW**

**Rule 12(b)(1).**   A motion to dismiss for lack of standing challenges the Court's subject matter jurisdiction and is reviewed under Rule 12(b)(1). *See Ellis v. Holy Comforter St. Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 340–41 (D.D.C. 2016). Here, Defendants have not raised a factual challenge to the Court's jurisdiction because they have not raised any issues of fact.[1] *See*

---

[1] To the extent that Defendants could have raised a factual challenge to the Court's jurisdiction, this Court would have needed to give the Plaintiff States "ample opportunity to secure and present evidence relevant to the existence of jurisdiction" and "assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties." *Houston v. Pavilion USA 2020, Inc.*, No. CV 22-00383 (CKK), 2023 WL 1860961, at *5 (D.D.C. Feb. 9, 2023) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)) (internal citations omitted).

*Bain v. Office of Attorney General*, 648 F.Supp.3d 19, 39 (D.D.C. 2022) ("Defendants'
jurisdictional challenges are . . . facial. Defendants offer no jurisdictional evidence and, instead,
merely assert that Bain has not pleaded facts establishing this Court's jurisdiction over those
claims."). Accordingly, "the court must accept as true all of the factual allegations in the complaint
and draw all reasonable inferences in favor of the plaintiff." *ICC Evaluation Serv., LLC v. Int'l
Ass'n of Plumbing & Mech. Offs., Inc.*, Civ. Action No. 16-54 (EGS) (DAR), 2020 WL 1905132,
at *4 (D.D.C. Apr. 17, 2020).

**Rule 12(b)(6).**  To withstand a challenge under Rule 12(b)(6), "a complaint must set forth
'factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged.'" *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (quoting
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court reviewing a motion to dismiss under Rule
12(b)(6) must "accept[] as true all of the factual allegations contained in the complaint and draw[]
all inferences in favor of the nonmoving party." *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir.
2014) (quotation marks and quoted authority omitted). Moreover, "[a] complaint survives a motion
to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and
the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures, LLC v.
Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th
Cir. 2011) (second alteration in original)). Even if the defendant believes that its version will
"prove to be the true one . . . that does not relieve defendant[] of [its] obligation to respond to a
complaint that states a plausible claim for relief, and to participate in discovery." *Id.* "Plausibility
requires more than a sheer possibility that a defendant has acted unlawfully, but it is not a
probability requirement. A claim crosses from conceivable to plausible when it contains factual

allegations that, if proved, would allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up).

## ARGUMENT

### I.    The Plaintiff States Have Standing.

Plaintiff States have standing if they have "suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. ___, 143 S. Ct. 2355, 2358 (2023).[2] Only one Plaintiff State needs to satisfy standing requirements for this action to proceed. *See id.* at 2365 ("If at least one plaintiff has standing, the suit may proceed."); *Dept. of Commerce v. New York*, 588 U.S. 752, 766 (2019). Courts have also recognized that, in the context of Appointment Clause claims, judicial review may proceed "even where any possible injury is radically attenuated." *Landry v. F.D.I.C.* 204 F.3d 1125, 1131 (D.C. Cir. 2000); *see Jefferson v. Harris*, 285 F.Supp.3d 173, 187 (D.D.C. 2018) (noting in standing analysis that "this Circuit has held that Appointments Clause claims 'will proceed even where any possible injury is radically attenuated'" (quoting *Landry*, 204 F.3d at 1131)); *Lofstad v. Raimondo*, 117 F.4th 493, 497 (3rd Cir. 2024) ("[A] 'litigant need not show direct harm or prejudice caused by an Appointments Clause violation . . . . Such harm is presumed.'" (quoting *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 154 (3d Cir. 2020) (cleaned up)). The Complaint's allegations of injury, causation, and redressability are sufficient to establish Plaintiff States' standing and to defeat Defendants' motion.

---

[2] This standard differs from the irreparable harm standard applicable to a motion for temporary restraining order, and as this Court observed in granting Plaintiff States' motion for expedited discovery, this Court did not address standing in determining that Plaintiff States had not established irreparable harm for purposes of issuing a TRO. ECF No. 60 at 13 n.2.

A.    **The Plaintiff States Have Alleged Injury in Fact Caused by Defendants.**

Plaintiff States sufficiently allege that Defendants' unauthorized actions have caused them actual "concrete and particularized" injuries. *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61). Plaintiff States' allegations of future injuries are also sufficient to establish standing because they are "certainly impending" or "there is a substantial risk that the harm will occur." *Dep't of Comm.*, 588 U.S. at 767-68 (states had standing to challenge addition of citizenship question on census where state harm alleged would result from noncitizen households responding to the census at lower rates, causing population undercount and leading to loss of federal funds distributed based on population size).

Mischaracterizing Plaintiff States' pleadings and the applicable legal standard, Defendants argue that the Complaint fails to make "a single allegation showing an actual or imminent injury suffered by the States" and instead "complain[s] about *possible* injuries that *might* happen." ECF No. 58 at 2. This Court should reject Defendants' standing argument for at least three reasons: First, Plaintiff States allege that financial and programmatic harm has already occurred from Defendants' termination of USAID funding. Second, Plaintiff States allege imminent financial and programmatic harm resulting from Defendants shutting down the CFPB and other government agencies. Third, Plaintiff States allege that Defendants' unauthorized access to states' proprietary data creates substantial risk that these data will be disclosed or otherwise compromised, and Defendants have used their access to plan and execute their unlawful actions. Each of these is independently sufficient to establish Plaintiff States' injury in fact, but Plaintiff States have plausibly alleged all three.

### 1.    Financial and programmatic harm has actually occurred.

Defendants effectively concede that Plaintiff States allege an injury in fact with regard to the loss of USAID funding to public universities. ECF No. 58 at 11. As Defendants acknowledge in their moving papers, the loss of federal funding to a state or its instrumentalities is a financial harm that supports Article III standing. *Id.*; *see Biden*, 143 S. Ct. at 2364–65 (holding that Missouri had standing to challenge student loan forgiveness plan based on fees a state-created corporation participating in the student loan market would lose under its contract with the federal Department of Education); *Clinton v. City of New York*, 524 U.S. 417, 430–31 (1998) (holding that New York City had standing based on contingent tax liability despite unresolved waiver requests because it "immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor"); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("[L]oss of funds promised under federal law[]satisfies Article III's standing requirement." (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). Here, Plaintiff States alleged, and submitted supporting declarations, that USAID awarded millions of dollars of grants to various programs within the University of Washington and Washington State University (Compl. ¶ 105; ECF No. 2-1 (Decl. Chapman-See) ¶ 10; ECF No. 2-7 (Decl. Brunelli) ¶¶ 3-5, 7), and that all of Washington State University's USAID grantees received Suspension/Stop Work Orders (Decl. Brunelli ¶ 6). These are allegations of actual harm.

Defendants admit that "a financial harm of [this] type could support Article III standing," but claim that Plaintiffs have not adequately alleged that "Defendants—as opposed to USAID itself—were responsible" for that harm. ECF No. 58 at 11-12. Defendants are wrong. The Complaint details Defendants' efforts to dismantle USAID and includes direct quotes from Mr. Musk himself including, "[w]e spent the weekend feeding USAID into the woodchipper" and "we're shutting it down." Compl. ¶¶ 94-103. Furthermore, "[a]t the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (third alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1992)).

