**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW MEXICO, *et al.*,

                                  Plaintiffs,

              v.

ELON MUSK, in his official capacity, *et al.*,

                                  Defendants.

Civil Docket No. 1:25-cv-00429

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     The States Fail to Plead Article III Standing ................................................................ 2

     A.     USAID and Financial Harm ................................................................................ 2

     B.     General Programmatic Harm .............................................................................. 4

     C.     Data Access ......................................................................................................... 7

II.     The Complaint Should Be Dismissed for Failure to State A Claim ........................... 10

     A.     The States' Appointments Clause Count Fails to State a Claim .................... 10

          1.     The States Fail to Allege Mr. Musk Occupies an Office Established by Law ................................................................................................. 11

          2.     Even if Mr. Musk Functionally "Directed" the Complained-of Actions, the States' Appointments Clause Claim Fails .................... 15

          3.     The States Acknowledge That Mr. Musk is a Special Government Employee Who is Serving as a White House Advisor ..................... 17

          4.     Mr. Musk Does Not Occupy a "Continuing" Office ........................ 18

     B.     The States' Ultra Vires Count Fails to State a Claim ..................................... 20

III.     The Appointments Clause Claim Against the President Should Be Dismissed .................... 23

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**

*Am. Fed. of Labor & Congress of Indus. Orgs. v. Dep't of Labor,*
No. 25-0339, 2025 WL 542825 (D.D.C. Feb. 14, 2025)........................................................8

*\*Andrade v. Regnery,*
824 F.2d 1253 (D.C. Cir. 1987) ................................................................ 10, 15, 16, 17

*Biden v. U.S. IRS,*
No. CV 23-2711 (RC), 2024 WL 4332072 (D.D.C. Sept. 27, 2024)................................23

*Bohnak v. Marsh & McLennan Cos.,*
79 F.4th 276 (2d Cir. 2023) ...............................................................................................8

*Buckley v. Valeo,*
424 U.S. 1 (1976) .............................................................................................................15

*\*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) .............................................................................20, 21, 22

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)...................................................................................................... 5, 8

*Conley v. Gibson,*
355 U.S. 41 (1957) .............................................................................................................4

*Does 1-26 v. Musk,*
No. 25-cv-462, 2025 WL 840574 (D. Md. Mar. 18, 2025) ....................................12, 13, 19

*\*Fed. Express Corp. v. U.S. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) .............................................................................20, 21, 22

*Franklin v. Massachusetts,*
505 U.S. 788 (1992)..........................................................................................................25

*Freytag v. Comm'r,*
501 U.S. 868 (1991)..........................................................................................................15

*Hi Depu v. Yahoo! Inc.,*
950 F.3d 897 (D.C. Cir. 2020) ............................................................................................3

*In re Progressive Leasing Breach Litig.,*
No. 23-cv-00783, 2025 WL 213744 (D. Utah Jan. 16, 2025)..............................................9

*Jefferson v. Harris,*
285 F. Supp. 3d 173 (D.D.C. 2018) ............................................................................2, 6, 14

*Jooce v. FDA*,
  981 F.3d 26 (D.C. Cir. 2020) ...................................................................................13

*Kone v. District of Columbia*,
  808 F. Supp. 2d 80 (D.D.C. 2011) ................................................................7, 13, 23

*\*Landry v. FDIC*,
  204 F.3d 1125 (D.C. Cir. 2000) ........................................................................10, 11

*Lucia v. Sec. & Exch. Comm'n*,
  585 U.S. 237 (2018) .............................................................................10, 11, 14, 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................4

*Mayor & City Council of Balt. v. CFPB*,
  Civ. No. MJM-25-458, 2025 WL 814500 (D. Md. Mar. 14, 2025) ...........................7

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ....................................................................................................4

*National Treasury Employees Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ................................................................................25

*New Jersey v. EPA*,
  989 F.3d 1038 (D.C. Cir. 2021) ................................................................................5

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ..............................................................................25

*Pappas v. Dist. of Columbia*,
  513 F. Supp. 3d 64 (D.D.C. 2021) ..........................................................................23

*\*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Srvs.*,
  656 F. Supp. 3d 137 (D.D.C. 2023) ......................................................................4, 5

*Ryder v. United States*,
  515 U.S. 177 (1995) ................................................................................................15

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................................25

*Teva Pharms. USA, Inc. v. Azar*,
  369 F. Supp. 3d 183 (D.D.C. 2019) ..........................................................................4

*Tucker v. Comm'r*,
  676 F.3d 1129 (D.C. Cir. 2012) ...................................................................11, 12, 14

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) ...................................................................10, 18, 20

*United States v. Maurice*,
  26 F. Cas. 1211 (C.C.D. Va. 1823) ........................................................14, 19, 20

*United States v. Texas*,
  599 U.S. 670 (2023) .......................................................................................... 5, 6

*Univ. of Cal. Students Ass'n v. Carter*,
  No. 25-354, 2025 WL 542586 (D.D.C. Feb. 17, 2025) .........................................8

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................................................22

*Wille v. Raimondo*,
  No. 22-cv-0689, 2024 WL 2832599 (D. Md. June 3, 2024) ...............................13

*Willy v. Admin. Rev. Bd.,*
  423 F.3d 483 (5th Cir. 2005) ..............................................................................14

## STATUTES

5 U.S.C. § 3161 ......................................................................................20, 21, 23

18 U.S.C. § 202 ......................................................................................19, 21, 23

29 U.S.C. § 301 ....................................................................................................14

## REGULATIONS

*Establishment of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq,*
  Exec. Order 13,431, 72 Fed. Reg. 26,709 (May 8, 2007) ...................................22

*Establishing & Implementing the President's "Department of Government Efficiency,"*
  Exec. Order 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ............................... 15, 21

## UNITED STATES CONSTITUTION

U.S. Const. art. 2, § 2 ..........................................................................................15

## INTRODUCTION

The States' response goes a long way in narrowing the legal disputes currently before this Court, and confirming why this Complaint should be immediately dismissed.

*First*, the States lack standing. In their response, the States reduce their sixty-page complaint to three theories of harm. All falter under the weight of either the States' own allegations, or binding law. The States start with the allegation that one State university has had its USAID grants cancelled. But the States' own declarant admits those decisions came from USAID—not any Defendant. Another State's declarant asserts that his agency has had problems drawing on federal funds for unknown reasons, but that declarant similarly offers no connection between that difficulty and any Defendant's act. And as for the actions contemplated by the parties actually named in this case, the States' arguments fare even worse. They object to what *might* follow from what *might* happen at certain *possible* agencies—such as the CFPB—that are supposedly targets of "DOGE." And they press the same data access concerns that have been rejected in other courts, and regardless have nothing to do with the legal theories pressed here—all of which turn on the *use* of data, and have nothing to do with its *access*.

