# EXHIBIT A

FILED: March 28, 2025

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

No. 25-1273
(8:25-cv-00462-TDC)

───────────────

J. DOES 1-26,

      Plaintiff – Appellee,

v.

ELON MUSK, in his official capacity; UNITED STATES DOGE SERVICE;
DEPARTMENT OF GOVERNMENT EFFICIENCY,

      Defendants – Appellants.

───────────────

O R D E R

───────────────

Upon consideration of Defendants' Emergency Motion for Stay Pending Appeal,
the Court orders that the district court's preliminary injunction dated March 18, 2025, as
clarified by its order dated March 20, 2025, be stayed and hereby is stayed pending the
resolution of this appeal.

Entered at the direction of Judge Quattlebaum with the concurrence of Judge
Niemeyer. Judge Gregory filed a separate opinion concurring in the result.

For the Court

/s/ Nwamaka Anowi, Clerk

QUATTLEBAUM, Circuit Judge, with whom NIEMEYER, Circuit Judge concurred:

Elon Musk, in his official capacity, the United States DOGE Service and the Department of Government Efficiency move to stay the district court's preliminary injunction pending their appeal. Finding that they have made a strong showing that they are likely to succeed on the merits of the appeal, that they will be irreparably injured absent the stay, that plaintiffs will not be injured because of the stay and that the stay favors the public interest, we grant their motion.

# I.

This matter involves the United States Agency for International Development ("USAID") and President Donald J. Trump's Executive Order establishing the Department of Government Efficiency ("DOGE"). Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025). Twenty-six unidentified current and former employees or contractors of USAID sued defendants claiming they unlawfully cancelled government contracts, placed USAID personnel on administrative leave, reduced the force of USAID employees and contractors, closed the USAID headquarters and took down the USAID website. Plaintiffs claim those actions violated the Constitution's Appointments Clause because Musk acted as the Administrator of DOGE without being properly appointed for that position. Additionally, plaintiffs claim that defendants' actions in dismantling USAID infringe upon Congress' responsibilities and, therefore, run afoul of separation of powers principles. And for those alleged wrongs, they seek a judicial declaration that defendants, "as currently operating," are violating the Constitution, that their actions are unlawful and should be set aside and

that defendants should be enjoined from "performing their significant and wide-ranging duties unless and until Musk is properly appointed." ECF No. 14, ¶82.

Defendants disagree, insisting Musk is not an Officer of the United States in his role. Instead, they argue he is a Senior Advisor to the President who may have influence on decisions regarding USAID but does not have the required significant authority to carry out the actions complained of. They contend that Musk is not the actual or effective Administrator of DOGE, pointing out that the President designated Amy Gleason for that position. What's more, defendants assert the actions complained of at USAID were carried out by duly appointed Officers of the United States—more specifically, that the President designated Secretary of State Marco Rubio as USAID's Acting Administrator, who then designated Peter Marocco as Deputy Administrator. Defendants add that USAID subsequently, and in accordance with the Executive Order, established an internal DOGE Team led by Jeremy Lewin. And defendants argue that all decisions alleged as unconstitutional are within both agency discretion and the President's inherent Article II authority to direct foreign policy.

Plaintiffs moved for a preliminary injunction, and the district court granted the motion, finding that defendants' conduct likely violated the Constitution and harmed plaintiffs and that the injunction was in the public interest. *Does 1–26 v. Musk*, --- F. Supp. 3d ---, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025). The district court ordered that

defendants[1] (1) reinstate access to various computer and electronic systems of current USAID employees and contractors, whether in active status or on administrative leave; (2) not disclose any confidential information of current USAID employees and contractors, whether in active status or on administrative leave; (3) not take any action relating to the shutdown of USAID; (4) not take any action relating to USAID without authorization from a USAID official; and (5) submit to the court a written agreement indicating USAID will be able to occupy its headquarters in Washington, D.C. in the event plaintiffs prevail in this lawsuit. *Id*. at *32–33.

Defendants subsequently moved for clarification or modification of that injunction as it pertained to Lewin. While Lewin had led the USAID DOGE Team prior to the injunction, defendants sought clarity about whether the injunction covered Lewin in his current role of chief operating officer at USAID and asked that, if so, Lewin be carved out from the injunction to be able to do his job with USAID. The district court clarified that its injunction did, in fact, include Lewin and declined to grant any modifications. Defendants appealed the district court's preliminary injunction and its denial of their motion for

---

[1] The individuals enjoined by the preliminary injunction include "Elon Musk, in his official capacity; the United States DOGE Service; the Department of Government Efficiency; and their officers, agents, servants, employees and attorneys," and "all individuals who at any time from January 20, 2025 through the pendency of [the] Preliminary Injunction have been designated as, or have served in the role as, a DOGE Team Lead or DOGE Team Member pursuant to Executive Order 14,158 for purposes of any activities relating to [USAID], regardless of the personnel status of that individual." *Does 1–26*, 2025 WL 840574, at *32.

clarification or modification. They also filed an emergency motion for us to stay the injunction pending the appeal.

## II.

Under the well-established standard for granting a stay pending appeal, we consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
> (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Those factors, applied to this record, favor granting a stay of the preliminary injunction pending appeal. Thus, for the reasons described below, we grant defendants' motion.

### A. Likelihood of Success on the Merits

While *Nken* governs this motion, our consideration of defendants' likelihood of success on the merits here requires defendants to show that the district court erred in its assessment of plaintiffs' motion for preliminary injunctive relief under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). In essence, "[t]here is substantial overlap between [the *Nken* factors] and the factors governing preliminary injunctions, . . . not because the two are one and the same, but because similar concerns arise whenever a

court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken*, 556 U.S. at 434 (citation omitted).

To start, "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances . . . ." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (internal quotation marks omitted). Granting this sort of relief, when the harm is admittedly not present or immediate, and is conditioned on possible future events, contradicts our rule that a plaintiff seeking preliminary relief must show a present threat of irreparable harm. *See id.* A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. We turn now to the district court's findings as to the *Winter* factors.

### 1.

First, defendants have made a strong showing that the district court erred in finding plaintiffs were likely to succeed on the merits of both their Appointments Clause claim and their separation of powers claim. The ultimate questions in those two claims are who carried out the disputed actions at USAID and did those actions violate the Constitution.

The district court found that defendants established that most of the actions about which plaintiffs complain were approved or ratified by Rubio, Marocco and other USAID officials. *Does 1–26*, 2025 WL 840574, at *13. And for those reasons, the district court conceded that the terminations of contracts, the administrative leave decisions and the

reductions in force were either approved or ratified by USAID officials. *Id*. (finding "[p]laintiffs have not provided specific evidence refuting [d]efendants' documentation," and "that it is, at a minimum, more likely than not that USAID officials either took or ratified the relevant personnel and contract actions"). Thus, as the district court acknowledged, those actions provide no basis for the injunction in connection with plaintiffs' Appointments Clause claim because those individuals possessed the requisite authority.

