**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*, <br><br><br> Plaintiffs, <br><br> v. <br><br> ELON MUSK, in his official capacity, *et al.*, <br><br><br> Defendants. | Civil Docket No. 1:25-cv-00429-TSC |
| JAPANESE AMERICAN CITIZENS LEAGUE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ELON MUSK, in his official capacity, *et al.*, <br><br> Defendants. | Civil Docket No. 1:25-cv-00643-TSC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
JACL PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

I.     The United States DOGE Service & Elon Musk ............................................................ 2

     A.     Executive Order 14,158 ...................................................................................... 2

     B.     Executive Order 14,210 ...................................................................................... 3

     C.     Executive Order 14,222 ...................................................................................... 4

     D.     Elon Musk .......................................................................................................... 5

II.     This Litigation ................................................................................................................. 5

LEGAL STANDARD ............................................................................................................... 6

ARGUMENT ............................................................................................................................ 7

I.     The Court Lacks Jurisdiction ......................................................................................... 7

     A.     Plaintiffs Fail to Plead Article III Standing ...................................................... 7

           1.     Legal Standards ..................................................................................... 7

           2.     Associational Standing .......................................................................... 8

           3.     Organizational Standing ...................................................................... 13

     B.     Plaintiffs' Claims are Precluded from Judicial Review in this Court ............. 16

           1.     The Court Lacks Subject-Matter Jurisdiction to Assess the Legality of any Challenged Contract and Grant-Related Actions ....................... 16

           2.     Congress Has Precluded Judicial Review in the District Courts Concerning the Legality of the Government Personnel Actions ................... 19

II.     The Complaint Should Be Dismissed under Rule 12(b)(6) ......................................... 25

     A.     Plaintiffs' Appointment Clause Count Fails to State A Claim ....................... 25

           1.     Plaintiffs Fail to Allege Mr. Musk Occupies an Office Established by Law ................................................................................................ 26

           2.     Even if Mr. Musk Functionally "Directed" the Complained-of Actions, Plaintiffs' Appointments Clause Claim Fails ......................... 29

|   | 3. | An Advisor Is Not an Officer Merely Because He Is Effective | 30 |
|   | 4. | Mr. Musk Does Not Occupy a "Continuing" Office | 31 |
| B. | | Plaintiffs' APA Claims Must Be Dismissed. | 32 |
|   | 1. | The APA Does Not Provide a Cause of Action to Challenge Programmatic Government-Wide Efforts | 32 |
|   | 2. | Defendants' Activities Are Not Reviewable Because None Are Final Agency Action | 36 |
| C. | | The Court Should Dismiss Plaintiffs' Derivative Claims | 37 |
|   | 1. | Plaintiffs' Separation-of-Powers Claim Fails to State a Claim | 38 |
|   | 2. | Plaintiffs' *Ultra Vires* Claim Fails to State a Claim | 39 |
| CONCLUSION | | | 44 |

## TABLE OF AUTHORITIES

**CASES**

*AFGE v. Sec'y of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ................................................................................. 21, 23

*Air Excursions LLC v. Yellen,*
66 F.4th 272 (D.C. Cir. 2023) .......................................................................................10

*Am. Anti-Vivisection Soc'y v. Dep't of Agric.,*
946 F.3d 615 (D.C. Cir. 2020) ........................................................................................8

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001) .....................................................................................35

*Am. Chemistry Council v. Dep't of Transp.,*
468 F.3d 810 (D.C. Cir. 2006) .........................................................................................8

*Am. Fed'n of Labor & Cong. of Indus. Org. v. Dep't of Labor,*
--- F. Supp. 3d ---, 2025 WL 543938 (D.D.C. Feb. 7, 2025) ........................................14

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
No. 25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ...........................23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ......................................................... 19, 20, 21, 22

*Am. First Legal Found. v. U.S. Dep't of Agric.,*
Civ. A. No. 22-3029 (BAH), 2023 WL 4581313 (D.D.C. July 18, 2023) .................... 33, 36

*Am. Foreign Serv. Ass'n v. Trump,*
No. 1:25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ...............................23

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ..........................................................................................................39

*\*Andrade v. Regnery,*
824 F.2d 1253 (D.C. Cir. 1987) ............................................................................2, 28, 29

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................................................................39

*\*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...............................................................................................*passim*

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993) .......................................................................................30

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ............................................................................... 20, 21, 23, 24

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) ............................................................................................. 37, 39

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................... 6

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................................................. 36

*Buaiz v. United States,*
    471 F. Supp. 2d 129 (D.D.C. 2007) ........................................................................ 17

*Burnap v. United States,*
    252 U.S. 512 (1920) ................................................................................................. 25

*Californians for Renewable Energy v. Dep't of Energy,*
    860 F. Supp. 2d 44 (D.D.C. 2012) ............................................................................ 8

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ...................................................................... 40, 41, 44

*City of N.Y. v. U.S. Dep't of Def.,*
    913 F.3d 423 (4th Cir. 2019) ................................................................................... 32

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..................................................................................... 7, 10, 13

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) ................................................................................. 33

*Common Purpose USA, Inc. v. Obama,*
    227 F. Supp. 3d 21 (D.D.C. 2016) ............................................................................. 6

*Cowtown Found., Inc. v. Dep't of Agric.,*
    638 F. Supp. 3d 1 (D.D.C. 2022) ............................................................................. 10

*Crowley Gov't Servs., Inc. v. GSA,*
    38 F.4th 1099 (D.C. Cir. 2022) .......................................................................... 17, 18

*Ctr. for Biological Diversity v. Trump,*
    453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................................... 38

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................................... 9

*Dalton v. Specter,*
  511 U.S. 462 (1994) ......................................................................................... 2, 38

Dep't of Educ. v. California,
  604 U.S. ---, 145 S. Ct. 966 (2025) ...........................................................................19

Detroit Int'l Bridge Co v. Gov't of Canada,
  189 F. Supp. 3d 85 (D.D.C. 2016) ...........................................................................33

Doe v. Lee,
  No. 19-cv-0085 (DLF), 2020 WL 759177 (D.D.C. Feb. 14, 2020).....................................42

DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.,
  76 F.3d 1212 (D.C. Cir. 1996) ...........................................................................37

Elgin v. Dep't of Treasury,
  567 U.S. 1 (2012) .....................................................................................21, 22, 24

EPIC v. Presidential Advisory Comm'n on Election Integrity,
  878 F.3d 371 (D.C. Cir. 2017) ...........................................................................13

FDA v. All. for Hippocratic Med.,
  602 U.S. 367 (2024) ....................................................................................7, 8, 15

Fed. Express Corp. v. U.S. Dep't of Com.,
  39 F.4th 756 (D.C. Cir. 2022) .......................................................................40, 41, 42

Fed. L. Enf't Officers Ass'n v. Ahuja,
  62 F.4th 551 (D.C. Cir. 2023) ...........................................................................22, 23

Filebark v. DOT,
  555 F.3d 1009 (D.C. Cir. 2009) ...........................................................................21

Flowers v. The Exec. Off. of The President,
  142 F. Supp. 2d 38 (D.D.C. 2001) ...........................................................................39

Food & Water Watch, Inc. v. Vilsack,
  808 F.3d 905 (D.C. Cir. 2015) ...........................................................................13, 15

Fornaro v. James,
  416 F.3d 63 (D.C. Cir. 2005) ...........................................................................23

Franklin v. Massachusetts,
  505 U.S. 788 (1992) ...........................................................................33

Franklin-Mason v. Mabus,
  742 F.3d 1051 (D.C. Cir. 2014) ...........................................................................17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................................................25

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ..........................................................................................25, 26

*Friends of Animals v. Jewell*,
   115 F. Supp. 3d 107 (D.D.C. 2015), *aff'd on other grounds*, 828 F.3d 989 (D.C. Cir. 2016) ......... 10, 11

*Front Range Equine Rescue v. Vilsack*,
   753 F. Supp. 3d 6 (D.D.C. 2024) ........................................................................14

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................................................................15

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ............................................................................20

*Green Oceans v. Dep't of Interior*,
   Case No. 1:24-cv-141-RCL, 2025 WL 973540 (D.D.C. Apr. 1, 2025) ................8

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ............................................................................................23

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1997) ..............................................................................................8

*In re Snyder*,
   472 U.S. 634 (1985) ............................................................................................37

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015) ................................................................................20

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021) ............................................................................42

*Kidwell v. Dep't of the Army*,
   56 F.3d 279 (D.C. Cir. 1995) ..............................................................................17

*Landry v. Fed. Deposit Ins. Corp.*,
   204 F.3d 1125 (D.C. Cir. 2000) ..........................................................................26

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ............................................................................................39

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................15

*Lewis v. U.S. Parole Comm'n,*
  743 F. Supp. 3d 181 (D.D.C. 2024) ...........................................................41

*\*Lucia v. SEC,*
  585 U.S. 237 (2018) ...................................................................*passim*

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...........................................................32, 34, 36

*Lyons v. VA,*
  273 F. App'x 929 (Fed. Cir. 2008) ...........................................................22

*Marshall v. HHS,*
  587 F.3d 1310 (Fed. Cir. 2009) ...........................................................22

*Med. Imaging & Tech. All. v. Libr. of Cong.,*
  103 F.4th 830 (D.C. Cir. 2024) ...........................................................41

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ...........................................................17

*Moms Against Mercury v. FDA,*
  483 F.3d 824 (D.C. Cir. 2007) ...........................................................6

*Morrison v. Olson,*
  487 U.S. 654 (1988) ...........................................................31

*\*Murthy v. Missouri,*
  603 U.S. 43 (2024) ...................................................................*passim*

*N.Y. Republican State Comm. v. SEC,*
  799 F.3d 1126 (D.C. Cir. 2015) ...........................................................20

*N.Y.C. Transit Auth. v. Beazer,*
  440 U.S. 568 (1979) ...........................................................37

*Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census,*
  945 F.3d 183 (4th Cir. 2019) ...........................................................35

*Nat'l Ass'n of Home Builders v. Norton,*
  415 F.3d 8 (D.C. Cir. 2005) ...........................................................2, 36

*Nat'l Treasury Emps. Union v. Trump,*
  ---F. Supp. 3d---, 2025 WL 561080 (D.D.C. Feb. 20, 2025) ...........................................................23

*Niedermeier v. Off. of Max S. Baucus,*
  153 F. Supp. 2d 23 (D.D.C. 2001) ...........................................................42

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ........................................................................................2, 32, 34

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) .....................................................................2, 40, 42

*OPM v. AFGE,*
   ---S. Ct.---, 2025 WL 1035208 (Apr. 8, 2025).....................................................13

*PETA v. USDA,*
   797 F.3d 1087 (D.C. Cir. 2015) ...........................................................................13

*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.,*
   656 F. Supp. 3d 137 (D.D.C. 2023) ........................................................................8

*Physicians Comm. for Responsible Med. v. Dep't of Agric.,*
   656 F. Supp. 3d 158 (D.D.C. 2023) ........................................................................6

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs,*
   87 F.3d 1242 (11th Cir. 1996).............................................................................35

*Pub. Citizen, Inc. v. Trump,*
   297 F. Supp. 3d 6 (D.D.C. 2018) ...........................................................................8

*Ramirez v. U.S. Immigr. & Customs Enf't,*
   310 F. Supp. 3d 7 (D.D.C. 2018) .........................................................................32

*Rempfer v. Sharfstein,*
   583 F.3d 860 (D.C. Cir. 2009) .............................................................................35

*Sackett v. EPA,*
   566 U.S. 120 (2012)..............................................................................................23

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974)................................................................................................9

*Schroer v. Billington,*
   525 F. Supp. 2d 58 (D.D.C. 2007) .......................................................................40

*Spectrum Leasing Corp. v. United States,*
   764 F.2d 891 (D.C. Cir. 1985) .......................................................................18, 19

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)................................................................................................7

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)......................................................................................8, 9, 11

*Sunshine Anthracite Coal Co. v. Adkins,*
   310 U.S. 381 (1940) .................................................................................................26

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................................................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007) ...................................................................................................6

