## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>ELON MUSK, *et al.*,<br><br>　　　　　　　　Defendants. | Civil Action No. 25-429-TSC (Lead) |
| JAPANESE AMERICAN CITIZENS LEAGUE, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>ELON MUSK, *et al.*,<br><br>　　　　　　　　Defendants. | Civil Action No. 25-643-TSC |

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS JACL PLAINTIFFS' COMPLAINT

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Miriam Becker-Cohen (DC Bar No. 1616670)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF *AMICUS CURIAE* ....................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

ARGUMENT ........................................................................................................................... 4

I. Under the Appointments Clause and Foundational Separation of Powers Principles, the President Has No Power to Unilaterally Create Offices .............. 4

  A. As Constitutional Text and Structure Make Clear, Congress Has the Authority to Establish Offices "By Law," Limiting the Presidential Role in Office-Creation to Recommendation and Veto ............................ 4

  B. Seeking to Break with the British Model and Stave Off Tyranny and Corruption, the Framers Separated the Power to Create Offices from the Power to Fill Them .............................................................................. 8

II. Unilateral Executive Establishment of an Office Is a Substantive *Violation* of the Appointments Clause, not an *Exemption* from the Clause ............................. 15

CONCLUSION ....................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................................ 4, 7, 16, 20

*Does 1-26 v. Musk*,
--- F. Supp. 3d ---, No. CV 25-462-TDC, 2025 WL 840574
(D. Md. Mar. 18, 2025) ............................................................................... 16, 18, 19

*Does 1-26 v. Musk*,
No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ............................... 17-19

*Edmond v. United States*,
520 U.S. 651 (1997) .............................................................................................. 8

*Freytag v. Comm'r*,
501 U.S. 868 (1991) ...................................................................... 1, 4, 8, 12, 18

*INS v. Chadha*,
462 U.S. 919 (1983) .............................................................................................. 6

*Landry v. FDIC*,
204 F.3d 1125 (D.C. Cir. 2000) ......................................................................... 17, 18

*Lucia v. SEC*,
585 U.S. 237 (2018) ........................................................................................ 4, 18-20

*Morrison v. Olson*,
487 U.S. 654 (1988) .............................................................................................. 16

*Myers v. United States*,
272 U.S. 52 (1926) ................................................................................................ 7

*Powell v. McCormack*,
395 U.S. 486 (1969) .............................................................................................. 10

*State v. Kennon*,
7 Ohio St. 546 (1857) ........................................................................................... 21

*Trump v. United States*,
603 U.S. 593 (2024) ................................................................................. 8, 12, 14, 16

*Tucker v. Comm'r*,
676 F.3d 1129 (D.C. Cir. 2012) ................................................................... 17, 18, 20

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)...................................................................................................  20

*United States v. Germaine*,
  99 U.S. 508 (1878)...................................................................................................  19

*United States v. Maurice*,
  26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) ...................................  3, 4, 15, 17

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915)...................................................................................................  6

*Weiss v. United States*,
  510 U.S. 163 (1994)...................................................................................................  12

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)...................................................................................................  7


CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

An Act to Establish an Executive Department to Be Denominated the Department of War,
  ch. 7, 1 Stat. 49 (1789) ..............................................................................................  14

An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65 (1789) ...............................  14

The Declaration of Independence (U.S. 1776) .......................................................  2, 11

Regency Act of 1705, 4 & 5 Anne. c. 8 ..................................................................................  9

U.S. Const. art. I, § 1, cl. 1.......................................................................................  6

U.S. Const. art. I, § 6, cl. 2.......................................................................................  7

U.S. Const. art. I, § 7................................................................................................  6

U.S. Const. art. I, § 8, cl. 18.....................................................................................  7

U.S. Const. art. II, § 2, cl. 2 ...................................................................................  1, 3-6

U.S. Const. art. II, § 3 ..............................................................................................  6

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

OTHER AUTHORITIES

Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967) ...................... 10

William Blackstone, *Commentaries on the Laws of England* ............................... 8, 10

Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*,
79 Cornell L. Rev. 1045 (1994) ..................................................................... 8-11

Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*,
132 U. Pa. L. Rev. 741 (1984) ........................................................................ 6

James Durling & E. Garrett West, *Appointments Without Law*,
105 Va. L. Rev. 1281 (2019) ........................................................................ 5

*The Federalist No. 69* (Clinton Rossiter ed., 1961) ................................................ 3, 13

John Jay, Address to the People of Great Britain (Sept. 5, 1774), *in* 1 *The Correspondence and Public Papers of John Jay* (Henry P. Johnston ed., New York, G.P. Putnam's Sons 1890) ...................................................................................... 10

David Lindsey Keir, *The Constitutional History of Modern Britain Since 1485*
(9th ed. 1969) ...................................................................................... 2, 9

Letter from Alexander Hamilton to George Washington, President of the U.S. (May 5, 1789), *Founders Online*, National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0128......................................................................................... 14

Letter from George Washington, President of the U.S., to the U.S. Senate (Sept. 11, 1789), *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-04-02-0011 ...................................................................................... 14