In addition, Plaintiff States alleged harm from an inability to draw down federal funds. *See* ECF No. 2-5 (Chang Decl.) ¶¶ 18-19 (explaining that a division within New Mexico's Energy, Minerals and Natural Resources Department has been unable to draw against grants for approximately $440,091 in outstanding expenditures). Harm to a state "in the performance of its public function is necessarily a direct injury" to the state. *Biden*, 143 S. Ct. at 2366. The statements in the Complaint and annexed declarations, which the Court must presume to be true on a motion to dismiss, plausibly allege that the State of Washington, the State of New Mexico, and the other Plaintiff States have suffered injury in fact traceable to Defendants' unlawful conduct.

### 2. Plaintiffs allege injury based on substantial risk of financial and programmatic harm.

In addition to the injury in fact caused by the termination of USAID funding and disruption of federal funding, which are independently sufficient to establish standing, Plaintiff States also adequately pleaded the substantial risk of future financial and programmatic harm stemming from Defendants' unlawful efforts to dismantle the CFPB and other government agencies.

The "substantial risk" standard requires "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (emphasis in original). Standing based on the substantial risk of future harm can rely on the "predictable effect" Defendants' actions will have on "the decisions of third parties." *Dep't of Comm.*, 588 U.S. at 767-68 (holding that "concrete and imminent injury" to a state based on its "expectation that reinstating a citizenship question will

depress the census response rate and lead to an inaccurate population count"); *Massachusetts,* 549 U.S. at 520–23.

As alleged in the Complaint, Mr. Musk stated his intent to shut down the CFPB, and the CFPB's employees were subsequently told to stand down, which will place increased demands and costs on state consumer protection agencies. Compl. ¶¶ 146-149. This is not merely conjectural harm; it is entirely predictable that consumers with complaints will turn to the states when the CFPB is no longer an option. In addition, the State of Minnesota is a co-Plaintiff with the CFPB in two consumer-protection enforcement cases, but CFPB has ceased taking an active role, which will increase Minnesota's costs in prosecuting the matters. *Id*. ¶ 149. At the pleading stage, these allegations satisfy the "substantial risk" standard.

*United States v. Texas*, 599 U.S. 670 (2023), does not preclude the States' standing on this basis, as Defendants suggest. ECF No. 58 at 10-11. There, the Supreme Court concluded that, under Article III standing rules, "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or [criminally] prosecute" could not be brought by an individual who was "neither prosecuted nor threatened with prosecution." *Id.* at 677 (cleaned up). In light of this "fundamental Article III problem with this lawsuit," the plaintiff states' other theories of standing were simply irrelevant. *Id.* at 680 n.3. Here, Plaintiff States do not ask the Court to order Defendants to take the type of executive action that the Supreme Court held to be non-redressable; Plaintiff States instead ask this Court to order Defendants to cease unconstitutional actions. Moreover, the Supreme Court cautioned that its conclusion about standing in *Texas* might not apply where "the Executive Branch wholly abandoned its statutory responsibilities," as Plaintiff States argue here. *Id.* at 682.

The Complaint and attached declarations contain numerous other allegations of the substantial risk of harm to Plaintiff States, many based on Defendants' efforts to use their unlawful control of federal agencies to stop already-committed funding to the States that support "law enforcement, healthcare, education, and many other programs." Compl. ¶¶ 229-230; s*ee, e.g.*, *id.* at ¶ 203 ("DOGE has expressly indicated that it intends to eliminate every contract not essential to operations or required by law, over objection from agency officials."); *id.* ¶ 231 ("Defendants . . . stated that they intend to use Treasury's BFS system to halt payments to innumerable recipients, including the Plaintiff States; and stated that they intend to destroy the U.S. Department of Education, which provides billions of dollars in funding to the Plaintiff States"); *id.* ¶ 238 ("If the federal government ceases to fulfill its obligations under [federal-state partnerships and contracts], Plaintiff States will incur greater financial costs and strain on personnel and other resources to compensate for the lost federal funding and staffing needed to administer and operate these programs, or else cut them entirely"); *see* ECF No. 2-3 (Nair Decl.) ¶¶ 5 ("I expect the actions of the Department of Government Efficiency (DOGE), led by Elon Musk, to adversely impact the operation of the Department of Workforce Solutions," which has approximately eighty-five contracts with the Department of Labor.); ECF No. 2-4 (Gilliam Decl.) ¶ 10 ("Any disruption in federal resources or workforce at agencies like the Department of Energy could undermine the effectiveness of [the Waste Isolation Pilot Plant], increasing risks to national security and hindering the nation's ability to safely manage and dispose of nuclear waste, in addition to creating public health and environmental risks."); Compl. ¶¶ 133, 140 (alleging harm to Plaintiff State's sovereign interests).

**3.    The risk of disclosure and unauthorized use of Plaintiff States' private data is an injury in-fact.**

Defendants' unauthorized access to proprietary data and the resulting substantial risk that these data will be disclosed is another injury in fact alleged in the Complaint. Plaintiffs also meet the injury in fact requirement through their allegations that Defendants have used their access to federal data systems to plan and execute their unlawful official actions.

This Court summed up the substantial risk associated with improper access to these sensitive data during the February 14, 2025 TRO hearing:

> [O]nce financial and other confidential data is made public, you can't unring that bell. You can't get it back. There is a world of dangerousness in that sort of information being taken and, you know, and made public or used in improper ways. And so the use of private data, and confidential data and agency data. I mean, some of the Department of Labor, as you might imagine, Department of Education, as you might imagine, has a large amount of data that is incredibly confidential and should not be in the public domain, and should not be in the hands of people who may or may not be legally entitled to access it. So I think that is a big problem.

Tr. at 39-40.

Just a few weeks ago, the United States District Court for the Southern District of New York found that there was "a realistic danger that the rushed and ad hoc process that has been employed to date by the Treasury DOGE Team has increased the risk of exposure of the States' information" and granted a preliminary injunction restraining anyone affiliated with USDS or DOGE from accessing Treasury Department data systems. *New York v. Dep't of the Treasury*, No. 1:25-cv-01144-JAV, [ECF No. 76] (S.D.N.Y. Feb. 21, 2025).