*Second*, the States fail to state a claim. The States agree their Appointments Clause claim rises (and falls) on whether a person with sizable influence—but no formal authority—is an officer of the United States. But the answer to that question is obviously no, under binding precedent, first principles, and common sense. And the States' follow-on statutory claim fails for many of the same reasons (among much else).

The States attempt to shoehorn far-flung policy grievances into a constitutional challenge. But while placed within the four corners of a complaint, the States' suit does not have any mooring in law. On its terms, this suit is baseless. It should be dismissed.

1

## ARGUMENT

### I.    The States Fail to Plead Article III Standing

The States seem to abandon their argument that they need not allege an Article III injury in order to proceed with their case.  ECF No. 64 at 7–8.  And for good reason.  *See* ECF No. 58 at 7–8; *see also Jefferson v. Harris*, 285 F. Supp. 3d 173, 187 (D.D.C. 2018) (dismissing Appointments Clause challenge for failure to plead judicially cognizable injury).  But in its place, the States fail to identify any judicially cognizable injury that is traceable to Defendants or redressable by this Court.  Instead, the States rely on allegations (1) that USAID suspended contracts with one State's university and for some unknown reason another State's agency could not draw federal funds; (2) that Defendants allegedly intend to direct agencies to take future actions that might hypothetically harm the States' programmatic interests; and (3) that federal employees have gained access to certain government data systems containing the States' data, and that this increases the risk of public disclosure of such data. None of these allegations satisfy the requirements of Article III.

### A.    USAID and Financial Harm

The States' response is clarifying in how little it can muster as to *actual* harms that the States have already suffered.  From a sixty-page complaint numbering 277 paragraphs, the States' allegations of actual financial injury boil down to two assertions (one of which is not even contained within that document's four corners).  *See* ECF No. 64 at 9–10.  First, the States allege that USAID suspended certain grants to Washington State University, and second, they point to a lone declaration asserting that a New Mexico state agency was unable to draw against federal funds.  These allegations, however, are not linked to any conduct of Defendants, and therefore fail to meet Article III's requirements, even at the pleading stage.

2

The States here do not allege that any identified Defendant directed USAID to suspend any contracts with any State entity. As the States' own declarant acknowledged, the suspension of payments from USAID to Washington State University were caused either by USAID or the prime award recipients—not Defendants. ECF No. 58 at 11 (citing Decl. of Leslie Anne Brunelli ¶ 6). In response, the States contend that Defendants "directed the government agencies' actions." ECF No. 64 at 15-16. But the States' 277-paragraph Complaint does not support this claim. In fact, the *only* paragraph that discusses these alleged suspensions, paragraph 231, cites to the paragraphs of the Brunell declaration acknowledging that *USAID* or *the prime award recipients*—not Defendants—were responsible for this action. Brunelli Decl. ¶ 6.

Nor do the States' allegations about other USAID contract suspensions suffice. The States rely on Mr. Musk's "woodchipper" statement, ECF No. 64 at 9 (citation omitted), but that comment does not refer to USAID contracts at all, let alone any specific cancelations that harmed the States without proper USAID approval. The one USAID action the States allege was taken by "DOGE personnel" was a response by Jeremy Lewin to an email from USAID contract officers to authorize the cancelation of "programs abroad." *Id.* at 3; Compl. ¶ 101 & n.42. Even assuming the dubious proposition that Washington State University contracts were within the scope of "programs abroad" that were canceled, the email at issue *confirms* that USAID officials had approved the cancelations. *See* Decl. of Thomasina Doe ¶ 8, *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (D.D.C. Feb. 11, 2025), ECF No. 24-8 (describing email as stating that "all of the terminations in these tranches have been signed off by Secretary [of State] Rubio and Acting Deputy Administrator Marocco.").[1] The States

---

[1]    The Court may consider this Declaration because it is "incorporated in the complaint." *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) (citation omitted); *see* Compl. ¶ 101 n.42.

have pled themselves out of establishing that the cancellation of USAID payments were caused by Defendants, and for similar reasons they cannot establish a redressable harm as to those payments.

The States provide even less about the New Mexico agency that was allegedly unable to draw down federal funds. *See* ECF No. 64 at 10; Decl. of Albert C.S. Chang ¶ 15, ECF No. 2-5. No allegations about that inability appear in the Complaint. And neither Mr. Chang nor the States link the agency's inability to draw funds to any decision, direction, or conduct of a Defendant.

As the Supreme Court recently explained, it is "critically important" to heed Article III's conditions "in a sprawling suit like this one." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). That means the States cannot rest on the "overly broad assertion" that every agency action is attributable at least in part to Defendants' conduct. *Id.* at 60. Yet, that is precisely what the States attempt, arguing that "general factual allegations" are sufficient at the pleading stage because courts may "presume" those generalities "embrace those facts that are necessary to support the claim." ECF No. 64 at 10 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). But that language "can be traced to" the laxer pleading standard described in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which is no longer the law. *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 201 (D.D.C. 2019); *see Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Srvs.*, 656 F. Supp. 3d 137, 155 (D.D.C. 2023) (explaining that courts' prior willingness "to presume facts under which the plaintiffs would suffer injury has less force under the contemporary, more demanding pleading requirements"). The States simply do not allege that any State has suffered any programmatic or financial injury traceable to the Defendant.

### B. General Programmatic Harm

The States' remaining allegations of programmatic harm fail because they are contingent on future possibilities that may not occur. *See* ECF No. 58 at 9–11. Indeed, the States do not appear to contest that their laundry list of hypothetical harms, ECF No. 64 at 12, do not amount to certainly

impending harm under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). *See* ECF No. 64 at 12. Instead, the States argue that they have adequately pled a "substantial risk of *future* financial and programmatic harm." *Id.* at 10–12 (emphasis added) (citing *New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021). But each of the alleged future harms would occur only if agencies take certain actions that they may never take. Such hypothetical harms are definitionally contingent on future agency actions that may never occur. *See, e.g., id.* at 12 (citing allegation the States "will incur greater financial costs" "*if* the federal government ceases to fulfill its obligations" (emphasis added)).