The district court concluded, however, that defendants produced no specific evidence showing USAID officials approved or ratified the decisions to move USAID out of its previous headquarters and to take down the USAID website. *Id*. Therefore, the district court granted the injunction based on those two actions and a finding that as to plaintiffs' separation of powers claim, defendants, "as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency." *Id*. at 18. That conclusion is dubious.

The only evidence cited by plaintiffs in support of their motion, which was subsequently relied on by the district court, were social media posts and news reports. To be sure, Musk claimed involvement in the USAID decisions in those posts and reports. But that is not the point because no one disputes his involvement. The question is whether Musk both directed those decisions and did so without the approval or ratification of USAID officials. And no record evidence shows that he did. In contrast, defendants put forth evidence that in all pertinent actions, Musk acted as a Senior Advisor to the President and not as the Administrator of DOGE, and that all decisions pertaining to USAID were

either made or approved by those so authorized. *See* ECF No. 28-2. Moreover, the relocation of United States Customs and Border Protection into USAID's former headquarters and removal of USAID's website occurred after Rubio and Marocco had assumed their roles at USAID. Finally, the news articles and social media posts detailing Musk's involvement do not indicate Rubio and Marocco were not part of those two decisions.[2]

And as to Musk, the evidence before us creates a strong likelihood that he functioned as an advisor to the President, carrying out the President's policies of shrinking government and reducing spending, not as an Officer who required constitutional appointment. The current evidence in the record indicates that Musk's actions did not involve the exercise of authority of an office granted by law but rather the implementation of Executive policies. In order to be an Officer, he must (1) be "exercising significant authority pursuant to the laws of the United States" and (2) be "occupying a continuing position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up). Based on the current record, it appears that Musk's role satisfies neither criterion.

---

[2] Our concurring colleague claims the Majority "improperly meddles in factual determination properly left to the discretion of the district court," in violation of our standard of review. Conc. Op. at 17–18 n.1. He is right to emphasize the importance of those standards. We are duty bound to apply them. But we apply our standard of review here in the context of our precedent that instructs that preliminary injunctions should be granted "sparingly and in limited circumstances" because of their implication of "very far-reaching [judicial] power," *Direx Israel, Ltd.*, 952 F.2d at 816, and that "ambiguity is simply insufficient to support a finding that success on the merits is 'likely' rather than merely 'possible' . . . ." *Di Base v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017). In that context, our conclusion is consistent with our standard of review.

Further, regardless of whether the alleged actions—authorized, ratified or not—could form the basis of a separation of powers claim that the Executive branch is dismantling USAID in contravention of the Legislative branch's power, plaintiffs have failed, in part, to name the unconstitutional actors as defendants. The district court identified USAID as authorizing and ratifying all actions complained of except closing the prior USAID headquarters and taking down its website. Yet, neither the Executive nor USAID is named here. Confined to the two allegedly unlawful actions identified by the district court, there is no strong likelihood of success on the merits of a separation of powers claim against a defendant who the district court found to be acting without authority and who the government claims is not an Officer of the United States.[3]

While defendants' role and actions related to USAID are not conventional, unconventional does not necessarily equal unconstitutional. And none of this is to say that plaintiffs will not be able to develop evidence of unconstitutional conduct as the case progresses. Time will tell. Our holding is merely that, at this time, the record does not support the district court's finding of a likelihood of constitutional violations.

---

[3] Our concurring colleague eloquently articulates general principles of separation of powers. At least in the abstract, we agree with many of the principles he recites. But he then applies those principles to parties who are not in this case. Our job is to resolve the actual claims by the actual plaintiffs against the actual defendants. And since we all agree that doing that here requires that the injunction be stayed, we will not opine on what might be a proper claim against parties not before us.

## 2.

Even apart from the evidentiary issues, defendants have shown that the district court erroneously concluded that plaintiffs showed irreparable harm under *Winter*. To start, the court correctly noted that these alleged constitutional violations alone, even if established, do not create irreparable harm to these plaintiffs. *See Does 1–26*, 2025 WL 840574, at \*26. Instead, individualized irreparable harm is required. *Id*. The district court found irreparable harm in three ways.

One, it found that John Doe 22 was an overseas USAID employee in a high-risk location on administrative leave whose electricity, cell phone and internet bills cannot be paid because of USAID's payment system being shut down. *Id.* at \*27. According to the court, this plaintiff faced a physical security risk that amounted to irreparable harm. *Id*. But as the court acknowledged, none of the services John Doe 22 complained about have been discontinued, and defendants introduced evidence representing that "overseas employees 'will retain access to Agency systems and to diplomatic and other resources' until they return to the United States." *Id*.

Two, the district court found that another plaintiff, John Doe 12, had heard remarks accusing USAID workers of being corrupt. *Id*. at \*28. And it noted that John Doe 9 said "Musk's derogatory statements about USAID are available on media outlets in [the Middle East] region and 'have a direct negative impact on the perception of USAID where [he] work[s].'" *Id*. Again, to the district court, this showed irreparable harm. *Id*.

Three, the district court found plaintiffs' fear that personal, confidential and sensitive information could be released created irreparable harm. *Id*. But other than the

10

district court's concern over defendants' alleged lack of care regarding security clearances and a lack of "assurances" from DOGE that it will comply with protocols for personal information, the record contains no evidence of any such disclosure. *Id*. at *28–29.

None of this evidence establishes the irreparable harm required to issue an injunction. Our law is clear. The "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC* v. *6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx*, 952 F.2d at 812).

Turning to plaintiffs here, the district court found irreparable harm based on subjective fear of a lack of physical security, fear of nonpayment of expenses, fear their reputations will be harmed by the negative comments of defendants about USAID employees and contractors and fear that their confidential information might be exposed. But subjective fear that is remote and speculative is insufficient to show the required actual and imminent harm to establish irreparability.

Aside from their fear-based alleged damages, plaintiffs allege emotional distress based largely on loss of employment or contract status. *See* ECF No.17-1, pp. 19–20 ("J. Doe 19, . . . lost access to their email and all USAID systems . . . and has received no information about their employment status. . . . J. Doe 19 is 'emotionally and psychologically harmed' by Defendants' actions.") (internal citations omitted). However,

they allege no violations of employment law or any breach of contract. *Id*. And even more significantly, they do not allege facts that show any physical manifestations or medical treatment which is required for almost any emotional distress claim recognizable by law. *Id*.

Furthermore, to the extent these alleged harms are cognizable damages at all, most can be remedied by money damages. Generally, injuries that can be cured by monetary relief, by law, are not irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); *see also Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("Monetary relief typically may be granted as easily at judgment as at a preliminary injunction hearing, and a party does not normally suffer irreparable harm simply because it has to win a final judgment on the merits to obtain monetary relief."). In sum, plaintiffs have failed to show any irreparable injury to date as required under our precedent.

### 3.

Last, for several reasons, defendants have shown the district court erred in concluding that the balance of equities favors issuing an injunction and that the injunction furthers the public interest.