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) .................................................................................................20

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................................................15

*Tulare Cnty. v. Bush,*
   306 F.3d 1138 (D.C. Cir. 2002) ..............................................................................33

*Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n,*
   786 F.3d 18 (D.C. Cir. 2015) ..................................................................................13

*U.S. Chamber of Com. v. EPA,*
   642 F.3d 192 (D.C. Cir. 2011) ..................................................................................8

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
   No. 1:25-CV-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................17, 19

*United States v. Donziger,*
   38 F.4th 290 (2d Cir. 2022) ................................................................................. 2, 31

*United States v. Fausto,*
   484 U.S. 439 (1988) ............................................................................................ 20, 21

*United States v. Hartwell,*
   73 U.S. (6 Wall.) 385 (1867) ...................................................................................31

*United States v. Maurice,*
   26 F. Cas. 1211 (C.C.D. Va. 1823) ..........................................................................31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
   454 U.S. 464 (1982) ...................................................................................................9

*W. Wood Preservers Inst. v. McHugh,*
   925 F. Supp. 2d 63 (D.D.C. 2013) ............................................................................8

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...................................................................................................7

*Widakuswara v. Lake,*
  Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...........*passim*

**STATUTES**

2 U.S.C. § 683 ...................................................................................................................38

5 U.S.C. § 551 ...................................................................................................................32

5 U.S.C. § 704 ...................................................................................................................36

5 U.S.C. § 706 ...................................................................................................................35

5 U.S.C. § 3161 .............................................................................................................3, 43

5 U.S.C. § 7105 .................................................................................................................20

5 U.S.C. § 7123 .................................................................................................................20

5 U.S.C. § 7703 ............................................................................................................20, 22

18 U.S.C. § 202 .............................................................................................................5, 31

28 U.S.C. § 1491 .........................................................................................................16, 17

31 U.S.C. § 1104 ...............................................................................................................44

Congressional Budget and Impoundment Control Act of 1974,
  Pub. L. No. 93-344, 88 Stat. 297 ................................................................................38

**UNITED STATES CONSTITUTION**

U.S. Const. art. II, § 2 .......................................................................................................25

U.S. Const. art. II, § 3 .......................................................................................................44

**RULES**

Fed. R. Civ. P. 12 .............................................................................................................24

**REGULATIONS**

*Establishment of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq,*
  Exec. Order No. 13,431, 72 Fed. Reg. 26,709 (May 8, 2007) ....................................43

*Establishing & Implementing the President's "Department of Government Efficiency,"*
  Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ..............................2, 3, 43

*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*,
    Exec. Order. No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ............................................... 3, 4

*Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*,
    Exec. Order. No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ................................................. 4

## OTHER AUTHORITIES

*Project*, Merriam-Webster.com,
    https://www.merriam-webster.com ......................................................................................... 43

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
    40 Op. O.L.C. 1 (2016) ........................................................................................................... 31

## INTRODUCTION

In their sprawling, 110-page, 342-paragraph Complaint, Plaintiffs effectively challenge the implementation of three Executive Orders across vast swaths of the federal government, naming 16 agencies, the heads of those agencies, a portion of the Executive Office of the President and its Administrator, and a Senior Advisor to the President as Defendants. But the ambition of the Complaint's scope is matched by the weakness of Plaintiffs' claims, which are grounded in vague, speculative, broadbrush allegations and bear numerous legal defects. The Complaint must be dismissed, for a multitude of reasons—many of which the D.C. Circuit just confirmed. *See Widakuswara v. Lake,* Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025).

First, the Court has no jurisdiction over Plaintiffs' claims. Plaintiffs offer only vague and conclusory allegations of speculative, future injury that do not meet their burden under Article III. And even if Plaintiffs had cleared this hurdle, their alleged grievances fall into essentially two buckets, neither of which this Court has jurisdiction to hear. Insofar as their claims are founded in the "reduct[ion] of the federal workforce" or similar grievances regarding federal employment issues, their claims here are precluded under Congress' "comprehensive statutory schemes for adjudicating employment disputes with the federal government." Compl. ¶ 144, ECF No. 1; *Widakuswara,* 2025 WL 1288817, at *2. And if they are based on the alleged terminations of "federal grants and contracts," the claims are subject to the exclusive jurisdiction of the Court of Federal Claims. Compl. ¶ 144; *see Widakuswara,* 2025 WL 1288817, at *4-5.

Second, Plaintiffs' claims fare no better on the merits. Plaintiffs' Appointments Clause claim, directed at Defendant Elon Musk, fails as a matter of law because Plaintiffs concede that Mr. Musk "does not occupy an office created by Congress" and has "act[ed] without . . . legal authorization," Compl. ¶¶ 264, 266. That is fatal, because the Appointments Clause is concerned only with the appointment to "a continuing position established by law" that is vested with "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citation omitted). Plaintiffs' theory that Mr. Musk planned or directed *others* to take complained of action despite

concededly having no independent legal authority of his own is foreclosed by the D.C. Circuit's holding in *Andrade v. Regnery* that "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the [challenged] governmental action." 824 F.2d 1253 (D.C. Cir. 1987). And Plaintiffs further plead away their Appointments Clause claim by alleging that Mr. Musk's role is unique and unprecedented, as offices subject to the Appointments Clause cannot be "personal to a particular individual." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022).

Plaintiffs' Administrative Procedure Act ("APA") claim also fails, as the cursory invocation of the APA naming 16 federal agencies at the end of Plaintiffs' 110-page complaint fails to identify any specific "circumscribed, discrete agency action" subject to challenge under the APA and is instead an impermissible paradigmatic "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-64 (2004). And their vague and speculative allegations fail to challenge any final agency action, as necessary to plead an APA claim. *See, e.g., Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005).

Finally, Plaintiffs' catchall *ultra vires* and "Separation of Powers" claims must be dismissed because they fail to satisfy the demanding standards of these "Hail Mary pass" claims and improperly seek to constitutionalize statutory claims. *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009); *see Dalton v. Specter*, 511 U.S. 462, 473-74 (1994).

## BACKGROUND

I. **The United States DOGE Service & Elon Musk**

A. **Executive Order 14,158**

On January 20, 2025, President Trump signed Executive Order 14,158, which directed changes to the United States Digital Service to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("USDS E.O."). The USDS E.O. redesignated the United States Digital Service as the United States DOGE Service ("USDS") and established that entity

in the Executive Office of the President. *Id.* § 3(a). And under 5 U.S.C. § 3161, it established a "U.S. DOGE Service Temporary Organization" within USDS to terminate on July 4, 2026. *Id.* § 3(b). The DOGE Service Temporary Organization "shall be dedicated to advancing the President's 18-month DOGE agenda," and shall be headed by the USDS Administrator. *Id.* The USDS Administrator reports to the White House Chief of Staff. *Id.* The USDS E.O. also requires agency heads to establish DOGE Teams within their agencies composed of agency employees, which may include Special Government Employees ("SGEs"). *Id.* § 3(c).

The USDS E.O. directed USDS to collaborate with Executive agencies to modernize the government's technology and software infrastructure to increase efficiency and productivity and ensure data integrity. *Id.* § 4. To do so, the USDS E.O. directed USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructed, USDS must "adhere to rigorous data protection standards." *Id.*

**B.      Executive Order 14,210**

On February 11, 2025, President Trump signed Executive Order 14,210, which "commences a critical transformation of the Federal bureaucracy" to "restore accountability to the American public" by "eliminating waste, bloat and insularity." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order. No. 14,210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce E.O."). Among other things, the Workforce E.O. directed the Director of the Office of Management and Budget ("OMB") to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* § 3. The Workforce E.O. further required that new career appointment hiring decisions shall be made "in consultation with the agency's DOGE Team Lead, consistent with applicable law," and that the agency shall not fill vacancies for career appointments that the DOGE Team Lead assesses should not be filled, "unless the Agency Head determines the positions should be filled." *Id.* § 3(b)(i)–(ii). And the Workforce E.O. directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force

(RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c).

### C.    Executive Order 14,222

On February 26, 2025, President Trump signed Executive Order 14,222, which "commences a transformation in Federal spending on contracts, grants, and loans to ensure government spending is transparent and government employees are accountable to the American public." *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order. No. 14,222, § 1, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ("Cost Efficiency E.O."). The Cost Efficiency E.O. directed agency heads to "build a centralized technological system within the agency to seamlessly record every payment issued by the agency pursuant to each of the agency's covered contracts and grants, along with a brief, written justification for each payment . . . ." *Id.* § 3(a). It further directed agency heads to "review all existing covered contracts and grants," and "where appropriate and consistent with applicable law . . . reduce overall spending or reallocate Federal spending to promote efficiency and advance the policies" of the Administration. *Id.* § 3(b). The Cost Efficiency E.O. further directs agency heads to "conduct a comprehensive review of each agency's contracting policies, procedures, and personnel," and subsequently "issue guidance on signing new contracts or modifying existing contracts to promote Government efficiency" and Administration policy. *Id.* § 3(c) & (d)(i). The Cost Efficiency E.O. also directed agency heads to build a system "that centrally records approval for federally funded travel for conferences and other non-essential purposes" and froze, with some exceptions, credit cards held by agency employees for a 30-day period. *Id.* § 3(e) & (f). The Cost Efficiency E.O. also directed agency heads to undertake a process "for the disposition of Government-owned real property which has been deemed by the agency as no longer needed." *Id.* § 3(g)(iii); *see id.* § 3(g). The order directs agency heads to undertake the above activities "in consultation with the agency's DOGE Team Lead" or "with assistance from the agency's DOGE Team Lead" (in the case of building the directed technological systems). *Id.* § 3(a)-(f).

D.    **Elon Musk**

Elon Musk is an SGE. *See* Compl. ¶ 36.[1] An SGE is "an officer or employee of the executive or legislative branch of the United States Government" who "is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis." 18 U.S.C. § 202(a). Mr. Musk "does not occupy an office" and has no authority to exercise the powers of an officer. Compl. ¶¶ 266, 334; *see id.* ¶ 36. Indeed, Plaintiffs disclaim that Mr. Musk has any formal authority at all; Plaintiffs instead contend that Mr. Musk holds "de facto" power over Executive Branch operations. *Id.*

## II.    **This Litigation**

Plaintiffs—the Japanese American Citizens League, OCA-Asian Pacific American Advocates, Sierra Club, and Union of Concerned Scientists—filed this suit on March 5, 2025. *See* Compl. The Complaint names as defendants Elon Musk, in his official capacity, the USDS, Amy Gleeson, in her official capacity, and sixteen federal agencies and the heads of those agencies in their official capacities. *Id.* ¶¶ 12–54. Raising a claim under the Appointments Clause and contending that Mr. Musk, "DOGE," and Ms. Gleeson have acted "in violation of the separation of powers" and *ultra vires*, *id.* ¶ 329, *see id.* ¶¶ 322-338, Plaintiffs seek wide ranging injunctive and declaratory relief. *Id.*, Prayer for Relief. Specifically, the Complaint alleges a "lawless alteration of federal spending" related to the "cancel[lation of] federal grants and contracts" and through the "terminat[ion of] federal employees," and seeks an injunction prohibiting Defendants from engaging in a wide swath of activities, including "implementing or enforcing" the Cost Efficiency E.O., and prohibiting Defendants Musk, "DOGE," and Gleason from an even broader swath of activities. *Id.* ¶ 144; *id.*, Prayer for Relief ¶ h. The Complaint also seeks a declaration targeting broad classes of both identified and unidentified conduct

---

[1] Unless otherwise indicated, ECF numbers cited herein refer to the ECF number on the docket of *JACL v. Musk*, 1:25-cv-00643 (D.D.C.), although on March 20, 2025, the Court consolidated this case with *New Mexico v. Musk*, No. 25-cv-429 (D.D.C.) ("*New Mexico*"), which, in Plaintiffs' words, "share[s] central legal and factual issues" with this case and "[o]verlapping legal claims." Joint Status Report at 2 (Plaintiff's Position), ECF No. 47.