Jennifer L. Mascott, *Who Are "Officers of the United States?"*,
70 Stan. L. Rev. 443 (2018)........................................................................ 12

Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* (2020) .............................................................. 2, 9, 10, 13

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890).................. 20, 21

*Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73 (2007) ..................................................................... 20, 21

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ............................ 12, 13

Robert J. Reinstein, *The Limits of Executive Power*,
   59 Am. U. L. Rev. 259 (2009) ....................................................................................... 8-10

Goldwin Smith, *A Constitutional and Legal History of England* (1990) ............................... 10

*The Test for Determining "Officer" Status Under the Appointments Clause*,
   41 Op. O.L.C. __, slip op. (2025) ....................................................................................... 18

Thomas Pitt Taswell-Langmead, *English Constitutional History from the Teutonic
   Conquest to the Present Time* (4th ed. 1905) .................................................................... 9

E. Garrett West, *Congressional Power over Office Creation*,
   128 Yale L.J. 166 (2018) ............................................................................................. 7, 11, 14

Gordon S. Wood, *The Creation of the American Republic 1776-1787* (1969) ............... 2, 10-12

David S. Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of
   Punctuation in the Constitution*,
   79 Tenn. L. Rev. 687 (2012) ................................................................................................ 5

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' construction of the Appointments Clause guts that critical constitutional provision. In their view, the fact that Elon Musk does not occupy an office "established by Law" is a *defense* to Plaintiffs' Appointments Clause claim. That gets it backwards. The President's unilateral creation of Musk's office—the head of DOGE—is a substantive *violation* of the Appointments Clause separate and apart from the fact that Musk was not appointed in accordance with the procedures mandated by that Clause.

The text of the Appointments Clause makes this clear. The Clause prescribes two distinct requirements. First, except for offices created by the Constitution itself, all other offices of the United States "*shall* be established *by Law*." U.S. Const. art. II, § 2, cl. 2 (emphases added). Second, once Congress creates an office, the President may fill that office only "with the Advice and Consent of the Senate," unless Congress prescribes "by Law" a streamlined appointment process, available only for "inferior Officers." *Id.* Violation of either of those requirements is a violation of the Appointments Clause and the fundamental "principle of separation of powers . . . embedded in [it]." *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991).

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties in the consolidated cases consent to its filing.

1

The separation of the power to create offices from the power to fill them was born out of centuries of suffering under the rule of a British monarch.  It was well-known in seventeenth- and eighteenth-century England that the consolidation of these powers in the Crown was the chief source of corruption and patronage that plagued British government.  The King could effectively control the lawmaking process by creating lucrative offices and offering them up to influential Members of Parliament, in exchange for votes on his favored policies.  "Even the least important appointments in the gift of the Crown were gradually drawn into this system for inducing political support by offering material rewards."  David Lindsey Keir, *The Constitutional History of Modern Britain Since 1485*, at 328 (9th ed. 1969).

As backlash against this patronage system grew in England, the resistance also traveled across the Atlantic.  Colonists were intimately familiar with Opposition writings describing corruption and abuses of power spurred by royal control of all offices.  They also saw the same corruption taking root in the colonies through the influence of royal governors.  This grievance justified their call for independence: the King had "erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance."  The Declaration of Independence para. 12 (U.S. 1776).

"Because of its connection to the 'corruption' and 'influence' so decried by the founding generation," early Americans "made certain that the American executive would have no such power."  Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 153 (2020).  In rejection of the British model, all the early state constitutions vested the power to create offices in the legislature, and many also gave the legislature unilateral appointment authority.  *See* Gordon S. Wood, *The Creation of the American Republic 1776-1787*, at 148 (1969).

2

But before long, the Founders recognized that consolidation in the legislature of the power both to create offices and to fill them posed nearly as many problems as consolidation of those powers in the executive. They thus separated those powers in the text of the Appointments Clause. By giving the President the power of appointment over only those offices "established by Law," U.S. Const. art. II, § 2, cl. 2, the Constitution provides "a great inferiority in the power of the President, in this particular, to that of the British king," who "not only appoint[ed] to all offices, but [could] create offices" as well. *The Federalist No. 69*, at 421 (Clinton Rossiter ed., 1961) (Alexander Hamilton).

Defendants would write this check on executive power out of the Constitution, allowing the President to create as many powerful offices as he likes—and to fill them with individuals purely of his own choosing. In their view, a person may be deemed an "officer" subject to the Appointments Clause's strictures only if his or her position was "established by Law." In other words, *violation* of the "established by Law" requirement of the Appointments Clause—*i.e.*, through unilateral presidential creation of a powerful office—would amount to an *exemption* from liability under that very constitutional provision.