Defendants do not—and cannot—contest that Plaintiff States have a proprietary interest in maintaining the privacy and security of their financial and banking information that they have transmitted to federal agencies. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (holding that "disclosure of private information" is a concrete harm "traditionally recognized as

providing a basis for lawsuits in American courts"). Defendants wrongly suggest that Plaintiffs must allege improper disclosure of proprietary data to state an injury, and they rely on the recent denial of a TRO in *AFL-CIO v. Dep't of Labor* is misplaced. No. 1:25-cv-339-JDB, 2025 WL 542825, at *2 (D.D.C. Feb. 14, 2025); ECF No. 58 at 14. There, the question was not whether the risk of disclosure was an actionable injury for an Appointments Clause claim but whether DOGE's access to DOL data was a violation of the Privacy Act. *Id.*

The substantial risk of disclosure of confidential information itself is a sufficient injury to confer standing. "Courts have routinely found that plaintiffs have standing to seek injunctive relief where inadequate cybersecurity measures put their confidential information at risk of disclosure." *New York v. Dep't of the Treasury,* 25-1144(JAV), ECF No. 76 at 28-29. For example, in *Bohnak v. Marsh & McLennan Companies., Inc.*, the Second Circuit explained that, in the context of disclosure of confidential information, a party "exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." 79 F.4th 276, 285 (2d Cir. 2023). That court further held that "'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts,'" such that "an injury arising from such disclosure" is "'concrete' for purposes of the Article III analysis." *Id.* at 286 (quoting *TransUnion*, 594 U.S. at 425).

Here, Plaintiff States plausibly allege a substantial risk of unauthorized disclosure of their proprietary information—a risk of future harm sufficient to establish standing at the pleading stage. For example, Plaintiff States allege that Mr. Musk and DOGE have been granted "access to any requested DOL system *without regard to security protocols*," that these systems contain New Mexico's proprietary data, and that New Mexico would be "vulnerable to embezzlement, cyber

theft, ransom attacks, and other financial crimes" if the data were compromised." Compl. ¶¶ 177-178 (emphasis added); Decl. Nair ¶¶ 25-26. In addition, New Mexico provides bank account information and other sensitive financial data to the Treasury Department and the Department of Transportation, which if compromised would subject New Mexico to significant risk of financial fraud and disruption to government operations, among other things. ECF No. 6-11 (Decl. Propst) ¶¶ 19-20.[3] Plaintiffs allege that DOGE has obtained full access to the Treasury Department's BFS payment systems, which BFS's own threat intelligence team has identified as "the single greatest threat" BFS has ever faced. Compl. ¶¶ 85, 87. Plaintiffs also allege that DOGE has been using artificial intelligence to analyze data gathered from agencies. *Id.* ¶ 90. News reports following the Complaint revealed that DOGE has already posted classified information on its website.[4]

These allegations—that Defendants have improperly obtained access to sensitive, proprietary state data and, in so doing, have created a substantial risk of cybersecurity breaches—are sufficient to support standing and defeat a Rule 12(b)(1) motion.

### B.    Plaintiff States Adequately Plead Causation and Redressability.

The Court should reject Defendants' argument that Plaintiff States have merely alleged that their injuries were caused by various other state and federal agencies rather than Defendants. ECF No. 58 at 11-12. Plaintiff States plausibly allege that Mr. Musk and DOGE caused the harms

---

[3] The Declaration of Wayne Propst was attached as an exhibit to Plaintiffs' TRO motion, but as Defendants note in their moving brief, the Court may consider these additional materials on Defendants' 12(b)(1) motion.

[4] *See* Will Steakin, Lucien Bruggeman, and Cindy Smith, *Agency Data Shared by DOGE Online Sparks Concern Among Intelligence Community*, ABC NEWS (Feb. 15, 2025), https://abcnews.go.com/US/agency-data-shared-doge-online-sparks-concernintelligence/story?id=118858837.

.

detailed above because they directed the government agencies' actions (*e.g.*, Compl. ¶¶ 64-223), and because they used agency data and IT systems to plan and execute terminations of grants, reductions in force, and contract cancellations that resulted in injury to Plaintiff States (*e.g.*, Compl. ¶¶ 78-91; 94-103; 109-121; 126-133; 137-141; 155-162; 167-175; 177-179; 184-186; 190-192; 198; 203-211). Furthermore, but for the President's unlawful delegation of executive authority, *see discussion* Section II.A.1 *infra*, Mr. Musk and DOGE could not effectuate the harms described above. These allegations of injury resulting from Defendants' conduct are sufficient to support standing at the pleading stage. *Lujan*, 504 U.S. at 561.

Plaintiff States seek injunctive relief that specifically corresponds to the injuries identified in the Complaint, including an order that directs "Mr. Musk to identify all ways in which any data obtained through unlawful agency access was used" and "to destroy any copies or any derivative data from such unauthorized access in his or DOGE's possession," and that bars Mr. Musk and the DOGE Defendants from "ordering any change in the disbursement of public funds by agencies," "extending offers on behalf of the United States that would bind the government to an appropriation that has not been authorized by law," "cancelling government contracts," "disposing of government property," "ordering the rescission or amendment of regulations," "making personnel decisions for agency employees," "taking steps to dismantle agencies created by law or otherwise asserting control over such agencies, including, e.g., placing employees on administrative leave," "accessing sensitive and confidential agency data, using agency data for other than its authorized purpose," and "altering agency data systems without authorization by law and without taking all appropriate protections against cybersecurity risks." Compl. ¶ 273. In addition, Plaintiffs States request a declaratory judgment that Defendants' unconstitutional conduct

as set forth in the Complaint is *ultra vires* and without effect. Compl. ¶ 275. If ordered by the Court, such relief will redress Plaintiff States' injuries to date and prevent further injury.

## II.    Plaintiff States Have Stated a Claim for Violation of the Appointments Clause and *Ultra Vires* Acts by Defendants.

### A.    Count I | The Appointments Clause.

The Complaint alleges that Mr. Musk wields significant executive authority, not mere influence. Those exercising "significant authority" are officers of the United States. *Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). The Constitution requires that all "Officers of the United States" holding offices "established by Law" be nominated by the President and confirmed by the Senate except for direct appointments of inferior officers by the President, the courts, or heads of departments as provided by law. U.S. Const. art. II, § 2, cl. 2.

Thus, on its face, the Appointments Clause limits executive power in *two* important ways. ***First***, it grants Congress the power to create executive offices for the exercise of significant executive authority. ***Second***, it requires that officers filling those offices be nominated by the President and confirmed by the Senate absent an exception to this appointment process created by law for inferior officers.

For Mr. Musk to exercise significant executive power across all executive departments lawfully, as he has purported to do since President Trump's inauguration, Congress would have had to create an office with those duties, and Mr. Musk would have had to be properly appointed under the Constitution. Neither happened here. President Trump unilaterally delegated to Mr. Musk "massive" and "perhaps even decisive" executive power, ECF No. 58 at 1, without Congress serving its constitutional role. This unprecedented and unconstitutional abuse of executive power is not immune from judicial review, as Defendants seem to claim. Defendants argue that the

Appointments Clause has "nothing to say" about the exercise of executive power by Mr. Musk because he does not occupy an office created by Congress, but they have it backwards. *Id.* Significant executive authority can be exercised by someone other than the President *only if* Congress has created an office for its exercise. The Appointments Clause prohibits the President from creating an office through a unilateral delegation of executive power, and Defendants cannot read this aspect of the Appointments Clause out of the Constitution by transforming its prohibition into a license. To state it differently, Defendants' argument simply reads the first aspect of the Appointments Clause out of the constitution entirely. This, they cannot do.