The substantial-risk-of-harm standard "is hard to meet where the harm-causing event is still subject to" future regulatory action. *Pharm. Rsch. & Mfr. of Am.*, 656 F. Supp. 3d at 151 (cleaned up). Here, the States rely entirely on expectations of future action by non-party agencies and Defendants' alleged intentions about State contracts and programs. *See* ECF No. 64 at 12 (citing allegations that "DOGE . . . intends to eliminate" contracts, that Defendants "intend to" halt payments, and "intend to destroy the" Department of Education). "But expectations may be wrong, and intentions may change." *Pharm. Rsch. & Mfr. of Am.*, 656 F. Supp. 3d at 152. Lacking allegations of specific, concrete, and imminent agency actions, the States' arguments concerning potential future harm fail.

In their response, the States focus heavily on the Consumer Financial Protection Bureau ("CFPB"), and their hyper-speculative assertion that the agency will not only be shuttered (at some time in the future), but also shuttered by the hands of the Defendants (as opposed to anyone else in government).

These claims are both illustrative and patently deficient. Their theory of injury—that the alleged decrease in CFPB enforcement efforts will cause "consumers with complaints" to "turn to the states when the CFPB is no longer an option," ECF No. 64 at 11—runs directly into the holding of *United States v. Texas*, 599 U.S. 670 (2023). There, a collection of states argued that the federal

government's allegedly lax enforcement of immigration law might "generate indirect effects on state revenues or state spending." *Id.* at 680 n.3. But the Court held that States lack a "judicially cognizable interest" in procuring the enforcement of the law against others. *Texas*, 599 U.S. at 677. The same result attends here. The States cannot convert their complaint about the federal government's alleged failure to enforce consumer protection laws into a judicially cognizable injury by citing the indirect effects of that decision. Either way, "a governmental decision *not* to investigate others[] involves no judicially cognizable interest," as the States' own cited cases establish. *Jefferson*, 285 F. Supp. 3d at 187 (citation omitted); *see* ECF No. 64 at 7 (citing *Jefferson*).

It is no answer to say that the States "do not ask the Court to order Defendants to take the type of executive action that the Supreme Court held to be non-redressable" in *Texas*. ECF No. 64 at 11. That case was not about redressability, as the States contend. *Id.* Rather, the Supreme Court concluded that alleged *injuries* flowing from a lack of federal enforcement were not "legally and judicially cognizable." *Texas*, 599 U.S. at 676–77. It is therefore immaterial that the States seek different relief here; the asserted injury is the same one the Court rejected as judicially non-cognizable.

Nor do the States adequately plead that the CFPB has "entirely ceased enforcing the relevant statutes"—which the Supreme Court preserved as a circumstance that "arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 683; *see* ECF No. 64 at 11. For all their speculation that the CFPB might be dismantled in the future, the States nowhere allege that it has yet failed in its statutory duties. Indeed, the States' specific allegations of facts that have already occurred as to the CFPB are that (1) the agency's website no longer works; (2) the agency's Acting Director emailed employees to cease work tasks and not come to the office, and (3) in "two consumer cases" the CFPB is "no longer taking an active role." Compl. ¶¶ 147–49. But another court has already determined that similar facts do not establish that the CFPB has decided not to engage in

statutorily mandated operations and are "consistent with stated goals of the Trump administration and current leadership of the CFPB to reduce spending and increase efficiency while maintaining the Bureau's statutory functions." *Mayor & City Council of Balt. v. CFPB*, Civ. No. MJM-25-458, 2025 WL 814500, at *14 (D. Md. Mar. 14, 2025). And setting aside whether the facts alleged among to some sort of abdication, the States affirmatively plead that the relevant orders came from CFPB's acting Director, not any Defendant here. Compl. ¶ 148. There is, therefore, no factual allegation linking the allegedly unlawful exercise of executive authority by any Defendant to the pertinent CFPB actions. The States fail to plead any judicially cognizable injury traceable to any Defendant in this case.

## C.    Data Access

Defendants' Motion established that the States had not plausibly alleged any "unauthorized" access to their data, that they failed to allege that any non-public data had been transferred to third parties outside the government or otherwise made public, and that any alleged injury from future public disclosure was speculative. ECF No. 64 at 13–14. Although the States continue to use the label "unauthorized" in their Opposition, they do not dispute that the allegations in their Complaint do not support this legal conclusion. *See id.* at 13. Nor do they dispute that none of their data has been transferred to third parties outside the government or otherwise been made public. Accordingly, these two points are conceded. *See Kone v. District of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded." (citations omitted)).[2]

---

[2]    In addition, the States fail to address, let alone dispute, Defendants' arguments that the States lack *parens patriae* standing for alleged harm to their citizens and that they have failed to allege any cognizable harm to their sovereign interests through "increased risks to nuclear safety" and public health due to alleged access to certain agency IT systems. ECF NO. 58 at 16. The States have thus forfeited any argument regarding their standing on these two grounds. *Kone*, 808 F. Supp. 2d at 83.

Rather than address these key points, the States instead contend that the "substantial risk" of disclosure is a sufficient injury to confer standing. ECF No. 64 at 14. But as Defendants explained in their Motion—and which the States fail to address—a fear that the States' data may be publicly disclosed at some point in the future due to authorized access does not constitute an Article III injury because the harm is not certainly impending. *Clapper*, 568 U.S. at 416; *see Univ. of Cal. Students Ass'n v. Carter*, No. 25-354, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025) (rejecting argument that access to personal data given to purportedly unauthorized government employee increases risk of identity theft as "entirely conjectural" and failing to establish irreparable harm for a temporary restraining order).[3]

The States' continued reliance upon the Second Circuit's decision in *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276 (2d Cir. 2023), is misplaced. That case involved a "targeted hack" rather than an "intra-company disclosure." *Id.* at 289. And it was in that context that the Second Circuit held that the "most important factor in determining whether a plaintiff whose [personal information] has been exposed has alleged an injury in fact is whether the data was compromised as the result of a targeted attack intended to get" that information. *Id.* at 288. The States make no such allegations here. Accordingly, even if *Bohnak* were correctly decided, the Court should reject the States' reliance upon this out-of-circuit case to support their claimed injury.[4]

---

[3]    The States attempt to distinguish the decision in *Am. Fed. of Labor & Congress of Indus. Orgs. v. Dep't of Labor*, No. 25-0339, 2025 WL 542825 (D.D.C. Feb. 14, 2025), on the grounds that the case involved a violation of the Privacy Act rather than a violation of the Appointments Clause. ECF No. 64 at 14. But this obscures the theory of harm, which in both *Am. Fed. of Labor* and this case concerned the unlawful disclosure of private and sensitive data. 2025 WL 542825, at *1 n.1. The district court held that this could only be a cognizable Article III injury if the information was disclosed. *Id.* The States fail to explain why that basic principle of Article III standing does not apply with equal force here.