To begin, the mandatory obligations of the district court's order extend well beyond granting relief to the individual plaintiffs who brought this lawsuit and enjoining the defendants named. Injunctions of this scope are disfavored when, as here, they are unnecessary to address the alleged harms. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921,

927 (2024) (mem.) (Gorsuch, J. concurring) (stating "universal injunctions circumvent normal judicial processes and 'tend to force judges into making rushed, high-stakes, low-information decisions' at all levels"); *see also* Order Granting Defendants' Motion for a Stay Pending Appeal, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Donald J. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), Dckt. No. 29 (granting the government's request for a stay pending appeal of a nationwide injunction banning the government's enforcement of two Executive Orders pertaining to diversity, equity and inclusion).

Also, the district court failed to limit relief to the irreparable harms it found—fear of physical security, fear of nonpayment of expenses, fear of reputational harm and fear of disclosure of confidential information. For example, the district court's injunction requires defendants to submit to the district court a written agreement indicating USAID will be able to occupy its headquarters in Washington, D.C. in the event plaintiffs prevail. *Does 1–26*, 2025 WL 840574, at *33. This part of the court's order does little to allay plaintiffs' fear-based claims. In addition, while the rest of the injunction may address some of the fear-based harms John Doe 22 complains of regarding physical security and payment, it fails to provide any relief for the alleged reputational harms of John Doe 9 and John Doe 12.

Next, the mandatory obligations of the injunction are inconsistent with the district court's express findings regarding authorized actions. The district found that USAID officials approved or ratified the decisions to terminate certain USAID contracts, to place certain USAID employees on administrative leave and to terminate others; yet, the district court's order requires defendants to reinstate various computer and electronic systems of

USAID employees and contractors on administrative leave. If, as the district court explained, the administrative leave and contract termination decisions were not unconstitutional, injunctive relief reinstating terminated access is inappropriate.

Continuing, the injunction order requires vast and detailed actions related to the operation of USAID, an Executive agency. But neither that agency, nor its leaders, nor the Executive branch are named as parties to the lawsuit. Not only that, the district court ordered defendants, who it earlier found to lack constitutional authority to act for USAID, to carry out those remedial actions for the agency. In other words, the district court ordered more of the conduct that it held to be unconstitutional. These inconsistent conclusions cannot support the relief ordered by the court.

For all these reasons, the district court's order does not properly balance the equities involved in this case. And it follows that it harms, rather than furthers, the public interest.

## B.  Remaining *Nken* Factors

Having evaluated defendants' likelihood of success on the merits, we turn to the remaining *Nken* factors. But we need not spend much time here because, as stated earlier, much of the analysis of the underlying preliminary injunction considers these same points.

The next *Nken* factor considers whether defendants will be irreparably injured absent a stay. Here, the district court's order prevents defendants from complying with Executive branch instructions because the district court summarily determined that Rubio, Marocco and Lewin are blindly taking instructions from defendants. That means the district court has, based on alleged injuries from a handful of plaintiffs, issued injunctive orders

that dictate and restrict a separate branch of government. Unlike the harm alleged by plaintiffs, this harm cannot be remedied by monetary damages. It truly is irreparable.

Turning to whether the issuance of the stay will substantially injure the other parties interested in the proceeding, the analysis of plaintiffs' harms under Section II.A.2 establishes that the answer is no. Plaintiffs' alleged harms are not actual or imminent and are certainly not irreparable. Also, nothing in the record shows any injuries plaintiff might be able to establish as the case progresses could not be addressed through the normal litigation process.

Last, as to the public interest, the public certainly has an interest in ensuring the government is acting constitutionally. However, the public also has an interest in judges wielding power only when so authorized. That authorization limits us to deciding cases and controversies, not political disputes. Cases and controversies involve actual injuries to actual parties, not injuries that are speculative and extend beyond the parties in this case. Courts must be wary of stretching to find harm at the preliminary injunction stage when the record does not support it. This is because the normal practice of "methodically developing arguments and evidence," is necessarily cast aside for what is often and "almost by design a fast and furious business." *Labrador*, 144 S. Ct. 921, 927 (2024) (mem.) (Gorsuch, J. concurring) (quoting *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) Gorsuch, J. concurring).

In sum, defendants have made the requisite showing under *Nken* that they have a strong likelihood of success on the merits, that they will be irreparably injured if a stay is

not issued, that a stay would not substantially injure plaintiffs and that a stay is in the public interest.

## III.

For all these reasons, we grant defendants' motion to stay the preliminary injunction pending appeal.

GREGORY, Circuit Judge, concurring only in the result:

When Congress first authorized the creation of the USAID in 1961, it spoke of American values and a desire to spread freedom and democracy across the world.  *See* Act for International Development of 1961, Pub. L. No. 87–195, § 102 (1961).  For a generation, through times of peace and war, economic prosperity and struggle, Democratic and Republic administrations alike, USAID has remained.  But approximately six weeks ago, Defendant Elon Musk and his compatriots "spent the weekend feeding USAID to the wood chipper."  *Does 1-26 v. Musk*, No. CV 25-0462-TDC, 2025 WL 840574, at *10 (D. Md. Mar. 18, 2025) (citation omitted).

We may never know how many lives will be lost or cut short by the Defendants' decision to abruptly cancel billions of dollars in congressionally appropriated foreign aid. We may never know the lasting effect of Defendants' actions on our national aspirations and goals.  But those are not the questions before the Court today.  The question before us is whether Defendants have satisfied their burden for a stay of the district court's injunction pending their appeal to this Court.  *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 408 (4th Cir. 2024) (Diaz, C.J., concurring) (writing separately to comment on standing despite agreeing on the merits).

Because Plaintiffs failed to include the proper Defendants, I am forced to concur in the Majority's grant of Defendants' request for a stay pending appeal.  But I write separately to make clear that my concurrence today should not be seen as an endorsement of the Executive's likely unconstitutional actions in closing USAID, effectively dissolving a "creature[] of statute" that can only be created or destroyed by Congress.  *See* infra § I.;

16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*., 595
U.S. 109, 117 (2022).

Below, I start by addressing the merits of the case. I first explain why I believe that
the Executive's actions violated the separation of powers. Secondarily, I explain why
Defendant Musk acted as an Officer of the United States, in violation of the Appointments
Clause, rendering his feeding of USAID to the "wood chipper" constitutionally invalid.
But after opining on the merits, I discuss why Plaintiffs have failed to sue the proper
Defendants, which has forced me to concur in the Majority's grant of the stay.

In different circumstances, Plaintiffs very well may have demonstrated a likelihood
of success on the merits of their constitutional claims. But like Defendants, I am
constrained by the Constitution to go no further than my jurisdiction allows.

## I.

I believe the merits of Plaintiffs' separation of power claim are clear. The Executive
branch may not eliminate a *congressionally* created and funded agency without
*congressional* authorization.[1] By doing so here, the Defendants' actions violated a core
tenet of our Constitution.