"are ultra vires and shall have no legal effect" and "violate the separation of powers." *Id.*, Prayer for Relief ¶¶ b, d. Plaintiffs also bring claims against the 16 named agencies and agency heads under the APA on the grounds that unspecified agency actions involving the reduction of the federal workforce and termination of contracts or grants is "arbitrary and capricious" or "contrary to law." *Id.* ¶ 342; *see id.* ¶¶ 339-41.

## LEGAL STANDARD

To survive a Rule 12(b)(1) motion a plaintiff must prove that the court has subject matter jurisdiction. *Physicians Comm. for Responsible Med. v. Dep't of Agric.*, 656 F. Supp. 3d 158, 162 (D.D.C. 2023). While the Court will accept factual allegations in the Complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 25 (D.D.C. 2016) (citation omitted). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The court accepts the factual allegations as true, but "bare assertions" and "conclusory" allegations are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. The Complaint must allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted).

## ARGUMENT

### I.     The Court Lacks Jurisdiction

#### A.     Plaintiffs Fail to Plead Article III Standing

Despite spanning 342 paragraphs and over 100 pages, Plaintiffs' complaint lacks any legally cognizable injury that is concrete and particularized. The only statement alleging *direct* harm that is particular to Plaintiffs or any of their members is a single paragraph alleging that an unidentified UCS member had a single unidentified grant canceled. Compl. ¶ 315. That generic allegation does not work on its own. But it *especially* does not work as a bootstrap for the rest of the Plaintiffs; one grant cancellation as to a single member of one of four plaintiffs cannot support a general challenge to the way large swaths of the federal government have operated since President Trump's inauguration.[2] Plaintiffs' other allegations of injury are either speculative fears or generalized grievances about how the federal government has chosen to operate certain facilities—*i.e.*, how it will take action upon *other* people in the future. Those harms are not cognizable under Article III.

##### 1.     Legal Standards

To invoke the jurisdiction of this Court, Plaintiffs "must show" that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). At "the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The alleged injury-in-fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). To claim standing based on "[a]n allegation of future injury," a plaintiff must show that "the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409, 414 n.5).

---

[2] All the more so because, as set forth *infra* Part I.B.1, that claim belongs in the Court of Federal Claims—the Tucker Act deprives this Court of jurisdiction.

Organizations like Plaintiffs may establish standing in two ways. First, an organization may have standing in its own right. That requires the organization to make "the same showing required of individuals: an action or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) (citations omitted); *see All. for Hippocratic Med.*, 602 U.S. at 393-94. Second, an organization may assert associational standing by showing "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 334 (1997). Plaintiffs' Complaint meets neither standard.

## 2.    Associational Standing

**a.** Plaintiffs' claim of associational standing necessarily fails because they nowhere identify by name any member who has supposedly suffered harm. To allege associational standing, it "is not enough to aver that unidentified members have been injured." *U.S. Chamber of Com. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011). Rather, the plaintiff "must specifically identify members who have suffered the requisite harm." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)). Thus where "organizations have not identified any members by name," they "do not have associational standing to bring a claim." *Green Oceans v. Dep't of Interior*, Case No. 1:24-cv-141-RCL, 2025 WL 973540, at *8 (D.D.C. Apr. 1, 2025); *see also W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013); *Californians for Renewable Energy v. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012).[3]

Plaintiffs' failure to identify any specific member that was injured makes it impossible to determine whether any individual member has standing. *See Summers*, 555 U.S. at 499. Without such

---

[3] To be sure, "[c]ourts in this district have divided over whether an association must identify an injured member by name at the motion to dismiss stage or instead a lesser degree of identification is enough." *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 153 (D.D.C. 2023) (citation omitted). At "the very least," however, "the identity of the party suffering an injury in fact must be firmly established." *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 19 (D.D.C. 2018) (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006)).

specific identification, "[h]ow is the court to assure itself that some of [Plaintiff's] members plan to make use of the specific sites" that are experiencing alleged degraded conditions resulting from government funding cuts or "that these same individuals will find their recreation burdened by [those cuts]"? *Id.* "While it is certainly possible—perhaps even likely—that one individual will meet all of these criteria, that speculation does not suffice." *Id.* For this reason alone, Plaintiffs may not rely on alleged injuries to their members.

**b.** Even had Plaintiffs adequately identified any injured members, their allegations nevertheless fail to establish any member's injury related to a claim that this Court has jurisdiction to remedy. Nearly all the harms Plaintiffs cite are generalized grievances about the way certain agencies are operating. *See, e.g.*, Compl. ¶¶ 1–2 (alleging harms to "everyday Americans" in "a wide array of areas of daily life"). Such allegations are exactly the sort of abstract and generalized grievances that cannot be redressed by a federal court under Article III. "All citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 226–27 (1974). This "generalized interest . . . is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 227; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 482-83 (1982). Such a programmatic injury is also not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006).

Plaintiffs offer only two allegations that are tied to any particular individual member: (1) Plaintiffs allege that at "least one OCA member has already lost an opportunity to fulfill a graduate school educational requirement because of" unspecified "federal funding cuts," Compl. ¶ 20; and (2) a single UCS member allegedly "had a project shut down due to tens of thousands of dollars of terminated grant funding," *id.* ¶ 315. Neither of those allegations is sufficient to invoke this Court's jurisdiction.

The first allegation regarding the OCA member is a vague reference to unspecified funding cuts made by an unknown actor at an unidentified agency that for some unexplained reason led to a

lost educational opportunity. That allegation does "not allow the court to discern if sufficient facts apply to any particular individual to establish that he or she suffered a concrete and particularized injury that was caused by Federal Defendants and is redressable by the Court." *Cowtown Found., Inc. v. Dep't of Agric.*, 638 F. Supp. 3d 1, 12 (D.D.C. 2022). Even at the motion to dismiss stage, "[s]uch general allegations" of injury "are disregarded." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 278 (D.C. Cir. 2023) (cleaned up).

The only other allegation of injury to any of Plaintiffs' particular members is that one unidentified UCS member lost a project because of the termination of grant funding. Compl. ¶ 315. But that too is insufficient. Plaintiffs do not explain which Defendant, if any, terminated the grant funding or what reason was offered for the termination. It is not even clear that the UCS member was the recipient of the specific grant that was terminated. *See id.* ¶¶ 315–16 (alleging that "the group with which" the unidentified UCS member's "lab was contracting reported that the EPA was 'clamming up'" and caused "his lab to make the decision not to proceed with contracting"). "Vague factual allegations like this simply do not suffice." *See Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 119 (D.D.C. 2015), *aff'd on other grounds*, 828 F.3d 989 (D.C. Cir. 2016).

Plaintiffs' other allegations as to this unidentified UCS member involve self-inflicted injury. *See* Compl. ¶ 317 (alleging that this individual "altered how he is conducting his research" and is voluntarily "delaying large purchases" due to "uncertainty"). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

**c.** Plaintiffs' other allegations of "ongoing harm" to their members from the downstream effects of certain agencies' staffing and programmatic decisions fare no better. *See* Pls.' Reply in Supp. of Expedited Mot. for Expedited Disc. at 5-6, *New Mexico* ECF No. 70. Specifically, Plaintiffs argue that they have alleged "Mr. Musk and DOGE's actions" have resulted in "cancelled reservations," "degraded facilities conditions," "guided tour cancelations," "reduced visitor center hours," "longer lines to enter parks," and "suspension of weather-balloon data" and that these downstream effects

hinder "Sierra Club and its members in their enjoyment of the outdoors in national parks, national forests, and federal lands." *Id.* at 5 (citing Compl. ¶¶ 21–23, 26–29, 31, 223, 307).

That argument is unsupported by the allegations in the Complaint, which do not allege that any of Plaintiffs' members have actually been subjected to any of these conditions, or that any of these downstream harms have plausibly been caused by a discrete governmental action that this Court could identify and remedy. Thus, "the primary weakness" of Plaintiffs' claim to standing "is the lack of" any allegation of "specific causation." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). The "complexities" of Plaintiffs' allegations—in which their alleged injuries are primarily derivative of government actions on *other* people—require them to "line up" particular government acts with specific harm, which "is critically important in a sprawling suit like this one." *Id.* at 60-61.

For example, Plaintiffs allege that "Sierra Club Outings face increased risk of cancellation and . . . increased safety risks," but do not allege that any Sierra Club member has had a reservation or guided tour cancelled or faced unsafe conditions. Compl. ¶ 31. Sierra Club generally alleges that certain national parks have experienced long lines for entry, but again it does not clearly allege facts supporting their claim that any Sierra Club member has been among those that experienced those lines. *Id.* ¶ 223 (alleging only that "Sierra Club members regularly visit national parks throughout the United States, including these parks"). Indeed, many of Plaintiffs' allegations about degraded service at national parks are made "[o]n information and belief," *e.g.*, *id.* ¶ 224, which would be unnecessary if their members were among the allegedly injured. And while a separate allegation states that "Sierra Club members are experiencing . . . longer lines at park entrances" and other degraded services, *id.* ¶ 31, that allegation is not tied to any specific park or member, and so there is no link between any alleged action of the Defendant and the suffered harm, *see Summers*, 555 U.S. at 499; *Friends of Animals*, 115 F. Supp. 3d at 119 (rejecting as insufficient factual allegation that organization's members "recreate near some of the tortoise species in question" (citation omitted)). More fundamentally, Plaintiffs do not allege that any of these things have been specifically caused by a discrete action by one of the Defendants—as opposed to being the product of a separate host of factors. *Cf. Murthy*, 603 U.S. at 59-61.

JACL alleges that its members "will be harmed" by "cuts and staffing reductions" at certain historic sites, including two sites that certain of its members may visit. Compl. ¶ 225; *see id.* ¶ 274. Again, however, those harms are purely speculative and conditional.[4] While JACL alleges that it is "deeply concerned that cuts" to funding and staff at sites its members visit "will impact basic services its members rely on," *id.* ¶ 280, it provides no factual allegation that any JACL member has or will imminently experience degraded services at those sites. Instead, JACL simply speculates that services its members want will not be available when they visit at some point in the future. *See id.* ¶ 225 (alleging that cuts to staff "threatens to seriously diminish" services). But that is entirely uncertain. For all JACL knows, the government may be able to operate these parks more efficiently with fewer staff, may hire additional employees or temporary staff, or its members may not notice any difference. JACL itself alleges that a probationary staff member who no longer works for the National Parks Service was "hired by a private organization to ensure continuity of staffing." *Id.* ¶ 225 n.93. Simply put, it is uncertain whether JACL members will perceive reduced services at historic sites *at all.* Plaintiffs have admitted as much in arguing that there "is no meaningful way absent discovery for Plaintiffs to accurately ascertain" the effect of reduced staff at national parks and historic sites on JACL and Sierra Club. Pls.' Expedited Mot. for Expedited Disc. at 14, ECF No. 11.

Plaintiffs' allegations as to the harms faced by unidentified OCA and UCS members are similarly speculative and contingent. OCA alleges that its members will be harmed by any "elimination or disruption of the FAFSA" and "uncertainty as to whether Pell grants and federal student loans will remain available in the near future." Compl. ¶¶ 288–89. But they do not allege that any of that has yet occurred. *See id.* ¶ 292 (alleging harm "[i]f . . . threatened cuts . . . come to pass"). Aside from the one allegation described above, UCS relies entirely on the "uncertainty around future federal funding." *Id.* ¶ 313. That, however, does not work: A *potential* change in services based on a reallocated budget is

---

[4] The Complaint appears to be internally inconsistent in places. In one paragraph, Plaintiffs allege that staffing cuts are exacerbated because "[s]ites such as Minidoka are not open in the winter." Compl. ¶ 282. But in another Plaintiffs allege that the termination of a single staff member at Minidoka "threatens to seriously diminish the site's ability to meet the needs of the public, including JACL members, especially during the winter months." *Id.* ¶ 225.

not a "*certainly impending*" injury under Article III; Plaintiffs' alleged harms are premature. *Clapper*, 568

U.S. at 409 (citation omitted).