Chief Justice Marshall rejected this circular reading of the Appointments Clause two centuries ago, in the very first judicial interpretation of the Clause, when he declared that the Appointments Clause's requirements are not limited to only "those offices . . . established by law." *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (No. 15,747). Such a narrow interpretation of the Clause, Marshall reasoned, would "leav[e] it in the power of the executive . . . to create in all laws of legislative omission, such offices as might be deemed necessary for their execution, and afterwards to fill those offices," and thus would be inconsistent "with the general

spirit of the constitution, which seems to have arranged the creation of office among legislative powers." *Id.*

Controlling case law is consistent with *Maurice*. To be sure, the Supreme Court has frequently scrutinized the text of statutes establishing government positions to help determine whether the individuals filling those positions qualify as "Officers" within the meaning of the Constitution, *see, e.g.*, *Lucia v. SEC*, 585 U.S. 237, 245 (2018); *Buckley v. Valeo*, 424 U.S. 1, 137-39 (1976) (per curiam), but the Court has never held that the absence of a statutorily established office immunizes an officer from an Appointments Clause claim.

Indeed, none of the cases Defendants cite grapple with the issue presented here: a double-barreled assault on *both* of the Appointments Clause's substantive requirements. The novelty of the Trump administration's violation of the Clause should give rise to close judicial scrutiny, not newfangled immunity.

## ARGUMENT

I.     **Under the Appointments Clause and Foundational Separation of Powers Principles, the President Has No Power to Unilaterally Create Offices.**

A.     **As Constitutional Text and Structure Make Clear, Congress Has the Authority to Establish Offices "By Law," Limiting the Presidential Role in Office-Creation to Recommendation and Veto.**

"The structural principles embodied in the Appointments Clause do not speak only, or even primarily, of Executive prerogatives simply because they are located in Article II." *Freytag*, 501 U.S. at 880. Rather, the text of the Clause imposes important limits on executive authority by creating two distinct requirements. *First*, before a person may be appointed an "Officer of the United States," Congress must create the office through the lawmaking procedures prescribed by the Constitution (unless the Constitution itself has already established the office). U.S. Const. art. II, § 2, cl. 2. *Second*, once Congress has created an office, the President may appoint someone to

fill that office only with the advice and consent of the Senate, unless, in the case of an inferior

officer, Congress—again, through the constitutionally prescribed lawmaking process—enacts a

statute authorizing appointment by the President alone, by a federal court, or by the head of a

department. *Id.* In light of these separate requirements, a court may find a substantive Appoint-

ments Clause or separation-of-powers violation arising out of the President's unilateral creation of

an office (in violation of the first requirement) without even reaching the question of whether the

officer was appointed in accordance with the required procedures (under the second requirement).

Examination of the full text and structure of the Appointments Clause in context makes

this clear:

> [The President] shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of
> the supreme Court, and *all other Officers of the United States, whose Appointments
> are not herein otherwise provided for,* and *which shall be established by Law*: but
> the Congress may by Law vest the Appointment of such inferior Officers, as they
> think proper, in the President alone, in the Courts of Law, or in the Heads of De-
> partments.

*Id.* (emphases added). The second-emphasized phrase, "which shall be established by Law," mod-

ifies, at a minimum, the first-emphasized phrase, "all other Officers of the United States[] whose

Appointments are not herein otherwise provided for."[2]  It operates as a non-restrictive clause—

meaning, a clause that provides additional information about those "other Officers of the United

States." *See* David S. Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of

Punctuation in the Constitution*, 79 Tenn. L. Rev. 687, 723-25 (2012) (describing the Framers'

---

[2] The question of whether "established by Law" *also* modifies the enumerated offices of
"Ambassadors, other public Ministers and Consuls, [and] Judges of the Supreme Court," U.S.
Const. art. II, § 2, cl. 2, is grammatically unclear and unsettled as a matter of practice, *see generally*
James Durling & E. Garrett West, *Appointments Without Law*, 105 Va. L. Rev. 1281 (2019), but
it is not implicated in this case because everyone agrees that *if* Musk is an officer, he fits into the
residual category as an "other Officer of the United States," not a diplomat or Supreme Court
justice.

usage of restrictive and non-restrictive clauses).  The drafters of the Constitution used this type of clause frequently to create mandates, like in the Legislative Vesting Clause, declaring that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, *which shall* consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1, cl. 1 (emphasis added).

Indeed, the word "shall," as in "shall be established by Law," notably contrasts with the Inferior Officers Clause, which states that Congress "*may* by Law" provide for the appointment of inferior officers by "the President alone," the "Courts of Law," or "the Heads of Departments."  *Id.* art. II, § 2, cl. 2 (emphasis added).  Throughout the Constitution, "shall" conveys an obligation, while "may" confers discretion.  *See, e.g.*, Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U. Pa. L. Rev. 741, 782-86 & n.147 (1984) (cataloging the uses of "shall" and "may" in the Constitution).  The juxta-position of "shall" and "may" within the Appointments Clause underscores the deliberateness of the Framers' choice to make the office-creation power exclusively Congress's.  While the Framers were willing to delegate (though notably, only to Congress itself) the decision of whether to pre-scribe a streamlined appointment process for inferior officers, they left no room for discretion with respect to Congress's paramount and exclusive role in the office-creation process.