### 1. The Appointments Clause precludes the President from unilaterally delegating executive power to Mr. Musk.

The "established by Law" requirement of the Appointments Clause exists as a check on the President's power. Specifically, the Framers' decision to withhold from the President the power to create offices was no historical accident; it was a direct response to 18th century abuses by the English King in creating a legion of offices and filling them with his supporters to the detriment of the colonists.[5] The Framers addressed the danger of a single Chief Executive amassing too much power in this way by assigning the authority to create executive offices to the legislative branch and the authority to fill them to the President, with the Senate's advice and consent (absent an exception created by law for inferior officers).

Thus, "[t]he principle of separation of powers is embedded in the Appointments Clause." *Freytag*, 501 U.S. at 882. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Id.* at 880. Separation of powers principles are at their zenith in this context:

> If there is a principle in our Constitution, indeed in any free Constitution more sacred than another, it is that which separates the

---

[5] Jennifer L. Mascott, *Who Are "Officers of the United States"?* 70 Stan. L. Rev. 443, 492 (2018).

> legislative, executive and judicial powers. If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers *and offices*.

*Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting Madison, 1 Annals of Cong. 581 (1789) (emphasis added)).

Because it would be impossible for the President to fulfill all responsibilities of the Executive Branch alone, "the Framers expected that the President would rely on subordinate officers for assistance." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020). But the President "'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it.'" *United States v. Arthrex*, 594 U.S. 1, 11 (2021) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010)). Indeed, by the structure of the Constitution, the President can delegate significant executive authority only in a manner prescribed by Congress. This is so because of the Appointments Clause.

By referring to officers holding offices "established by Law," the Appointments Clause assigns to Congress the exclusive authority to "create offices." *Freytag*, 501 U.S. at 883. The First Congress confirmed this understanding of the Appointments Clause by creating the Department of the Treasury, the Department of the War, and the Department of Foreign Affairs, with Secretaries as their heads. "The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation." James Madison, 1 Annals of Cong. 581 (1789), *quoted in Myers v. United States*, 272 U.S. at 128.

With this power, Congress has created the executive departments, 5 U.S.C. § 101, and authorized the delegation of significant executive power to the heads of those departments. These "Cabinet-level departments are limited in number and easily identified." *Freytag*, 501 U.S. at 886. They serve as "a subdivision of the power of the Executive," *United States v. Germaine*, 99 U.S.

508, 510 (1879), and form "a great division of the executive branch of the government," *Burnap v. United States*, 252 U.S. 512, 515 (1920).

But Congress did not create any "department of government efficiency," did not create any other department with the power to supervise and direct all other departments, and did not confer executive authority on any individual overseeing such a department. Instead, the President created DOGE and installed Musk as the head of that department, effectively exercising Congress's powers. Executive Order 14,158 classifies DOGE as a "department," which has a specific constitutional and statutory meaning. As the Supreme Court has noted, "'Departmen[t]' refers only to a part or division of the executive government, as the Department of State, or of the Treasury, expressly creat[ed] and giv[en] . . . the name of a department by Congress." *Freytag*, 501 U.S. at 886 (internal quotations omitted) (alterations and omission in original). Although the Executive Order itself assigns this "department" only the rather mundane power to "moderniz[e] Federal technology and software to maximize governmental efficiency and productivity," the President has authorized DOGE, and Musk as its head, to exercise a level of executive power that even Cabinet-level principal officers do not possess. Compl. ¶¶ 59, 65. In other words, the President purported to delegate a significant amount of his executive power to DOGE, an entity of presidential creation, and to Musk, an unelected and unconfirmed special government employee. Compl. ¶ 67 ("No executive position wields as much power over the operations of the Executive Branch other than the President."). In doing so, the President violated the Appointments Clause and usurped the authority of Congress.

Defendants argue that an examination of an employee's duties under the Appointments Clause is a formalistic inquiry that relies only on the duties specified by law, not the duties the employee actually performs. ECF No. 58 at at 18-19. This argument overlooks precedent and the

myriad ways in which Appointments Clause issues arise. *See Lucia v. SEC*, 585 U.S. 237, 241-42, 248 (2018) (relying on administrative regulations assigning duties to administrative law judges); *Tucker v. C.I.R.*, 676 F.3d 1129, 1133-34 (D.C. Cir. 2012) (relying on actual duties and administrative regulations for an Appointments Clause inquiry because "no statute created positions in the Office of Appeals"); *Willy v. Admin. Review Bd.*, 423 F.3d 483, 491-92 (5th Cir. 2005) (assuming ARB members to be inferior officers "because they make final decisions" and finding that general statutory authority to create the ARB satisfies the Exceptions Clause even though "no specific federal statute creates the ARB"); *United States v. Maurice*, 26 F. Cas. 1211, 1213-14 (Cir. Ct. D. Va. 1823) (Marshall, Circuit Justice) (relying on army regulations that "define the duties of the agents of fortification," which had "the sanction of law" by virtue of "legislative recognition" of the regulations as a whole); *see also Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 2, 7 (Jan. 13, 2016) (relying on a special government employee's actual duties for purposes of officer status under the Appointments Clause).

Plaintiff States' challenge thus focuses on the duties assigned by the President to Mr. Musk and DOGE that involve the significant exercise of executive authority but without those duties having been established by law. Those duties involve "hard power," ECF No. 58 at 19, to dismantle the government through direct executive action and through directives issued to agencies. Related to Defendants' focus on duties, Defendants contend that Plaintiffs' claim of an unlawful exercise of *de facto* executive power somehow forecloses an Appointments Clause claim. ECF No. 58 at 1. However, a government actor cannot have *de jure* power as an officer, that is lawful power, without being appointed under the Appointments Clause. Therefore, *all* Appointments Clause claims challenge a *de facto* exercise of power. *See Buckley*, 424 U.S. at 142 ("The past acts of the

Commission are therefore accorded *de facto* validity . . . ."); *see also Ryder v. United States*, 515 U.S. 177, 188 (1995) (declining to accord "*de facto* validity to the actions of the civilian judges of Coast Guard Court of Military Review" after a violation of the Appointments Clause). Just as it would be "tautological" to defend an Appointments Clause claim by relying on a lack of appointment to argue that a government actor is not an officer, *Officers of the United States within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 116 (2007), it simply begs the question to defend an unlawful delegation of executive authority by arguing that Congress did not create the office. Under Defendants' theory, the Appointments Clause would lose its structural component and be a mere matter of "etiquette or protocol." *See id.*; *see also Buckley*, 424 U.S. at 125. The Constitution's core separation of powers principles cannot be so easily evaded.

In fact, a presidential delegation of executive power without congressional authorization is a compound Appointments Clause violation and a greater aggrandizement of executive power than the simple lack of nomination and Senate confirmation. *See Freytag*, 501 U.S. at 878 ("[S]eparation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch."); *Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring) "Congress could not evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no 'office' of Attorney General would be created by law." 31 Op. O.L.C. at 117. Likewise, the President could not evade the Appointments Clause by unilaterally installing a Supervisory Attorney General that directs the executive functions of the Department of Justice in place of or even in conjunction with the Attorney General.