[4]    One court recently observed that *Bohnak*'s dispensing of the requirement of some evidence of misuse of data, such as through posting the data on the dark web or through identity theft, before finding an imminent injury was "a notable exception" to the "majority of courts both pre- and post-

Indeed, the States do not dispute that their own declarants characterize the potential risk of harm of future disclosure as speculative. *See* Decl. of Wayne Propst ¶ 20, ECF No. 6-11 ("*If* this sensitive data is compromised . . .") (emphasis added); Decl. of Sarita Nair ¶ 26, ECF No. 2-3 ("Upon information and belief, *if* this sensitive data is compromised, the State of New Mexico would be vulnerable to embezzlement, cyber theft, ransom attacks, and other financial crimes.") (emphasis added).

Moreover, the States do not even try to explain how this alleged injury—improper data access—is linked to their legal theories, or how such an injury would be redressed by their requested relief. As Defendants explained, and as the States do not dispute, agencies have provided Defendants with data access as a result of the President's Executive Order, not because of any independent command of a Defendant. ECF No. 3, 14, 25–26. Likewise, even if Defendants were unlawfully exercising power in violation of the Appointments Clause or a statute—and to be clear, they are not— none of that is implicated by the States' allegations with respect to data access. That is because the Defendants have been separately granted access to that data by those with uncontested authority. Indeed, the States themselves seem to agree with this, emphasizing that their gripe is not really with Defendants' *access* to data, but rather the *use* of that data. ECF No. 64 at 14–15 (citing risks that data could be used for "embezzlement, cyber theft ransom attacks, and other financial crimes" (citation omitted)). But that mismatch is fatal to standing. The States' injury must be attributable to some unauthorized *use* of power under their chosen theories; it is not enough that their data happened to be accessed by the powerful.

---

*TransUnion.*" *In re Progressive Leasing Breach Litig.*, No. 23-cv-00783, 2025 WL 213744, at *9 (D. Utah Jan. 16, 2025).

Accordingly, without more, the States fail to establish an imminent, non-speculative injury based on their allegations concerning Defendants' data access.

## II.    The Complaint Should Be Dismissed for Failure to State A Claim

### A.    The States' Appointments Clause Count Fails to State a Claim

The States contend that Defendants have violated the Appointments Clause because Mr. Musk, in their view, must be nominated by the President and confirmed by the Senate as a principal officer of the United States because he is exercising significant authority. *See* Compl. ¶ 256.  To qualify as an officer subject to the Appointments Clause, "an individual must occupy a 'continuing' position established by law" and "exercis[e] significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (citation omitted).

Defendants' Motion demonstrated that the States' allegations fail to state an Appointments Claus claim because: (1) the States concede—and expressly allege—that Mr. Musk "does not occupy an office of the United States," Compl. ¶¶ 6, 25, a threshold requirement for an Appointments Clause claim, *see, e.g., Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000); (2) binding Circuit precedent establishes that no Appointments Clause claim will lie when a constitutionally appointed official "has final authority over the implementation of [a] governmental action," *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987); (3) Presidential advisors do not wield "significant authority" requiring nomination and confirmation under the Appointments Clause simply because they are influential; and (4) the States do not allege that Mr. Musk holds a "continuing position" necessary for an Appointments Clause claim, *see Lucia*, 585 U.S. at 245 (citation omitted), rather than a position that is "personal to [him as] a particular individual*," United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). The States fail to refute any of these independently fatal deficiencies in their Appointments Clause claim, and their Appointments Clause claim must be dismissed.

10

1.    **The States Fail to Allege Mr. Musk Occupies an Office Established by Law**

In their Opposition, the States note that the Appointments Clause "requires that officers filling . . . offices [created by Congress] be nominated by the President and confirmed by the Senate." ECF No. 64 at 17. No party disputes this. *See generally Lucia*, 585 U.S. at 245 (the Supreme Court has "made clear that an individual must occupy a 'continuing' position established by law to qualify as an officer" (citation omitted)). The problem for the States is that they have specifically conceded that Mr. Musk "does not occupy an office created by law." Compl. ¶ 257, *see id.* ¶ 6. Whatever objection the States have to Mr. Musk's alleged conduct, this dooms their Appointments Clause claim. A plaintiff must plead that the holder of an "office"—that is, a "position established by Law"—was not duly appointed to make out an Appointments Clause claim. *See* ECF No. 58 at 18; *Landry*, 204 F.3d at 1133 ("The office of STJ was 'established by Law' (the threshold trigger for the Appointments Clause) and the 'duties, salary, and means of appointment' for the office were specified by statute, a factor that has proved relevant in the Court's Appointments Clause jurisprudence."). The States have not done so here—and again, have in fact affirmatively disclaimed doing so.

In an attempt to avoid the obvious consequences of this concession, the States contend that the D.C. Circuit dispensed with that requirement in *Tucker v. Comm'r*, 676 F.3d 1129, 1133 n.1 (D.C. Cir. 2012). ECF No. 64 at 23. The States misread *Tucker*. There, the D.C. Circuit explained that determining whether any relevant office was established by law "may but need not be the start of an Appointments Clause analysis." *Tucker*, 676 F.3d at 1133 n.1. But far from holding that the determination that an office was "established by law" was not an indispensable requirement for the Appointments Clause, the *Tucker* court's point was procedural: It explained that it did not need to determine whether the plaintiffs' claim in that case *satisfied* the "established by law" element in that case *first,* because it was sufficient to determine that the Appointments Clause claim failed for other

11

reasons.  *See id.* at 1133 ("[B]ecause we conclude below that Appeals employees do not exercise significant authority within the meaning of the Appointments Clause cases, we need not resolve whether their positions were 'established by Law' for purposes of that clause."). Thus, *Tucker* does not obviate the requirement that an office be "established by law" to trigger the Appointments Clause.[5]

The States also misunderstand Defendants' argument regarding the distinction between *formal government power* and mere *influence*. The former—with which the Appointments Clause is concerned— is the *legal authority* that is granted to a position whether by statute or regulation, while the latter—with which the Appointments Clause is not concerned—is ability of someone without formal power to achieve their policy goals through *others* who do have formal power.

The States' theory of the Appointments Clause fails to grapple with this distinction.  Indeed, the States offer no explanation of how the President's Chief of Staff, White House Counsel, or numerous other presidential advisors would not have to be to be Senate confirmed under their reading of the Appointments Clause given their significant *de facto* power.