---

[1] The Majority questions this characterization of the results of Defendants' actions.
Maj. Order at 7. But, in doing so, it improperly meddles in factual determination properly
left to the discretion of the district court. Second guessing factual findings of a district
court in an emergency stay posture where the applicant has not even asserted that such
findings were erroneous, let alone clearly so, is entirely inappropriate. As we have long
held, a party seeking reversal of a district court's injunction order must "overcome a
deferential standard of appellate review." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th
194, 210 (4th Cir. 2024). We evaluate a district court's decision to grant a preliminary

The Constitution's great genius is its system of separation of powers.  As the Founders recognized, "[i]n framing a government which is to be administered by men over men, the great difficulty lies in this:  you must first enable the government to control the governed; and in the next place oblige it to control itself."  The Federalist No. 51 (Alexander Hamilton or James Madison).  They understood that if the Constitution put too much power in the hands of one person or one body, the United States risked sliding into tyranny.  James Madison acknowledged as much, writing that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist No. 47 (James Madison).

To address the "great difficulty" of creating a government capable of governing itself, the Founders established a system of separation of powers.  The Federalist No. 51 (Alexander Hamilton or James Madison).  "The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility."  *INS v. Chadha*, 462 U.S. 919, 951 (1983).  Article I of the Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const. Art. I, § 1; Article II vests "[t]he executive Power . . . in a President of the United States," U.S. Const.

---

injunction under an abuse of discretion standard and only review the district court's factual findings for clear error.  *Id*.; *see also Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).  Indeed, "[w]here there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous."  *Id*. (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

Art. II, § 1; and Article III vest "the judicial Power" in the federal courts, U.S. Const. Art. III § 1. "Even a cursory examination of the Constitution reveals the influence of . . . [the] thesis that checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). "Time and again [the Supreme Court has] . . . reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches." *Morrison v. Olson*, 487 U.S. 654, 693 (1988).

The case before us considers the extent of the President's power and is governed by the familiar framework set forth in Justice Robert Jackson's *Youngstown* concurrence. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J. concurring). All members of the Executive branch derive their authority solely from the President, in whom the Constitution vests the Executive power of the United States. *See* U.S. Const. Art. II, § 1. The President may, of course, delegate his power to Executive branch officials. *See, e.g.*, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020). But he may only delegate authority that he possesses. As the *Youngstown* framework shows, he does not possess the power to shutter USAID or any other congressionally created agency.

The *Youngstown* framework divides Executive power into three categories. "First, when 'the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J. concurring)). "Second, 'in absence of either a congressional grant or denial of authority' there is a 'zone of twilight in which he

and Congress may have concurrent authority,' and where 'congressional inertia, indifference or quiescence may' invite the exercise of executive power."  *Id*. (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring)).  "Finally, when 'the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Id.* (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring)).  In the third category, the President's power is at its "lowest ebb."  *Id.* (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring)).

As these three categories show, "[n]o matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown*, 343 U.S. at 585). This is because we have a President, not a King.  *Trump v. Vance*, 591 U.S. 786, 795 (2020).  Our Founders made this choice explicit.  Thus, "[i]f the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump v. United States*, 603 U.S. at 608 (quoting *Youngstown*, 343 U.S., at 655 (Jackson, J., concurring)).  While the President may wield significant power from behind the Resolute Desk, the judiciary must stand just as resolute in ensuring that the President wields his power within the Constitution's bounds.

Like the district court found, and as I will now explain, I believe that the Executive's actions here fall in the third and final *Youngstown* category.  And because the President lacks the independent constitutional authority to close a congressionally created and funded agency, I believe that the Executive's actions violate the separation of powers and are

unconstitutional.  Simply put, *no* Executive branch officer—the President, the Secretary of State, and certainly not Defendant Musk—may close USAID or a similar agency without congressional approval.

### A.

By shuttering USAID, the Executive acted without Congress's "express or implied authorization."  *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J. concurring)).  Lacking Congress's keys, the Executive cannot claim refuge in the first and most forgiving *Youngtown* category.

A generation ago, Congress first endowed the President with the authority to create USAID.  In 1961, President John F. Kennedy "strongly urge[d]" Congress to enact the legislation establishing USAID.  John F. Kennedy, Special Message to the Congress on Foreign Aid (March 22, 1961), *The American Presidency Project*, https://www.presidency.ucsb.edu/node/236184.  Later that year, heeding President Kennedy's call, Congress did just that.  *See* Act for International Development of 1961, Pub. L. No. 87–195 (1961).

The 87th Congress affirmed that it was American policy "to continue to make available to other free countries and peoples, upon request, assistance of such nature and in such amounts as the United States deems advisable and as may be effectively used by free countries and peoples to help them maintain their freedom."  *Id.* at § 102.  To achieve these aims, Congress authorized the President to create an agency to provide international aid.  *See generally id*.  So, like all executive agencies, USAID is a creature of Congress.  *See Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117.  Then and only then, "[b]y virtue of the

authority vested in [him] by the Foreign Assistance Act of 1961," President Kennedy established the United States Agency for International Development.  Exec. Order 10973, 26 F.R. 10469 (signed Nov. 3, 1961).  For over sixty years, USAID has stood as a testament to President Kennedy's and the 87th Congress's shared vision.

In 1998, under the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. 105-277, Congress codified USAID in statute.  FARRA states:

> Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5, United States Code.

22 U.S.C. § 6563.  This remains federal law.

It is true that the statute gave the President the ability to reorganize USAID "pursuant to . . . section 6601," but that limited authorization has long since expired.  Section 6601 allowed the President, "[n]ot later than 60 days after October 21, 1998," to send Congress a reorganization plan to provide for "the consolidation and streamlining of the Agency [for International Development] and the transfer of certain functions of the Agency to the Department."  22 U.S.C. § 6601(a).  Pursuant to FARRA, President Bill Clinton submitted a reorganization plan on the eve of 1999.  *See* Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277.  But President Clinton's plan did not eliminate USAID.  Rather, it reiterated that USAID "will be a separate agency" within the Executive branch.  *Id*.  While the statute allowed for the President to modify the reorganization plan, the modification deadline passed more than twenty years

22

ago. 22 U.S.C. § 6601(g)(2). Under FARRA, it is too late for President Trump to dismantle USAID—regardless of whether he acts through Musk, DOGE, Secretary of State Marco Rubio, or any other Executive actor—without first getting the consultation and approval of Congress. It is clear that the Executive cannot "get rid" of USAID without further congressional authorization, contrary to Defendants' actions. *Does 1-26*, 2025 WL 840574 at *5–6 (Musk stating: "you've just got to basically get rid of the whole thing . . . That is why [USAID has] got to go, it's beyond repair.").

Since the limited authorization to modify USAID under FARRA expired, Congress has not granted the President statutory authority to modify, reorganize, or eliminate USAID. That is uncontested. So by shuttering USAID, the President acted without express or implied congressional authorization, in violation of the Constitution.

## B.

Not only has the Executive acted without Congress's blessing, but it has acted in defiance of Congress's express will. The Executive did not act in response to "congressional inertia, indifference or quiescence," *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring), and its actions thus did not fall within *Youngstown*'s second category.

Congress has consistently voiced its support for USAID. As recently as 2023, several members of the House of Representative introduced a bill to abolish it. *See* H.R. 5108 (118th Cong.). Instead of passing the measure, Congress increased the funds appropriated to USAID. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118–47, Title II (March 23, 2024). Thus, Congress reaffirmed its enduring commitment to USAID and its mission. *Cf. United States v. Texas*, 599 U.S. 670, 685 (2023) (noting the

23

Congress "possesses an array of tools to analyze and influence [the Executive branch's] policies" including the appropriation process).