### 3.    Organizational Standing

Many of the same reasons preclude any claim of organizational standing. Indeed, it is

"established law" that allegations indistinguishable from those offered here "are insufficient to support

the organization's standing." *OPM v. AFGE*, ---S. Ct.---, 2025 WL 1035208, at *1 (Apr. 8, 2025)

(Mem.) (citing *Clapper*, 568 U.S. 398). To establish standing as organizations, Plaintiffs must allege that

Defendants' challenged actions "cause[d] a concrete and demonstrable injury to [their] activities."

*EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (citation

omitted). This involves a two-part inquiry: "first, whether the agency's action or omission to act injured

the [organization's] interest and, second, whether the organization used its resources to counteract

that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *PETA v.*

*USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

At the first prong, Plaintiffs fail to allege that the challenged conduct "perceptibly impaired

[their] ability to provide services." *Id.* (quoting *Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*, 786

F.3d 18, 24 (D.C. Cir. 2015)). All Plaintiffs offer on that front is a string of contingent and speculative

allegations about conjectured future harm. The Sierra Club, for example, alleges on information and

belief that "cuts at NOAA" may reduce the availability of weather data that Plaintiffs surmise may

affect the safety of some future outings. *See* Compl. ¶¶ 306–08. Yet, Plaintiffs do not allege that this

harm is imminent or that the weather and safety data on which they rely has stopped being published;

their allegations merely explain that they rely on the data. *Id.*

The other possible downstream effects that Plaintiffs worry about from challenged budget

cuts and staffing decisions are similarly speculative and contingent. *See, e.g.*, *id.* ¶ 284 (alleging

"uncertainty" about potential harm alleged "on information and belief"); *id.* ¶ 285 (alleging "risk" of

harm based on "information and belief" if certain Department of Education funding is cut); *id.*

¶¶ 286–88 (alleging "uncertainty"); *id.* ¶¶ 288–90 (alleging that certain members of Plaintiff

organization receive certain federal benefits with no allegation that they have lost access to such

benefits); *id.* ¶ 292 (alleging potential efforts "if" certain alleged plans of Defendants "come to pass"); *id.* ¶ 294 (alleging certain funding cuts "may" cause changed plans); *id.* ¶ 296 (alleging harms would occur "if" certain events occur); *id.*¶ 300 (Sierra Club members "may decide" not to visit certain parks "if" alleged cuts result in degraded service at those parks); *id.* ¶ 300–305 (alleging that "members fear that risks" of fires "will escalate *if*" certain services are cut, which "could require" certain trips to be postponed or canceled (emphasis added)).

Plaintiffs identify only a handful of concrete examples of supposedly diminished federal services, including technological problems with a national park's "day-use reservation system" and trash accumulation in certain parks. *See id.* ¶ 222. But even as to those examples—which are far too scant to support the sweeping claims pressed here—Plaintiffs only speculate that these problems will have any perceptible effect on their activities. *See id.* ¶¶ 297–99 (citing "concern[s]" that certain plans will be disrupted "due to uncertainty"). And once again, Plaintiffs fail to trace these alleged harms to specific government actions or actors as required. *See Murthy*, 603 U.S. at 60-61.

Even assuming Plaintiffs satisfied the first prong, they nonetheless fail at the second because they nowhere allege that they "used [their] resources to counteract the alleged harm." *Front Range Equine Rescue v. Vilsack*, 753 F. Supp. 3d 6, 16 (D.D.C. 2024); *cf. Am. Fed'n of Labor & Cong. of Indus. Org. v. Dep't of Labor*, --- F. Supp. 3d ---, 2025 WL 543938, at *4 (D.D.C. Feb. 7, 2025) (denying temporary restraining order because plaintiffs' motion did not "even allege any of them will divert resources"). The Complaint barely mentions that any Plaintiff has used its resources to counteract any alleged degradation of federal services. And when it does, it largely alleges that a Plaintiff might suffer monetary harm in the future contingent on other uncertain events. *E.g.*, Compl. ¶ 292 (alleging OCA "will make every effort to raise money . . . to be able to increase the amount of scholarship[s]" *if* "threatened cuts to the Department of Education come to pass"); *id.* ¶ 296 (alleging Sierra Club will incur monetary harm "[i]f" it "is forced to cancel" certain outings).

The sole allegation that any Plaintiff organization has expended resources to counteract an alleged harm is that UCS "redirected" its resources to teach its members about "data preservation," give information on "protections for scientists" who "fear retaliation and retribution," convey

"guidance on how to handle political harassment and legal intimidation," and provide instructions on "state and local open-records laws and protections for research." *Id.* ¶ 320. But it is entirely unclear how expenses for these trainings are in any way related to the employment actions and grant terminations that form the basis of the Complaint. More fundamental, the Supreme Court has flatly rejected the proposition that "standing exists when[ever] an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. What is required is some allegation that Defendants' actions "directly affected and interfered with [Plaintiffs'] core business activities," *id.* and that Plaintiffs expended resources to counteract that interference, *see Food & Water Watch*, 808 F.3d at 920. It is not enough, by contrast, for an organization to divert funds from one set of member services to another based on what is most responsive to the outside world. That is the precise theory of universal organizational standing the Supreme Court just foreclosed.

*    *    *

The common defect running across the Complaint is that Plaintiffs operate at too high and too programmatic a level to set forth a justiciable case or controversy: At bottom, the Complaint fails to identify specific challenged actions, that give rise to specific concrete injuries, that are caused by an identified Defendant. That mirrors the precise sort of error that the Court rejected in *Murthy. See* 603 U.S. at 60. Again, standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "And a plaintiff's remedy must be 'limited to the inadequacy that produced his injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

Plaintiffs' Complaint, however, comes nowhere close to adhering to these principles. Instead, they seek to bootstrap claims of sporadic disagreements with government services and one cancelled federal grant into a challenge to a huge range of programs and policy initiatives conducted by sixteen federal agencies and the White House over the first months of a presidential administration. And then they seek to have this Court superintend the Executive Branch until they are satisfied with the services

15

they receive.[5] *See* Compl., Prayer for Relief ¶ j (requesting that the Court "[r]etain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court"). But Article III does not permit the courts to exercise "general legal oversight of the other branches of Government." *Murthy*, 603 U.S. at 76 (citation omitted).

**B.    Plaintiffs' Claims are Precluded from Judicial Review in this Court**

At bottom, all of Plaintiffs' sweeping allegations boil down to two overarching contentions: (1) the government should pay money on certain grants and contracts; and (2) the federal government improperly removed federal employees, resulting in an anticipated reduction in government services. *See* Compl ¶ 144; *see generally id.*, Prayer for Relief. But the Court has jurisdiction over neither type of claim. Jurisdiction over the former is exclusively vested in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1), and jurisdiction over the latter lies outside the federal District Courts.

**1.    The Court Lacks Subject-Matter Jurisdiction to Assess the Legality of any Challenged Contract and Grant-Related Actions**

Plaintiffs challenge various contract and grant-termination decisions in their Complaint, including alleging that "one UCS member" "has already had a project shut down due to tens of thousands of dollars of terminated grant funding." Compl. ¶ 315; *see, e.g., id.* ¶ 3 ("UCS members have suffered harm and face an imminent threat of harm from Mr. Musk and DOGE's actions" including "UCS members who are scientists and researchers throughout the United States who rely on federal grant funding . . .").

---

[5] Plaintiffs do not even *attempt* to connect their alleged harms to more than half of the 32 total agencies and agency heads named in the Complaint. Specifically, Plaintiffs fail to identify *any* putative harm from any the following Defendants: (1) Office of Personnel Management; (2) Charles Ezell; (3) United States Department of Commerce; (4) Howard Lutnick; (5) Department of the Interior, (6) Doug Burgum; (7) Department of Health and Human Services; (8) Robert F. Kennedy, Jr.; (9) National Institutes of Health; (10) Matthew J. Memoli; (11) Substance Abuse and Mental Health Services Administration; (12) Christopher D. Carroll; (13) National Science Foundation; (14) Sethuraman Panchanathan; (15) Department of Agriculture; (16) Brooke Rollins; (17) Federal Emergency Management Agency; (18) Cameron Hamilton; (19) Department of Housing and Urban Development; and (20) Scott Turner. At a minimum, these agencies and agency heads should be dismissed from this lawsuit.

The court lacks jurisdiction to hear such claims, as the D.C. Circuit reaffirmed just last week. *See Widakuswara,* 2025 WL 1288817, at \*3-\*5. That case compels dismissal here. An action must be brought under the Tucker Act in the Court of Federal Claims if, "in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government," *Kidwell v. Dep't of the Army,* 56 F.3d 279, 284 (D.C. Cir. 1995); *see Crowley Gov't Servs., Inc. v. GSA,* 38 F.4th 1099, 1106 (D.C. Cir. 2022); *see generally* 28 U.S.C. § 1491(a)(1).

It is of no moment that the Plaintiffs style their claims as constitutional or APA claims.[6] The D.C. Circuit "prohibits the creative drafting of complaints . . . to avoid the jurisdictional consequences of the Tucker Act." *Crowley,* 38 F.4th at 1107 (cleaned up). "If a claim against the United States is contractual at its essence, district courts have no power to resolve it. The same rule applies to claims for breach of grant agreements executed through binding government contracts." *Widakuswara,* 2025 WL 1288817, at \*3 (citation omitted); *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C. Cir. 1982) (a plaintiff "should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA.").

"Whether a claim is 'at its essence' contractual" "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley,* 38 F.4th at 1106 (quoting *Megapulse,* 672 F.2d at 968). Here, both the source of the rights alleged and the remedy sought by Plaintiffs confirm that their claims related to grants and contracts are essentially contractual.

---

[6] Plaintiffs do not identify a particular source of sovereign immunity in their Complaint. *Cf. Franklin-Mason v. Mabus,* 742 F.3d 1051, 1054 (D.C. Cir. 2014) ("To bring a claim against the United States, a plaintiff must identify an unequivocal waiver of sovereign immunity."). And none of the bases for jurisdiction set forth in the Complaint—federal question, the All Writs Act, and the Declaratory Judgment Act, *see* Compl. ¶ 10—provide the requisite waiver of sovereign immunity. *See, e.g., Buaiz v. United States,* 471 F. Supp. 2d 129, 138 (D.D.C. 2007) (citing cases). Defendants presume in light of Plaintiffs' APA claim that they would identify APA § 702 as the relevant waiver, but that "waiver comes with a catch—it does not apply if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," including the Tucker Act's provision of exclusive jurisdiction to the Court of Federal Claims. *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,* No. 1:25-CV-00465 (TNM), 2025 WL 763738, at \*4 (D.D.C. Mar. 11, 2025) (citation omitted).

As to the former, Plaintiffs' only remotely direct allegation of injury stems from a single individual's loss of a project "due to tens of thousands of dollars of terminated grant funding." Compl. ¶ 315. While the allegation is hardly clear, this individual would have no alleged injury or right to vindicate absent this loss of grant funding. Other allegations are also premised on the cancellation of contracts and grants. *See, e.g., id.* ¶ 35 ("UCS members have suffered harm and face an imminent threat of harm . . . includ[ing] UCS members who are scientists and researchers throughout the United States who rely on federal grant funding . . . to conduct their work, and are experiencing ongoing uncertainty about the availability of funding for future research"); *id.* ¶¶ 40, 48, 51 (naming specific Defendants with reference to their "provision of grant funding"); *id.* ¶¶ 91-100 (addressing Cost Efficiency E.O.'s direction to review, *inter alia,* federal grants); *id.* ¶¶ 154-62 (section entitled "Mr. Musk and DOGE's Lawless Termination and Cancellation of Federal Grants and Contracts"); *id.* ¶¶ 163-74 (section entitled "Mr. Musk and DOGE's Lawless Efforts to Stop Federal Disbursements"). The thrust of all these allegations is that Plaintiffs "seek an injunction requiring the government to pay monies" under numerous unidentified contracts and grants. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). "The right to these payments is created in the first instance by the contract" or grant agreement, not by any statutory or constitutional provision, and any such provision "confers no such right in the absence of the contract [or grant agreement] itself." *Id.*; *see also Widakuswara*, 2025 WL 1288817, at *3.