The two words "by Law" expressly trigger the Constitution's requirements for the lawmak-ing process, *see* U.S. Const. art. I, § 7, which must "be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment that the Fram-ers selected, *INS v. Chadha*, 462 U.S. 919, 951 (1983).  Thus, while the President can recommend that Congress create an executive office, U.S. Const. art. II, § 3, and he can veto a congressional effort to create one, *id.* art. I, § 7, cl. 2, he has no power to establish an executive office on his own, for the Constitution simply "does not confer upon him any power to enact laws," *United States v.*

*Midwest Oil Co.*, 236 U.S. 459, 505 (1915); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

The text of the Ineligibility Clause and the Necessary and Proper Clause underscores this point. The Ineligibility Clause provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl. 2. The Clause contemplates that Congress will establish offices and "annex[] a compensation" to them, *Myers v. United States*, 272 U.S. 52, 128 (1926), and its express purpose is to reduce the incentive for members of Congress to create offices with the hope of being appointed to them.

Meanwhile, the Necessary and Proper Clause grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power authorizes Congress to pass laws "augmenting and channeling the powers of the executive and judicial branches." E. Garrett West, *Congressional Power over Office Creation*, 128 Yale L.J. 166, 177 (2018); *see Buckley*, 424 U.S. at 138 (per curiam). This in turn reinforces the structural principle that "*Congress* should be first among equals in the construction and definition of the federal government." West, *supra*, at 178.

The President thus has no unilateral authority to create offices where Congress has not done so by statute. Constitutional text and structure guard against "the danger" posed by such executive

"aggrandiz[ement] [of] power at the expense of another branch." *Freytag*, 501 U.S. at 878. In so doing, they further the foundational principle of separation of powers reflected in the Appointments Clause, ensuring that the Clause remains a "significant structural safeguard[] of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997).

**B.      Seeking to Break with the British Model and Stave Off Tyranny and Corruption, the Framers Separated the Power to Create Offices from the Power to Fill Them.**

**1.** The textual "limitation on the President's power to create offices grew out of the Founders' experience with the English monarch." *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J., concurring). In the seventeenth and eighteenth centuries, British Kings had used their royal prerogatives both to create government offices and to fill them, all without the oversight of Parliament. *See* 1 William Blackstone, *Commentaries on the Laws of England* *272 ("[A]s the king may create new titles, so may he create new offices."). The result was the emergence of a royal patronage system with an overwhelming influence on "the conduct of politics in seventeenth- and eighteenth-century England." Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 Cornell L. Rev. 1045, 1053 (1994). While a "whole generation of young men went to Parliament with the express purpose of making their fortunes by obtaining an office," the Crown exercised near-total control over the lawmaking process. *Id.* For instance, when a majority of the House of Lords did not support her foreign policy agenda, Queen Anne simply created and filled twelve new peers to effectively establish a majority supportive of her efforts. Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 289 (2009). The ruling monarchs repeatedly garnered support for their policies by promoting influential Members of Parliament to newly created ministerial offices, or even just "dangling the prospect of a lucrative office." Calabresi & Larsen, *supra*, at 1053.

After the Glorious Revolution, Parliament made several attempts to insulate itself and the judiciary from the corrupting influence of the King, *e.g.*, Regency Act of 1705, 4 & 5 Ann. c. 8 §§ 24, 25 (requiring new ministers appointed from Parliament to stand for reelection), but none were especially successful, *see* Calabresi & Larsen, *supra*, at 1056. Instead, the patronage system persisted for years because it arguably operated efficiently and brought riches to the kingdom. *See, e.g.*, Keir, *supra*, at 297 ("The whole system operated with remarkable effect. No king had to resort to the royal veto, never employed after Anne in 1708.").

That all changed, however, with the "disastrous results" of George III's reign. Reinstein*, supra*, at 291. By the time of George III's ascent, nearly 200 members of the House of Commons enjoyed separate offices under the Crown. McConnell, *supra*, at 153. Through "his meddlesome energy and restless activity in regulating every affair of State from the greatest to the least, combined with a resolute obstinacy in enforcing his own views against the opinions of his Constitutional advisers, [George III] succeeded in alienating the affections of his people" and in "reducing the nation from prosperity to the depths of adversity." Thomas Pitt Taswell-Langmead, *English Constitutional History from the Teutonic Conquest to the Present Time* 723 (4th ed. 1905). Before long, "[a]ll of the parties in England understood that the appointment, removal, and related prerogatives were the source of the King's power," as well as all the abuses attendant to it. Reinstein, *supra*, at 291.

The opposition in England grew swiftly and vocally. People were "disgusted by the amount of corruption in the government and . . . fearful of the concentration of power in the Crown," which they "saw as destroying the necessary balance of powers in the British Constitution and violating [their] liberties." *Id.* High-profile exposés filled the newspapers, as the people of England decried "the various methods by which the king and his ministers could persuade a majority of the

members of Parliament to vote for government measures . . . [with] appeal . . . to men hungry with ambition or greed or both."  Goldwin Smith, *A Constitutional and Legal History of England* 396 n.1 (1990); Calabresi & Larsen, *supra*, at 1054 ("[P]arliamentary corruption was the 'obsessive concern' of both the left and right in eighteenth century England, and the opposition literature from both ends of the political spectrum hurled invective at the corrupting system of royal influence." (quoting Bernard Bailyn, *The Ideological Origins of the American Revolution* 48 (1967))).