Defendants rely on the "threshold trigger" language in *Landry v. F.D.I.C.*, 204 F.3d 1125, 1133 (D.C. Cir. 2000), to argue that there must be an office established by law to assert an

Appointments Clause claim. This "threshold trigger" means "an inquiry that may but need not be the start of an Appointments Clause analysis." *Tucker*, 676 F.3d at 1133 n.1. It made eminent sense for the court in *Landry* to identify the Appointments Clause triggering event as the creation of a position by law when confronting the question of where to draw "[t]he line between 'mere' employees and inferior officers" and whether the nomination and confirmation process applies to a position established by law. *Id.* at 1132. But *Landry* did not involve a challenge to an unlawful delegation of executive authority. Defendants cite no case, *Landry* included, holding that there is no Appointments Clause recourse when the President usurps Congress's power to delegate executive authority and when an individual uses the unlawful delegation to take executive action. Consistent with Madison's observation during the First Congress, courts have consistently held that the power to create an executive office for the delegation of executive authority rests only with Congress, not the President. *See Myers*, 272 U.S. at 128.

Defendants' argument seems to posit that, when Congress has not acted, it must be lawful for the President to act in its place. Chief Justice Marshall put this argument to rest centuries ago. *Maurice*, 26 F. Cas. at 1213-14 (Cir. Ct. D. Va. 1823) (rejecting the notion that the President could create offices upon "legislative omission"). Defendants cannot avoid scrutiny under the Appointments Clause by citing Congress's to act. *See Trump v. United States*, 603 U.S. at 650 ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office.").

The Complaint alleges that:

- the President—not Congress—created the "Department" of Government Efficiency, Compl. ¶ 52,
- the President—without Senate advice and consent—established Musk as the head of the department, Compl. ¶¶ 59-60,

- the President—not Congress—delegated to Musk the exercise of significant executive authority, Compl. ¶¶ 70, 72, 76, and;
- Musk—without Senate confirmation—wields this authority while reporting only to the President, Compl. ¶¶ 71, 77-225.

The Complaint makes plain that, despite the unequivocal requirements of the Appointments Clause, Congress has not authorized this delegation of authority, and Musk has been neither nominated by the President nor confirmed by the Senate. Compl. ¶¶ 64, 66. These allegations state, with particularity, factual assertions that establish the elements of an Appointments Clause violation. Therefore, Defendants' Rule 12(b)(6) motion with respect to Count I should be denied.

## 2. *Andrade* does not foreclose Plaintiff States' Appointments Clause claim.

Defendants' reliance on *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987), fails for three reasons: first, the case is factually inapposite; second, Mr. Musk is exercising the powers of an Officer of the United States notwithstanding any purported ratification; and third, Defendants' position relies on facts not alleged in the Complaint and, therefore, not properly before the Court.

Contrary to Defendant's assertion, *Andrade* does not control, much less foreclose, the States' Appointments Clause claim. Under *Andrade*, agency action that is unconstitutional pursuant to the Appointments Clause may be cured through ratification of the action by a constitutionally competent officer *within that department*. *See Andrade*, 824 F.2d at 1256-57. In *Andrade,* the Court held that there was no Appointments Clause injury where a properly appointed administrator within a Department of Justice agency implemented a Reduction in Force policy that had been developed by an unappointed individual in another DOJ agency. *Id.* That is, *Andrade* allows for an *intra*-departmental cure of an Appointments Clause violation provided that the final agency action is determined by a duly appointed official. *Id.* This is simply not the situation presented here. *Andrade* does not contemplate the sweeping *inter*-departmental decisions made by Mr. Musk that are identified in the Complaint, let alone speak to whether directives from an

improperly appointed individual sitting outside a department may be cured by subsequent action by a properly appointed individual within the department. No court has decided a case with such a fact pattern. Nor has the Supreme Court endorsed the overall proposition that ratification can cure the unlawful dictates of an improperly appointed officer.

Moreover, under well-understood principles governing a 12(b)(6) motion, the Government's reliance on *Andrade* is inapposite. Citing *Andrade,* the Government asserts that Plaintiffs' Appointments Clause claim fails because it purportedly depends on the factual question "whether the *actual action—e.g.*, a termination, cancellation, sale of property, or whatever acts supposedly harm the States—was done by someone lacking the authority to do so. 824 F.2d at 1257." ECF No. 58 at 22-23. Defendants ignore, however, Plaintiffs' allegations that Mr. Musk directed the reduction of federal spending, Compl. ¶¶ 201-02; canceled hundreds of federal contracts, Compl. ¶¶ 203-11; promised to terminate employees and effect policy and programmatic changes within agencies, *see generally* Compl. ¶¶ 78-199; bound the government to future financial commitments; and exercised significant discretion and power over agencies, Compl. ¶¶ 218-223. These well-pleaded allegations, which are assumed to be true at this stage of the proceedings, require denial of Defendants' motion to dismiss as a matter of law.

Plaintiffs clearly allege that Mr. Musk is not providing mere recommendations to agency officials and that he has wielded authority without accountability to a Principal Officer. The Complaint describes Mr. Musk and DOGE affiliates as *compelling* agency heads, *directing* agency officials, and *overruling* agency officials' decisions. *See, e.g.*, Compl. ¶¶ 82-85 (Treasury); Compl. ¶¶ 94-104 (USAID); Compl. ¶¶ 110-121 (OPM); Compl. ¶ 137-139 (Department of Energy); Compl. ¶ 221 ("Mr. Musk and his DOGE personnel have conducted their work by threatening, ignoring, and overriding any objections or concerns raised by agency heads and staff."). Given the

mounting evidence exhibiting Mr. Musk's ability to control and override agency officials, these assertions clear the plausibility standard with ease. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (cited authority omitted).

Additionally, an individual may still "exercise significant authority" even if some of his or her powers are made in consultation with others. Plaintiffs have alleged that Mr. Musk exercised significant power to make changes of great significance. This unprecedented delegation and exercise of executive authority is not cured because agency heads may have been involved in carrying out Mr. Musk's decisions.

### 3. Plaintiffs do not allege that Mr. Musk is acting as a mere White House adviser.

Plaintiffs nowhere allege that Mr. Musk is an adviser to the President. In fact, Plaintiffs have alleged the opposite, that Mr. Musk is "far more than an adviser to the White House." Compl. ¶¶ 67−70. Mr. Musk has personally, and through his authority over DOGE staff, exercised virtually unchecked power across the entire Executive branch, making decisions about federal expenditures, contracts, government property, and the very existence of federal agencies. Compl. ¶¶ 200-225. DOGE staff have been placed within dozens of federal agencies, where they access federal databases, use the information stored therein to aid Mr. Musk in making his decisions, and execute his directives. Compl. ¶¶ 218-225. Indeed, the DOGE Executive Order directs "Agency Heads [to] take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order No. 14,158, § 4(b); *see* Compl. ¶¶ 52-57.

On a motion to dismiss, Defendants must take Plaintiffs' allegations at face value. Defendants' arguments regarding the legality of "advisory" groups and White House advisers are therefore immaterial to whether Plaintiff States have stated a viable claim under the Appointments Clause. ECF No. 58 at 27-28, 29 (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993)). Plaintiffs agree that the President and other executive officers may "choose to consult with and receive advice from" an adviser. ECF No. 58 at 29. The Complaint, however, plainly alleges that Mr. Musk is not an adviser and instead that he wields executive authority.