The States' repeated suggestion that Mr. Musk's role involves "a presidential delegation of executive power without congressional authorization" suffers from this very defect—it collapses the distinction between hard and soft power, which is vital to the Appointments Clause.  ECF No. 64 at 22.  The President's Chief of Staff is one of the most powerful people in Washington.  And her instructions or directions undoubtedly carry tremendous weight, because they are done with the understanding they are communicated on the President's behalf.  None of that makes her an *officer* of

---

[5]     The recent district court opinion granting a preliminary injunction in *Does 1–26 v. Musk* makes the same error.  *See* No. 25-cv-462, 2025 WL 840574, at *15 (D. Md. Mar. 18, 2025). The *Tucker* court did not hold "that an Appointments Clause claim may proceed even if the office at issue was not formally created by Congress or the Executive Branch."  *Id.*  It merely concluded it need not decide that issue because of other deficiencies with the claim.  *See Tucker*, 676 F.3d at 1133.

the United States subject to the Appointments Clause.[6]  The States do not offer any legal grounds why Mr. Musk's role is different.

Defendants do not contend (as the States suggest) that only statutory authority matters for an Appointments Clause claim.  *See* ECF No. 64 at 21.  That is a straw man.  Authorities and duties conferred by regulation and other legal sources are of course relevant in determining whether a position involves the exercise of "significant authority."  That is why when Defendants explained that the USDS Administrator was not an Officer subject to the Appointments Clause, Defendants did so by referencing the duties assigned that position by Executive Order 14,158.  *See* ECF No. 58 at 20–22.[7]  The key point is that to be an "office" in the first place, *some* source of law must grant that position "significant authority."  But if no source of law grants that position any formal, legal authority, there is no "office" for the Appointments Clause to apply.[8]

The States' cited cases all confirm this, as each involves the examination of the formal legal authority of a position created by law, to determine whether that authority is sufficient to constitute

---

[6]    This would be the case even if what the President's Chief of Staff conveyed to other officials were not in fact the President's wishes, but the Chief of Staff's own.  Even if such action could be improper, it would not transform the *office* or *legal authority* of the Chief of Staff such that it would offend the Appointments Clause.

[7]    The States do not respond to this argument, thereby forfeiting any claim that the USDS Administrator is an office subject to the Appointments Clause.  *Kone*, 808 F. Supp. 2d at 83.

[8]    The district court in *Does 1–26* cited two cases to support its view that "courts have considered Appointments Clause challenges not only when Congress conferred upon the position held by the decisionmaker the legal authority to take the action in question, but also in situations where a government official did not have such statutory authority but nevertheless exercised that authority without having been appointed in the constitutionally required manner."  2025 WL 840574, at *15 (citing *Jooce v. FDA*, 981 F.3d 26, 27–28 (D.C. Cir. 2020) and *Wille v. Raimondo*, No. 22-cv-0689, 2024 WL 2832599, at *2, *5 (D. Md. June 3, 2024), *appeal filed*, No. 24-1734 (4th Cir. Aug. 7, 2024)).  The States cite neither case—for good reason.  Both cases expressly did "not reach the question of the constitutionality" of the challenged acts "under the Appointments Clause" because the claims failed for other reasons.  *Wille*, 2024 WL 2832599 at *5; *see Jooce*, 981 F.3d at 29 (explaining that the court "need not consider appellants' Appointments Clause objections" to the issuance of a rule).

an "office" for purposes of the Appointments Clause. *See, e.g.*, *Lucia,* 585 U.S. at 248-49 (SEC ALJ's are officers because their "appointment is to a *position created by statute, down to its duties*, salary, and means of appointment" and they "exercise . . . significant discretion . . . when carrying out . . . important functions" including issuing decisions that can, without review, "become[] final and . . . deemed the action of the Commission" (emphasis added)); *Tucker*, 676 F.3d at 1132–33 (explaining that although "no statute created positions in the Office of Appeals, . . . the 1998 act entitled taxpayers to a hearing in that office . . . and called for a determination by the 'appeals officer' on various issues relating to a proposed collection and to tax liability," such that it was a position "*to which Congress assigned 'significant authority*'" (emphasis added)); *Willy v. Admin. Rev. Bd.,* 423 F.3d 483, 494 (5th Cir. 2005) (holding "the language of 29 U.S.C. § 301 and of the Reorganization Plan No. 6 of 1950 is broad enough to allow the Secretary to create the ARB, appoint its members, *and delegate decision-making authority to it* [by regulation]" such that the "appointment of ARB members and delegation of decision-making authority to them do not violate the Appointments Clause of the Constitution" (emphasis added)); *United States v. Maurice*, 26 F. Cas. 1211, 1213-14 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice) (asking the question "[h]as the office of agent of fortifications been established by law?" and considering "army regulations . . . referred to in acts of congress" in making that determination); *Jefferson*, 285 F. Supp. 3d at 188 (explaining that *Landry* and *Tucker* hold that "the *absence of any authority to render final decisions* [was] fatal to the claim that the [persons] at issue were Officers rather than employees" (emphasis added)).

To be sure, the exercise of power by an actor without any legal authority whatsoever may be subject to challenge for other reasons, but it would not offend the Appointments Clause.[9] Because the States do not allege that *any* source of law gives Mr. Musk formal authority, and contend instead that he "does *not* occupy an office created by law," they do not plead a valid Appointments Clause Claim.[10] Compl. ¶ 257 (emphasis added).

**2.      Even if Mr. Musk Functionally "Directed" the Complained-of Actions, the States' Appointments Clause Claim Fails**

Defendants demonstrated in their Motion that the D.C. Circuit's decision in *Andrade v. Regenery*, 824 F.2d 1253 (D.C. Cir. 1987) forecloses the States' Appointments Clause Claim. In that

---

[9]      The States' statement that "all Appointments Clause claims challenge a *de facto* exercise of power" is not supported by the cases they cite and misses the point. ECF No. 64 at 21. The States' cited cases address the "*de facto* officer doctrine," which in some contexts "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder v. United States*, 515 U.S. 177, 180 (1995); *see also Buckley v. Valeo*, 424 U.S. 1, 142 (1976) ("It is also our view that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date[.]"). This doctrine has nothing to do with what constitutes an Appointments Clause violation *in the first place*; it addresses the question of *remedy* assuming one has already occurred. Defendants' point is that one must plead a defect in the appointment to an office to give rise to such a claim in the first instance.