Congress went a step further than merely funding USAID. In the most recent appropriations bill passed in 2024, Congress limited the Executive's authority to reprogram or allocate funds congressionally appropriated to USAID. Congress stated: "None of the funds made available [to USAID], shall be available for obligation to— . . . (2) suspend or eliminate a program, project, or activity; . . . [or] (4) create, close, reorganize, downsize, or rename bureaus, centers, or offices; . . . unless previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation." Pub. L. 118–47, § 7015(a). Furthermore, Congress stated that

> None of the funds [appropriated to USAID] . . . shall be available for . . . programs, projects, or activities through a reprogramming of funds in excess of $1,000,000 or 10 percent, whichever is less, that—
>
>> (1) augments or changes existing programs, projects, or activities;
>>
>> (2) relocates an existing office or employees;
>>
>> (3) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by Congress; or
>>
>> (4) results from any general savings, including savings from a reduction in personnel, which would result in a change in existing programs, projects, or activities as approved by Congress;
>
> unless the Committees on Appropriations are notified 15 days in advance of such reprogramming of funds.

*Id.* at § 7015(b).

The statute further clarified that "[f]unds appropriated . . . [to] the Department of State, foreign operations, and related programs . . . may not be used to implement a reorganization, redesign, or other plan described . . . [therein] by . . . the United States

24

Agency for International Development . . . without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id.* at § 7063(a).[2]  Pursuant to the statute, "any such notification submitted to such Committees shall include a detailed justification for any proposed action." *Id.*  Through these provisions, Congress made its will clear:  Before interfering with USAID and its functioning, the President must consult with Congress and comply with the laws enacted by it.

As the district court found as a factual matter, the President did *not* consult with Congress prior to gutting USAID, as required by Pub. L. 118-47, § 7015 and § 7063.  *Does 1-26*, 2025 WL 840574 at *22–23.  While Secretary of State Rubio sent a letter to Congress stating that USAID officials would "begin the process of engaging in a review and potential reorganization of USAID" on February 3, 2025, he only did so after Defendants had already publicly announced the closure of USAID and notified USAID employees of the

---

[2] The statute defined "a reorganization, redesign, or other plan shall include any action to—

(1) expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations, including bureaus and offices within or between such departments, agencies, or organizations, including the transfer to other agencies of the authorities and responsibilities of such bureaus and offices;

(2) expand, eliminate, consolidate, or downsize the United States official presence overseas, including at bilateral, regional, and multilateral diplomatic facilities and other platforms; or

(3) expand or reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce of the Department of State and USAID from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024.

*Id.* at § 7063(b).

closure of USAID's headquarters. *Id.*; *see also id.* at \*6.  As the district court found, "there is no evidence that the congressional committees had the opportunity to weigh in before these key actions were taken and publicly announced." *Id*. at \*22.

By closing USAID, the Executive acted in flagrant defiance of Congress.  This is true whether the Executive acted through the President, a "Senior Advisor," DOGE, the Secretary of State, USAID's Interim Director, or any other member of the branch.

C.

Acting without Congressional authority and contravention of Congressional will, the Executive's power is at "its lowest ebb." *Zivotofsky*, 576 U.S. at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring)).  To act at this nadir of Executive power, the Executive must demonstrate that it has the inherent constitutional authority to unilaterally shutter a statutorily created and congressionally funded federal agency.  *Id.*  It is clear that it does not.

Only Congress can create a federal agency.  As the Supreme Court has observed, "[a]dministrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117.  And "Congress has . . . [the] exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution 'in the Government of the United States, or in any Department or Officer thereof.'" *Youngstown*, 343 U.S. at 588–89; *see also* U.S. Const. Art. I, § 1.  Since the Founding, Congress has exercised its exclusive authority to create federal agencies.  *See, e.g*., An Act for establishing an Executive Department, to be denominated the Department of Foreign Affairs, 1 Stat. 28 (July 27, 1789); An Act for establishing an Executive Department, to be denominated the War

26

Department, 1 Stat. 49 (August 7, 1789).  Congress has likewise legislatively reorganized Executive departments.  *See* National Security Act of 1947, Pub. L. No. 80-253 (reorganizing the United States military and intelligence agencies, including creating the Department of Defense).  Since the dawn of our Republic, it is Congress, and Congress alone, that has the power to establish and delineate the bounds of an Executive agency.

Just as Congress alone has the power to create an agency, it also has the sole power to abolish an agency.  In the past, Congress has abolished agencies it no longer believed were necessary.  *See, e.g*, ICC Termination Act of 1995, Pub. L. No. 104-88 § 101 (abolishing the Interstate Commerce Commission); Homeland Security Act of 2002, Pub. L. 107-296 § 471 (abolishing the Immigration and Naturalization Service).  This power must remain solely in Congress's hands.  This is because, as the Supreme Court has long recognized, "the power to destroy may defeat and render useless the power to create." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819).  To allow the Executive branch to "destroy" the Legislature's creations would disrupt the Founders' careful balance of power. *See Olegario v. United States*, 629 F.2d 204, 224 (2d Cir. 1980) ("[t]he Constitution's grant of executive authority does not include the right to nullify legislative acts or ignore statutory directives.").

The fact that USAID is associated with the exercise of foreign policy does not change this analysis.  While it is true that, "in foreign affairs the President has a degree of independent authority to act," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003), Congress and the President still share "authority over the Nation's foreign relationships," *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016); *see also Zschernig v. Miller*, 389

U.S. 429, 432 (1968) ("the Constitution entrusts [the field of foreign affairs] to the President *and the Congress*.") (emphasis added). The field of foreign policy is not the President's exclusive domain, nor does acting in that field give him a carte blanche to ignore congressional will. *See, e.g.*, *Youngstown*, 343 U.S. at 646 (Jackson, J. concurring) ("[n]o penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role."). This is equally true when it comes to our provision of foreign aid. When President Kennedy first called for the establishment of USAID, he noted that "[c]lose consultation and cooperation with the Congress and its Committees will still be essential, including an annual review of the program." Kennedy, Special Message to the Congress on Foreign Aid (March 22, 1961). The fact that USAID provides foreign aid does not place it beyond Congress's purview.

Defendants argue that they have not truly shuttered USAID, but rather are exercising their broad discretion in "'how best to marshal [their] resources and personnel to carry out [their] delegated responsibilities.'" Mot. at 20 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007)). It is certainly true that the Executive must have some degree of discretion in carrying out its duties to execute the laws. But that "broad discretion" is not unlimited. *Massachusetts v. EPA*, 549 U.S. at 527. Additionally, I believe that Defendants' framing of their actions misses the mark.

Here, as the district court found as a matter of fact, Defendants have de facto shut down USAID such that it cannot carry out its congressionally delegated functions. *Does 1-26*, 2025 WL 840574 at *18 ("The record demonstrates that Defendants, as well as other

government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency.").  The court found that Musk and the DOGE team were responsible for closing USAID headquarters and taking down its website.  *See id.* at *13–14 (referencing Musk's posts on X that it was "Time for [USAID] to die," that "we're in the process of . . . shutting down USAID," and that "We spent the weekend feeding USAID into the wood chipper.").  Musk's actions initiated the end of USAID, leading to what will be the end of the United States' humanitarian aid to foreign countries.