As to the latter, the "type of relief sought" similarly establishes that Plaintiffs' grant and contract related claims belong in the Court of Federal Claims. *Crowley*, 38 F.4th at 1106. Plaintiffs seek an injunction preventing all Defendants from "terminating federal grants and contracts, and/or stopping federal payments," Compl., Prayer for Relief ¶ g, and enjoining certain Defendants from "[t]erminat[ing] or cancel[ing] federal grants and contracts," "[s]top[ping] or paus[ing]" federal payments;" "[c]law[ing] back already-disbursed federal payments"; or "[d]irect[ing] or caus[ing]" the same. *Id.*, Prayer for Relief ¶¶ a(iii)-(viii), e. And they seek a declaration that any such actions previously taken "are *ultra vires* and have no legal effect." *Id.*, Prayer for Relief (b). "whether phrased as a declaration that the agreements remain in force, or an order to pay the money committed by those

18

agreements, [Plaintiffs' requested relief] in substance [seeks] . . . specific performance . . . a quintessentially contract remedy." *Widakuswara*, 2025 WL 1288817, at *4; *see Spectrum*, 764 F.2d at 894. This is outside the power of federal district courts. *See id.*; *U.S. Conf. of Cath. Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks . . . reinstatement of contracts terminated by the Government—is beyond the power of this Court."); *Dep't of Educ. v. California*, 604 U.S. ---, 145 S. Ct. 966, 968 (2025) (reversing temporary restraining order because "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of [grant] money under the APA" because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money" and "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States." (citations omitted)).

This Court thus lacks jurisdiction over Plaintiffs' claims that stem from the alleged cancellation of certain grants or contracts.

### 2. Congress Has Precluded Judicial Review in the District Courts Concerning the Legality of the Government Personnel Actions

Plaintiffs challenge various alleged personnel actions taken by the Executive Branch that they contend have harmed them. *See* Compl. ¶¶ 272-321. For example, JACL complains about the alleged termination of National Park Service ("NPS") workers and the reduction of the NPS workforce, which allegedly causes downstream harms to JACL and its members. *Id.* ¶¶ 272, 278. Similarly, the Sierra Club contends that "cuts to NPS staffing and funding may cause Sierra Club Outings trip leaders to delay or cancel planned trips." *Id.* ¶ 294. It further claims that the "[l]oss of trained NPS and" United States Forest Service "firefighters impacts Sierra Club and its members." *Id.* ¶ 301. And UCS contends that the "reduction of the federal workforce pose[s] an immediate and very likely threat of forcing UCS members to close labs, end ongoing research projects, and terminate researchers and graduate students." *Id.* ¶ 310.

But even if Plaintiffs could establish standing for such attenuated injuries (they cannot), the Court lacks jurisdiction to assess the legality of Executive Branch personnel actions because Congress

has divested the federal district courts of jurisdiction over federal employment matters like this one. *See Widakuswara*, 2025 WL 1288817, at *2-*3; *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019) (ordering jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme). As the Supreme Court has explained, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). That includes challenges under the APA. *AFGE*, 929 F.3d at 756.

Congress can preclude district court review both explicitly and, as here, implicitly. In the latter case, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. To resolve an implicit preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Applying the inquiry here, jurisdiction over these claims is impliedly precluded.

**a.** The first step, Congress's intent to preclude, is well satisfied: "Congress has . . . established comprehensive statutory schemes for adjudicating employment disputes with the federal government." *Widakuswara*, 2025 WL 1288817, at *2. Federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the Federal Labor Relations Authority ("FLRA") for labor disputes. *See United States v. Fausto*, 484 U.S. 439, 445 (1988) (analyzing the CSRA); *AFGE*, 929 F.3d at 752 (discussing the Federal Service Labor-Management Relations Statute ("FSL-MRS")). Judicial review, if any, is available only in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham v. Ashcroft,* 358 F.3d

931, 934 (D.C. Cir. 2004) (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" for an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme does. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)).

It matters not that Plaintiffs here are not employees subject to a possible adverse employment action and the attendant administrative review of such action. The "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455. As the Supreme Court has explained, "the CSRA's 'elaborate' framework . . . demonstrates Congress' intent to entirely foreclose judicial review to" those outside the scope of the statutory review framework. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012) (quoting *Fausto*, 484 U.S. at 443). Thus, if it is true that the CSRA excludes Plaintiffs from obtaining administrative review, that supports, rather than detracts from, evidence of Congress's intent to preclude. *See Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

**b.** The second *Thunder Basin* step asks whether particular claims in a suit are of the type Congress intended to be reviewed in this scheme. *See Axon*, 598 U.S. at 186. As explained below, the answer to that question is yes, and consideration of these claims is precluded.

To determine whether Congress's preclusion scheme reaches the claims in this case, the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review

provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (citation and alteration omitted). These "considerations" are ultimately merely guideposts to best "understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim." *Id.* And it is critical to remember that constitutional and APA claims are as amenable to channeling as any other type. *See, e.g.*, *Filebark v. DOT*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). It is the content of the claim that matters—not the manner in which a plaintiff attempts to raise it.

Plaintiffs bring four claims, all of which concern, as relevant here, whether someone was lawfully terminated. First, they assert that the actions of Mr. Musk, USDS and Ms. Gleason are *ultra vires*. Compl. ¶¶ 322–25. Second, they claim that the actions of Mr. Musk, USDS and Ms. Gleason violate separation of powers principles. *Id.* ¶¶ 326–29. Third, Plaintiffs contend that Mr. Musk's role in the Executive Branch violates the Appointments Clause. *Id.* ¶¶ 330–38. And finally, Plaintiffs assert APA claims against sixteen agencies and their current heads. *Id.* ¶¶ 339-42. All fall comfortably within the administrative scheme.

First, the CSRA provides for meaningful judicial review. This is so even if the scheme Congress established does not allow for Plaintiffs "to obtain 'pre-implementation' review" "or immediate relief." *See AFGE*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE* itself, certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757.

Specifically, a federal employee who is aggrieved by a personnel decision may challenge an employment action as conflicting with a federal rule, guidance, or within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("FLEOA"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system). The same would even be true for constitutional challenges to employment actions taken. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to

22

conduct judicial review." (citation omitted)). And the broader administrative law claims fall comfortably within the court's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 7703(c)(1), (2). In sum, there are certain methods, for certain parties, to obtain certain relief on these very topics.

That Plaintiffs may not be included in these pathways is no issue. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong." *Sackett v. EPA*, 566 U.S. 120, 130 (2012). Indeed, "[w]ere [the Court] to hold otherwise, a union [employee] could circumvent the CSRA's strictures by requesting that a [federal] union file general APA claims outside the CSRA." *See Air Force*, 716 F.3d at 639. It would be natural for Congress to preclude those not directly involved in the federal employment relationship—whether they be nonaffiliated third-party entities or federal unions—from filing a separate attack on employment policies. And "[n]othing about the fact that plaintiffs' action is a systemic challenge to [personnel] policy mitigates" this preclusion. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (holding an APA challenge asserted against an OPM policy precluded); *see Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025); *see also Nat'l Treasury Emps. Union v. Trump*, ---F. Supp. 3d---, 2025 WL 561080, at *3 (D.D.C. Feb. 20, 2025) (finding implied preclusion for "constitutional and statutory challenges to the firing of probationary employees, the deferred resignation program, and [an] Executive Order"); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 573762, at *7–10 (D.D.C. Feb. 21, 2025) (same for "alleged unlawful dismantling of USAID" because "the alleged injuries on which

plaintiffs rel[ied] in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID" (cleaned up)).[7]

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such separation exists here. The claims challenge the Executive Branch's employment decisions that go to the core of the employment relationship scheme and allege that those decisions violate the constitution and the APA. More specifically, Plaintiffs claim that they are harmed by employment decisions undertaken by the Executive Branch, and that those decisions were unlawful. As relief, Plaintiffs seek, among other things, a declaration and injunction that "Defendants Musk, DOGE, and Gleason have no legal authority to" "[m]ake, direct, or cause personnel decisions regarding federal employees at any federal agency outside DOGE" or to "[d]irect or cause reductions in force or otherwise reduce the size of the federal workforce outside DOGE[.] Compl., Prayer for Relief ¶¶ a(ix)-(x); *see id.* ¶ e. The MSPB and FLRA are well versed in the particulars of the interplay of federal employment authorities, as is the Federal Circuit. The claims thus lie at the heart of the CSRA and accordingly satisfy the second prong.

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point. As the Court noted: "preliminary questions

---

[7] Nor can Plaintiffs evade these jurisdictional "requirements and limitations" by styling their allegations as systemwide APA or constitutional violations. The jurisdictional bar "applies to a systemwide challenge to an agency policy, just as it does to the implementation of such a policy in a particular case." *Widakuswara*, 2025 WL 1288817, at *2; *see id.* at *3.

unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the agency these "threshold questions" may "alleviate [the other] concerns." *See id.*

In sum, all the guideposts establish Congress's intent to preclude these kinds of claims from district court review. Instead, they are channeled through the CSRA or the FSL-MRS. *See Widakuswara*, 2025 WL 1288817, at *2-*3.

## II.    The Complaint Should Be Dismissed under Rule 12(b)(6)

Because this Court lacks jurisdiction, it need go no further. If the Court does reach the merits, however, it should dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

### A.    Plaintiffs' Appointment Clause Count Fails to State A Claim

The Appointments Clause of the Constitution prescribes the method for appointing officers of the United States. U.S. Const. art. II, § 2, cl. 2. Individuals are officers, and thus must receive a constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercise[e] significant authority pursuant to the laws of the United States." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010) (citation omitted). Federal employees who do not meet these criteria "need not be selected in compliance with the strict requirements of Article II." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

Here, Plaintiffs' Complaint does not plausibly allege an Appointments Clause violation. Indeed, it pleads it away: Plaintiffs repeatedly allege that Mr. Musk has no office and no legal authority. *See, e.g.*, Compl. ¶¶ 8, 76, 90, 108, 266, 334. Those concessions doom Plaintiffs' Appointments Clause claim; without an office or legal authority, Mr. Musk is necessarily no "officer" with whom the Clause is concerned. Plaintiffs' remaining allegations are entirely consistent with the idea that Mr. Musk influenced other government officials—whose authority is not challenged in this lawsuit—to take certain decisions with which Plaintiffs disagree. But even if Mr. Musk could be said to have "directed" these decisions in some colloquial sense, as Plaintiffs allege, that would not establish an Appointments

Clause violation. So long as a duly authorized agency official takes formal responsibility for those decisions, the Appointments Clause is satisfied.

Plaintiffs' claim further fails because their allegations establish that Mr. Musk's role and attendant influence are personal to him rather than a "continuing position," as required for the Appointments Clause to apply. *See, e.g.*, *Lucia*, 585 U.S. at 245. This claim should be dismissed.

### 1. Plaintiffs Fail to Allege Mr. Musk Occupies an Office Established by Law

For there to be an Appointments Clause challenge, there needs to be an office—*i.e.*, "a continuing position established by law" that is vested with "significant authority pursuant to the laws of the United States." *Id.* (citation omitted); *see Burnap v. United States*, 252 U.S. 512, 516 (1920) ("Whether [a federal official] is an officer or an employé is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties[,] and appointment thereto."). Both prongs of the test established by the Supreme Court make the "office" requirement clear: the first expressly requires consideration of a *position*, and the second considers the powers *that the law vests in that position*, *i.e.*, what "authority *pursuant to* the laws of the United States" it affords its incumbent. *Lucia*, 585 U.S. at 245 (citation omitted) (emphasis added).