**2.**  This outrage made its way across the Atlantic and "left an indelible impression on American memories."  Calabresi & Larsen, *supra*, at 1057; *see also, e.g.*, Reinstein, *supra*, at 292 ("From these opposition writings, as well as from first-hand observations by colonial visitors to London, the colonists knew of the widespread corruption and consolidation of power in England."); McConnell, *supra*, at 153 ("The Oppositionist literature so popular among American patriots regarded this corruption as having undermined the mixed, or balanced, British constitution praised by Blackstone and Montesquieu, and considered the result as approaching something like an absolute monarchy." (quotation marks omitted)); *Powell v. McCormack*, 395 U.S. 486, 527-31 (1969) (describing the corruption that led to the expulsion of John Wilkes from the House of Commons and how his case "became a cause célèbre for the colonists").

At the same time, the colonists experienced the perils of the patronage system firsthand: with an ocean between them and any prospect of accountability, the Royal Governors of the colonies were "unrestrained in their ability to wield the 'insidious and powerful weapon' of patronage to buy support for the Crown."  Calabresi & Larsen, *supra*, at 1057 (quoting Wood, *supra*, at 143). John Jay wrote of these officials: "We might tell of dissolute, weak, and wicked governors having been set over us; . . . of needy and ignorant dependants on great men advanced to the seats of justice, and to other places of trust and importance."  John Jay, Address to the People of Great

Britain (Sept. 5, 1774), *in* 1 *The Correspondence and Public Papers of John Jay* 17, 26 (Henry P. Johnston ed., New York, G.P. Putnam's Sons 1890).

Alongside their fears of this growing "artificial inter-colonial aristocracy," Wood, *supra*, at 111, the colonists worried that consolidation of the power to create offices and the power to fill them had created an unbalanced structure of power in the colonies whereby the legislatures were wholly dependent on the executive branch, *see* West, *supra*, at 194; Calabresi & Larsen, *supra*, at 1055-57. Governors of the colonies had "used their power to influence and control the other parts of the constitution" by "appointing [representatives] to executive or judicial posts, or by offering them opportunities for profits through the dispensing of government contracts and public money." Wood, *supra*, at 156-57. This grievance justified the colonists' call for independence. As they wrote in the Declaration of Independence, the King had "erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance." The Declaration of Independence para. 12.

Early state constitutions thus took pains to limit executive power with respect to office-creation and appointment. Indeed, every single one vested the power to create offices in a legislative body. Calabresi & Larsen, *supra*, at 1058. Most states also granted their legislatures the appointment power, at least with respect to the highest offices, Wood, *supra*, at 148 n.41 (citing Delaware and Virginia as examples), while others kept the appointment power separate from the office-creation power by vesting the former in the executive branch, *id.* (citing Maryland and Pennsylvania as examples).

Giving the legislature the power both to create offices and to fill them was not without its own problems. The same corruption that had resulted from consolidation of those powers in the Crown took root anew in the fledgling states, becoming "the principal source of division and

faction" within them. Wood, *supra*, at 407; *see, e.g.*, *Weiss v. United States*, 510 U.S. 163, 184 (1994) (Souter, J., concurring) (describing the combination of both powers in the legislative branch as an "overcorrection"); *Freytag*, 501 U.S. at 904 (Scalia, J., concurring in part and concurring in the judgment) ("The Framers' experience with post revolutionary self-government had taught them that combining the power to create offices with the power to appoint officers was a recipe for legislative corruption.").

Thus, when the delegates gathered in Philadelphia to draft a new Constitution, they "could draw on their experiences with two flawed methods of appointment." *Weiss*, 510 U.S. at 184 (Souter, J., concurring). The answer was a middle ground: the separation of the power to create offices from the power to fill them, along with a default method of appointment that would involve both the legislative and executive branches. *See Trump*, 603 U.S. at 646 (Thomas, J., concurring) ("The Founders broke from the monarchial model by giving the President the power to *fill* offices (with the Senate's approval), but not the power to *create* offices."); Jennifer L. Mascott, *Who Are "Officers of the United States?"*, 70 Stan. L. Rev. 443, 492-93 (2018) (The Framers "addressed concerns about the King's ability to amass too much power by (i) permitting only limited mechanisms for appointing officers and (ii) imposing the constitutional requirement that new officer positions be 'established by Law' rather than through a King-like custom of the head magistrate unilaterally creating new offices.").

The structuring of the appointment power itself was the subject of significant debate at the Convention until Alexander Hamilton eventually suggested, 1 *The Records of the Federal Convention of 1787*, at 292 (Max Farrand ed., 1911), and Nathaniel Gorham formally proposed, 2 *id*. at 41, a system in which the executive would make appointments with the approval of the Senate. Some delegates had argued stridently for vesting the power in the Senate alone, 1 *id.* at 233 (James

Madison argued the Senators would be "sufficiently numerous to justify such a confidence in them"); 2 *id*. at 43 (Roger Sherman "was clearly for an election by the Senate"); 2 *id*. at 81 (Charles Pinckney "was for placing the appointmt. in the [Senate] exclusively"), while others had preferred that the President retain sole responsibility for appointments, *e.g.*, 2 *id.* at 41 (Nathanial Gorham and James Wilson "prefer[red] an appointmt. by the Executive").