Defendants accuse the States of conflating the authority and the influence of an effective adviser. ECF No. 58 at 1. The only confusion, however, is on the part of Defendants about Plaintiffs' actual allegations. The Complaint asserts that Mr. Musk has *authority* as the leader of DOGE. *See supra,* Section II.A.2 (describing the Complaint's allegations that Mr. Musk himself has directed policy changes). No Executive position – much less an adviser – wields as much inter-agency power as Mr. Musk is alleged to have exercised.

### 4. Plaintiffs have alleged facts sufficient to find that Mr. Musk holds a continuing position.

The well-pleaded allegations in the Complaint satisfy the "continuity" requirement of the Appointments Clause. Defendants' argument to the contrary is based on a flawed understanding of relevant law.

Plaintiffs have alleged that Mr. Musk is acting as the "leader" of DOGE based on Mr. Musk's own statements (Compl. ¶ 60), President Trump's repeated description of Mr. Musk as being in charge of DOGE (Compl. ¶¶ 51, 59, 60), and the conduct of other federal officials (Compl. ¶¶ 218-221; 224-225). The plain text of the DOGE Executive Order makes clear that DOGE is a continuing organization; the only entity with a termination date is the DOGE Temporary Service.

Compl. ¶¶ 8, 56; *see* Exec. Order No. 14,158, at § 3(b) ("The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026. The termination of the U.S. DOGE Service Temporary Organization shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order."). Moreover, the DOGE Executive Order does not contain a sunset provision applicable to the "head" of DOGE. *See id.* As long as this "Department" exists, it will be led by a department head tasked with the same objectives as Mr. Musk.

The President may not evade the Appointments Clause by designating Mr. Musk as an SGE when he is acting as the head of a continuing organization such as DOGE. As noted in the Complaint, the SGE statute expressly contemplates that such a designation may apply to "an officer." Compl. ¶ 63; 18 U.S.C. § 202(a).

Moreover, Mr. Musk is an officer subject to the Appointments Clause regardless of whether his tenure is in fact finite. *See, e.g.*, *Morrison*, 487 U.S. at 671−72, 671 n.12 (holding that an "independent counsel" was clearly "an 'officer' of the United States" even though she served for a finite period, was empowered only to perform "certain, limited duties," and was "limited in jurisdiction").[6] Indeed, Defendants concur that a nonpermanent position may still qualify as "continuing." ECF No. 58 at 30 (noting that "some nonpermanent positions can qualify as offices"). Otherwise, the Government could easily evade the Appointments Clause by creating positions of sweeping authority, as long as it rotated the officers in those positions.

---

[6] *See The Test for Determining 'Officer' Status Under the Appointments Clause*, 49 Op. O.L.C. at 3 (Jan 16, 2025), https://www.justice.gov/olc/media/1385406/dl; *see Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 112–13 (2007); Mascott, *supra*, at 534 (explaining that although the historical meaning of "officer" included the idea of "ongoing duties," "one did not necessarily need to be continuously employed or remunerated to qualify as an officer.").

In evaluating whether a position is continuing for Appointments Clause purposes, courts have considered whether the role stands in contrast to a transient one, the latter being characterized by duties that are personal, contractual, or limited to a single task. *See, e.g.*, *Edmond*, 520 U.S. at 661; *United States v. Germaine*, 99 U.S. 508, 512 (1878); *Maurice*, 26 F. Cas. at 1214.[7] Defendants' attempted reliance on *United States v. Donziger* as setting forth an alternate analysis is based on selectively quoted language from that decision. ECF No. 58 at 30. When read in its entirety and against relevant Supreme Court precedent, *Donziger* recognizes that the "continuity" of an office depends on both on the length of tenure *and* the breadth of power wielded. *See United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (considering whether the position is substantively "more than incidental" to the operations of government in assessing continuity).[8]

Defendants contend that, under *Donziger*, Mr. Musk's role cannot constitute a "continuous" position because it is "personal." ECF No. 58 at 31. This is insufficient to defeat Plaintiffs' claims. First, a defendant's factual dispute with properly pled allegations in a complaint has no bearing on the resolution of a Rule 12(b)(6) motion. Defendants' *Donziger* argument is premised on disagreement with the nature of Mr. Musk's position. Second, to the extent Defendants argue that Plaintiffs' allegations, even if true, cannot satisfy the "continuing office" requirement for an Appointments Clause claim, Defendants misstate the law.

If anything, the extraordinary nature of Mr. Musk's power sets his role leagues apart from positions the Supreme Court has deemed "personal" in the cases cited by Defendants, such as the civil surgeon in *Germaine* and the merchant appraiser in *Auffmordt v. Hedden,* 137 U.S. 310, 326-

---

[7] E. Garrett West, *Clarifying the Employee-Officer Distinction in Appointments Clause Jurisprudence*, 127 YALE L.J. F. 42, 53 (2017) ("The early emphasis on continuity can be construed as errant language that illustrates the functional difference between officers and contractors").

[8] *See also The Test for Determining 'Officer' Status Under the Appointments Clause*, 49 Op. O.L.C. at 5-6.

27 (1890). Mr. Musk is not alleged to be a mere contractor selected to do a job specific to him and without any "general functions." *Id.* at 326-27. Rather, Plaintiffs assert that Mr. Musk has been granted general and enduring powers to restructure the entire federal government as the head of DOGE. Although this delegation of vast executive powers is unprecedented, any individual could exercise the same authority in that position.

Accordingly, Plaintiffs have adequately alleged that Mr. Musk's position and authority satisfy the continuity element.

### B.    Count II | Excess of Authority Claim.

Count II is not "derivative" of Count I, as Defendants claim, but the two claims are related. As previously noted, Congress makes the laws and establishes policy under the separation of powers. Congress also creates agencies to assist the President with the execution of the laws. The President invaded Congress's core function by purporting to give DOGE and Mr. Musk the authority to make wholesale changes to the structure of the federal government and the use of federal funds without congressional authorization. Simply stated, an executive branch entity, whether created by Congress or the President, cannot wield executive power of vast economic and political influence without express authorization from Congress as the branch of government responsible for making policy.

Plaintiffs have alleged facts sufficient to state a viable claim of *ultra vires* action by Mr. Musk, US DOGE Service, and the US DOGE Service Temporary Organization. Courts have long recognized that "judicial review is available when an agency acts *ultra vires*, even if a statutory cause of action is lacking." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (internal quotation marks and citation omitted). The conduct of federal employees is also reviewable pursuant to an allegation of *ultra vires* action, "even if the [official] [was] acting at the behest of the President." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir.

1996) (cleaned up). Further, courts "may enjoin federal officers from taking actions that the sovereign has not empowered [the officer] to do or [the officer] is doing [ ] in a way which the sovereign has forbidden." *Leopold v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949)). Such relief is permissible even where the official engaged in *ultra vires* action was "attempt[ing] to enforce the President's directive." *Reich*, 74 F.3d at 1328 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment)). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### 1. Plaintiffs have stated a claim for traditional equitable review of Defendants' conduct as *ultra vires* official action.