[10]      The States' reliance on *Freytag v. Comm'r*, 501 U.S. 868 (1991), to suggest that Mr. Musk must effectively be a cabinet level official because the White House office assisting to "implement the President's DOGE Agenda," is called the "*Department* of Government Efficiency" is misplaced. *Establishing & Implementing the President's "Department of Government Efficiency*," Exec. Order 14,158 § 1, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("USDS E.O.") (emphasis added). *Freytag* does not stand for the proposition that use of the term "department" in any legal document has constitutional significance. To the contrary, *Freytag* offers a "limiting construction" to the term "department" as used in the Appointments Clause itself. 501 U.S. at 886. Indeed, *Freytag* undermines the States' argument. Rather than allow anything *called* a "department" to have the constitutional significance of a "Department[]" as the term is used in the Appointments Clause (which would under certain conditions authorize the "head" of any such office or agency to appoint inferior officers, *see* U.S. Const. art. 2, § 2), the Court chose to "constrain[] the distribution of the appointment power" rather than "diffuse it," *Freytag*, 501 U.S. at 886. Under the States' view, by contrast, an agency or office head could be constitutionally empowered to appoint inferior officers simply by virtue of their office or agency being described as a "department" in an executive order or regulation establishing it. This is not the law.

15

case, plaintiffs claimed that a reduction in force ("RIF") violated the Appointments Clause, where the RIF had been planned—including notice to the employees in the affected divisions that there would be a RIF and, subsequently, that specific employees would be laid off or demoted pursuant to the RIF effective a date certain—during a period when no duly appointed officeholder had the authority to implement the RIF. *See id.* at 1255. The D.C. Circuit concluded that the RIF occurred without a violation of the Appointments Clause for one simple reason: the official who "bore statutory responsibility for demoting or firing [the plaintiffs]" "had been properly appointed Deputy Administrator of [the office employing the plaintiffs] on the date the RIF was implemented." *Id.* at 1256-57. "Thus," as the Court of Appeals explained, "the RIF, at least insofar as it affected [the plaintiffs], was carried out by the duly appointed official in charge of the agency. Appellants therefore suffered no injury at the hands of an official who exercised power in violation of the Appointments Clause." *Id.* at 1257.

The States seek to escape the binding effect of *Andrade* by characterizing it as holding that "agency action that is unconstitutional pursuant to the Appointments Clause may be cured through ratification of the action by a constitutionally competent officer *within that department*." ECF No. 64 at 24. But *Andrade's* holding turned neither on ratification nor on any inter-/intra-departmental distinction. To be sure, the *district court* in *Andrade* had cited ratification as the third of "three alternative reasons why the implementation of the RIF did not offend the Appointments Clause." 824 F.2d at 1256. But the D.C. Circuit did not rest its decision on that ground, finding that "we need go no further than the district court's first proffered rationale," *i.e.*, that because "[an official] had been duly appointed as Deputy Administrator of OJJDP on March 26, 1982, when the controversial RIF went into effect . . . Appellants therefore suffered no injury at the hands of an official who exercised power in violation of the Appointments Clause." *Id.* at 1256–57.

16

As the above demonstrates, the States' emphasis on whether the planning of the RIF was instituted by officials in or outside the department likewise had no bearing on the D.C. Circuit's decision in *Andrade*. That is because, as the D.C. Circuit made clear, for purposes of the Appointments Clause, the planning of the RIF (*i.e.*, the plans that had been ratified, including "notification to appellants informing them that a RIF was to be instituted sometime early in 1982" and "appellants [being] formally notified that they were among the 14 OJJDP employees who would be laid off or demoted in a RIF to be implemented" the next month) was irrelevant. *Id.* at 1255. All that mattered for purposes of the Appointments Clause was that, at the time the RIF took effect, the implementing official was duly appointed.

The States' failure to distinguish *Andrade* is fatal. Although they argue that their allegations that Mr. Musk "directed" or "*compel[ed]*" certain actions create a "factual question," ECF No. 64 at 25, they do not dispute their failure to "plausibly allege that the complained-of actions were not formally approved by a relevant agency actor with proper authority." ECF No. 58 at 23; *see id.* at 23–26. *Andrade* makes clear that, for purposes of the Appointments Clause, it does not matter who had the idea or developed the plan to undertake the action at issue in the case; it is sufficient that a duly appointed actor *carried out* any complained of action. *See* 824 F.2d at 1256–57. Absent a contrary allegation, the States do not and cannot controvert that they "suffered no injury at the hands of an official who exercised power in violation of the Appointments Clause." *Id.* at 1257.

### 3. The States Acknowledge That Mr. Musk is a Special Government Employee Who is Serving as a White House Advisor

The States contend in their opposition that Mr. Musk is not acting as a "mere White House adviser" due to the alleged influence he wields. ECF No. 64 at 26. As an initial matter, the States acknowledge in their Complaint that Mr. Musk is a "special government employee," and that, as such, he is "retained, designated, appointed, or employed to perform" certain duties not to exceed "one

hundred and thirty days during any period of three hundred and sixty-five consecutive days." Compl. ¶¶ 62–63. The States' Complaint further alleges that Mr. Musk occupies a role created by President Trump and that Mr. Musk reports only to Mr. Musk. *Id.* ¶¶ 64, 71. And the Complaint further acknowledges that Mr. Musk is an adviser to the President. *Id.* ¶ 120 ("The email was sent out via a custom-built email system from Mr. Musk's team and was sent without consultation with *other* advisers to the President or OMB officials." (emphasis added)). Accordingly, the States' attempt to disclaim the allegations in their Complaint concerning Mr. Musk's role as a White House advisor should be summarily rejected. ECF No. 64 at 26.

The States nevertheless claim that Mr. Musk is asserting "powers" beyond that of a White House advisor and is instead asserting the "powers" of an Officer. Compl. ¶ 64; *id.* ¶ 67 (describing responsibilities that the States claim render Mr. Musk "far more than an adviser to the White House."). But as discussed in Defendants' Motion and *supra*, the States' entire theory under the Appointments Clause impermissibly rests on their claims concerning Mr. Musk's *de facto* power rather than on his *de jure* authority associated with his role as a White House advisor. Accordingly, accepting the States' well-pled allegations as true dooms their claim that Mr. Musk holds an "office" subject to the Appointments Clause.

### 4. Mr. Musk Does Not Occupy a "Continuing" Office

For a position to qualify as that of an officer of the United States subject to the requirements of the Appointments Clause, it must be a "'continuing' position established by law." *Lucia*, 585 U.S. at 245. There is no dispute that "[c]ontinuing offices are distinguished from those that are personal[.]" Compl. ¶ 42; *see Donziger*, 38 F.4th at 294, 297 (officer positions under the Appointments Clause are a "not personal to a specific individual").