I believe that when the Executive branch systematically guts an agency such that it cannot carry out its congressionally designated role, it has stepped beyond the bounds of its constitutional authority.  As the district court found, this is exactly what has happened here.  *Id.* at *19 ("[a]s a result of these and other actions, USAID appears to be unable to perform its core functions and even certain basic functions of a governmental agency.").  I do, therefore, think that the Executive branch has unconstitutionally invaded the role of the Legislature, upsetting the separation of powers.

## II.

The separation of powers question is assuredly of great, and even existential, import: That the Executive does not infringe upon the Legislative branch's powers is and has always been a pillar of American democracy.  In this context, the challenge brought under the Appointments Clause, *see* U.S. Const. Art. II § 2, cl. 2, may seem less consequential, as Defendants could engage in an easy "fix" by simply adhering to the constitutionally mandated processes.  In some ways, I agree, and could rest the merits finding on the

separation of powers question.  But the Appointments Clause, too, is a bastion of our democratic system and serves as yet another crucial check on the limits of Executive power. As Alexander Hamilton wrote, "the most sacred duty and the greatest source of security in a Republic" is "[a]n inviolable respect for the Constitution and Laws."  Alexander Hamilton, Tully No. III (Aug. 28, 1794).  To ignore any unconstitutionality is a failing of that duty.  I therefore write to explain why I believe Plaintiffs' Appointments Clause claim—separately and in addition to their separation of powers claim—is also likely meritorious.

The Appointments Clause of the Constitution was born from colonists' frustration and distrust with how government offices were filled.  At the time of our nation's founding, "[t]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag v. C.I.R.*, 501 U.S. 868, 883 (1991) (quoting Gordon Wood, *The Creation of The American Republic 1776–1787*, 79 (1969)).  To address this grievance, and after great debate at the Constitutional Convention, the Framers created the Appointments Clause, which, according to Hamilton, was the best plan "to promote a judicious choice of men for filling the offices of the Union."  The Federalist No. 76 (Alexander Hamilton).

Under the Appointments Clause, "Officers of the United States," who are "distinct from mere employees" by virtue of their roles, must be appointed through one of two permissible methods.  *Lucia v. SEC*, 585 U.S. 237, 241, 244 n.3 (2018).  "Principal Officers" may be appointed only by the President, with the advice and consent of the United States Senate.  *Id*. at 244 n.3.  "Inferior Officers" may be appointed in the same manner, or, if Congress so provides, they may be appointed by "the President alone," by a federal

30

court, or by the head of a department.  *Id.*  The Appointments Clause "is more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976)).

It was paramount to our Framers—and must remain paramount today—that the President cannot bypass this structural safeguard and unilaterally select Officers to wield incredible power without legislative oversight of that process.  To do so returns us to the very monarchy that our Framers fought and wrote against.  But that seems to be exactly what the Executive Branch and Musk have done.  It is undisputed that Musk was not duly appointed through either of the permissible methods outlined above.  The Senate never had the opportunity to provide its advice and consent on his appointment, nor did Congress create the amorphous and omnipotent Office he now occupies.  Thus, according to Plaintiffs, because Musk nevertheless carried out the functions of an Officer, he has violated the Appointments Clause.

The question is now whether Musk is acting as an Officer of the United States.  An individual constitutes an "Officer" if they (1) "exercise[] significant authority pursuant to the laws of the United States," and (2) "occupy a 'continuing' position established by law."  *Lucia*, 585 U.S. at 245 (cleaned up).  The Majority merely states that Musk's "role satisfies neither criterion" but does not explain its reasoning.  Maj. Order at 8.  I have come to the opposite conclusion, and believe it prudent to set forth my reasoning, as the district court did as well.

31

A.

As for the first of these two factors—significant authority—our inquiry focuses on "the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245; *see also Buckley*, 424 U.S. at 126. The "main criteria" are "(1) the significance of the matters resolved by the official[], (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker v. C.I.R.*, 676 F.3d 1129, 1133 (D.C. Cir. 2012); *see also Carr v. Saul*, 593 U.S. 83, 86 (2021) (whether the individual "exercised significant discretion when carrying out important functions" and whether they "often had the last word") (cleaned up).

It seems plain to me that these three criteria are satisfied. First, the significance of Musk's actions cannot be overstated. As explained above, the district court found that Musk and DOGE were responsible for closing USAID headquarters and taking down its website. *Does 1-26*, 2025 WL 840574 at *13–14. Defendants and the Majority question whether Musk was actually responsible for these actions, *see* Reply Br. at 3, Maj. Order at 7, but provide no evidence to cast doubt on the district court's factual findings. To me, the record supports the district court's factual finding that Musk and DOGE directed the effective closure of USAID, impacting the lives of thousands of employees and their families, as well as the lives of governments and individuals worldwide who have for decades relied on our foreign aid. Additionally, the closure of USAID headquarters resulted in the permanent closure of its classified operations center, the significance of which the district court reasonably likened to the closure of the Pentagon for the Department of Defense. *See Does 1-26*, 2025 WL 840574 at *14.

Musk has taken other incredibly significant actions; as the district court found, Musk was likely responsible for the shutdown of the Consumer Financial Protection Bureau ("CFPB") as well. *See id.* at *2 (referencing Musk's post on X stating "CFPB RIP" hours before that agency's website and X account were shut down); *see Lucia v. SEC*, 832 F.3d 277, 284 (D.C. Cir. 2016), *rev'd on other grounds*, 585 U.S. 237 (2018) (when assessing an Appointments Clause challenge, we should "look not only to the authority exercised in a petitioner's case but to all of that appointee's duties").

Second, Musk has wielded considerable discretion. Again, without any mandate from Congress, Musk and DOGE closed USAID's headquarters and website, in effect shuttering USAID. That is but one example of the many actions Musk has taken with little oversight. As the President explained, "after he signs an executive order, it gets 'passed on to [Musk] and his group' and 'they're all getting done.'" *Does 1-26*, 2025 WL 840574 at *2 (citation omitted). As Musk confirmed, "one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out." *Id.* (citation omitted). By signing a far-reaching Executive Order, the President acts as a legislature of one; he then hands it off to Musk for execution. This process is contrary to the proper constitutional process and allows Musk to act with substantial discretion, checked only by the President.

Third, Musk's decisions were final. After he closed the USAID headquarters, the General Services Administration formally cancelled USAID's occupancy of the building and ordered it transferred to United States Customs and Border Protection. *See id.* at *3, *15. There was no question that USAID was not to resume operations in that location.