**a.** To state an Appointments Clause violation the "threshold trigger" is a governmental position that is "'established by Law.'" *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1133 (D.C. Cir. 2000) (quoting *Freytag*, 501 U.S. at 881). Once the position is identified, courts analyze whether the authority imbued in that position is significant by reference to the position's duties and powers as reflected in that position's organic law. *See, e.g.*, *Lucia,* 585 U.S. at 248–49 (analyzing whether administrative law judges are officers solely by reference to their duties set forth in statute and regulation); *Freytag*, 501 U.S. at 881; *Landry*, 204 F.3d at 1133. Where the office identified does not reflect a continuing position that exercises significant authority pursuant to the laws of the United States, "the Appointments Clause cares not a whit about who named" a person to that post. *Lucia*,

585 U.S. at 245. As these cases reflect, this is a formalist inquiry: It turns exclusively on the *de jure*—not *de facto*—authority that a person wields.[8]

Plaintiffs identify no "office" whose authority Mr. Musk allegedly wields. To the contrary, they allege that Mr. Musk "does not occupy an office created by Congress." Compl. ¶ 266; *see id.* ¶¶ 90, 108 ("None of these executive orders purport to create an office of the United States . . . ."); *id.* ¶ 334. That allegation alone ends their Appointments Clause challenge.

**b.** Relatedly, it is not enough to identify some "office" to plead an Appointments Clause claim; a court must examine the *authority vested by law* in that particular office. *See, e.g.*, *Freytag*, 501 U.S. at 881 (looking to statute for office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute"). That is why the second prong of *Lucia*'s test asks whether the incumbent of an office is exercising authority vested in that office "*pursuant to the laws* of the United States." 585 U.S. at 245 (emphasis added and citation omitted). To exercise the powers vested in a particular office *by law*, the incumbent of the office must be appointed in the manner the constitution requires for *that particular office* to safeguard the accountability of the official authority of the United States.

Here, Plaintiffs concede that Mr. Musk does not occupy an office with any such formal powers. *See, e.g.*, Compl. ¶¶ 266, 334; *id.* ¶ 264 ("Mr. Musk and DOGE have been acting without even the pretense of legal authorization . . . ."). Indeed, this is the entire framing of Plaintiffs' allegations, such as that "Mr. Musk and DOGE lack any legal authority to undertake this massive attack on the infrastructure of the federal government." *Id.* ¶ 8. These allegations are fatal under *Lucia*'s second prong. They are a concession that Mr. Musk is *not* exercising authority vested in an office "*pursuant to the laws* of the United States." *Lucia*, 585 U.S. at 245 (emphasis added and citation omitted); *see, e.g.*, Compl. ¶¶ 117-21 (alleging 12 different times that "[n]o federal statute authorizes DOGE or Mr.

---

[8] The private nondelegation sphere involves a similar formalist inquiry. There, so long as a governmental officer is the one formally authorizing the given action there is no constitutional defect—even if that action was conceived of by an independent body composed of private persons that exercised decisive influence. *See, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). What matters for constitutional purposes is who signed on the dotted line.

Musk," to take various actions). The very crux of their case is the contention that Mr. Musk is using power that is *not* vested in the position he occupies. But this is not an issue with which *the Appointments Clause* is concerned.

**c.** Plaintiffs' alternative theory fundamentally misunderstands the Appointments Clause. On their view, the Court's focus should be not on the powers imbued in the *office* a person occupies but on whether the particular *person* has wielded significant power. *See, e.g., id.* ¶¶ 332, 336 (alleging that Mr. Musk "is exercising significant authority and is acting as a principal officer" and characterizing the "significant power that Mr. Musk [allegedly] exercises" notwithstanding Plaintiffs' concession that he does not occupy an office of the United States); *contra Lucia*, 585 U.S. at 245. Plaintiffs cite no authority for this novel claim, which conflates formal authority and informal influence. Nobody thinks, for instance, that the White House Chief of Staff or White House Counsel are *officers* in any fashion, despite the fact they may exercise *tremendous* influence across the government. This is because they do not occupy a *position* that is equipped with any formal authority. And without that, there is nothing that implicates the Appointments Clause.

Besides having no basis in law, there is also nothing to recommend Plaintiffs' functional approach as a practical matter. As Plaintiffs would have it, the constitutional analysis here would turn on how much "de facto" power an individual person wields—as determined, of course, by an Article III court. Compl. ¶¶ 36, 38. But it cannot be, for instance, that a Chief of Staff is an officer in some administrations (when she effectively marshals her agenda), but a mere advisor in others (when people ignore her advice). Nor can it be the case that the same individual presidential advisor is an officer at one point in time, when they are perceived as close to the President and their proposals are adopted, and then no longer an officer if their influence is perceived as having waned. Yet, that is precisely the type of analysis Plaintiffs appear to contemplate. *See id.* ¶¶ 332-48.

In sum, Plaintiffs concede Mr. Musk has no legal authority over any personnel decision or decision regarding government spending. *See id.* ¶ 154 ("Mr. Musk and DOGE lack any legal authority to alter federal spending or to terminate or cancel, or direct or cause the termination or cancellations of, federal grants contracts, or leases."); *id.* ¶ 181 ("Mr. Musk and DOGE, again, have no lawful power

to engage in reduction in force or reorganization of federal agency work forces, or any other federal personnel decisions . . . ."). And because they do not otherwise identify an office Mr. Musk supposedly holds without proper appointment, their claim fails.

### 2. Even if Mr. Musk Functionally "Directed" the Complained-of Actions, Plaintiffs' Appointments Clause Claim Fails

Unable to identify any *actual* authority possessed by Mr. Musk, Plaintiffs' primary theory appears to be that Mr. Musk has "directed" others to wield their power accordingly. *See id.* ¶ 146. That theory is foreclosed by binding D.C. Circuit precedent. In *Andrade*, the D.C. Circuit rejected an Appointments Clause challenge asserted in an employment removal action based on the same exact theory. 824 F.2d at 1256–57. The plaintiffs argued that an official not validly appointed as an officer of the United States "had complete responsibility for crafting and executing" their terminations—*i.e.*, that someone without appointment was pulling the strings, and directing the actions that harmed them. *Id.* at 1257. The court explained that, even if true, that fact was irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id.*

That principle applies here: Again, Mr. Musk does not have—as Plaintiffs concede—any independent legal authority to command anyone to do anything. Accordingly, *even if* Mr. Musk advised, recommended, or indeed "directed" certain actions across multiple agencies, the actual legal authority for such actions is not vested in Mr. Musk, but instead in the actual decisionmakers making those decisions. In other words, even assuming that Mr. Musk or USDS employees "conceive[d of] and even carr[ied] out policies" to which Plaintiffs object, there is no Appointments Clause violation under *Andrade*, because duly appointed agency heads ultimately "take official responsibility" for those actions. *Id.* What is needed for an Appointments Clause challenge is a governmental action taken by someone lacking the authority to do so. Because Plaintiffs do not plausibly allege a single example of that, their Appointments Clause claim fails as a matter of law.[9]

---

[9] Many of Plaintiffs' allegations related to Mr. Musk are bare assertions or legal conclusions that the Court need not credit. *Compare Iqbal*, 556 U.S. at 680–81 (declining to assume the truth of allegations

### 3.    An Advisor Is Not an Officer Merely Because He Is Effective

As a fallback, Plaintiffs seem to suggest that when an advisor's suggestions are accepted, he essentially wields the power of the advised—*i.e.*, as the "*de facto* head of DOGE" he is "wielding sweeping power across the executive branch" and "exercising authority . . . *in excess* of a principal officer." Compl. ¶¶ 1, 2, 36; *see id.* ¶ 8. But as explained, this is fundamentally not the stuff of an Appointments Clause challenge, which requires *de jure* authority. Thus, even assuming the truth of those allegations does not establish a constitutional problem. Indeed, across contexts, federal courts consistently have held that those acting in a formally advisory role—that is, those who rely on the legal authority of others to actually effectuate a given decision—do not exercise "significant authority" and do not qualify as officers, even where they have significant ability to convince, influence, or cajole others to adopt their proposed policies.

Courts have long recognized that the President is entitled to his choice of senior advisors, who can help him execute his agenda, without having to seek approval from Congress. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). The President can of course direct duly appointed officers of the United States (including Senate-confirmed Department Heads) to take all manner of actions permitted under their relevant statutory authorities. And in doing so, the President may choose to rely on a close advisor to identify actions for these officers to take. The

---

that Attorney General was "the 'principal architect'" of a challenged policy (citation omitted)), *with* Compl. ¶ 2 (asserting that Mr. Musk "is exercising authority even *in excess* of a principal officer"); *id.* ¶ 1 (alleging Mr. Musk and DOGE are "wielding sweeping power across the executive branch"); *id.* ¶ 264 ("Mr. Musk and DOGE have . . . directly interfer[ed], on information and belief, with the work of federal agencies, dismantling agencies, and assuming authority to unilaterally direct the spending and personnel management of the United States . . . ."); *id.* ¶ 131. Even with respect to agency-specific actions about which Plaintiffs complain, Plaintiffs nowhere plausibly allege that Mr. Musk was the final decisionmaker on whose authority the action was taken. *See, e.g.*, *id.* ¶¶ 182-85 (allegations related to "'Fork in the Road' email [that] was *sent by OPM*" (emphasis added)); ¶ 207 ("On information and belief, Mr. Musk and DOGE are directing *and partnering* with the Department of Education . . . ." (emphasis added)); *id.* ¶¶ 250-51 (quoting statements of EPA Administrator regarding actions taken "in partnership with DOGE").

President's choice to rely on such advice before making an ultimate decision does not transform an advisor into an officer of the United States who exercises "significant authority" in his own right. And, likewise, the President may act through his advisors and other non-officers when communicating his decisions.[10] Because Plaintiffs do not once plausibly allege how Mr. Musk wields the sort of *actual* authority required under the Appointments Clause, dismissal is warranted.

### 4.     Mr. Musk Does Not Occupy a "Continuing" Office

Plaintiffs' claim also fails for an independent reason: They have not plausibly alleged that Mr. Musk occupies any continuing office. *See Lucia*, 585 U.S. at 245 ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer." (citation omitted)). Plaintiffs do not dispute that Mr. Musk is a non-career SGE, Compl. ¶ 36—a status that lacks the duration characteristic of an office. *See United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867) (explaining the term "office" "embraces the ideas of tenure, duration, emolument, and duties"). As defined by statute, SGEs are necessarily time-limited in their service. *See* 18 U.S.C. § 202. That stands in contrast to the administrative law judges in *Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the limited duration of Mr. Musk's SGE status indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office—in particular, 'tenure,' 'duration,' and 'continuous duties'" (citation omitted)).

To be a continuing office, the position also must not be "personal to a particular individual." *Donziger*, 38 F.4th at 297.[11] Here, there is no allegation that Mr. Musk's role will outlast his tenure. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice)

---

[10] As Defendants demonstrated in their Motion to Dismiss in *New Mexico*, this tracks longstanding historical practice, and it has long been understood that those who occupy advisory roles do not wield "authority" in a manner that could make them an officer. *See New Mexico* ECF No. 58, at 27-29.

[11] Unlike the situation alleged in this case, however, the nonpermanent independent counsel position discussed in *Morrison* was not personal to a particular officeholder as reflected by the fact that Morrison replaced James C. McKay as independent counsel. *See* 487 U.S. at 667.

(explaining that an office has "duties [that] continue, though the person be changed"). Indeed, the entire thrust of the Complaint is that Mr. Musk has achieved a special status, particular to him alone. *See* Compl. ¶ 2 (alleging Mr. Musk is "exercising authority even *in excess* of a principal officer" (emphasis original)); *id.* ¶ 133 ("As an indicator of Mr. Musk's expansive role in federal government, he attended President Trump's first Cabinet meeting" and "ultimately spoke three times as long as any of the Senate-confirmed members of the Cabinet"); *id.* ¶ 335 (alleging that Mr. Musk "reports only to the President of the United States, if anyone"). This does not work. Presidents have long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others—precisely because the President depends on those advisors' personalized advice and judgment. *Donziger*, 38 F.4th at 297. But those advisors—including Mr. Musk—occupy definitionally *personal*, not *permanent* positions.