Yet the idea that the power to *create* offices would be vested in Congress, through the lawmaking process, was subject to little debate. Indeed, there was no record of *any* delegate advocating for the British system of executive creation of offices. When the Committee of Detail's first draft omitted the "established by Law" language, James Madison and Charles Pinckney suggested the Necessary and Proper Clause be amended to give Congress the power to "establish all offices." 2 *id.* at 344-45. The amendment was rejected, but only because others "urged that [it] could not be necessary," as it was already implicit in the structure of the Constitution. 2 *id.* at 345. Ultimately, however, the substance of Madison's proposal was adopted in the Committee of Style, which added the phrase "and which shall be established by law" to the Appointments Clause. 2 *id.* at 628.

The result was a "double-barreled repudiation of any presidential prerogative power to create offices." McConnell, *supra*, at 154. As the Convention records indicate, the "Necessary and Proper Clause implicitly grant[ed] Congress the power to create offices," while the Appointments Clause expressly gave "the President power of appointment only over offices created 'by law.'" *Id.* The Constitution thus provides "a great inferiority in the power of the President, in this particular, to that of the British king"—a king who "not only appoint[ed] to all offices, but [could] create offices" as well. *The Federalist No. 69*, *supra*, at 421 (Alexander Hamilton).

**3.**  Early American practice and precedent by all three branches of government reflected the collective understanding that Congress must create offices by law before individuals wielding significant government authority reserved for officers could be appointed to them.  The First Congress "routinely and explicitly created offices by statute."  *Trump*, 603 U.S. at 646-47 (Thomas, J., concurring); *see, e.g.*, An Act to Establish an Executive Department to Be Denominated the Department of War, ch. 7, §§ 1-2, 1 Stat. 49, 49-50 (1789) (establishing offices of the Secretary of War and his Chief Clerk); An Act to Establish the Treasury Department, ch. 12, § 1, 1 Stat. 65, 65 (1789) (establishing offices of the Secretary of the Treasury, the Comptroller, the Auditor, the Treasurer, the Register, and Assistant to the Secretary).

And President Washington made it his practice to appoint officers only after their offices had been created by acts of Congress.  West, *supra*, at 189.  For instance, despite being in regular communication with Alexander Hamilton about government matters early in his term, *see, e.g.*, Letter from Alexander Hamilton to George Washington, President of the U.S. (May 5, 1789), *Founders Online*, National Archives, https://founders.archives.gov/documents/Hamilton/01-05-02-0128, Washington waited to nominate Hamilton as Secretary of the Treasury until shortly *after* Congress had passed a law creating the office, *see* 1 Stat. at 65 (establishing the Treasury Department); Letter from George Washington, President of the U.S., to the U.S. Senate (Sept. 11, 1789), *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-04-02-0011 (nominating Hamilton as Secretary of the Treasury nine days after the office was created by Congress).  Washington thus did not bestow upon Hamilton significant government authority until Congress had first passed a statute authorizing the exercise of such authority.

Not long thereafter, Chief Justice Marshall, while riding circuit, reaffirmed the exclusive commitment of the office-creation authority to Congress in the first ever judicial interpretation of

the Appointments Clause. *See Maurice*, 26 F. Cas. at 1213-14. In deciding whether James Maurice, appointed by the Secretary of War to perform the "important duties" of "a purchasing quartermaster, commissary, and paymaster," should be deemed an "officer of the United States" within the meaning of the Appointments Clause, Chief Justice Marshall grappled with two possible interpretations of the Clause. *Id.* at 1214. Under the first, the Appointments Clause would contain two distinct requirements: (1) that "all offices . . . shall be established by law," and (2) "that the president shall nominate, and by and with the consent of the senate, appoint to all offices of the United States, with such exceptions only as are made in the constitution." *Id.* at 1213. Under the second, the method of appointment of officers prescribed by the Appointments Clause would apply to "those offices only which might be established by law." *Id.* This extraordinarily narrow second reading permitted circumvention of the Appointments Clause through unilateral executive creation of an office—meaning a person wielding the authority of an "Officer of the United States" would be exempt from the requirements of the Appointments Clause if there were no statute creating his office. Marshall rejected the second reading as inconsistent "with the general spirit of the constitution, which seems to have arranged the creation of office among legislative powers," *id.*, and instead adopted the first reading, concluding that the Clause contained two distinct requirements: congressional-office creation, and presidential adherence to the proper method of appointment.

## II.    Unilateral Executive Establishment of an Office Is a Substantive *Violation* of the Appointments Clause, not an *Exemption* from the Clause.