Defendants are incorrect in positing that *ultra vires* claims challenging unconstitutional executive actions must satisfy the three criteria required of such claims when brought against agencies for exceeding statutory authority, as was the case in *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). Defendants confuse the traditional equitable review of unconstitutional action described in *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), with the more limited statutory equitable review available under *Leedom v. Kyne*, 358 U.S. 184 (1958). *See, e.g.*, *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *9 (D. Md. Feb. 14, 2025) (distinguishing *ultra vires* claims challenging agency action that exceeds a clear statutory mandate from those that challenge an official's actions that are unconstitutional or in excess of authority). Yet, as the Court of Appeals for the District of Columbia has recognized, "[t]he reasoning of *McAnnulty* has been employed repeatedly." *Reich*, 74 F.3d at 1327 (discussing

cases). Here, Plaintiffs bring a quintessential *McAnnulty* claim. DOGE is not an agency, and there is no statute that authorizes Mr. Musk and DOGE's exercise of tremendous governmental authority.

In *McAnnulty*, the plaintiff sought to enjoin his local postmaster from carrying out an order of the Postmaster General to retain mail sent to the plaintiff's businesses. 187 U.S. at 108-09. Without considering whether a statutory cause of action existed, the Supreme Court stated that "[t]he acts of all [the post office's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Id.* at 108. "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual." *Id.* at 110. Plaintiff States' allegations describe essentially the same scenario: harm caused by the actions of an "uncontrolled and arbitrary" public officer (Mr. Musk) and public entity (the DOGE Defendants), neither of which are purporting to act pursuant to any statutory grant of substantive authority. As alleged in the Complaint, the only bases for Mr. Musk's position and the DOGE Defendants' creation are the SGE statute and temporary organization statute, respectively. Neither confers any substantive power. And neither contains any provisions concerning judicial review. Thus, these statutes have no relevance to whether or what type of claim for equitable relief may be lodged against an SGE or a temporary organization, as Defendants' mistakenly applied test would have the Court decide.

Courts have regularly entertained constitutional or general excess of authority challenges to non-agency action under *ultra vires* review without conducting a comparable *Changji* analysis. *See, e.g.*, *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, ___ F. Supp. 3d ___, 2025 WL 752738, at *18 n.18 (D.D.C. March 10, 2025) ("'When an executive acts *ultra vires*'—meaning beyond the scope of his power—'courts are normally available to reestablish the limits on his authority.'

Defendants do not identify any authority, statutory or otherwise, that would authorize this sort of vast cancellation of congressionally appropriated aid.") (quoting *Reich*, 74 F.3d at 1328)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *see also Larson*, 337 U.S. at 689-90 (distinguishing an *ultra vires* claim "where the officer's powers are limited by statute" from one "in which the statute or order conferring power is claimed to be unconstitutional"). Indeed, the D.C. Circuit has made clear that "exceeding statutory limitations is just one example of an *ultra vires* act—not the only example of an *ultra vires* action." *Manger*, 102 F.4th at 495.

Foisting the statutory equitable review analysis onto Plaintiffs' factually and legally distinguishable *ultra vires* claims is akin to forcing a square peg into a round hole. The analysis would require Plaintiff States to show that "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji*, 40 F.4th at 722 (internal quotation marks and authority omitted). Here, no statute speaks to whether Mr. Musk's or the DOGE Defendants' actions are judicially reviewable. Indeed, the *lack* of any adequate statutory or other legal authority for Mr. Musk's and the DOGE Defendants' actions is the crux of Plaintiffs' claim.

### 2. The major questions doctrine further shows that Plaintiffs have stated a colorable claim of *ultra vires* action against Defendants.

There is no plausible statutory authorization for Mr. Musk or DOGE's exercise of authority over the federal government. The major questions doctrine makes clear that the special government statute or the temporary organization statute, 5 U.S.C. § 3161, could not provide an adequate statutory basis for Defendants' actions.

The Supreme Court's method for evaluating the legality of novel agency action impacting matters of "vast economic and political significance" provides a framework for evaluating the

constitutionality of Defendants' actions pursuant to a claim of *ultra vires* official action. *W. Virginia v. Env't Protect. Agency*, 597 U.S. 697, 700 (2022) (cleaned up). The Court's essential question to determine whether an agency has acted within or beyond the bounds of its authority is "whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 721. Agencies are creatures of statute and limited jurisdiction, whose purpose is to implement legislation passed by Congress. Accordingly, the Supreme Court has held that where an agency seeks to act in an unprecedented manner on "major questions," courts must "hesitate before concluding that Congress meant to confer such authority." *Id.* at 700 (internal quotation marks omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)). In part, this is because of the presumption that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (quoted authority omitted). Thus, if an agency seeks to assert authority over a major question, it "must point to 'clear congressional authorization' for the power it claims." *Id.*

Mr. Musk's and the DOGE Defendants' cancellation of millions of dollars' worth of federal contracts and grants, termination of thousands of employees, and effective if not actual dissolution of entire federal agencies through their use of agency data and IT systems are novel official actions implicating questions of major economic, political, and social importance. Turning to whether Mr. Musk or the DOGE Defendants have "clear congressional authorization" for effectuating such actions, the answer is a resounding no. Defendants do not even attempt to suggest otherwise.

As set forth in Section II.A.3 *supra*, Mr. Musk's official acts fall well beyond what is permitted of a White House "advisor." The only statute conferring any form of official government status on him is the SGE statute, which contains no substantive grant of power. Under 18 U.S.C § 202(a), a special government employee is, in pertinent part,

an officer or employee of the executive or legislative branch of the United States Government, of any independent agency of the United States or of the District of Columbia, who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days[.]

Finally, as Plaintiffs' Complaint indicates, Congress has not delegated to Mr. Musk any legislative or executive powers.

By its plain language, the Executive Order delegates discrete authority to the two DOGE entities, namely to "implement the President's DOGE Agenda by modernizing Federal technology and software to maximize governmental efficiency and productivity" and to improve "inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." Exec. Order 14,158, §§ 1, 4. Since its creation, however, DOGE has inserted itself into federal agencies and immediately implemented radical agency reorganization by mandating the agency alter how it allocates and expends funds and staffs its administration and substantive work. DOGE personnel have used their access to agency technology and software to create and execute plans for agency operations that have rendered it virtually or actually impossible to continue to function pursuant to congressional mandates. Compl. ¶¶ 54-61, 70, 205-08. These allegations are the basis for Plaintiffs' *ultra vires* claim against the DOGE Defendants. Compl. ¶¶ 261-272.