The entire thrust of the States' Complaint is that Mr. Musk's role is unique and based on the particular trust that the President has in him. *See, e.g.*, Compl. ¶ 5 ("Mr. Musk's seemingly limitless and unchecked power"); *id.* ¶ 67 ("Mr. Musk is far more than an advisor to the White House."); *id.* ¶ 68 ("Mr. Musk has . . . sweeping and unprecedented access to sensitive data, information, systems, and technological and financial infrastructure across the federal government. This access is seemingly limitless and dependent upon Mr. Musk's discretion"); *id.* ¶ 71 ("the individual with the closest proximity to Mr. Musk is President Trump"); *id.* ¶ 213 ("Mr. Musk has made clear that he plans to embark on a massive and unprecedented deregulation project"); *id.* ¶ 220 (The President "is 'not closely monitoring Mr. Musk's moves; instead, he provides Mr. Musk unfettered discretion . . . because he 'views Mr. Musk as doing the task he assigned him'" (citation omitted)). Likewise, there is no dispute that, as a Special Government Employee, Mr. Musk's time in government is limited. *id.* ¶¶ 25, 63; *see* 18 U.S.C. § 202(a).

The States argue that the question of whether Mr. Musk's role constitutes a "continuous position" involves a "factual dispute" regarding "the nature of Mr. Musk's position." ECF No. 64 at 29. Not so. Their own Complaint—as well as their opposition brief—is inconsistent with any understanding other than that Mr. Musk's role is unique to him. *See, e.g., id.* (referencing the alleged "extraordinary nature of Mr. Musk's power"). Per the States' own allegations, the unique duties of Mr. Musk will not "continue, though the person be changed." *Maurice*, 26 F. Cas. at 1214.[11]

Nor can the States escape this straightforward reading of their own Complaint with the contention in their brief that "DOGE" is a "continuing organization." ECF No. 64 at 27. That is

---

[11]    Likewise, the *Does 1–26* court's conclusion that the USDS Administrator position is likely a continuing office for purposes of a preliminary injunction motion was based on a distinct record and relied on facts not alleged in the States' complaint. 2025 WL 840574, at *16 (relying on the fact that others had been identified as "being a leader of DOGE").

beside the point, and their last-minute contention that "[a]s long as [it] exists, it will be led by a department head tasked with the same objectives as Mr. Musk" is contrary to the allegations in their own Complaint. *Id.* at 28. The States repeatedly allege in their Complaint that "Mr. Musk does not occupy an office of the United States." Compl. ¶ 6; *see id.* ¶ 257. And they express concern about Mr. Musk's authority as an *individual*, with his alleged "unfettered discretion" to act and "seemingly limitless" access to information "dependent upon Mr. Musk's discretion" based on the trust he has from the President, not his role with respect to any particular group in the White House or elsewhere. *Id.* ¶¶ 68, 220. The allegations in the States' Complaint challenge the role "personal" to Mr. Musk "specific[ally]." *Donziger*, 38 F.4th at 297. Because that role would not and will not "continue[ if] the person be changed," the States do not set forth an Appointments Clause claim. *Id.* (quoting *Maurice*, 26 F. Cas. at 1214).

### B. The States' *Ultra Vires* Count Fails to State a Claim

The States' statutory claim—that the U.S. DOGE Service Temporary Organization is working in excess of 5 U.S.C. § 3161—fares no better. The States fail to appreciate the high bar that *ultra vires* relief imposes; and fail to clear it, wherever it is actually set.

**1.** *Ultra vires* review is demanding. To reiterate, the D.C. Circuit has stressed "that *ultra vires* review has 'extremely limited scope.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citations omitted). Under D.C. Circuit precedent, the States must satisfy three requirements in order to establish an *ultra vires* claim: "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the [Defendants] plainly act[] in excess of [their] delegated power and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022). The third factor is "especially demanding," and only applies where the error "is

patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute." *Changji*, 40 F.4th at 722.

The States try to escape this demanding standard of review. ECF No. 64, at 30–31. Specifically, they argue that this standard is only applicable for some *ultra vires* claims but not others based on some ill-defined distinction between actions "in excess of authority" and those "that exceed[] a clear statutory mandate." *Id.* at 31. But that is *exactly* the argument that the D.C. Circuit rejected in *Fed. Express Corp.* 39 F.4th at 764. There, this Circuit confirmed that *ultra vires* challenges—of whatever stripe—require more than "routine" error and instead require a "clear" excess of statutory authority. *Id.* at 764–65. And it reaffirmed that this test is "essentially a Hail Mary pass." *Id.* at 765.

**2.**    The States are not entitled to *ultra vires* relief here—a point that would hold true under any standard of review. Briefly, the temporary organization statute, 5 U.S.C. § 3161, defines a "temporary organization" as one that is "established by law or Executive order for a specific period not in excess of three years for the purposes of performing a specific study or other project." *Id.* § 3161(a)(1). In accordance with Section 3161, Executive Order 14,158 established the U.S. DOGE Service Temporary Organization and "dedicated" that entity "to advancing the President's 18-month DOGE agenda" and to "maximize governmental efficiency and productivity." USDS E.O. §§ 1, 3(b). As a facial matter, these purposes fall comfortably within the capacious scope of Section 3161's "other project" language. So ends the inquiry under the extremely limited scope of *ultra vires* review.

Nonetheless, the States persist, asserting that "[t]here is no plausible statutory authorization for Mr. Musk or DOGE's exercise of authority over the federal government." ECF No. 64 at 33. According to the States, "[t]he major questions doctrine makes clear that the special government statute [18 U.S.C. § 202(a)] or the temporary organization statute, 5 U.S.C. § 3161, could not provide an adequate statutory basis for Defendants' actions." *Id.*

21

The States' contentions fail on both the law and the facts (as alleged).

On the law, the States' exclusive statutory argument turns on the major questions doctrine. But that is fatal for purposes of *ultra vires* review. The major questions doctrine only applies where— as the States implicitly admit—a statute has some ambiguity, and a court is faced with two options, one more reaching than the other. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022). By definition, however, if a statute is ambiguous, adopting one reading is not *clearly* wrong, and thus cannot satisfy the demanding standard for *ultra vires* relief. *See Changji*, 40 F.4th at 722 (citing *Fed. Express Corp.*, 39 F.4th at 764).

For that matter, while the States assume that the major questions doctrine applies to Section 3161, they fail to ever substantiate that premise. As Defendants previously noted, Presidents have historically wielded the authority under Section 3161 to establish "temporary organizations" whose mandates *exceed* even the States' characterization of DOGE, such as projects to facilitate the reconstruction in Iraq. ECF No. 58 at 33–34 (citing *Establishment of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq*, Exec. Order No. 13431, 72 Fed. Reg. 26709 (May 8, 2007)).