33

Defendants make a few arguments that I find unavailing.  They contend that the lack of formal statutory or regulatory authority granted to Musk "should . . . have been dispositive" on this issue.  Mot. at 15; *see also* Reply Br. at 2.  But statutorily-granted decisionmaking authority is not one of the "main criteria" guiding our analysis.  Instead, whether authority is "established by law" is only a "threshold trigger," and "may but need not be the start of an Appointments Clause analysis." *Tucker*, 676 F.3d at 1133 n.1; *see also Freytag*, 501 U.S. at 881 (characteristics that make an individual an employee, rather than an Officer, are if the "position[] [is] not established by law, and whose duties and functions are not delineated in a statute" *as well as* the "temporary, episodic basis" and "ministerial tasks" of the role).  Next, the parties disagree on Musk's title and role within the Executive Branch: Defendants characterize his position as merely that of a Presidential advisor, Mot. at 4, which the Majority seems to endorse, Maj. Order at 7–8, while Plaintiffs contend that Musk is the de facto USDS Administrator, *see* Resp. Br. at 15–16, which the district court found likely to be true, *Does 1-26*, 2025 WL 840574 at *18.  The Executive cannot evade constitutional requirements by using the title of "Senior Advisor to the President" as a shield.  Nor can it use this evasion as a sword to wield unconstitutional power.  We must consider Musk's role and duties themselves, not what his title purports him to be.

The undisputed record evidence supports the district court's view that Musk does far more than merely advise President Trump.  DOGE's actions and Musk's statements on X show that he has exercised operational control over USAID and other agencies, even in the absence of a formal grant to do so, and even in light of his title as advisor.  *See id.* at

34

*2–3, *14, *17 (discussing Musk's actions toward USAID, CFPB, National Weather Service, United States Department of Agriculture, National Nuclear Security Administration, and Federal Emergency Management Agency).  Many of Musk's directives "thwart th[e] chain of command" necessary to close congressionally-created agencies, as he instead acts unilaterally.  *Lofstad v. Raimondo*, 117 F.4th 493, 500 (3d Cir. 2024).  Musk has publicly spoken on behalf of DOGE at a joint press conference with the President on February 11 and in a joint interview with the President on February 18.  *Does 1-26*, 2025 WL 840574 at *2, *17.

Defendants emphasize the district court's acknowledgement that they "presented evidence that *most* of the major actions taken at USAID . . . were actually approved by USAID officials," rebutting the idea that Musk was in control.  *See* Mot. at 17 (citing *Does 1-26*, 2025 WL 840574 at *13) (emphasis added).  The Majority seizes on this idea that "*most* of the actions about which plaintiffs complain were approved or ratified by Rubio, Marocco and other USAID officials."  Maj. Order at 6 (emphasis added).  The key word is *most*.  While the district court did find that most of Musk's actions challenged by Plaintiffs were subject to the oversight of others—and correctly so—at least some of Musk's actions were done unilaterally.  Thus, even if accepting that Musk-directed actions are the exception, and the majority of Musk's work is of an advisory nature, subject to others' approval—although, I must say, I am incredulous of this on the broader scale—the fact that those actions far exceed the bounds of mere advice, without his having been duly appointed, constitutes a significant departure from the protections that undergird our constitutional system.

35

Additionally, President Trump has indicated that he considers Musk to be acting far beyond an advisory capacity, and instead that he has entrusted Musk to direct agency action. Such presidential statements carry great weight. *See Texas v. United States*, 809 F.3d 134, 185 (5th Cir. 2015) (relying on presidential statements at the preliminary injunction stage), *aff'd by an evenly divided court*, 579 U.S. 547 (2016) (per curiam). Significantly, President Trump publicly stated, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." *Does 1-26*, 2025 WL 840574 at *2 (citation omitted). And when discussing DOGE's role in implementing Executive Orders, President Trump stated that "[Musk] would take that executive order that I'd signed, and he would have those people go to whatever agency it was – 'When are you doing it? Get it done. Get it done.'" *Id.* (citation omitted); *see also id.* (citations omitted) (Trump stating that Musk is a "leader" of DOGE; that DOGE was "headed by Elon Musk;" that one of the biggest functions of DOGE was to "mak[e] sure that the presidential executive orders are actually carried out"). The President also invited Musk to a Cabinet meeting, signifying that he believed that Musk had the authority equivalent to that of Senate-confirmed Cabinet members. *See id.* at *3.

Such duties and functions exceed that of an advisory nature and demonstrate authority, contrary to the Defendants' assertions and the Majority's belief. Accordingly, I agree with the district court that the present record support the finding that "at least during the time period relevant to this Motion, Musk was, at a minimum, likely the official performing the duties and functions of the USDS Administrator." *Id.* at *18. Furthermore, even if viewed under the auspices of his Presidential advisor title, "the record of his

36

activities" shows that Musk was "the leader of the DOGE, with the same duties . . . as if he were formally in that position." *Id.*

Although Musk was not formally granted authority by statute or regulation, he has exerted actual authority that only an Officer can exercise—and therein lies the problem. Without being tethered to any formal grant of authority, and without having been duly appointed in accordance with our Constitution.

## B.

The next factor in our analysis is whether the individual occupies a "continuing position." *Lucia*, 585 U.S. at 245 (internal quotation marks omitted). To be an Officer of the United States, the individual's duties must be "continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. 508, 511–12 (1878). The Supreme Court has since held that in certain circumstances, even if a position is time-limited, it can still be that of an Officer. *See Morrison*, 487 U.S. at 671 n.12, 682–83. There are "three factors that are helpful to consider in determining whether a temporary position is an office: (1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *United States v. Donzinger*, 38 F.4th 290, 297 (2d Cir. 2022).

First, I believe that the position is not personal to Musk. Defendants argue that Musk's advisory role is specific to him, and "there is no indication that [his] particular role as a 'Senior Advisor to the President' will outlast his tenure." Mot. at 17. But again, one's title—i.e., that of Presidential advisor—should not blind us from reality. As the district court found as a factual matter, the truth is that Musk is acting as the de facto USDS

administrator, which heads the U.S. DOGE Service Temporary Organization, as well as the leader of DOGE more broadly. This is substantiated by the significant actions Musk has taken, as well as information from the Executive Branch. *See Does 1-26*, 2025 WL 840574 at *17; *see also* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441 (DOGE Executive Order renamed the United States Digital Service as the United States DOGE Service ("USDS" or "DOGE") and created U.S. DOGE Service Temporary Organization, which is headed by the USDS Administrator); *Does 1-26*, 2025 WL 840574 at *2 (citation omitted) (President Trump stating that Elon Musk is "in charge" of DOGE); *id.* at *3 (citation omitted) (the same day that the White House announced that Amy Gleason was the Acting USDS Administrator, it also stated that "the President tasked Elon Musk to oversee the DOGE effort" while others, ostensibly Gleason, "are helping run DOGE on a day-to-day basis"); *id.* (at the hearing before the district court, Defendants were unable to identify who served as Acting USDS Administrator between January 20, 2025, when DOGE was created, and February 25, 2025, when Gleason was named as Acting USDS Administrator).

Neither the DOGE Executive Order nor any subsequent orders have indicated that the USDS Administrator position is limited to only Musk. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441; Exec. Order No. 14,170, 90 Fed. Reg 8,621; Exec. Order No. 14,222, 90 Fed. Reg. 11,095. And, as the district court found, "at various times other individuals, including Vivek Ramaswamy and Amy Gleason, have been referenced by the President or the White House as being a leader of DOGE." *Does 1-26*, 2025 WL 840574 at *16.