### B.    Plaintiffs' APA Claims Must Be Dismissed

Plaintiffs' challenge the ongoing implementation of several Executive Orders across vast swaths of the federal government, addressing dozens of disparate topics—from federal aid for primary schools to bathroom sanitation at national parks—across more than a dozen different agencies. In this way, their grievance fails to satisfy key statutory prerequisites for the APA. The Court should dismiss the APA claim because it is an impermissible programmatic attack that does not challenge discrete agency action, let alone "final agency action" reviewable under the APA.

### 1.    The APA Does Not Provide a Cause of Action to Challenge Programmatic Government-Wide Efforts

A plaintiff cannot invoke the APA to attack the entirety of government programs "consisting principally of . . . many individual" activities. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990). "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 891. Plaintiffs' challenge must target a "circumscribed, discrete agency action[]" that does not present a "broad programmatic attack" on government operations. *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 62-64 (2004); *see* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act."). Such limitations ensure that changes to government-wide initiatives come from "the halls of Congress, where programmatic improvements are normally made," not from "court decree." *Lujan*, 497 U.S. at 891; *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (this "ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").

Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891; *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018 (APA "precludes attacks that seek broad programmatic improvements of agency behavior"); *see also Widakuswara*, 2025 WL 1288817, at *3 ("plaintiffs may not use the APA to mount wholesale challenges to an agency's entire program" (citation omitted)). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006).

If there were ever a case of an impermissible programmatic challenge, Plaintiffs' attack on the government's "on-going executive policymaking" is it. *Am. First Legal Found., v. U.S. Dep't of Agric.*, Civ. A. No. 22-3029 (BAH), 2023 WL 4581313, at *7 (D.D.C. July 18, 2023). So broad and unbounded is this challenge that Plaintiffs expressly state in the first paragraph of the Complaint that their challenge is to the exercise of "sweeping power across the executive branch." Compl. ¶ 1. And, true to their word, over the course of the next 342 paragraphs, Plaintiffs assail a panoply of agency activities, *id.* ¶ 157 (alleging that 104 contracts have been terminated at 25 different agencies), and request to "enjoin all Defendants from implementing or enforcing the February 26, 2025, executive order," *id.*, Prayer for Relief ¶ h.

This does not work. As an initial matter, it is "well-settled" that Presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action."); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). The same is true

with agency implementation of executive orders. *See Detroit Int'l Bridge Co v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "[s]everal cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA").

But Plaintiffs' allegations fail even as they purport to address particular named agency Defendants. By the time Plaintiffs get to the actual single APA count in the Complaint, they do not identify which agency activity the particular count covers, instead asserting that all "Agency Defendants have terminated grants and contracts" and "have terminated federal workers, reduced the federal workforce, and accepted federal workers' response to the 'Fork in the Road' email." *See* Compl. ¶ 341. As such, Plaintiffs apparently invite this Court to serve as a super-personnel department for 16 agencies' employees and to review all those agencies' contracts and grants. And while their Complaint plucks out a litany of examples of purported agency plans and activities that they find objectionable (some of which relate to non-Defendant agencies and others which concededly have not yet taken place), the relief Plaintiffs seek is completely unbounded. *See id.*, Prayer for Relief ¶ d ("Declare that all Defendants are legally prohibited . . . [from] terminat[ing] and cancell[ing] grants and contracts, stopping federal payments, terminat[ing] federal employees and [undertaking] reduction[s] in force of the federal workforce . . . ."), *id.*, Prayer for Relief ¶ g ("Preliminarily and permanently enjoin all Defendants from . . . permanently eliminating staff positions, terminating federal grants and contracts, and/or stopping federal payments.").

This attack on unspecified agency plans and activities could not be farther from a challenge to discrete and reviewable "agency action." Indeed, courts regularly find that significantly narrower programs operated by a *single* agency are not amenable to APA review. *See, e.g.*, *SUWA*, 542 U.S. at 64-67. In *SUWA*, the Supreme Court considered plaintiffs' claims that the Bureau of Land Management failed to manage off-road vehicle use in federal lands classified as wilderness study areas in a manner so as not to impair the suitability of such areas for preservation as wilderness or to manage public lands in accordance with land use plans. *Id.* at 65-67. The Court rejected such claims, concluding that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency

compliance with such congressional directives is not contemplated by the APA." *Id.* at 67; *see also Lujan*, 497 U.S. at 890 (Plaintiffs "cannot seek *wholesale* improvement of [alleged] program by court decree" where program in question "extends to, currently at least, 1250 or so individual" determinations (citation omitted)). Notwithstanding the Supreme Court's clear pronouncement involving a single agency for the same style of grievance, Plaintiffs' Complaint generally alleges that BLM budgeting "could impact its and other agencies' ability to prevent and respond to wildfires," and how it could "maintain trails and campsites, remove hazards and trash, conduct search and rescue operations, enforce park rules" and on and on. Compl. ¶¶ 232, 300. But the overbreadth of the challenge in *SUWA* involved just one agency. The Complaint extends similar challenges to another 15 agencies. *See id.* ¶ 342.

Defendants are unaware of a single case in which a court relied upon the APA to review anything close to the kind of sprawling and unfocused challenge that Plaintiffs assert here. And, if the suit were to proceed, it is entirely unclear how the Court could begin to evaluate whether each and every agency activity complained of was "arbitrary and capricious," or "contrary to law and the constitution."

A wholesale challenge like Plaintiffs' is impossible to litigate under the mechanics of judicial review that the APA contemplates. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," "[t]he entire case on review is a question of law," and it "is based on [and limited to] the agency record." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (citation omitted); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment if necessary. Nor is it possible for the Court to apply the applicable standard of review, *see* 5 U.S.C. § 706, to the dozens of purported agency actions. Creating a record is impossible in this case where Plaintiffs have not clearly identified the name of the relevant contracts, grants, or employees at issue, much less alleged

what the discrete agency action was, what form it took, or when it happened for *any* of the numerous grievances raised in the Complaint. The impossibility of this task is a good indication that "the broad, sweeping nature of the allegations that the plaintiffs have elected to assert" are not cognizable under the APA. *Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*, 945 F.3d 183, 191 (4th Cir. 2019).

A litany of agencies and activities implementing several Executive Orders is simply not the type of "agency action" for which the APA authorizes suit. As the Supreme Court has explained, it is "entirely certain that the flaws in the entire 'program'—consisting . . . [of] many individual actions . . . , and presumably actions yet to be taken . . .—cannot be laid before the courts for wholesale correction under the APA . . . ." *Lujan*, 497 U.S. at 892–93. In short, Plaintiffs' claims are not cognizable under the APA.

## 2. Defendants' Activities Are Not Reviewable Because None Are Final Agency Action

Even if Plaintiffs trained their challenge on some specified and limited set of discrete and circumscribed agency activity, that would not save their claim. "[A]n agency action must be final in order to be judicially reviewable." *Norton*, 415 F.3d at 13; *see* 5 U.S.C. § 704 ("final agency action for which there is no other adequate remedy in a court [is] subject to judicial review"). Finality is governed by a two-part test. First, the action under review "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Norton*, 415 F.3d at 13 (quoting *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997)). Second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett,* 520 U.S. at 178). Plaintiffs fail to satisfy either of these criteria.

The gravamen of Plaintiffs' Complaint challenges alleged agency plans in which the decision-making process is "on-going." *Am. First Legal Found.*, 2023 WL 4581313, at *7; *see e.g.*, Compl. ¶ 7 (complaining about "ongoing uncertainty about the availability of federal research grants and scientific data"); *id.* ¶ 144 (Mr. Musk and DOGE *are working to*" take enumerated action) (emphasis added); *id.* ¶ 235 (alleging DOGE is "*planning* to cancel the lease for" a NOAA weather forecasting facility). Their

"uncertainty" lays bare that their APA claim is premature, speculative, and untethered to any final agency action. The commonality among the myriad activities about which Plaintiffs complain is that they do not "determine rights or obligations" or create "legal consequences" because the decisionmaking process is still underway. *Norton*, 415 F.3d at 15 ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.").

Thus, Plaintiffs complain about potential future events based on potential decisions that have yet to be made. *See, e.g.*, Compl. ¶ 8 ("[t]he full scale and impact of Mr. Musk and DOGE's ongoing cuts . . . is *not known*") (emphasis added); *id.* ¶¶ 210–11 (IDEA and Title I grants are "at imminent risk of termination or cancellation"); *id.* ¶ 216 (Mr. Musk and DOGE pose an *imminent threat to* federal funding for Pell grants, IDEA programs, Title I programs, and other forms of federal financial aid (emphasis added)); *id.* ¶ 294 (cuts to NPS "may cause Sierra Club Outings trip leaders to delay or cancel planned trips"). This does not suffice. "Courts have defined a nonfinal agency order as one, for instance, that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (citation omitted).

At bottom, where Plaintiffs do not complain about final agency actions that impact their rights, but rather their amorphous "uncertainty about" ongoing policy determinations, they failed to establish a cause of action under the APA.

## C. The Court Should Dismiss Plaintiffs' Derivative Claims

Along with their APA claim, Plaintiffs also raise duplicative *ultra vires* and separation-of-powers claims. This Court should dismiss those derivative counts. As discussed further below, "these constitutional claims" fail because they "simply flow from allegations that the Executive Branch has failed to abide by the governing statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims." *Widakuswara*, 2025 WL 1288817, at *5; *see also In re Snyder*, 472 U.S. 634, 642 (1985) ("We avoid constitutional issues when resolution of such issues is not necessary for disposition of a case."); *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568,

582 (1979) ("Before deciding [a] constitutional question," a court must consider whether other "grounds might be dispositive."). Likewise, where there is another "meaningful and adequate opportunity for judicial review"—as here, under the APA—an *ultra vires* cause of action is not available. *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991). The same holds true for Plaintiffs' similar contentions recast as a separation-of-powers claim. And even if Plaintiffs' *ultra vires* and separation-of-powers claims were not duplicative, they should be dismissed for failure to state a claim.

### 1.    Plaintiffs' Separation-of-Powers Claim Fails to State a Claim

Plaintiffs' separation-of-powers claim fails at the outset because it is purely statutory. Indeed, in Count II of the complaint, Plaintiffs specifically cite 2 U.S.C. § 683, Compl. ¶ 327, which Congress passed under the Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297. Section 683 sets forth certain procedures that the President must follow when seeking to impound appropriated funds. Accordingly, where Plaintiffs allege that "Congress has not authorized Mr. Musk or DOGE to cut spending of appropriated funds, to direct such cuts, or to otherwise unilaterally impound funds[,]" Compl. ¶ 125, this "constitutional" claim, is nothing more than Plaintiffs' statutory objections dressed up in constitutional garb. As the D.C. Circuit recently noted, this is insufficient. *See Widakuswara*, 2025 WL 1288817, at *5.

This is because, as the Supreme Court explained in *Dalton*, permitting a plaintiff to assert a separation-of-powers claim in such a case would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511 U.S. at 474. In other words, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims[.]" *Id.* at 473. Thus, Plaintiffs fail to state a constitutional separation-of-powers claim because Count II concerns "simply" whether Defendants have "exceeded [their] statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Id.* at 473–74 & n.6 (citation omitted); *see Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (rejecting separation-

of-powers claim based on Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority").

In any event, Plaintiffs' factual allegations are insufficient to state a claim. As the Supreme Court has recognized, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Here, Plaintiffs' allegations regarding Defendants' purported separation-of-powers violations substantially consist of legal conclusions that this Court need not credit. *E.g.*, Compl. ¶ 124 ("Mr. Musk and DOGE, as part of the executive branch, do not have authority under the Constitution to direct cuts to spending of federal appropriations or to impound funds, absent congressional authorization."); *id.* ¶ 125; *id.* ¶ 266 ("DOGE, Mr. Musk, and federal executive departments and agencies—lack authority to refuse to spend federally appropriated funds."). Plaintiffs' remaining allegations fare no better. Plaintiffs allege, "[o]n information and belief, Mr. Musk and DOGE are directing and partnering with the Department of Education to take actions . . . , including termination of federal grants, contracts, and related programs without legal authority and refusal to spend appropriated funds in violation of the separation of powers." *Id.* ¶ 207. But that allegation is a legal conclusion couched as a factual allegation. *See Iqbal*, 556 U.S. at 678. Moreover, that allegation is also insufficient because "pleadings on information and belief require 'an allegation that the necessary information lies within the defendant's control, *and* . . . such allegations must also be accompanied by a *statement of the facts* upon which the allegations are based.'" *Flowers v. The Exec. Off. of The President*, 142 F. Supp. 2d 38, 47 (D.D.C. 2001) (citation omitted and emphases in original). And here, Plaintiffs fail to provide any statement of the facts upon which they base their allegation. Thus, Plaintiffs fail to plausibly allege a constitutional separation-of-powers claim.