In a remarkable repudiation of this well-established text and history, Defendants characterize Plaintiffs' acknowledgement that Musk does not occupy an office created by law as a "concession[]" that "doom[s] Plaintiffs' Appointments Clause claim." JACL MTD at 25, ECF No. 90, 25-cv-429. In Defendants' view, because Congress did not create Musk's office leading DOGE, Musk cannot possibly be an "Officer of the United States" subject to the requirements of the

Appointments Clause. This is precisely the circular interpretation of the Clause that Chief Justice Marshall rejected two centuries ago. It is equally wrong today.

As described above, the text of the Appointments Clause imposes two distinct requirements for "Officers of the United States": (1) Congress must establish their offices, and (2) they must be appointed in accordance with the requirements prescribed by the Clause. These requirements do not "merely deal[] with etiquette or protocol," *Buckley*, 424 U.S. at 125 (per curiam); rather, they respond to centuries of corruption and strife brought about by consolidation of the power to create and fill offices vested in the British monarch. "[S]eparation of the powers to create and fill offices" is thus an "'absolutely central guarantee of a just Government' and the liberty that it secures for us all." *Trump*, 603 U.S. at 650 (Thomas, J., concurring) (quoting *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting)).

Defendants' construction of the Appointments Clause would write the first requirement out of the Constitution and thus vitiate the separation of the office-creation and appointment powers. By deeming the establishment of an office by law a *requirement* for officer status, Defendants would convert a substantive violation of the Appointments Clause into an escape hatch. In every instance, the President could avoid compliance with the Appointments Clause by creating powerful offices by executive fiat. No high-powered government official would ever be subject to Senate confirmation simply because the President—rather than Congress—created his or her office. *Accord Does 1-26 v. Musk*, --- F. Supp. 3d ---, No. CV 25-462-TDC, 2025 WL 840574, at *15 (D. Md. Mar. 18, 2025) [hereinafter *Does I*] ("To deny Plaintiffs' Appointments Clause claim solely on the basis that, on paper, Musk has no formal legal authority relating to the decisions at issue, even if he is actually exercising significant authority on governmental matters, would open the

door to an end-run around the Appointments Clause."), *stayed on other grounds by Does 1-26 v.*

*Musk*, No. 25-1273, 2025 WL 1020995, at \*4 (4th Cir. Mar. 28, 2025) [hereinafter *Does II*].[3]

Chief Justice Marshall put this construction of the Clause to rest in *Maurice* when he

adopted the view that the Appointments Clause contains two distinct requirements:  (1) that "all

offices . . . shall be established by law," and (2) "that the president shall nominate, and by and with

the consent of the senate, appoint to all offices of the United States, with such exceptions only as

are made in the constitution."  26 F. Cas. at 1213.  Marshall refused to embrace the notion that the

Clause "le[ft] it in the power of the executive or of those who might be entrusted with the execution

of the laws, to create in all laws of legislative omission, such offices as might be deemed necessary

for their execution, and afterwards to fill those offices."  *Id.*  Rather, he declared that "*[i]f* . . .

[Maurice] be an officer of the United States, in the sense in which that term is used in the consti-

tution," *then* "his office ought to be established by law."  *Id.* at 1214 (emphasis added).  This

statement makes clear that the inquiry into whether a person is an "Officer of the United States"

subject to the Appointments Clause is separate from the inquiry into whether that person's office

is established by law.  The separation of these inquiries honors the fundamental separation-of-

powers principles built into the Appointments Clause and avoids "anomalous" results.  *Tucker v.*

*Comm'r*, 676 F.3d 1129, 1133 (D.C. Cir. 2012).

None of the cases Defendants cite help them on this point.  In *Landry v. FDIC*, 204 F.3d

1125 (D.C. Cir. 2000), the D.C. Circuit mentioned in a brief parenthetical discussing the Supreme

Court's decision in *Freytag* that whether an office is "established by Law" is a "threshold trigger

---

[3] Despite staying the District of Maryland's injunction, the Fourth Circuit did *not* endorse Musk's argument that his lack of formal statutory authority should be dispositive of the officer-status inquiry, *Does II*, 2025 WL 1020995, at \*4, and Judge Gregory affirmatively found that argument "unavailing," *id.* at \*14 (Gregory, J., concurring only in the result).

for the Appointments Clause." *Id.* at 1133. Notably, it was undisputed in both *Landry* and *Freytag* that the putative "officers" in those cases occupied positions "established by Law." *See Freytag*, 501 U.S. at 881; *Landry*, 204 F.3d at 1133. Thus, neither court had occasion to consider whether a person might still be deemed an "officer" subject to the Appointments Clause if his or her position were established unilaterally through *de facto* power bestowed by the President, rather than by statute. It is thus no surprise that the D.C. Circuit expressly disclaimed the *Landry dictum* cited by Defendants several years later. *See Tucker*, 676 F.3d at 1133 n.1 ("We read *Landry*'s reference to the 'established by Law' question as a 'threshold trigger,' to mean that such an inquiry may but need not be the start of an Appointments Clause analysis." (citation omitted)); *id.* at 1133 ("it would seem anomalous if the Appointments Clause were inapplicable to positions . . . merely because" Congress had not "formally created the positions"); *Does I*, 2025 WL 840574, at *15 (describing *Tucker*'s repudiation of *Landry* on this point); *Does II*, 2025 WL 1020995, at *14 (Gregory, J., concurring only in the result) (same).