Here, the DOGE Defendants have commanded radical changes to the way multiple federal agencies operate and fulfill their legislative duties. The DOGE Defendants' personnel cuts, contract terminations, office closures, removal of information from agency websites, and other conduct described in the Complaint has resulted in significant departures from how each such agency has traditionally regulated or engaged in major political, economic, and social questions. Yet, as reflected in the Supreme Court's major-questions jurisprudence, such changes can be made

only by Congress through legislative action or through clear delegations of authority to a federal agency. Neither exists here. The DOGE Defendants were created by executive action, not statute, so Congress has not delegated any authority to them. To the extent the US DOGE Service Temporary Organization was created in conformity with the 5 U.S.C. § 3161, the statute does not empower it to make decisions of major economic and political significance, as "vague statutory grant[s]" are insufficient to satisfy the major question doctrine's stringent requirement that government entities must point to "clear congressional authorization for the authority [they] claim[]." *See W. Virginia*, 597 U.S. at 700-03.

Matters of vast "economic and political significance" must be traced back to Congress to ensure a "vital check on expansive and aggressive assertions of executive authority." *See Nat'l Fed. of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 127 (2022) (Gorsuch, J., concurring) (discussing the significance and purpose of the major questions doctrine). Here, there is no indication whatsoever that Congress authorized Defendants' exercise of power. For these reasons, Plaintiff States have stated a viable *ultra vires* claim.

### C. President Trump is Properly Named as a Defendant.

The Defendants' request for dismissal of President Trump should be denied. First, although the Complaint focuses primarily on the actions of Mr. Musk, the DOGE Temporary organization, and USDS, it is President Trump who made Mr. Musk the *de facto* head of the DOGE entities, endorsed his actions concerning federal agency staffing and expenditures, and directed agency heads to work with Mr. Musk, all without presenting Mr. Musk for approval by the Senate in violation of the Appointments Clause of the Constitution. Compl. ¶¶ 50-56. Similarly, President Trump created the DOGE Defendants through Executive Order 14,158 and, through a subsequent

executive order, authorized DOGE to veto hiring decisions at all federal agencies made by duly appointed officers other than the Agency head. Compl. ¶¶ 75-76.

Second, the harm to Plaintiff States flows from the illegal activities of Mr. Musk and the DOGE entities that he has directed precisely because President Trump improperly delegated authority to Mr. Musk and unconstitutionally exercised Congressional power in creating the DOGE entities. This makes the injury-in-fact and analysis of the other standing elements the same with respect to President Trump. Thus, as discussed above, Plaintiff States have standing to pursue claims against all Defendants.

Third, while Defendants' argument on this point focuses on injunctive relief, the Complaint does not seek an injunction against the President. The Prayer for Relief specifically asks this Court to order Mr. Musk and the DOGE entities to provide certain information and to enjoin them from taking certain actions because of the Appointment Clause violation. It then seeks declaratory relief against all Defendants. "A less intrusive remedy than an injunction, a declaratory judgment provides relief when legal or equitable remedies are too intrusive or are otherwise inappropriate." *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991); *see Steffel v. Thompson*, 415 U.S. 452, 466 (1974) ("Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction. . . .").

There is nothing improper about a declaratory judgment issued against the President. In *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), for example, a federal employees union brought suit against President Nixon (and only President Nixon) seeking to force the President to effectuate a pay raise passed by Congress. *Id.* at 616. In lieu of a writ of mandamus directing the President to effectuate the pay increase, the D.C. Circuit held that it was appropriate

to issue a declaratory decree that the President had a constitutional duty to grant the federal pay increase mandated by Congress. *Id.*

Finally, Defendants' request for dismissal is inappropriate, even if the Court were to dismiss President Trump from this action. They assert that "because this Court cannot issue a declaratory judgment or an order enjoining the President for his official, discretionary action, the Court should grant judgment *to Defendants* on the States' Appointment Clause claim against the President." ECF No. 58 at 37 (emphasis added). At most, the President would be the only Defendant entitled to dismissal of the States' Appointment Clause claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss, or, in the alternative, grant Plaintiffs leave to file an amended complaint reflecting Mr. Musk and DOGE's further unlawful conduct since the filing of the original complaint.

March 14, 2025

Respectfully submitted,

Respectfully submitted,

**RAÚL TORREZ**
Attorney General of the State of New Mexico

By: /s/ *Anjana Samant*
Anjana Samant
D.D.C. Bar ID 4267019
*Deputy Counsel*

James Grayson
*Chief Deputy Attorney General*
Steven Perfrement

38

*Senior Litigation Counsel*
Astrid Carrete
*Assistant Attorney General*
Malina Simard-Halm
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM  87501
jgrayson@nmdoj.gov
asamant@nmdoj.gov
sperfrement@nmdoj.gov
acarrete@nmdoj.gov
msimard-halm@nmdoj.gov
(505) 270-4332

*Attorneys for the State of New Mexico*


**DANA NESSEL**
Attorney General, State of Michigan

Jason Evans
*Assistant Attorney General*
Joseph Potchen
*Deputy Attorney General*
Linus Banghart-Linn**
*Chief Legal Counsel*
Michigan Department of Attorney General
525 W. Ottawa St
Lansing, MI 48933
(517) 335-7632
evansj@michigan.gov

*Attorneys for the People of the State of Michigan*


**KRISTIN K. MAYES**
Attorney General for the State of Arizona

Joshua D. Bendor
D.D.C. Bar ID 031908
*Solicitor General*
Daniel C. Barr
*Chief Deputy Attorney General*
Joshua Katz
*Assistant Attorney General*
2005 North Central Avenue

39

Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
Daniel.Barr@azag.gov
Joshua.Katz@azag.gov

*Attorneys for the State of Arizona*

**ROB BONTA**
Attorney General for the State of California

Nicholas R. Green
*Deputy Attorney General*
Thomas S. Patterson
*Senior Assistant Attorney General*
Mark R. Beckington\*
John D. Echeverria
*Supervising Deputy Attorneys General*
Maria F. Buxton
Michael E. Cohen
Carolyn Downs
*Deputy Attorneys General*
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415) 510–4400
nicholas.green@doj.ca.gov

*Attorneys for the State of California*

**WILLIAM TONG**
Attorney General for the State of Connecticut

Timothy Holzman
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

Kaliko'onālani D. Fernandes
*Solicitor General*
David D. Day
*Special Assistant to the Attorney General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawai'i*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

Adam D. Kirschner
*Senior Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
AKirschner@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

Gerard J. Cedrone
D.D.C. Bar ID MA0019
*Deputy State Solicitor*
Massachusetts Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2282
gerard.cedrone@mass.gov


**KEITH ELLISON**
Attorney General for the State of Minnesota

Liz Kramer
*Solicitor General*
445 Minnesota Street, Suite 600

St. Paul, MN 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for the State of Minnesota*


**AARON D. FORD**
Attorney General for the State of Nevada

Heidi Parry Stern
D.D.C. Bar ID 8873
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

Brian S. Marshall
D.D.C. Bar ID 501670
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
brian.s.marshall@doj.oregon.gov

*Attorneys for the State of Oregon*


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

Jeff Kidd
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jkidd@riag.ri.gov

*Attorneys for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

42

Ryan P. Kane
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

Kelsey Endres
*Assistant Attorney General*
Emma Grunberg
*Deputy Solicitor General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
kelsey.endres@atg.wa.gov
emma.grunberg@atg.wa.gov

*Attorneys for the State of Washington*


*\* Pro Hac Vice Motion Forthcoming*