More fundamentally, the States' allegations about the facts on the ground are insufficient to support their *ultra vires* claim. Defendants' Motion demonstrated that the States have failed to plausibly allege that any of the Defendants—especially the Temporary Organization—exerted any formal authority in their Complaint. *Id.* at 33. Notably, the States' allegations do not attribute any actions to the Temporary Organization specifically. *See, e.g.*, Compl. ¶ 201 ("Mr. Musk and DOGE have assumed and exercised authority over public funds held by the federal government."); *id.* ¶ 209 ("Mr. Musk and DOGE have made clear that they will continue to eliminate federal contracts."); *id.* ¶ 212 ("Through the 'Fork in the Road' initiative, Mr. Musk has committed to severance packages through

22

September."); *id.* ¶ 225 ("Mr. Musk's authority extends across all agencies in the Executive Branch in an unprecedented manner."); *id.* ¶ 202 ("Mr. Musk announced his intent to use DOGE to take control of federal spending . . ."); *id.* ¶ 213 ("Mr. Musk has made clear that he plans to embark on a massive and unprecedented deregulation project by rescinding thousands of agency regulations."); *id.* ¶ 216 ("Mr. Musk has called for the elimination of entire federal organizations, such as the CFPB and USAID."). The States have no response to Defendants' points regarding the sufficiency of their factual allegations in their opposition brief. Accordingly, the States concede the factual underpinnings of their *ultra vires* claim. *See Kone*, 808 F. Supp. 2d at 83.

Finally, in their opposition brief, the States—for the first time—invoke the Special Government Employee statute, 18 U.S.C. § 202(a), as a basis for their *ultra vires* claim. *See* ECF No. 64 at 34–35. But the States failed to plead any theory based on that statute in their complaint. It is a basic principle that "[a] party may not amend his complaint through a brief in opposition to a motion to dismiss." *Biden v. U.S. IRS*, No. CV 23-2711 (RC), 2024 WL 4332072, at *9 (D.D.C. Sept. 27, 2024) (citing *Pappas v. Dist. Columbia*, 513 F. Supp. 3d 64, 81 n.5 (D.D.C. 2021)), *appeal filed*, No. 24-5246 (D.C. Cir. Oct. 29, 2024). Under Count II, the States chose to invoke only one statute: the temporary organization statute, 5 U.S.C. § 3161. And that statute applies only to the U.S. DOGE Service Temporary Organization. The States do not and cannot plausibly assert that Section 3161 has any application to Defendants Mr. Musk or USDS (or the President). Count II instead rises—and indeed, falls—on the Temporary Organization, and the Temporary Organization alone, violating Section 3161.

## III.    The Appointments Clause Claim Against the President Should Be Dismissed

As Defendants explained in their Motion, the States have failed to allege a plausible Appointments Clause challenge against President Trump, cannot establish standing for that claim, and

cannot obtain injunctive or declaratory relief against the President.  ECF No. 58 at 35–37.  The States

do not seriously dispute that they have failed to allege an Appointments Clause violation against the

President.  Rather, they contend that President Trump took actions that facilitated Mr. Musk's alleged

violation of the Appointments Clause, including by promulgating several Executive Orders that

created USDS and "authoriz[ing]" it to "veto hiring decisions at all federal agencies made by duly

appointed officers other than the Agency head."  ECF No. 64 at 36–37.  But even if the States' factual

allegations were credited, that claim does not sound in the Appointments Clause.  Tellingly, the States

do not cite a single case to support their novel "aiding and abetting" theory of liability under the

Appointments Clause.  In short, the States fail to state a plausible Appointments Clause claim against

the President.

      For similar reasons, the States cannot establish Article III standing to sue President Trump

based on the claim that Mr. Musk violated the Appointments Clause.  The States assert that they are

harmed "because President Trump improperly delegated authority to Mr. Musk and unconstitutionally

exercised Congressional power in creating the DOGE entities."  ECF 64 at 37.  But the harm the

States claim derives from the actions allegedly taken by Mr. Musk and USDS—not the President.  The

Court need look no further than the States' claim for relief.  For example, the injunctive relief sought

by the States exclusively runs against Mr. Musk and the DOGE.  Compl. ¶¶ 273–74 (seeking to order

"Mr. Musk to identify all ways in which any data obtained through unlawful agency access was used

. . . orders Mr. Musk to destroy any copies or any derivative data from such unauthorized access in his

or DOGE's possession, custody, or control, and bars Mr. Musk and DOGE from" a laundry list of

activities).  The declaratory relief sought also relates exclusively to Mr. Musk and the USDS.  *Id.* ¶ 275

(seeking a declaration "that Mr. Musk's officer-level governmental actions to date, including those of

his subordinates and designees, are *ultra vires* and shall have no legal effect," and further seeking a

declaration that "any future orders or directions by Mr. Musk or DOGE" described in their claim for injunctive relief "are "*ultra vires* and of no legal effect.").  Accordingly, regardless of the President's role in the creation of USDS or the placement of Mr. Musk as a Senior White House Advisor, the States have failed to allege a cognizable injury-in-fact caused by the President that can be redressed by the Court.

Finally, the States disclaim seeking injunctive relief against the President but claim that declaratory relief is appropriate.  ECF No. 64 at 37.  But as the D.C. Circuit has held, "courts have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 827-28 (1992) (Scalia, J., concurring in part and concurring in the judgment)); *see Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) (recognizing separation-of-powers issues raised by requests for declaratory relief against the President).  Nor do the federal courts have the power to do so.

The sole case relied upon by the States to support their claim for declaratory relief against the President, *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), is misplaced.  As the D.C. Circuit recognized in *Swan*, "[i]t is not entirely clear, of course, whether, and to what extent, [*NTEU*] remains good law after *Franklin*." 100 F.3d at 978.  The D.C. Circuit in *Swan* explained that the separation-of-powers concerns with seeking injunctive or declaratory relief against the President can often be avoided by seeking relief against subordinate officials.  *Id.*  Here, the States are seeking injunctive and declaratory relief against Mr. Musk and the USDS.  The States have provided no legal basis or practical reason for seeking a declaration against President Trump in this case, and the Appointments Clause claim against him should be dismissed.

## CONCLUSION

For the foregoing reasons, the States' Complaint should be dismissed.

Dated:  March 19, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director,
    Federal Programs Branch

JOSHUA E. GARDNER
    Special Counsel

*/s/ Jacob S. Siler*
JACOB S. SILER
    (DC Bar No. 1003383)
CHRISTOPHER M. LYNCH
    (D.C. Bar No. 1049152)
JAMES J. WEN
    (NY Bar No. 5422126)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
(202) 353-4556
jacob.s.siler@usdoj.gov

Attorneys for Defendants