Musk is unique: never before in our Republic have we seen a non-appointed individual wield such immense power and control over government operations. Even the

Majority acknowledges that Musk's role and actions are "unconventional." Maj. Order at 8. However, as the head of DOGE and the U.S. DOGE Service Temporary Organization, Musk's role is not unique or personal to him.

Second, his position is not transient nor fleeting. The DOGE Executive Order did not put a time limit on the existence of DOGE, which was renamed and whose functions were redirected from the then-United States Digital Service. *See* Exec. Order No. 14,158, 90 Fed. Reg. at 8,441, sec. 3(a). I do acknowledge that the Executive Order provided for the "Establishment of a Temporary Organization," that being the "U.S. DOGE Service Temporary Organization," which "shall terminate" after an eighteen-month term. *See id.*, sec. 3(b). But the Supreme Court has clarified that a "continuing" position need not be permanent. *See Morrison*, 487 U.S. at 671 n.12, 682–83 (explaining that "it is clear that [the independent counsel] is an 'officer' of the United States, not an 'employee,'" even where the position was terminated when the counsel's duties were completed, such that "there remains no need for any continuing action"). What matters is the ongoing nature of the duties during that admittedly finite time period.

In *Germaine*, the Supreme Court found that a surgeon who was "only to act when called on by the Commissioner of Pensions in some special case," such that "[h]e may make fifty of these examinations in a year, or none," was not an Officer, as his duties were "occasional and intermittent." 99 U.S. at 512. Similarly, in *Auffmordt v. Hedden*, the Court found that merchant appraiser is "an expert, selected as an emergency arises" to "aid in ascertaining the value of the goods," and "acts only occasionally and temporarily." 137 U.S. 310, 326–27 (1890). The facts here are quite different. Musk's duties are robust,

wide, and ongoing, as the district court thoroughly explained, *see Does 1-26*, 2025 WL 840574 at *16, and he takes significant actions on a daily basis. Even if we are to assume that he has no "responsibilities that extend beyond the accomplishment of the mission" of the U.S. DOGE Service Temporary Organization, *Morrison*, 487 U.S. at 672—that is, to "advanc[e] the President's 18-month DOGE agenda," Exec. Order No. 14,158, 90 Fed. Reg. 8441, sec. 3(b)—his position can still be a "continuing" one at this time.

Third and finally, Musk's position is more than incidental to the regular operations of government. The district court deftly addressed this factor, and I think there can be no doubt about its having been satisfied. The import of "the DOGE duties described in the executive orders and the actual work conducted, which include the carrying out of presidential directives relating to reducing the number of regulations, addressing waste in grants and contracts, and determining the appropriate size of the federal workforce," speak for themselves. *Does 1-26*, 2025 WL 840574 at *17.

The President has made clear that he intends for Musk to be an ongoing, omnipresent fixture in American government. But under our Appointments Clause, it is up to Congress to determine which employees will maintain this extensive and extending control.

Musk has been given and does exert significant authority, and his position as head of DOGE and de facto USDS Administrator is robust and ongoing. He therefore acts as an Officer of the United States. But he does so without the required congressional authorization—either in the form of a Senate confirmation or a congressionally created office. Accordingly, Defendants have likely violated the Appointments Clause.

40

III.

As my above discussion of Plaintiffs' claims clearly indicates, I believe that the district court properly held that Plaintiffs had established a likelihood of success on the merits as to the unconstitutionality of Defendants' actions in dismantling USAID. But that does not end the analysis. As an Article III court, we are constrained to decide only the cases or controversies properly before us. The district court could not enjoin these unconstitutional actions because the proper defendants were not before it. However, Plaintiffs otherwise would have standing to pursue the relief they seek.

Courts can and have adjudicated cases seeking to invalidate allegedly unconstitutional Executive actions in the past. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (seeking declaratory relief against then President and Secretary of Education); *Trump v. Hawaii*, 585 U.S. 667 (2018) (bringing action against President, Executive Branch officials and agencies, and the United States, seeking to prohibit implementation and enforcement of Presidential Proclamation barring nationals from predominantly Muslim countries); *Zivotofsky*, 576 U.S. 1 (2015) (bringing action for declaratory and injunctive relief against Secretary of State); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) (challenging constitutionality of statute authorizing the Secretary of Defense to deny funding to educational institutions that prohibited on-campus military recruiting). But in those cases, the agency and often the Executive were named as defendants.

After the district court found that Musk and DOGE were responsible for dismantling USAID, the question then became: what's next? The Majority correctly identifies, the

41

constitutional violation and the remedy cannot go both ways: if Musk and DOGE lack the authority to order USAID officials to do anything, enjoining Musk to direct USAID officials to restore employment, building access, and security services, among other relief, also cannot stand. Plaintiffs did not name defendants with the proper authority to effectuate the relief that Plaintiffs seek. Suing Musk and DOGE constrained the court's ability to redress their constitutional claims, which I have noted above, and as the district court found as a matter of fact, were quite strong.

I do take issue with the Majority's minimization of the very real and irreparable harms suffered by Plaintiffs and their implied concern regarding standing. As the district court found, the Plaintiffs have suffered numerous actual injuries and face an imminent threat of additional injuries. *See Does 1-26*, 2025 WL 840574 at *9, *27–29; *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (plaintiffs "must make a clear showing of irreparable harm[,] . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent.") (cleaned up); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021) (recognizing that emotional injury is sufficient to establish Article III standing).

Further, I differ with the Majority's concern about the broad scope of the preliminary injunction, which it perceives as affording broad and structural constitutional relief that is mismatched with the Plaintiffs' claims. This is a mischaracterization of the relief sought. Plaintiffs' prayer for relief seeks to enjoin an unconstitutional Executive action to dismantle an agency, much like any other challenge to Executive actions as being unlawful. For example, the Supreme Court struck down a prior administration's student loan forgiveness program in its entirety despite only one state establishing standing through

42

one loan servicer.  *See Biden v. Nebraska*, 600 U.S. at 549 (Kagan, J. dissenting) ("So no proper party is before the Court.  A court acting like a court would have said as much and stopped.").  The Court found that harm to plaintiffs, financial and otherwise, gave standing to seek invalidation of the illegal actions leading to that harm.  Thus, an injunction preventing further harm in a case like this one would be entirely consistent with recent Supreme Court precedent.  *See, e.g.*, *id.* at 491.

In addition, the fact that, here, the Executive has taken many likely unconstitutional actions that, collectively, dismantled an agency, rather than just a single action, does not mean the court cannot render those actions invalid.  The sheer number of illegal actions taken necessitates relief that consists of "vast and detailed actions," Maj. Order at 14, to adequately redress the harms caused by the illegal shutdown of a government agency.  Rather than "micromanag[ing]" the Executive, Mot. at 22, the Court was simply attempting to remedy each of the likely illegal actions.

The judiciary is limited to the cases and controversies before it.  These Plaintiffs, suing these Defendants, cannot obtain the relief that they seek.