### 2.    Plaintiffs' *Ultra Vires* Claim Fails to State a Claim

Plaintiffs' *ultra vires* claim is substantially a rehash of their separation-of powers claim, and fails for similar reasons. *Compare* Compl. ¶ 329 *with id.* ¶ 324. Courts have recognized that an equitable cause of action for *ultra vires* review may be available in rare instances where, because Congress has failed to provide a cause of action, "the individual is left to the absolutely uncontrolled and arbitrary

action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); *see also Leedom v. Kyne*, 358 U.S. 184, 189 (1958). The Supreme Court, however, has expressly held that an *ultra vires* cause of action is not available whenever there is another "meaningful and adequate opportunity for judicial review," or "clear and convincing evidence that Congress intended to deny . . . District Court jurisdiction[.]" *MCorp Fin., Inc.*, 502 U.S. at 43–44; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015).

Moreover, *ultra vires* review is a "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt*, 589 F.3d at 449. Thus, as the D.C. Circuit has recognized, "[t]ime and again, courts have stressed that *ultra vires* review has extremely limited scope." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citations omitted). Under D.C. Circuit precedent, Plaintiffs must satisfy three requirements in order to establish an *ultra vires* claim: "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the [Defendants] plainly act[] in excess of [their] delegated power and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt*, 589 F.3d at 449). This last factor is "especially demanding," and only applies where the error "is patently a misconstruction of the Act, that disregard[s] a specific and unambiguous statutory directive, or that violates some specific command of a statute." *Id.* at 764 (citation omitted); *see id.* (holding that *ultra vires* claims are confined to "extreme" agency error where the agency has "stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court" (citation omitted)).

Plaintiffs cannot even make it onto the playing field, let alone prevail on this "Hail Mary" claim. Here, the Tucker Act and CSRA preclude Plaintiffs' claims, which are all ultimately employment or contract claims precluded by the Tucker act or the CSRA and related statutes. *See supra* Part I.B; *Widakuswara*, 2025 WL 1288817, at *5 (rejecting *ultra vires* claim). But Plaintiffs' claims are foreclosed

even under their own theory that the APA permits review of Agency Defendants' alleged "termination of . . . grants[ and] contracts," "termination of federal workers," "reduction of the federal workforce," and "dismantling of federal executive departments and agencies created by Congress," Compl. ¶ 342. This is because *ultra vires* review is foreclosed due to the availability of an alternative procedure for review.[12] *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 841 n.7 (D.C. Cir. 2024) ("Because we hold that Congress has provided for APA review of DMCA rules, the *ultra vires* claim is no longer available, and we need not address it." (citing *Changji Esquel Textile Co.*, 40 F.4th at 722)); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200–01 (D.D.C. 2024) ("These prudential considerations favor interpreting the *ultra vires* pleading standard to foreclose the mutual survivability of a statutory claim and an *ultra vires* claim, even at the motion to dismiss stage.").

Second, Plaintiffs fail to allege sufficient facts to state a plausible claim for relief on their *ultra vires* claim. Plaintiffs principally contend that Defendants acted *ultra vires* by directing staff reductions and funding cuts at various agencies. Compl. ¶¶ 323–25. Specifically, Plaintiffs allege, *inter alia*, that "despite lacking lawful authority, Defendants have . . . engaged in a zero-based budgeting process that involves analyzing the federal budget and federal spending for substantive cuts on an ongoing basis— including for termination and cancellation of grants and contracts, termination of federal employees, and reduction of the federal workforce." *Id.* ¶ 324. "This analysis," according to Plaintiffs, "includes the use of artificial intelligence to analyze agency spending in a manner that amounts to a line-item veto." *Id.* But, as discussed above, the Complaint's allegations regarding Defendants substantially consist of bare assertions that the Court need not credit. *Iqbal*, 556 U.S. at 681 ("As such, the allegations are conclusory and not entitled to be assumed true.").

Notably, Plaintiffs' allegations are substantially based solely on "information and belief." *E.g.*, Compl. ¶ 147 ("On information and belief, DOGE is engaged in a 'zero-based budgeting process' for

---

[12] To be sure, Plaintiffs' APA claim is defective as pled, but Plaintiffs' own defective pleading of their APA claim does not make *ultra vires* review available. The presence of the APA remedy is all that is required to displace this claim in equity. *Cf. Fed. Express Corp.*, 39 F.4th at 765 ("*ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review . . .")

the federal government."); *see id.* ¶¶ 152, 264.[13] The D.C. Circuit "require[s] that the allegations based on information and belief be accompanied by a statement of the facts upon which the allegations are based," *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (citation omitted). But here, Plaintiffs fail to state facts to substantiate their allegations. Accordingly, "[i]t is well-settled that such conclusory allegations supported by information and belief are insufficient to survive a motion to dismiss." *Doe v. Lee*, No. 19-cv-0085 (DLF), 2020 WL 759177, at *6 (D.D.C. Feb. 14, 2020) (quoting *Niedermeier v. Off. of Max S. Baucus*, 153 F. Supp. 2d 23, 31 (D.D.C. 2001)).

Additionally, rather than plausibly alleging Mr. Musk or USDS exercise any unilateral authority in allegedly acting *ultra vires*, many of Plaintiffs' allegations illustrate that it is the agencies making the final decisions as to implementing the President's DOGE initiative, which undermines their claim. *E.g.*, Compl. ¶ 207 ("On information and belief, Mr. Musk and DOGE are directing and partnering with the Department of Education to take actions . . . including termination of federal grants, contracts, and related programs . . ."); *id.* ¶ 251 ("Administrator Zeldin announced that he had, 'in partnership with DOGE,' 'identified and cancelled an additional 20 grants totaling $60,958,537.30 in taxpayer savings.'"); *see also id.* ¶ 181 ("A February 26, 2025, guidance memorandum from the heads of OPM and OMB instructed agency heads to 'collaborate with their [DOGE] team leads' in developing reduction in force and reorganization plans."). Accordingly, Plaintiffs fail to plausibly allege that the complained-of actions were not formally approved by a relevant agency actor with proper legal authority. Because their allegations are "compatible with" lawful behavior, they do not state a claim on which relief can be granted. *Iqbal*, 556 U.S. at 680.

Finally, even excusing the absence of any on-point allegations, Plaintiffs have failed to plead any facts to show that they can satisfy the "especially demanding" requirement of *ultra vires* review that Defendants "plainly act[ed] . . . contrary to a specific [statutory] prohibition . . . that is clear and mandatory." *Fed. Express Corp.*, 39 F.4th at 764 (quoting *Nyunt*, 589 F.3d at 449).

---

[13] Indeed, the complaint consists mostly of allegations that Plaintiffs make on information and belief. *See* Compl. ¶¶ 131, 134, 142, 144, 146–47, 151–52, 160, 163, 169, 172–73, 178, 182, 184, 188–89, 191, 194, 196–98, 204, 207, 209, 212–13, 215, 219, 222–24, 228–30, 233, 235–37, 241, 245, 247, 249, 253, 255, 258, 260–64, 268, 271–72, 278, 283–85, 288, 305–06, 310, 341.

Plaintiffs' *ultra vires* claim is defective because they fail to identify any specific statute in the portion of their Complaint setting forth their *ultra vires* claim itself. This inherently fails to meet the D.C. Circuit's requirements for such a claim. *Id.*

Nor can Plaintiffs' claim succeed if they seek to ground their claim in the allegation that 5 U.S.C. § 3161 provides no authorization for "DOGE's actions" and "does not provide an independent legal basis for the creation of any temporary organization." Compl. ¶ 116. This legal conclusion is wrong. Section 3161—the temporary organization statute—defines a "temporary organization" as one that is "established by law or Executive order for a specific period not in excess of three years for the purposes of performing a specific study or other project." 5 U.S.C. § 3161(a)(1). Pertinently, in accordance with Section 3161, Executive Order 14,158 established the U.S. DOGE Service Temporary Organization and "dedicated" that entity "to advancing the President's 18-month DOGE agenda" and to "maximize governmental efficiency and productivity." USDS E.O. §§ 1, 3(b). Thus, the executive order establishing the U.S. DOGE Service Temporary Organization facially satisfies the plain terms of Section 3161.

And as for the rest of Defendants' alleged operations, Plaintiffs offer no basis for why an initiative to streamline the work of government cannot constitute a permissible "project" under Section 3161. Indeed, this statute served as the basis for facilitating the reconstruction of Iraq. *See, e.g.*, *Establishment of Temporary Organization To Facilitate United States Government Assistance for Transition in Iraq*, Exec. Order No. 13,431 § 2, 72 Fed. Reg. 26,709 (May 8, 2007) (establishing a temporary organization "to perform the specific project of supporting executive departments and agencies in concluding remaining large infrastructure projects expeditiously in Iraq, in facilitating Iraq's transition to self-sufficiency, and in maintaining an effective diplomatic presence in Iraq"). Whatever policy disagreements Plaintiffs may have with the work USDS is allegedly performing—such as the alleged zero-based budget analysis work here—there can be no serious doubt that such work falls comfortably within section 3161's capacious "other project" language. Indeed, Mirriam Webster's dictionary defines "project" as "a specific plan or design," and "a planned undertaking; such as" "a large usually government-supported undertaking." *Project*, Merriam-Webster.com, https://www.merriam-

webster.com (last visited May 5, 2025). Certainly, the implementation of "the President's DOGE Agenda," which includes "modernizing Federal technology and software to maximize governmental efficiency and productivity," USDS E.O. § 1, falls squarely within the broad definition of "other project." For example, when taking Plaintiffs' allegations as true that "Defendants are engaged in a zero-based budgeting process that involves analyzing the federal budget and federal spending for substantive cuts[,]" by "us[ing] . . . artificial intelligence[,]" Compl. ¶ 324, such work is consistent with the Section 3161's plain text, and Plaintiffs cite no other authority that forbids the President or his advisors from undertaking that sort of data-driven policy analysis. Indeed, Plaintiffs appear to challenge activity that is not prohibited by law for *anyone* to conduct, such as to "substantively analyze federal spending," *id.* ¶ 113, "perform or review audits of federal agency spending," *id.* ¶ 126, or "engage in zero-based budgeting," *id.* ¶ 150. Numerous private organizations can, and do, analyze federal spending to identify potential areas to be adjusted, and of course the President and his advisors can, and may, identify policy priorities and areas of government that they believe can and should be cut, particularly given the President's role in the federal budgeting process and Constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see* 31 U.S.C. § 1104(a) ("The President shall prepare budgets of the United States Government . . . .")

Plaintiffs, therefore, facially fail to show they can satisfy the requirements to prevail on their *ultra vires* claim, including the "especially demanding" third requirement. *Changji Esquel Textile Co.,* 40 F.4th at 722. Thus, their *ultra vires* claim should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

Dated: May 6, 2025                    Respectfully submitted,

                                      YAAKOV M. ROTH
                                      Acting Assistant Attorney General

                                      DIANE KELLEHER
                                      Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

JOSHUA E. GARDNER (FL Bar No. 302820)
Special Counsel

/s/ *Christopher M. Lynch*
CHRISTOPHER M. LYNCH
(DC Bar No. 1049152)
GARRY D. HARTLIEB (IL Bar. No. 6322571)
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
(202) 353-4537
christopher.m.lynch@usdoj.gov

*Attorneys for Defendants*

45