Similarly, in *Lucia v. Securities and Exchange Commission*, 585 U.S. 237 (2018), the Supreme Court had no occasion to address the question of whether a President violates the Appointments Clause's requirement of congressional establishment of offices when he unilaterally creates an office and grants it significant government authority. Again, in *Lucia*, there was no question that the SEC's administrative law judges occupied offices established by law—all the parties "agree[d] on that point." *Id.* at 247; *accord The Test for Determining "Officer" Status Under the Appointments Clause*, 41 Op. O.L.C. __, slip op. at 3 n.2 (2025) (noting that the Supreme Court was "not focused" on the phrase "established by Law" in *Lucia* and subsequent cases). The plaintiffs in *Lucia* did not allege a violation of the Appointments Clause's requirement of congressional office-creation as Plaintiffs do here, *see* Compl. ¶ 334, ECF No. 1, 25-cv-643; rather, they merely

asserted a violation of the Appointments Clause's authorized method for appointments, *see Lucia*, 585 U.S. at 247-48.

In other words, what sets this case apart from the majority of Appointments Clause cases decided by courts in the past is that Plaintiffs allege violation of *both* of the Appointments Clause's substantive requirements: the requirement that Congress create offices by law, Compl. ¶ 334, and the requirement of Senate confirmation for all officers in the absence of an express statute authorizing a different manner of appointment, *id.* ¶¶ 332-33. As Defendants would have it, violation of the first requirement exempts them from application of the second. That cannot be.

To be sure, the Supreme Court has often examined the statute creating a putative office to assess whether a person is in fact an "Officer of the United States." After all, the first prong of the test for determining whether a person is an "Officer of the United States" asks whether a government official's position embraces "duties [that are] continuing and permanent," *United States v. Germaine*, 99 U.S. 508, 511-12 (1878), so where there *is* a statute creating the position under scrutiny, the text of the statute may provide evidence of the continuing nature of the position in the same manner that the text of the Executive Order creating DOGE may provide evidence of the continuing nature of Musk's position. *See Does I*, 2025 WL 840574, at *16 (DOGE executive order "contemplate[s] robust, ongoing duties for DOGE during [the prescribed] time period"); *Does II*, 2025 WL 1020995, at *16 (Gregory, J., concurring only in the result) (same). However, no case has ever held that a statute creating the position is *required* for the position to be continuing in the manner that the Appointments Clause contemplates for offices.

As for the second prong of the officer-status inquiry, again, the text of a statute establishing a government position may provide probative evidence of the significance of the government duties "exercis[ed]" by the holder of the position. *Lucia*, 585 U.S. at 245 (quotation marks omitted).

19

But the existence of a statute is not dispositive; rather, the "main criteria" are "(1) the significance of the matters resolved by the official[], (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker*, 676 F.3d at 1133; *see also Lucia*, 585 U.S. at 245 (inquiry into "significant authority . . . focus[es] on the extent of power an individual wields in carrying out his assigned functions"); *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (conducting "an appraisal of how much power an [Administrative Patent Judge] *exercises*" to conclude that such judges are principal officers under the Appointments Clause (emphasis added)).

For instance, in *Buckley*, the Court analyzed the statutory powers conferred on Federal Election Commissioners who had not been appointed in accordance with the Appointments Clause. 424 U.S. at 137-39 (per curiam). Noting that the statute "establish[ing]" the Commissioners' offices conferred "substantial powers," including the "discretionary power to seek judicial relief," the Court held that the Commissioners were "Officers of the United States." *Id.* at 138. But the Court did not treat the existence of a statute conferring substantial authority—as opposed to, say, presidential delegation of substantial authority—as a *requirement* for officer status. It simply grappled with the evidence presented in the specific case before it. Thus, "as *Buckley* and many other authorities . . . recognize, the source of any such authority, and particularly any statutory delineation by Congress, will unavoidably help to determine whether an office exists," but the "authority of a public officer" may be attached to the office by other means, including even "'by common law as incidents to it.'" *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 118-19 (2007) (quoting Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 570, at 332 (1890)).

At bottom, "[t]he Constitution requires an examination of 'the nature of the functions devolved upon' a position by legal authority, not the way or form in which they are devolved." *Id.*

at 118 (quoting *State v. Kennon*, 7 Ohio St. 546, 558 (1857)).  When the President unilaterally confers significant government authority on a continuing position sufficient to render it an office within the meaning of the Appointments Clause, he does so in derogation of that Clause and in violation of the fundamental separation of powers principles embedded in it.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss the JACL Plaintiffs' Complaint.

Dated:  May 28, 2025                                  Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Miriam Becker-Cohen (DC Bar No. 1616670)
CONSTITUTIONAL ACCOUNTABILITY CENTER
    1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Times New Roman font.

Executed this 28th day of May, 2025.

<u>/s/ Brianne J. Gorod</u>
Brianne J. Gorod

*Counsel for Amicus Curiae*