**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW MEXICO, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00429 (TSC) (Lead) |
| ELON MUSK, *in his official capacity*, et al., | |
| *Defendants.* | |
| JAPANESE AMERICAN CITIZENS LEAGUE, et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-00643 (TSC) |
| v. | |
| ELON MUSK, *in his official capacity*, et al., | |
| *Defendants.* | |

## <u>JAPANESE AMERICAN CITIZENS LEAGUE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND....................................................2

STANDARD OF REVIEW .......................................................................................3

ARGUMENT ..........................................................................................................3

I.      Plaintiffs Have Article III Standing. ..............................................................3

        A.      All Plaintiffs have alleged associational standing resulting from Defendants' cuts
                to federal services and funding upon which their members rely. ...........................4

                1.      Members of Plaintiff groups can demonstrate standing in their own right..4

                2.      Plaintiffs have met the other criteria for associational standing. ..............10

        B.      Sierra Club, JACL, and UCS also have organizational standing..........................11

        C.      Plaintiffs' and their members' harms are traceable Defendants' action and likely to
                be redressed by a favorable decision. .................................................................15

II.     Plaintiffs' Claims Are Not Precluded from Judicial Review. ...........................18

        A.      This Court has jurisdiction to hear Plaintiffs' claims relating to contracts and
                grants..............................................................................................................19

                1.      Plaintiffs' rights are based in the Constitution and federal statute, not any
                        grant or contract..................................................................................19

                2.      Plaintiffs seek injunctive and declaratory relief, not money damages.......21

        B.      This Court has jurisdiction to hear Plaintiffs' claims affecting government
                employees ........................................................................................................22

III.    Plaintiffs Have Stated Claims for Relief...........................................................25

        A.      Defendant Elon Musk is acting in violation of the Appointments Clause.............25

                1.      Mr. Musk is not shielded from the Appointments Clause by virtue of his
                        lawless assumption of executive power. ...................................................26

                2.      Plaintiffs have sufficiently alleged that Mr. Musk is wielding significant
                        authority. ...........................................................................................27

                3.      Mr. Musk occupies a continuing office......................................................29

        B.      The Complaint sufficiently alleges that Mr. Musk and DOGE have violated the
                separation of powers. .......................................................................................30

        C.      The Complaint sufficiently alleges that Mr. Musk and DOGE have acted without
                lawful authority...............................................................................................34

        D.      Plaintiffs have properly alleged a claim under the APA. .......................................37

1.    The APA provides a vehicle for Plaintiffs to challenge multiple forms of
      agency power, including the power exercised here. ...................................38

2.    Plaintiffs have challenged final agency action...........................................42

3.    Agency Defendants acted arbitrarily or capriciously or otherwise not in
      accordance with the law. ...........................................................................44

CONCLUSION..............................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*AIDS Vaccine Advocacy Coalition v. United States Department of State,*
  No. 25-00400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) .......................................35

*AIDS Vaccine Advocacy Coalition v. United States Department of State,*
  No. 25-0400, 2025 WL 1380421 (D.D.C. May 13, 2025) .....................................22

*American Bar Association v. U.S. Department of Justice,*
  No. 25-CV-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025).......................20, 21, 22

*American Federation of Government Employees, AFL-CIO v. Trump,*
  No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025)....................................35

*American Federation of Government Employees, AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ..................................................................................24

*\*American Federation of Labor & Congress of Industrial Organizations v. Department of Labor,*
  No. CV 25-339 (JDB), 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ...........5, 11, 16, 23, 24, 25

*American Federation of Teachers v. Bessent,*
  No. CV DLB-25-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025).............................38

*American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94 (1902).................36

*Americans for Safe Access v. Drug Enforcement Administration,*
  706 F.3d 438 (D.C. Cir. 2013) ...................................................................................3

*Andrade v. Regnery,* 824 F.2d 1253 (D.C. Cir. 1987)............................................28, 29

*\*Axon Enterprise, Inc. v. Federal Trade Commission,* 598 U.S. 175 (2023) .............22, 23, 24, 25

*Bennett v. Spear,* 520 U.S. 154 (1997).................................................................17

*Bowen v. Massachusetts,* 487 U.S. 879 (1988) ....................................................21, 22

*Bowsher v. Synar,* 478 U.S. 714 (1986) ..................................................................4

*Buckley v. Valeo,* 424 U.S. 1 (1976).......................................................................27

*Clapper v. Amnesty International USA,* 568 U.S. 398 (2013) ......................................7

*\*Crowley Government Services, Inc. v. General Services Administration,*
  38 F.4th 1099 (D.C. Cir. 2022) ..............................................................19, 20, 21, 22

*Dalton v. Specter,* 511 U.S. 462 (1994) .................................................................31

*De La Mota v. United States Department of Education,* No. 02 CIV. 4276 (LAP), 2003 WL
  21919774 (S.D.N.Y. Aug. 12, 2003)........................................................................42

*Department of Commerce v. New York,* 588 U.S. 752 (2019)......................................17

*Department of Education v. California,* 145 S. Ct. 966 (2025)....................................22

*Department of Homeland Security v. Regents of the University of California,*
  140 S. Ct. 1891 (2020).............................................................................................45

*Detroit International Bridge Company v. Government of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................41

*Edmond v. United States*, 520 U.S. 651 (1997)..................................................28

*Elgin v. Department of Treasury*, 567 U.S. 1 (2012) ...............................................23, 25

*\*Food and Drug Administration v. Alliance for Hippocratic Medicine* ("*FDA*"),
602 U.S. 367 (2024)..................................................11, 12, 13, 14, 17

*Federal Express Corporation v. United States Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022) ........................................................34

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010)..................................................23, 24

*Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991) .....................................26, 27

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (2000)..............4, 6, 7

*Healthy Gulf v. Burgum*, No. 23-CV-604 (APM), 2025 WL 928684 (D.D.C. Mar. 27, 2025)........5

*Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982)........................................12

*Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ........................................40

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988)............................10

*In re U.S. Office of Personnel Management Data Security Breach Litigation*,
928 F.3d 42 (D.C. Cir. 2019) ........................................................4

*Ingersoll-Rand Company v. United States*, 780 F.2d 74 (D.C. Cir. 1985) .....................................19

*International Brotherhood of Teamsters v. Transportation Security Administration*,
429 F.3d 1130 (D.C. Cir. 2005)........................................................4

*Kidwell v. Department of Army, Board for Correction of Military Records*,
56 F.3d 279 (D.C. Cir. 1995) ........................................................21, 22

*Landry v. Federal Deposit Insurance Corporation*, 204 F.3d 1125 (D.C. Cir. 2000) ...................26

*League of United Latin American Citizens v. Executive Office of the President*,
No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24, 2025)......................................5

*League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................14

*Lewis v. U.S. Parole Commission*, 743 F. Supp. 3d 181 (D.D.C. 2024) ........................................37

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)................17

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)..................................................39, 42

*Lucia v. Securities and Exchange Commission*, 585 U.S. 237 (2018)......................................26, 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)..................................................17

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990)..................................................39

*Marin Audubon Society v. Federal Aviation Administration*,
121 F.4th 902 (D.C. Cir. 2024) ........................................................34, 35

*Maryland Department of Human Resources v. Department of Health & Human Services,*
763 F.2d 1441 (D.C. Cir. 1985) ....................................................................................21

*Medical Imaging & Technology Alliance v. Library of Congress,*
103 F.4th 830 (D.C. Cir. 2024) ....................................................................................37

*Megapulse v. Lewis*, 672 F.2d 959 (D.C. Cir 1982) ........................................................19, 20

*Middle East Broadcasting Networks, Inc. v. United States*, No. 25-5150, 2025 WL 1378735
(D.C. Cir. May 7, 2025) ......................................................................................19, 33, 38

*Missouri Public Service Commission v. FERC*, 337 F.3d 1066 (D.C. Cir. 2003) .........................45

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................................................................28, 30

*National Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272 (D.C.
Cir. 2005) ......................................................................................................................42

*National Center for Manufacturing Sciences v. United States*, 114 F.3d 196 (Fed. Cir. 1997) .....22

*National Treasury Employees Union v. Vought*, No. CV 25-0381 (ABJ),
2025 WL 942772 (D.D.C. Mar. 28, 2025) ..................................................................13, 31, 33

*Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009) ...............19

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) .................................................................38, 40

*North Star Alaska v. United States*, 9 F.3d 1430 (9th Cir. 1993) .................................................22

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) .............................................41

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) .............................................21, 22

*\*People for the Ethical Treatment of Animals v. United States Department of Agriculture*
("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015) ................................................................11, 12, 14

*PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ..........35

*Prutehi Litekyan: Save Ritidian v. United States Department of Airforce,*
128 F.4th 1089 (9th Cir. 2025) ....................................................................................18

*Public Employees for Environmental Responsibility v. National Park Service*, No. CV 19-3629
(RC), 2021 WL 1198047 (D.D.C. Mar. 30, 2021) ..................................................................43

*Ramirez v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 7 (D.D.C. 2018) ...........38

*RELX, Inc. v. Baran*, 397 F. Supp. 3d 41 (D.D.C. 2019) ..............................................................3

*Rhode Island v. Trump,*
No. 1:24 cv 128 JJM LDA, 2025 WL 1303868 (D.R.I. May 6, 2025) .............................33, 40

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ..........................................................38, 40

*Rocky Ford Housing Authority v. United States Department of Agriculture,*
427 F. Supp. 118 (D.D.C. 1977) ....................................................................................31

*San Juan Audubon Society v. Veneman*, 153 F. Supp. 2d 1 (D.D.C. 2001) ...................................39

*Secretary of the Interior v. California*, 464 U.S. 312 (1984) ..........................................................4

*Sierra Club v. United States Department of the Interior*, 899 F.3d 260 (4th Cir. 2018) ...............17

*Spectrum Leasing Corporation v. United States*, 764 F.2d 891 (D.C. Cir. 1985)..........................21

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ........................................................6

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ......................................................6

*Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994) ....................................................23

*Travelers United, Inc. v. Hyatt Hotels Corporation*,
 No. 23-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ..............................................................10

*Trump v. United States*, 603 U.S. 593 (2024) ........................................................................32

*Tucker v. Commissioner of Internal Revenue,* 676 F.3d 1129 (D.C. Cir. 2012).....................26, 27

*Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1 (D.D.C. 2019)....................................................3

*United States v. Arthrex, Inc.,* 594 U.S. 1 (2021).......................................................................26

*United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022) ............................................................29

*United States v. Fausto*, 484 U.S. 439 (1988)............................................................................23

*United States v. Germaine*, 99 U.S. 508 (1878)..........................................................................29

*United States v. Hartwell*, 73 U.S. 385 (1867)............................................................................28

*United States v. Maurice*, 26 F.Cas. 1211 (Cir. Ct. D. Va. 1823)..............................................27

*Widakuswara v. Lake*,
 No. 1:25-CV-2390 (JPO), 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025)...............40, 42, 43, 44

*Widakuswara v. Lake*,
 No. 1:25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025).......................33, 38, 42

*Widakuswara v. Lake*,
 No. 25- 5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025).................................................18

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ..................................................5

*Woonasquatucket River Watershed Council v. USDA*,
 No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025)..............40, 43, 45

*Yaman v. United States Department of State*, 634 F.3d 610 (D.C. Cir. 2011)...............................37

*Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952) ..........................30, 31, 34

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ........................................................31

**Statutes, Rules, and Constitutional Provisions**

5 U.S.C. § 702.................................................................................................................37

5 U.S.C. § 704.................................................................................................................37

5 U.S.C. § 706.................................................................................................................37

5 U.S.C. § 3161...............................................................................................................35

18 U.S.C. § 202...............................................................................................................29

Fed. R. Civ. P. 12(b)(1)....................................................................................................3

Fed. R. Civ. P. 12(b)(6) ................................................................................3

U.S. Const. art. I, § 8, cl. 1 .........................................................................32

U.S. Const. art. I, § 9, cl. 7 .........................................................................32

U.S. Const. art. I, § 7, cl. 1 .........................................................................32

**Other Authorities**

*Bill Summary: Interior, Environment, and Related Agencies Fiscal Year 2025
    Appropriations Bill*, U.S. Senate Comm. on Appropriations (July 25, 2024),
    https://perma.cc/T52W-E3XF ...............................................................33

Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ...................2, 30

Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) .......................39

Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025) .....................39

H.R. 4366, 118th Cong. (2024) ..................................................................32

H.R. 9747, 118th Cong. (2024) ..................................................................32

Pub. L. 111-203, 124 Stat. 1376 (2010) .....................................................32

Pub. L. 117-169, 136 Stat. 1818 (2022) .....................................................33

Union of Concerned Scientists, Programs, https://www.ucs.org/about/programs. ........................14

## INTRODUCTION

Since January 20, 2025, Defendants Elon Musk and his organization, the U.S. DOGE Service, have sought to fulfill Mr. Musk's promise that DOGE act as a "wood chipper for bureaucracy." ECF No. 1, ¶ 193, No. 1:25-cv-00643 (Compl.). They have caused or directed the termination of thousands of federal employees, impairing vital government services, and they have cancelled or ordered the cancellation of a myriad of federal grants that fund important scientific research. As the Complaint carefully details, Mr. Musk and DOGE have done all this in violation of basic tenets of the rule of law. Mr. Musk has not been confirmed by the Senate but is nevertheless exercising substantial authority across the Government. No statute or Constitutional provision authorizes Mr. Musk and DOGE's activities, so their efforts to dismantle programs and departments established by Congress violate the separation of powers and are ultra vires. And to the extent that the agencies named as Defendants (Agency Defendants) are following these lawless directives, such actions violate the Administrative Procedure Act (APA).

Rather than confront any of these issues, Defendants offer the Court a litany of distractions, none of which have merit. *First*, all Plaintiffs have standing to pursue this action. They represent members across the country who have been injured by Defendants' lawless conduct. Moreover, Sierra Club, the Japanese American Citizens League (JACL), and Union of Concerned Scientists (UCS) have also suffered organizational harm. And while the Complaint includes sufficient allegations for this Court to find standing, Plaintiffs now produce various declarations from injured members of all four groups and a JACL chapter documenting those harms. *Second*, neither the Tucker Act nor federal employment law deprive this Court of jurisdiction to hear Plaintiffs' constitutional and APA claims. *Third and finally*, Plaintiffs have sufficiently alleged that Mr. Musk's conduct violates the Appointments Clause, that Musk and DOGE's work is contrary to

separation-of-powers doctrine and is ultra vires, and that Agency Defendants violate the APA by following their directives. Defendants' Motion to Dismiss, ECF No. 90 (Mot.) should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 2024, President-elect Trump announced that he would create a "Department of Government Efficiency" to "dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies," and which Mr. Musk would "lead." Compl. ¶ 60. Upon assuming office, President Trump signed the executive order "Establishing and Implementing the President's 'Department of Government Efficiency.'" Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). The order renamed an existing office within the Executive Office of the President "the U.S. DOGE Service," and created within it the U.S. DOGE Service Temporary Organization (collectively, DOGE).[1] The President has confirmed that Mr. Musk is indeed "in charge" of DOGE. Compl. ¶ 135.

Mr. Musk and DOGE have undertaken a broad and destructive mission to attack the infrastructure of the federal government. They have dismantled agencies, cut federal funding appropriated by Congress, and slashed the federal workforce. Compl. ¶ 64, 144, 151, 160, 172, 178, 191. These actions include massive cuts at the National Park Service (NPS), Compl. ¶¶ 219-227, U.S. Forest Service (USFS), Compl. ¶¶ 228-231, Bureau of Land Management (BLM), Compl. ¶ 232, National Oceanic and Atmospheric Administration (NOAA), Compl. ¶¶ 233-238, and many other agencies across the federal government. Compl. ¶¶ 239-263.

On March 5, 2025, Plaintiffs filed suit challenging Defendants' lawless exercise of power over federal spending and agencies. ECF No. 1. Plaintiffs' Complaint includes ultra vires and separation of powers claims against Defendants Musk, DOGE, and Gleason; an Appointments

---

[1] This definition includes Defendant Amy Gleason in her official capacity.

Clause claim against Mr. Musk; and an APA claim against federal Agency Defendants. On March 10, Plaintiffs moved for expedited discovery. ECF No. 11, 1:25-cv-00643. On March 20, the Court consolidated this case with *New Mexico v. Musk*, No. 25-cv-429 (D.D.C.). While the Court granted in part the *New Mexico* plaintiffs' motion for expedited discovery, ECF No. 12, that order was stayed by the D.C. Circuit in *In re Musk*, No. 25-5072. On May 27, the Court granted in part and denied in part a motion to dismiss the *New Mexico* Plaintiffs' complaint. ECF No. 93.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) may assert either a facial or factual challenge to subject-matter jurisdiction. *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 47 (D.D.C. 2019). Courts analyzing a facial challenge must accept the complaint's allegations as true and deny the motion if those allegations plausibly establish jurisdiction. *Id.* at 48. A court hearing a factual challenge "may consider materials outside of the pleadings." *Id.* at 47-48.

Under Rule 12(b)(6), a motion to dismiss "does not require a court to assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 6 (D.D.C. 2019) (citation omitted). Instead, the court must accept the allegations of the complaint as true, "construe[] all factual inferences in favor of the plaintiff," and deny the motion if the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (citations omitted).

## ARGUMENT

## I.    Plaintiffs Have Article III Standing.

All Plaintiffs have associational standing, and Sierra Club, JACL, and UCS have also demonstrated organizational injury. Each of these is independently sufficient to establish Plaintiffs' standing. *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013) ("[W]e need only find

one party with standing").[2] Defendants do not challenge Plaintiffs' theories of standing or their factual allegations. *See* Mot. at 7-15. Instead, their refrain is that Plaintiffs' pleadings are simply "insufficient," *id.* at 10, 11, 13, "vague," *id.* at 1, 9, 10, and "speculative," *id.* at 1, 7, 9, 12, 13. But Defendants can only make these claims by disregarding both Plaintiffs' allegations of concrete injury and the applicable pleading standard. Where, as here, "defendants challenge standing at the pleading stage without disputing the facts alleged in the complaint," the court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) (internal citations omitted). Plaintiffs easily meet this standard.

### A.    All Plaintiffs have alleged associational standing resulting from Defendants' cuts to federal services and funding upon which their members rely.

All Plaintiffs have demonstrated associational standing because they have alleged that (1) their members would have "standing to sue in their own right"; (2) the interests they seek to protect are germane to their organizational purposes; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005).

### 1.    Members of Plaintiff groups can demonstrate standing in their own right.

***Sierra Club.*** Sierra Club has alleged that at least one of its members has suffered an injury in fact that is traceable to the challenged actions of Defendants and is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81

---

[2] This Court held that State Plaintiffs in the consolidated case, *New Mexico v. Musk*, have standing to pursue their Appointments Clause and ultra vires claims. ECF No. 93 at 11-22. The one-plaintiff rule extends to parties in consolidated cases. *See Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) (applying this principle in litigation "instituted through separate but similar complaints"); *Bowsher v. Synar*, 478 U.S. 714, 715 (1986) (same).

(2000). The Complaint alleges that "Sierra Club members live, work, and recreate on and around lands managed by NPS, USFS, and BLM," Compl. ¶ 29, and that operation of many parks and forests on those lands are impacted by Defendants' actions. Compl. ¶¶ 300-01. These impacts include cancelled reservations, *id.* ¶ 31; degraded facilities, *id.* ¶ 31; guided tour cancellations, *id.* ¶ 223; reduced visitor center hours, *id.* ¶ 223; and significantly longer lines to enter parks, *id.* ¶ 223. Plaintiffs have thus alleged an injury-in-fact by "aver[ing] that [Sierra Club members] use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305-06 (D.C. Cir. 2013) (quoting *Laidlaw*, 528 U.S. at 183); *see also AFGE v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477, at *9 (N.D. Cal. May 9, 2025).

Defendants object that these members are "nowhere identif[ied] by name" in the Complaint, but accede that at the motion to dismiss stage, names are not necessary to "establish the identity" of the party suffering injury-in-fact. Mot. at 8 & n.3; *see also LULAC v. EOP*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *24 (D.D.C. Apr. 24, 2025) (noting Supreme Court permitted membership organization to establish standing without identifying members by name).

While Plaintiffs need not identify members with the specificity that Defendants demand, several declarations from named Sierra Club members describe specific plans to visit parks suffering from known service cuts due to Defendants' actions. *See, e.g.*, *Healthy Gulf v. Burgum*, No. 23-CV-604 (APM), 2025 WL 928684, at *5 (D.D.C. Mar. 27, 2025). For instance, Sierra Club member Mary Anne Kenworthy states she has plans to visit Grand Canyon National Park in September of this year, and has booked a hotel and paid over $3,000 in fees to a rafting company leading the trip. Ex. A, Kenworthy Decl. The park has *already* experienced significant staff cuts, leading to longer lines and uncertainty about hours and the conditions of trails. Compl. ¶¶ 6, 223.

Similarly, another member who takes an annual trip to Acadia National Park states they plan to visit this summer too, although the park has also already suffered from significant staff cuts. *See also* Ex. B, Doe 2 Decl. ¶¶ 9, 13-16; Compl. ¶ 295.[3] Plaintiffs have done far more than merely allege "'some day' intentions" to visit the parks managed by NPS, BLM, and USFS. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).[4]

**JACL**. JACL's mission includes the education of its members and the general public about Japanese American history. JACL leads educational visits for community partners and members to historic sites operated by NPS, in particular to Manzanar National Historic Site and Minidoka National Historic Site, where Japanese Americans were incarcerated during World War II. Compl. ¶¶ 5, 13, 15, 274. JACL members from across the country travel individually and participate in annual pilgrimages to an incarceration site, which typically garner between 150 and 500 attendees. Compl. ¶ 274.

JACL alleges that its members have suffered injury-in-fact because of Defendants' unlawful cuts to staff and services at these historic sites, which have degraded their members' recreational and educational experiences, and, in at least one case, reduced important services at Manzanar. *Laidlaw*, 528 U.S. at 183. As Plaintiffs allege, Mr. Musk and DOGE's actions have led to the firing of one of three regular park employees at Minidoka and two at Manzanar. Compl.

---

[3] These declarations allege actual harm as well as a "substantial risk" of additional future harm, either of which is sufficient. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

[4] Defendants cite *Summers*, 555 U.S. at 499, for the proposition that without "specific identification" of members, the court cannot "assure itself" that Sierra Club members will find "their recreation burdened" by Defendants' cuts. Mot. at 8-9. But associational standing in *Summers* rested upon the affidavit of one member that expressed only a "vague desire to return" to a location that might be affected by the regulations the group challenged. 555 U.S. at 496. The Complaint here alleges Sierra Club members "regularly visit" the national parks affected by Defendants' actions, and has been supplemented by declarations detailing members' specific plans to visit.

¶¶ 5, 278, 283. These cuts have and will continue to have concrete impacts on NPS staff services, including interpretative services, clean and usable bathrooms, and the safety, maintenance, and accessibility of the physical facilities. Compl. ¶¶ 279-280.

JACL members have described their plans to visit or make pilgrimages to these sites in 2025 and explained how the cuts to staff and services will affect their experiences. For instance, one member has stated that she organizes and chaperones a regular trip for fifth graders to Minidoka and the Cadillac Hotel, part of the Klondike Gold Rush National Historic Park. Ex. C, Doe 3 Decl. Because of staffing and services cuts—including the apparent termination of NPS's lease with the Cadillac Hotel—she made the "difficult decision" to cancel this year's fifth grade trip. *Id.* This member similarly was forced to cancel her own family's trip to Minidoka. *Id.*[5]

Since 2012, the JACL Chicago chapter has also run the Kansha Project, a four-day educational program that includes a trip to Manzanar, for Japanese Americans between ages 18 and 25 to connect with their cultural heritage and learn about the incarceration of Japanese Americans during World War II. Compl. ¶ 275. Participants engage in an in-depth examination of the Manzanar confinement site, including individualized small group tours and discussions led by NPS staff. Ex. D, Ozaki Decl. ¶ 4. NPS staff also provide Kansha participants with records of family members who were incarcerated at Manzanar and help organize a service project for participants, such as improving the Rose Gardens at Merritt Park, which were originally created by incarcerated Japanese Americans. *Id.* ¶ 13.

JACL Chicago was told on March 28, 2025 that the Manzanar site would not be able to

---

[5] Doe 3's cancellation was due to Defendants' actions at sites that were not merely "impeding" or "hypothetical," but that had *already* occurred. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). *Clapper*, by contrast, rested on a theory of future injury that relied on a "highly attenuated chain of possibilities" that required multiple "speculative" events by independent actors to occur before the challenged law might affect the plaintiffs. *Id.* at 410.

accommodate the Kansha Project's service project this year because of NPS resource constraints, the first interruption in this service project for over a decade. Ex. D, Ozaki Decl. ¶ 16. The Kansha Project participants will thus be deprived of this opportunity because of Defendants' cuts to the staff and funding at NPS historic sites. Mr. Musk and DOGE's actions have not simply "lessened" the "aesthetic and recreational values" of these sites for the declarants but eliminated longstanding JACL programs that would otherwise be available to its members. *See Laidlaw*, 528 U.S. at 183.

**UCS.** UCS is a nonprofit membership organization with more than 450,000 members and supporters who support its mission of advancing science-based decision-making in public policy, including in the federal government. Compl. ¶¶ 32-33. UCS members have standing because the funding cuts directed by Mr. Musk and DOGE at multiple agencies have terminated their existing federal grants as well as programs to which they had applied for future funding. Compl. ¶ 315.

For instance, the Complaint alleges that one UCS member, a Professor of Environmental Health Sciences, had a project shut down because Defendants caused the termination of their grant. Compl. ¶ 315. Defendants do not contest that loss of a government grant could constitute injury-in-fact, but again merely object that these allegations are "vague." Mot. at 10. Although this injury was adequately pled, the member declaration filed herewith further describes the termination of these grants and his concerns about further loss of funding. Ex. E, Doe 4 Decl. ¶¶ 4-6. The professor's institution was working on a two-year project to monitor air-quality improvements in Kigali, Rwanda, funded by a $75,000 USAID grant. *Id.* ¶ 4. In February 2025, their local partners received a stop-work order, and shortly after the professor received confirmation that the award had been suspended. *Id.* The professor's university also was slated to be a subcontractor on an air-quality research project funded by a separate EPA-administered grant; the professor attributes its halt to Defendants' actions. Ex. E, Doe 4 Decl. ¶ 7.

Plaintiffs also submitted a declaration from a research scientist who was injured when Mr. Musk and DOGE terminated their grant for a project concerning mental health, trauma, and equity in education. ECF No. 72-1, Doe 1 Decl. That three-year grant from the Department of Education (DOE) was terminated on February 10, 2025 before completion. *Id*. at ¶¶ 5-6. Although Mark Washington, DOE Deputy Assistant Secretary for Management and Planning, purportedly issued the termination notice, the document's metadata indicates it was authored by Brooks Morgan, who has been publicly identified as working for DOGE within DOE. *Id*. at ¶¶ 7-8.

Another UCS member who works as a CEO of a nonprofit organization focused on marine mammal conservation describes similar harms caused by Defendants. Ex. F, Doe 5 Decl. ¶ 1. For four years, their organization has regularly received competitive grant funding from NOAA for its work rehabilitating stranded marine mammals and collecting data for scientific research. *Id*. ¶ 4; *see also id*. ¶ 10. But following DOGE's cuts to NOAA's funding and staff, the CEO learned from contacts at NOAA that the entire project will likely not be funded at all this year, requiring them to devote two work weeks to pursuing replacement sources of funding. *Id*. at ¶¶ 4-5. In addition to the termination of current and future grant programs at NOAA, the CEO also fears the loss of access to NOAA information, experts, and other resources, such as a NOAA hotline from which their organization must obtain preauthorization for certain stranding responses. *Id*. at ¶ 8-9.[6]

*OCA*. OCA is a non-profit membership organization dedicated to advancing the well-being of Asian Americans, Native Hawaiians, and Pacific Islanders (AANHPIs), and to protecting access to education for AANHPI youth. Compl. ¶¶ 17-18. The Complaint alleges that at least one member

---

[6] Doe 5's organization has also lost access to a NOAA employee with expertise in fishing gear who had aided the organization's efforts to study whale stranding. Ex. F, Doe 5 Decl. ¶ 7. In February 2025, he was terminated as part of a reduction in force at NOAA, impeding the organization's work and forcing it to abandon a whale necropsy report that cannot now be finished. *Id*.

of OCA has suffered injury by losing an opportunity to fulfill a graduate school educational requirement because of federal funding cuts directed by Mr. Musk and DOGE. *Id*. ¶ 20. This OCA member began an internship at the Substance Abuse and Mental Health Services Administration (SAMHSA) in January 2025, but learned one month thereafter that she could not continue "due to a change in federal funding for the program." Ex. G, Doe 6 Decl. ¶¶ 17, 19, 20. The internship constituted a practicum requirement for the student's Master in Public Health program, and its cancelation jeopardizes the quality of her education. *Id.* ¶ 22, 24. The internship was also her sole source of income in the relevant period. *Id.* ¶ 23.

### 2. Plaintiffs have met the other criteria for associational standing.

The injuries suffered by Plaintiffs' members are traceable to the actions of Mr. Musk and DOGE, as well as the Defendant agencies, as argued in *infra* Part I.C. Defendants do not contest that Plaintiffs can show all other factors necessary for associational standing. Plaintiffs' asserted interests are clearly germane to their purposes. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). For instance, JACL is promoting its organizational mission by seeking to protect its members' access to NPS-operated historic sites that are central to the history of Japanese Americans in this country. Compl. ¶¶ 13, 221, 273-277. UCS seeks to ensure that its members maintain federal research grants and funding, as well as access to federal data and experts, which is important to its organizational purpose of promoting science-based public policy. Compl. ¶¶ 32-33. Nor do Plaintiffs' claims require the participation of individual members. Although cases seeking monetary relief may require the participation of members, *see Travelers United, Inc. v. Hyatt*, No. 23-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025), requests for "declaratory and injunctive relief" typically do not, *Hodel*, 840 F.2d at 53.

B.      **Sierra Club, JACL, and UCS also have organizational standing.**

Plaintiff groups have sufficiently alleged that Defendants' actions will both injure "the organization[s'] interest" and cause them to use their "resources to counteract that harm." *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

*Sierra Club.* Defendants' cuts to NPS, BLM, and USFS "directly affect[] and interfere[] with" Sierra Club's "core" mission, *FDA v. All. for Hippocratic Med.* (*FDA*), 602 U.S. 367, 395 (2024), i.e., to promote "[e]xploring, enjoying, and protecting America's wild places" for its members and the public. Compl. ¶ 6. One way Sierra Club advances its mission is operating facilities on or near national park land, including its Yosemite Conservation Heritage Center (Center) in the summer months. *Id.* ¶ 24. The Center is largely staffed by volunteers who come for a week at a time and camp in the park. *Id.* ¶ 297. The Center faces cuts to the basic NPS and USFS services and infrastructure that it relies on, including campground maintenance, emergency and public safety services, and building repair. *Id.* ¶¶ 31, 297-99. Defendants have also cut key Yosemite staff, including its only HVAC technician, its only locksmith, and a custodial worker who collects trash and cleans bathrooms. *Id.* ¶ 222.

Defendants assert that Sierra Club's allegations of imminent harm are "speculative and contingent," Mot. at 13, but the Center's activities have *already* been impacted by cuts to NPS staff and services. The Center director reports that their volunteer staffing schedule has been put in a "holding pattern" because of "uncertainty over whether campgrounds will be open and whether the park will be adequately staffed." Ex. H, McIntosh Decl. ¶ 5. She notes that one NPS employee is typically responsible for training dozens of Park volunteers, so "cutting NPS staff has cascading effects on our ability to host volunteers," *id*. ¶ 15; the Center will likely need to divert resources

from its programmatic activities to replace the volunteer training NPS previously had provided.[7]

Sierra Club also runs numerous trip programs, including its National Outings program of recreational and service trips to national parks and other lands under the jurisdiction of NPS, USFS, and BLM. Compl. ¶¶ 22, 23, 26. Sierra Club has planned at least twelve specific trips to national parks and forests currently experiencing known operational impacts, including to Grand Canyon National Park and Stanislaus National Forest, impairing the organization's ability to reliably and safely provide this important program. Compl. ¶¶ 6, 295. These outings face increased risk of cancellation, including loss of revenue, and participants face increased safety risks. Sierra Club staff have and will continue to divert their time away from standard trip planning and toward monitoring safety conditions and contacting remaining park staff for updates.

Defendants' cuts to staff and services at NPS and BLM parks and lands have thus not only "directly affected and interfered with [Sierra Club's] core business activities," *FDA*, 602 U.S. at 395, but have resulted in Sierra Club diverting its resources to make up the shortfall in services. *PETA*, 797 F.3d at 1094. This harm is not "simply a setback to the organization's abstract social interests"—it is a "concrete and demonstrable injury to the organization's activities . . . with [a] consequent drain on [its] resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

**JACL.** JACL has and will suffer organizational injury because of Defendants' cuts to services and staff in NPS-managed lands, in particular historic sites at which Japanese Americans were incarcerated during World War II. Compl. ¶¶ 5, 13. Defendants' actions diminish and block JACL programs at these sites, drain staff time and other resources that it has devoted to these

---

[7] As held in a different case challenging DOGE's operations, an organization need only show that its activities are "perceptibly impaired" by a Defendant's actions. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *11 (D.D.C. Apr. 16, 2025) (*AFL-CIO*) (quoting *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 40 (D.D.C. 2020)).

programs, and impede the organization's advancement of its mission to educate on and commemorate Japanese American history. *Id.* ¶¶ 273, 277-83.

As discussed *supra* at 7-8, the cuts to services have already deprived JACL's Chicago chapter of their annual service project at Manzanar. Defendants' actions have thus done far more than "interfere" with JACL's core activities, but in fact have effectively *eliminated* a long-standing organizational program that is central to its mission. Compl. ¶¶ 274-75. They have also required JACL Chicago to devote significant time and resources to adjusting the program, schedule, and content of its Kansha project this year. Ex. D, Ozaki Decl. ¶ 16. And because the Kansha Project is an important tool to recruit new JACL members and create future leaders in the Japanese American/Nikkei community, *id.* ¶¶ 7-8, the cancellation of key parts of the Project threatens JACL's membership recruitment and fundraising efforts as well. *See*, *e.g.*, *NTEU v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at *16 (D.D.C. Mar. 28, 2025) (NAACP's cancellation of an educational program because of cuts to CFPB "impede[s] the work of the organization" and constitutes organizational injury).

JACL also faces impacts on its resources due to these cuts. Many of the historic sites to which JACL organizes trips and pilgrimages are in remote locations, requiring advanced planning. Compl. ¶¶ 277-83. The uncertainty resulting from Mr. Musk and DOGE's actions has impeded this planning and has depressed participation rates in JACL pilgrimages and other activities at these sites. *Id.* Interest in at least one JACL program is lower in 2025 than in previous years. *Id.* Defendants' cuts to NPS thus have "directly affected and interfered with [JACL's] core business activities" because they prevent JACL from enabling its members and the public to learn about the history of Japanese Americans. *FDA*, 602 U.S. at 395.

**UCS.** UCS has also suffered organizational injury because, by cutting funding and making

essential scientific staff, resources, and data unavailable, Mr. Musk and DOGE interfere with the organization's mission of ensuring that science informs federal policy. Compl. ¶ 321. Mr. Musk and DOGE's unlawful actions have required UCS to alter the normal services it provides to members and divert its resources to support its members and the scientific community. *Id.* ¶ 320. For example, UCS has held events for hundreds of UCS members to provide advice on data preservation as scientific information on federal websites disappears; protections for those who are or were federal employees and fear retaliation; guidance on how to handle political harassment and legal intimidation; and information about open-records laws and protections for research. *Id.*

Defendants argue that standing does not exist when "an organization diverts its resources in response to a defendant's actions," Mot. at 15 (quoting *FDA*, 602 U.S. at 395), or "from one set of member services to another," *id.* This is misleading. To be sure, injury does not occur when an organization "expend[s] money to gather information and advocate against the defendant's action." *FDA,* 602 U.S. at 394. But where it must redirect "resources to counteract . . . [the] harm" caused by Defendants, *PETA*, 797 F.3d at 1094, to its *core activities*, *FDA,* 602 U.S. at 395, it is quintessential organizational injury. Here, UCS must divert resources from other core activities— including independent research and public education efforts on the issues of climate, transportation and global security[8]—to teach its members how to preserve government data and avoid retaliation. Because Defendants' actions have created "new obstacles" that "unquestionably make it more difficult for [UCS] to accomplish [its] primary mission[s]," this constitutes "injury for purposes . . . of standing[.]" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

---

[8] Union of Concerned Scientists, Programs, https://www.ucs.org/about/programs.

**C.    Plaintiffs' and their members' harms are traceable Defendants' action and likely to be redressed by a favorable decision.**

Defendants assert that "the primary weakness" of Plaintiffs' claim to standing is the lack of "specific causation," Mot. at 11, but the Complaint plausibly alleges that the injuries experienced by Plaintiffs and their members are traceable to Defendants' actions and are likely to be redressed by a favorable court decision. Indeed, many of the harms alleged are directly tied to cuts to federal spending for which Mr. Musk and DOGE have publicly taken credit.

As DOGE has broadcast on X, it intends to "sav[e] the Federal Government approx. $1 billion/day, mostly from stopping the hiring of people into unnecessary positions, deletion of DEI and stopping improper payments to foreign organizations." Compl. ¶ 155. The Complaint makes clear that Mr. Musk and DOGE's actions, including but not limited to their cuts to NPS, BLM, USFS, DOE, NOAA, EPA, and HHS, are directly connected to the declarants', and other members', terminated grants, canceled programs, and other injuries. *Id.* ¶ 309.

Mr. Musk and DOGE have targeted the NPS for funding cuts and employee terminations that have injured members of Sierra Club and JACL. Compl. ¶ 217. DOGE has allegedly caused the firing of approximately 1,000 NPS employees across the country, *id.* ¶ 219, and canceled NPS contracts, including a $3.7 million contract that would have allowed NPS to address staffing shortfalls and hire seasonal workers during the upcoming peak seasons of spring and summer, *id.* ¶ 227. As Plaintiffs allege, these cuts, including to staffing at Manzanar and Minidoka, have had acute effects on the historic sites that are central to JACL's mission. *Id.* ¶¶ 278-83.

Plaintiffs also allege that DOGE has targeted BLM, which plays a critical role in maintaining nearly 250 million acres of federal land. Compl. ¶ 232. DOGE created an X account "seeking help from the public" for cuts regarding DOI, BLM's parent agency, and claims it has already cut over $660,000 in BLM's contracts. *Id*. Plaintiffs also allege that "DOGE-directed cuts

are impairing the USFS's maintenance of America's national forests and grasslands," and include "the firing of approximately 3,400 USFS employees, representing 10% of the total workforce," *id.* ¶ 228, and the cancellation of USFS contracts, *id.* ¶ 231.

The Complaint also details Mr. Musk and DOGE's efforts to entirely dismantle agencies, such as DOE and USAID, that were the sources of UCS members' funding. For instance, that Mr. Musk stated of USAID, "We're shutting it down," *id.* ¶ 192, and that the agency was in the "wood chipper," *id.* ¶ 193. Similarly, Plaintiffs allege that Mr. Musk and DOGE "intend to functionally eliminate" the DOE. *Id.* ¶ 216. *See also id.* ¶¶ 200-02, 205-07, 212. Indeed, J. Doe 1 was informed of their terminated DOE grant by a letter that indicated, in its metadata, that it was authored by a DOGE employee. ECF No. 72-1, Doe 1 Decl. DOGE also claims to have cut NOAA contracts and grants, including a $9.9 million contract supporting NOAA's research arm. Compl. ¶ 236. DOGE has also caused the termination of federal grants and funding at EPA, *id.* ¶¶ 249, 251, as well as at SAMHSA, *id.* ¶ 258, and has terminated more than 10% of SAMHSA's staff, *id.*

Defendants do not deny that Mr. Musk and DOGE directed the cuts at these agencies that have and will cause injury to Plaintiffs' members. Instead, they assert that the Complaint failed to allege that these injuries "have been specifically caused by a discrete action by one of the Defendants—as opposed to being the product of a separate host of factors." Mot. at 11. But Defendants' causation argument is particularly inapposite in this action, where many of the agencies involved, including NPS, BLM, DOE, and NOAA, have been named as defendants in addition to Mr. Musk and DOGE. *See* Compl. ¶¶ 339-42. Defendants identify no other agency— or "factor"—that could have caused plaintiffs' alleged injuries "separate" from Mr. Musk, DOGE and the other Defendant agencies that are parties to the Complaint. *See*, *e.g.*, *AFGE*, 2025 WL 1358477, at *10 (harm to plaintiff groups from large-scale RIFs and reorganizations were traceable

to agencies because "beyond the defendants, there are no intervening actors causing these harms").

Even if Defendants mean to contest only whether the injuries experienced by Plaintiffs and its members are traceable to Mr. Musk and DOGE, their argument fails. Plaintiffs need not show that actions taken by Mr. Musk or DOGE are "the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). As this Court has found, "even if other employees or officials at agencies technically pushed the button to halt payments . . . States' allegations permit an inference that the third parties 'react[ed]' in predictable ways' to the defendants' conduct.'" ECF No. 93 at 20 (quoting *Murthy v. Missouri*, 603 U.S. ---, ---, 144 S.Ct. 1972, 1986 (2024)). So too can the Court infer from Plaintiffs' allegations that even if Defendant agencies had some role in implementing Mr. Musk and DOGE's decisions, the resulting actions are traceable to Mr. Musk and DOGE because the agencies "likely react[ed] in predictable ways," which "in turn will likely injure the plaintiffs." *FDA*, 602 U.S. at 383.

Finally, when assessing a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct . . . suffice." *Lujan v. Def's. of Wildlife*, 504 U.S. 555, 561 (1992). The Complaint plausibly alleges that Mr. Musk and DOGE directed or otherwise caused the termination of employment, contracts, and grants across the Defendant agencies, and that if any of the relevant Defendant agencies took additional actions to effect such terminations, they did so as a predictable response to Mr. Musk's and DOGE's directions. *See also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Plaintiffs need not "prove" that Mr. Musk or DOGE were the "proximate" cause of their injuries—and certainly not at this stage of the litigation. *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).[9]

## II.    Plaintiffs' Claims Are Not Precluded from Judicial Review.

Defendants assert that "all of Plaintiffs'" allegations relate to grants, contracts, or government personnel actions, and that this Court therefore lacks jurisdiction. Mot. at 16. But they offer only generalized and underdeveloped arguments in support, largely failing to confront the facts of this case. And Defendants solely address Plaintiffs' claims relating to contracts, grants, and personnel actions; they make no mention of allegations that do not fall into any of those categories. Those allegations include claims that Defendants have limited the *scope* of certain agency spending unrelated to any existing grant or contract, *see, e.g.,* Compl. ¶¶ 242-44, and others that cannot be shoehorned into Defendants' jurisdictional arguments.

Further, this Court has jurisdiction to hear even those claims related to contracts, grants, and federal personnel actions. This case is about Defendants' violation of the Constitution and federal statute, not about any failure to follow the specific terms of a contract or personnel agreement. Plaintiffs are not government contractors or employees; they are nongovernmental organizations that are largely not parties to those agreements.[10] And notably, Defendants' argument seeking to avoid jurisdiction relies principally on a divided motions panel opinion that was

---

[9] Defendants ask this Court to dismiss some agencies and agencies heads, *see* Mot. at 16 n. 5, but Defendants U.S. Department of Commerce, U.S. Department of Health of Human Services, and the Department of the Interior, and their respective Secretaries or Directors, are named in Plaintiffs' Complaint because they are the parent agencies of several agencies Plaintiffs are harmed by and may be partially responsible for the challenged agency actions under Plaintiffs' APA claim. *See Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025).

[10] UCS includes members who "rely on congressionally approved continued funding for scientific research." Compl. ¶ 7. While UCS itself receives no federal funding, some of its members are harmed by grant cancellation and the ongoing uncertainty caused by Defendants' actions. *Id.* ¶¶ 7, 35, 309-318. UCS has also had to divert resources to address ongoing harms from Defendants. *Id.* ¶¶ 319-321. Even UCS's representation of its members' rights to receive grant funding does not convert this into a purely contractual matter, as the claims and relief sought do not sound in contract.

subsequently partially administratively stayed by the *en banc* D.C. Circuit in a consolidated case which is now subject to further proceedings. *See Middle E. Broad. Networks, Inc., v. United States*, No. 25-5150, 2025 WL 1378735 (D.C. Cir. May 7, 2025) (staying in part *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025)); stay dissolved, No. 25-5150 (D.C. Cir. May 28, 2025).

### A. This Court has jurisdiction to hear Plaintiffs' claims relating to contracts and grants.

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over certain claims against the federal government "based on government contracts." *Megapulse v. Lewis*, 672 F.2d 959, 967 (D.C. Cir 1982). But that exclusive jurisdiction only applies when "a claim is 'at its essence' contractual." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,* 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 968). To make that determination, courts examine: (1) the source of the rights at issue; and (2) the type of relief that is sought. *Id.* at 1106-08. Here, Plaintiffs' claims are squarely rooted in constitutional and statutory rights, and Plaintiffs seek injunctive and declaratory relief, not money damages. This case is thus not one "within the unique expertise of the Court of Claims." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

### 1. Plaintiffs' rights are based in the Constitution and federal statute, not any grant or contract.

The D.C. Circuit has "explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily . . . within the Tucker Act because to do so would deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Crowley*, 38 F.4th at 1107 (quotation marks omitted). When determining the relevant source of rights, courts assess factors that include: whether the rights arise from a statute or the Constitution; whether they "exist[ed] prior to and

apart from rights created under the contract" or grant, *id.* (quotation marks omitted); and whether "it is possible to conceive of this dispute as entirely contained within the terms of the contract." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009).

Here, Plaintiffs allege that Defendants have acted beyond the scope of their statutory authority and violated the Constitution's separation of powers principles, the Appointments Clause, and the APA. Those claims unquestionably arise from the Constitution and federal statute, not from the rights created by any specific contract or grant. *See, e.g., Megapulse*, 672 F.2d at 969 (Tucker Act "does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority"); *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-CV-1263, 2025 WL 1388891 (D.D.C. May 14, 2025).

For example, Plaintiffs challenge Defendants' cancellation of contracts within the National Science Foundation (NSF), the NPS, and the DOE. *See* Compl. ¶¶ 200-232, 254-257. Determining whether those cuts violated the Constitution or the APA will not require analysis of contract terms, but rather an analysis of Defendants' statutory and constitutional authority. *See Crowley*, 38 F.4th at 1109 (source of right was not contractual because court was required to look to statute to determine whether agency exceeded its authority); *Megapulse*, 672 F.2d at 969; *Navab-Safavi*, 650 F. Supp. 2d at 68. Defendants make no serious attempt to argue otherwise and point to no part of any contract that will be relevant to this Court's analysis.

By the same token, the constitutional and statutory rights Plaintiffs invoke "exist[ed] prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107 (quotation marks omitted); *see Megapulse*, 672 F.2d at 969 n.47. Plaintiffs would possess those rights regardless of the existence of the specific grants and contracts at issue here, and "the same constitutional injury could have occurred through the denial of a different government benefit or entitlement." *Am. Bar*

*Ass'n*, 2025 WL 1388891, at *5. Indeed, Plaintiffs are not parties to the contracts and grants at issue[11] and do not seek to enforce terms of those agreements. *See Crowley*, 38 F.4th at 1108.

Defendants seek to avoid all this by flatly asserting that Plaintiffs "would have no alleged injury or right to vindicate" if they had not lost money from cancelled contracts or grants. Mot. at 18. But the D.C. Circuit has rejected the idea that "any case requiring some reference to or incorporation of a contract is necessarily on the contract." *Crowley*, 38 F.4th at 1107. Defendants also ignore the fact that Plaintiffs are not parties to the agreements in question and the numerous cases concluding that the Tucker Act does not apply even though a contract or grant *exists*, because of the legal questions involved. That is plainly the case here, and because the core of Plaintiffs' claims are constitutional or statutory, not contractual, this Court has jurisdiction to address the questions raised in the Complaint. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017); *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985); *Am. Bar Ass'n*, 2025 WL 1388891, at *5.[12]

### 2.    Plaintiffs seek injunctive and declaratory relief, not money damages.

Courts faced with the question of Tucker Act applicability also examine the relief sought. A claim is more likely to be contractual if it seeks more than $10,000 in damages from the government, *see Crowley*, 38 F.4th at 1107-08, but is not a case for money damages if it only seeks declaratory or injunctive relief that "has considerable value independent of any future potential for monetary relief." *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C.

---

[11] *See supra* n.10.

[12] Defendants' reliance on *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985), is misplaced. *See* Mot. at 18. The *Spectrum Leasing* Court held that the rights the plaintiffs claimed under the Debt Collection Act did not exist "in the absence of the contract itself." 764 F.2d at 894. Here, the rights Plaintiffs invoke undoubtedly exist outside the contract. Further, unlike here, *Spectrum Leasing* involved both parties to a contract. *See Crowley*, 38 F.4th at 1110 (distinguishing *Spectrum Leasing*).

Cir. 1995) (quotation marks omitted). Even if injunctive relief would lead to a monetary benefit, that does not mean it is equivalent to damages—unlike an injunction, money damages "provide[] relief that substitutes for that which ought to have been done." *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *see also Am. Bar Ass'n*, 2025 WL 1388891, at *6.

Plaintiffs here seek declaratory and injunctive relief, not damages. Compl. at 102-04. They ask this Court to enjoin Mr. Musk and DOGE from terminating federal grants and contracts and declare that they have no legal authority to do so. *Id*. at 102-03. It is that equitable relief that predominates—Plaintiffs seek non-monetary benefits such as uninterrupted access to National Parks and historic sites, not money from the contracts or grants at issue. *See Crowley*, 38 F.4th at 1111 (relief was not contractual because it centered on benefits from equitable relief); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 201-02 (Fed. Cir. 1997) (claim seeking disbursement of appropriated funds was not contractual); *Kidwell*, 56 F.3d at 285. Further, if relief is granted, it "would not be determined by reference to the terms of the contract." *Perry Cap.*, 864 F.3d at 619. Indeed, if the contracts and grants at issue are restored, Plaintiffs will receive no direct payments.[13] Moreover, the requested relief is not the type the Court of Federal Claims can provide. *See Bowen*, 487 U.S. 879 at 910; *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993).[14]

**B.    This Court has jurisdiction to hear Plaintiffs' claims affecting government employees.**

Defendants separately argue that this Court's review of "personnel actions taken by the Executive Branch" is precluded by the Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSL-MRS). Mot. at 19-20. When statutes create a special

---

[13] *See supra* n.10.

[14] In *Dep't. of Education v. California*, 145 S. Ct. 966 (2025), unlike here, the plaintiffs raised no constitutional claim, and the plaintiff states were direct recipients of the grants in question. *See AIDS Vaccine Advocacy Coal'n, v. Dep't of State*, No. 25-0400, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025); *Am. Bar Ass'n*, 2025 WL 1388891, at *6 (distinguishing *California*).

review scheme, district courts must ask "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quotation marks omitted). There are "three considerations designed to aid in that inquiry" (the *Thunder Basin* factors): whether (1) precluding district court jurisdiction could foreclose meaningful judicial review; (2) the claim is "wholly collateral to the statute's review provisions"; and (3) the claim is "outside the agency's expertise." *Id.* at 186; *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-213 (1994). If the answer to all three is yes, district courts presumptively have jurisdiction; if the answers are mixed, "[t]he ultimate question is how best to understand what Congress has done." *Axon*, 598 U.S. at 186.

Defendants' argument fails at the outset because the CSRA and FSL-MRS are intended to channel claims by government employees, not non-governmental organizations. The CSRA "provides a mechanism for *employees* who have suffered an adverse action to appeal" and the FSL-MRS established an agency "to resolve issues . . . between federal *employee unions and their employers*." *AFGE*, 2025 WL 1358477, at *11 (emphasis added).[15] Defendants' argument that all who are not government employees have been "deliberate[ly] exclu[ded]" from judicial review, Mot. at 21, clearly fails.[16]

Jurisdiction is also proper here because Plaintiffs' claims "are of the same ilk" as those over

---

[15] Those agencies are the Merit Systems Protection Board (MSPB) and the Federal Labor Relations Authority (FLRA), respectively.

[16] In *United States v. Fausto*, a case decided before *Thunder Basin* but on which Defendants nonetheless rely, *see* Mot. at 21, the Court concluded, based on exhaustive statutory analysis, that the CSRA excluded a specific "service category" of employee from review. 484 U.S. 439, 455 (1988). Here, Defendants make no attempt to establish that the CSRA similarly sought to prevent *all* who are not government employees from ever bringing a claim at all relating to a personnel action. And Defendants find support from *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), only by misleadingly quoting it. *Compare* Mot. at 21 (quoting *Elgin*) *to* 567 U.S. at 11 (discussing "Congress' intent to entirely foreclose judicial review to *employees* to whom the CSRA *denies* statutory review") (first emphasis added).

which federal district courts have jurisdiction. *Axon*, 598 U.S. at 189; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010). In *Axon* and *Free Enterprise Fund*, the petitioners relied on Article II to argue that certain actors lacked the authority to adjudicate disputes. *See Axon*, 598 U.S. at 189; *Free Enter. Fund*, 561 U.S. at 508. In both cases, the Court concluded that such questions were more appropriately heard in a federal district court. *Axon*, 598 U.S. at 195-96; *Free Enter. Fund*, 561 U.S. at 491. Here, Plaintiffs similarly assert that Defendants lack constitutional power to terminate employees—a question outside the competence and expertise of the MSPB or FLRA and appropriate for an Article III court.

The *Thunder Basin* factors confirm this conclusion. First, "preclusion of district court jurisdiction could foreclose all meaningful judicial review" of Plaintiffs' claims. *Axon*, 598 U.S. at 190 (quotation marks omitted). Even if Plaintiffs, as nongovernmental organizations, could proceed before the MSPB or FLRA and an appellate court later reviewed their constitutional claims, "[j]udicial review of [Plaintiffs'] constitutional claims would come too late to be meaningful"—Plaintiffs challenge unlawful actions that are decimating federal agencies; a future appellate decision in Plaintiffs' favor will not resolve that problem. *Id.* at 191. Defendants' argument to the contrary, Mot. at 22, ignores *Axon* and Plaintiffs' inability to obtain relief through agency review.[17]

The second and third *Thunder Basin* factors also weigh heavily in favor of this Court's jurisdiction. Plaintiffs' claims are collateral to the review provisions in the CSRA and FSL-MRS because they largely focus on Defendants' power to take the personnel actions, not "how that

---

[17] Defendants rely on *AFGE v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019), a case decided before *Axon*. Mot. at 22. While Defendants assert that Plaintiffs seek "pre-implementation review" as in *AFGE*, Mot. at 22, Plaintiffs here challenge many actions already taken by Defendants. Defendants further rely on pre-*Axon* cases focusing on non-constitutional claims. *See* Mot. at 23 (citing *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 635 (D.C. Cir. 2013)).

power was wielded" against individual employees. *Axon*, 598 U.S. at 193; *see also AFGE*, 2025 WL 1358477, at *14 (ultra vires and APA claims were "wholly collateral to the review authority of the" MSPB and FLRA because personnel challenges were "means by which [plaintiffs] challenged defendants' unlawfully halting [agencies'] work"). And claims relating to executive power under the Constitution, as well as Plaintiffs' APA claims, are outside the expertise of the MSPB or FLRA, which know "nothing special about the separation of powers." *Axon*, 598 U.S. at 194; *AFGE*, 2025 WL 1358477, at *15 (MSPB and FLRA had no "special expertise to bear" on claims "related to the appropriate distribution of authority to and within the executive branch").

Defendants have little to offer on the second and third *Thunder Basin* factors. Their assertion that Plaintiffs' claims "go to the core of the employment relationship scheme," Mot. at 24, is obviously wrong. Plaintiffs' claims concern wholesale terminations and other actions intended to render agencies powerless; they are not focused on any specific "employment relationship." And this case is unlikely to raise "'preliminary questions unique to the employment context.'" *Id*. at 24-25 (quoting *Elgin*, 567 U.S. at 22).[18] Instead, deciding those claims will focus on Defendants' power to engage in mass, unjustified terminations and other actions.

## III.    Plaintiffs Have Stated Claims for Relief.

### A.    Defendant Elon Musk is acting in violation of the Appointments Clause.

Just as in *New Mexico*, Plaintiffs here "allege that Musk occupies a continuing position established by law and exercises significant authority pursuant to the laws of the United States without proper appointment." ECF No. 93 at 34. Thus, "the Complaint states a claim under the Appointments Clause." *Id*.

Defendants correctly state that "[w]hat is needed for an Appointments Clause challenge is

---

[18] Defendants fail to point to any specific preliminary question, such as the ones identified in *Elgin*, that the MSPB would consider in resolving Plaintiffs' claims. *Id*. at 25; *see Elgin*, 567 U.S. at 23.

a governmental action taken by someone lacking authority to do so." Mot. 29. The Complaint alleges exactly that: Mr. Musk, as the de facto head of DOGE, "exercises authority in excess of . . . any lawful role for the DOGE Administrator" and "in excess of any lawful role as Senior Advisor to the President of the United States." Compl. ¶ 142. As such, he has acted as an officer of the United States without having been duly appointed to such a role. "The Appointments Clause of the Constitution lays out the permissible methods of appointing Officers of the United States." *Lucia v. SEC*, 585 U.S. 237, 241 (2018) (quotation marks omitted). Those who "exercise significant authority pursuant to the laws of the United States" and "occupy a continuing position established by law" are officers. *Id.* at 238 (quotation marks omitted). While "principal officers" may be appointed only by the President with the advice and consent of the Senate, "Congress has the discretion to change the default process for 'inferior officers.'" *United States v. Arthrex, Inc.*, 594 U.S. 1, 47 (2021) (quoting U.S. Const. art II., § 2, cl. 2.). Defendants' argument would render the Clause a mere technicality, undermining a check on "the manipulation of official appointments," which the Framers considered to be "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. C.I.R.*, 501 U.S. 868, 883 (1991).

1.    **Mr. Musk is not shielded from the Appointments Clause by virtue of his lawless assumption of executive power.**

Defendants first argue that because Musk's expansive position was not formally "established by law," he is not subject to the Appointments Clause. Mot. at 26. The D.C. Circuit explicitly refuted this notion, explaining that "the rule for which sorts of positions have been 'established by Law' such that they amount to offices subject to the Appointments Clause cannot be whether a position was formally and directly created as an 'office' by law." *Tucker v. Comm'r*, 676 F.3d 1129, 1133 (D.C. Cir. 2012). "Such a view," the Court explained, "would conflict with the substantive requirements of the Appointments Clause." *Id.* (internal quotations omitted); *see*

*also* ECF No. 93 at 28-29. Ignoring this, Defendants rely on *Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000), to claim that an office must be "established by law" to sustain an Appointments Clause challenge. Mot. at 26. But the D.C. Circuit clarified that "*Landry*'s reference to the 'established by Law' question as a 'threshold trigger'" means "that such an inquiry may but need not be the start of an Appointments Clause analysis." *Tucker*, 676 F.3d at 1133 & n.1.

Accordingly, Defendants' assertion that the Appointments Clause inquiry "turns exclusively on the *de jure*—not *de facto*—authority that a person wields" is incorrect. Mot. at 27. Rather, to determine whether an individual is exercising "significant authority pursuant to the laws of the United States," courts examine the duties they actually perform. In 1823, Chief Justice Marshall eschewed this formalistic approach to determine that the "agent of fortifications" in the Army was an officer because he exercised "important duties." *United States v. Maurice*, 26 F. Cas. 1211, 1126 (Cir. Ct. D. Va. 1823) (Marshall, Circuit Justice). Courts employ a functionalist approach, determining whether individuals are officers based on the nature and importance of their duties. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976) (FEC Commissioners were officers due to their "broad administrative powers" such as "rulemaking, advisory opinions, and determinations of eligibility for funds."); *Freytag*, 501 U.S. at 881-82 (special tax judges were officers because their power to "take testimony," "conduct trials," and "rule on the admissibility of evidence" were "important functions" requiring "significant discretion.").

### 2. Plaintiffs have sufficiently alleged that Mr. Musk is wielding significant authority.

Plaintiffs' allegations satisfy the functionalist "significant authority" test. That inquiry hinges "on the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245. To that end, courts consider: "(1) the significance of the matters resolved by the official[], (2) the discretion they exercise in reaching their decisions, and (3) the finality of those

decisions." *Tucker,* 676 F.3d at 1133.

Mr. Musk has enjoyed significant discretion to make important and irrevocable decisions. Specifically, the Complaint alleges that "Mr. Musk is the de facto head of DOGE", though "he has not been appointed as an officer of the United States in accordance with the Appointments Clause." Compl. ¶ 132. Mr. Musk is "in fact *directing* executive departments and agencies to cancel federal grants and loans, stop payments, terminate employees, reduce the workforce, and dismantle the department or agency itself." *Id.* ¶ 146. Mr. Musk has "terminated and caused the termination of federal spending, . . . including at a line-item level." *Id.* ¶ 151. "Mr. Musk and DOGE have . . . direct[ed] and caus[ed] federal personnel changes via the 'Fork in the Road' program." *Id.* ¶ 185.

As alleged, Mr. Musk's authority dwarfs that of others held to be officers of the United States. *See, e.g.*, *Edmond v. United States*, 520 U.S. 651, 652 (1997) (Coast Guard Court of Criminal Appeals Judges, who had "no power to render a final decision"); *Morrison v. Olson*, 487 U.S. 654 (1988) (special counsel with limited jurisdiction); *United States v. Hartwell*, 73 U.S. 385, 392-93 (1867) ("clerk in the office of the assistant treasurer of the United States"). That authority is unprecedented and sweeping even if agency heads were involved in implementing some of Mr. Musk's decisions.

Faced with plausible allegations that Mr. Musk is exercising significant authority in violation of the Appointments Clause, Defendants suggest a second end-run. Mot. at 29. Relying on *Andrade v. Regnery*, Defendants contend that Musk cannot have violated the Appointments Clause if some of his unlawful directives relied on others for implementation. 824 F.2d 1253 (D.C. Cir. 1987). But Plaintiffs' allegations—which must be taken as true—are that the President has designated Mr. Musk as the de facto head of DOGE, giving him power to "dismantle" a federal agency, Compl. ¶ 191, "terminate[] . . . federal spending," *id.* ¶ 151, and "cause[]" personnel

changes. *id.* ¶ 185. These are not the acts of someone advising "actual decisionmakers," Mot. at 29, but the sweeping and unchecked exercise of executive power across the federal government.

Even if Plaintiffs had not alleged that Mr. Musk has been the final decisionmaker, *Andrade* would not absolve his conduct. *Andrade* held that an individual's exercise of significant authority in violation of the Appointments Clause may sometimes be cured through ratification by a properly appointed individual from the same department. 824 F.2d at 1256-57. But neither *Andrade* nor any federal court has held that an unappointed individual may constitutionally direct "executive departments and agencies to cancel federal grants and loans, stop payments, terminate employees, reduce the workforce, and dismantle the department or agency itself," Compl. ¶ 146, if his directives are rubber-stamped by an officer in a separate agency. To do so would make a nullity of the Appointments Clause. *See* ECF No. 93 at 33-34.

For similar reasons, Defendants' argument that Mr. Musk is but an "effective advisor" fails. While it is certainly true that a President may "consult" with and "seek advice from" his advisors, that is not the conduct of which Plaintiffs complain. Mot. at 30 (quotation marks omitted). Moreover, there is no "advisor" carveout from the well-established "significant authority" test for distinguishing officers and employees. As alleged, Mr. Musk's actions easily clear that threshold.

### 3.    Mr. Musk occupies a continuing office.

Plaintiffs allege that Mr. Musk is a "special government employee within the Executive Office of the President *and the de facto head of DOGE*." Compl. ¶ 36 (emphasis added).[19] Because that position is not particular to Mr. Musk, nor is it temporary, transient, or incidental, it is a "continuing office" within the meaning of the Appointments Clause. Under the Appointments

---

[19] Even if Musk were only alleged to be a special government employee, he could still hold a continuing position within the meaning of the Appointments Clause. *See* 18 U.S.C. § 202 (defining "special Government employee" to "mean an *officer or employee* of the executive or legislative branch of the United States Government.") (emphasis added).

Clause analysis, an officer's duties are "continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. 508, 511–12 (1878). Positions are "continuing" where "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). Under this standard, the Supreme Court has found even time-limited positions to be "continuing" for Appointments Clause purposes. *See Morrison*, 487 U.S. at 671.

Plaintiffs have properly alleged that Musk holds a continuing position. Defendants do not argue that Mr. Musk's position is "incidental," "transient," or "fleeting," and instead attempt to cast Mr. Musk's role as specific to him, claiming "there is no allegation that Mr. Musk's role will outlast his tenure." Mot. at 31. But the Complaint alleges that Mr. Musk is the de facto head of DOGE, *see, e.g.*, Compl. ¶¶ 36, 38, and DOGE is not a time-limited entity. ECF No. 93 at 28. To the contrary, the executive order establishing DOGE states expressly that the eventual "termination" of the temporary organization *within* DOGE "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." 90 Fed. Reg. at 8,441. Neither that order nor any subsequent one specifies that only Musk can direct DOGE, and Defendants have repeatedly asserted that Amy Gleason is the DOGE administrator. Compl. ¶ 141. In other words, while Musk is a term-limited special government employee according to Defendants, the leader of DOGE is not term-limited. As such, the role of leading DOGE must eventually fall to someone else and cannot be considered personal to Mr. Musk.

### B.    The Complaint sufficiently alleges that Mr. Musk and DOGE have violated the separation of powers.

Although Defendants wave away Plaintiffs' separation of powers and ultra vires claims as derivative, they are at the heart of this case. Mr. Musk and DOGE, despite having no formal role or basis to do so, have run rampant through the federal government in violation of core separation-

of-powers principles. "The President's power . . . must stem from either an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Purported exercises of executive power are analyzed under Justice Jackson's concurrence in *Youngstown*: When "the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637 (Jackson, J., concurring). To succeed in this third category, "the President's asserted power must be both 'exclusive' and 'conclusive' on the issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

Defendants, however, misread Plaintiffs' separation-of-powers claim as purely statutory. Mot. at 50-51. Plaintiffs do not allege that Mr. Musk and DOGE are exceeding their statutory authority—neither has any. *See infra* Section III.C.; *see also* ECF No. 93 at 40. And Plaintiffs have not brought a claim under the Congressional Budget and Impoundment Act of 1974, nor can they, as that statute did not include a private enforcement mechanism. *See Rocky Ford Hous. Auth. v. U.S. Dep't of Ag.*, 427 F. Supp. 118, 134 (D.D.C. 1977).

Nor does the Complaint allege that the President or anyone else merely exceeded their constitutional authority. Plaintiffs instead allege that Mr. Musk and DOGE have violated the separation of powers by systematically undermining and dismantling numerous programs Congress established and funded. For that reason, *Dalton v. Specter*, 511 U.S. 462, 469-74 (1994), is largely inapposite. In *Dalton*, the plaintiffs alleged the President exceeded his authority under a specific statute. *Id.* at 466. While the Court determined that those claims did not present a constitutional issue, it affirmed that plaintiffs could bring claims that executive action violated the separation of powers. *Id.* at 472.

But Plaintiffs have not alleged that Mr. Musk or DOGE have simply exceeded statutory authority, as was the case in *Dalton*—they have alleged a plausible separation-of-powers claim that these Defendants are acting contrary to legislative will. *See NTEU*, 2025 WL 942772, at *7-9 (rejecting similar argument), *stay granted*, 2025 WL 996856 (D.C. Cir. Apr. 3, 2025).[20] Congress enacts law and controls the public fisc, U.S. Const. art. I, § 8, cl. 1, and it is the duty of the Executive Branch to carry out those laws, not defy or modify them to suit policy whims: "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump v. United States*, 603 U.S. 593, 608 (2024) (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)); ECF No. 93 at 38. This is precisely what the Complaint alleges—that Mr. Musk and DOGE have exercised authority without basis in the law, *see, e.g.*, Compl. ¶ 329, and that although there is no "authority, mandate, or mission [] 'to drive large scale structural reform' across the federal government," that is what they have been doing. *Id.* ¶¶ 63-64, 113-125.

The Complaint alleges that Mr. Musk and DOGE have dismantled and otherwise interfered with the functions of Congressionally-established departments and programs, even though that branch has exclusive authority to determine whether and how to spend public money and sets the budget priorities accordingly. *See* U.S. Const. art. I, § 9, cl. 7; *see also id.* § 7, cl. 1; H.R. 4366, 118th Cong. (2024); H.R. 9747, 118th Cong. (2024). For example, although Congress established the CFPB, Pub. L. 111-203, 124 Stat. 1376 (2010), Mr. Musk and DOGE have set out to unilaterally dismantle the agency. Compl. ¶ 146. Mr. Musk and DOGE have also claimed to

---

[20] The D.C. Circuit issued the stay "in light of appellants' representations that, absent congressional action, the [CFPB] will remain open and will perform its legally required functions." 2025 WL 996856, at *1. The D.C. Circuit later lifted the stay in part while the appeal of the district court's preliminary injunction is under consideration. No. 25-5091 (Apr. 28, 2025).

unilaterally block large numbers of previously-approved grants, *id.* ¶¶ 157-174, and to terminate thousands of federal workers across Congressionally-established agencies, *id.* ¶¶ 179-189. By their own admissions, Mr. Musk and DOGE led the dismantling of the DOE, *id.* ¶¶ 200-216; NPS, *id.* ¶¶ 217, 219, 222-224, 226-232; USFS, *id.* ¶¶ 228-231; BLM, *id.* ¶ 232; and NOAA, *id.* ¶¶ 233-238. They have also directed cuts to various Congressionally-authorized research programs, including scientific research through NIH, *id.* ¶¶ 239-246; EPA, *id.* ¶¶ 249-253; NSF, *id.* ¶¶ 254-257; SAMHSA, *id.* ¶ 258; USDA, *id.* ¶ 259-260; FEMA, *id.* ¶¶ 261-262; and HUD, *id.* ¶¶ 263. This includes blocking specific appropriations. In another example of particular importance to JACL and Sierra Club, in the Inflation Reduction Act, Congress appropriated "$500,000,000, to remain available through September 30, 2030, to hire employees to serve in units of the National Park System or national historic or national scenic trails administered by [NPS]," Pub. L. 117-169, § 50223, 136 Stat. 1818 (2022), to restore staffing at NPS,[21] only to have positions cut by Mr. Musk and DOGE.

These are agencies established by Congress, not the executive, to perform specific functions in the federal government, and cannot be unilaterally dismantled or otherwise left without function consistent with the separation-of-powers principles embedded in the Constitution. *See* ECF No. 93 at 38; *Widakuswara v. Lake*, No. 1:25-cv-1015, 2025 WL 1166400, *15 (D.D.C. Apr. 22. 2025), *stay granted in part*, 2025 WL 1378735 (D.C. Cir. May 7, 2025). Courts have recently blocked a number of recent executive efforts to undermine and dismantle programs established by law—laws that the executive has a plain duty to "take care" to execute. *Id.* at *1 (U.S. Agency for Global Media); *see also Rhode Island v. Trump*, No. 1:25-cv-00128-

---

[21] *Bill Summary: Interior, Environment, and Related Agencies Fiscal Year 2025 Appropriations Bill*, U.S. Senate Comm. on Appropriations (July 25, 2024), https://perma.cc/T52W-E3XF.

JJM-LDA, 2025 WL 1303868, at *1, 14-15 (D.R.I. May 6, 2025) (Institute of Media and Library Services, Minority Business Development Agency, and Federal Mediation and Conciliation Services); *NTEU*, 2025 WL 942772, at *21-22 (CFPB). Mr. Musk and DOGE, as executive officials operating without statutory mandates, cannot unilaterally block, dismantle, or disrupt the Congressionally-authorized programs at issue in this case.

### C.    The Complaint sufficiently alleges that Mr. Musk and DOGE have acted without lawful authority.

Plaintiffs allege that Defendants have taken the actions described above—exercised unprecedented control over the federal budget and spending, grants and contracts, and the termination of federal employees—without any legal authority, thus stating an ultra vires claim.

*First*, Defendants maintain that Plaintiffs "fail to plausibly allege that the complained-of actions were not formally approved by a relevant agency actor with proper legal authority." Mot. at 42. To support that argument, Defendants cherry-pick a handful of allegations in the Complaint and ignore allegations asserting that Mr. Musk and DOGE have acted without any basis in law and have themselves undertaken lawless action. *Supra* Section III(A)(2), III(B).

*Second*, Defendants misstate the law by asserting that an ultra vires claim requires a showing that Defendants "plainly act[ed] . . . contrary to a specific [statutory] prohibition . . . that is clear and mandatory." Mot. at 42 (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). Not so. Because they allege that the actions of Mr. Musk and DOGE are not authorized by *any* statute or constitutional grant of authority, Plaintiffs need not "identify any specific statute," Mot. at 43, as the basis of their ultra vires claim.

Executive branch officials must act pursuant to authority that "stem[s] either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. If no act of Congress or constitutional grant of authority exists, the official action is ultra vires. *Marin Audubon Soc'y v.*

*FAA*, 121 F.4th 902 (D.C. Cir. 2024) is particularly on point. There, the D.C. Circuit held that regulations promulgated by the Council on Environmental Quality (CEQ) were ultra vires because the CEQ derived its authority to issue such regulations from an executive order, not from statute. *Marin Audubon Soc'y*, 121 F.4th at 908. Plaintiffs allege that DOGE, like the CEQ, is an entity within the Executive Office of the President, and, like the CEQ, does not have the power to cause or dictate agency action by virtue of an executive order without a statutory delegation of power—even if that executive order purported to grant such power.

Courts have continued to permit plaintiffs to bring these types of ultra vires claims. Recently, a court in this district thoroughly rejected the precise argument Defendants make here, that Plaintiffs' ultra vires claim should be dismissed because the "complaint does not 'plead a specific statutory bound [that] USDS has allegedly exceeded.'" *AFL-CIO*, 2025 WL 1129227, at *22 (citation omitted). Here, as in *AFL-CIO*, "Plaintiffs allege that USDS has been directing operations and personnel decisions at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities," and "defendants' motion to dismiss points to no legal source that grants" DOGE such authority. *Id.* Other authority is in accord. *See, e.g.*, *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *9-10 (D. Md. Feb. 14, 2025) ("[T]his is not a case where the Court is tasked with determining whether the Executive has acted in excess of a specifically delegated *statutory* authority.") (citations omitted); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400, 2025 WL 752378, at *18 n.18 (D.D.C. Mar. 10, 2025) ("'When an executive acts ultra vires' . . . 'courts are normally available to reestablish the limits on his authority.'") (citations omitted).

Further, Defendants appear to argue that 5 U.S.C. § 3161 provides statutory authorization for DOGE's actions. But that statute only permits the creation of a "temporary organization" to

exist for no longer than three years "for the purpose of performing a specific study or other project." 5 U.S.C. § 3161. Setting aside that Plaintiffs' Complaint challenges the actions of several actors other than the U.S. DOGE Service Temporary Organization, it is of no moment whether the establishment of this temporary organization "facially satisfies the plain terms of Section 3161." Mot. at 43; ECF No. 93 at 39-41. As described comprehensively above and in Plaintiffs' Complaint, Plaintiffs do not allege that DOGE is merely "modernizing Federal technology and software" as the executive order creating DOGE purports to allow. Mot. at 44 (quoting Exec. Order No. 14,158). And Defendants do not attempt to argue, nor can they, that Section 3161's use of the term "project" permits Defendants Musk and DOGE to exercise unprecedented authority over federal spending, federal grants and contracts, and federal employees. Defendants' attempt to cast DOGE's actions as "an initiative to streamline the work of government" fitting within Section 3161's definition of "project," Mot. at 43, mischaracterizes Plaintiffs' Complaint. Defendants' failure to grapple with the true nature of Plaintiffs' allegations is fatal to their motion to dismiss.

*Third*, Defendants maintain that Plaintiffs have not stated an ultra vires claim because such a claim is precluded by other avenues of relief. Mot. at 40. As described *supra* Section II, neither the Tucker Act nor the CSRA affect the jurisdiction of this Court, nor do they preclude this Court from hearing a claim challenging the improper exercise of authority by executive branch officials. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, (1902) ("The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief.").

Nor does the APA provide "an alternative procedure for review" over Mr. Musk and DOGE's actions. Mot. at 41. Defendants elide the fact that Plaintiffs do not bring APA claims against Mr. Musk and DOGE and do not even suggest that APA review of challenged actions by

the non-Agency Defendants is available. Instead, Defendants rely on irrelevant authority to gesture at the notion that *sometimes* the availability of an APA claim forecloses the availability of other relief. *Id.* (citing *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 841 n.7 (D.C. Cir. 2024) and *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200-01 (D.D.C. 2024)). In each of these cases, the court declined to hear an ultra vires claim because the availability of a statutory APA claim foreclosed the need for ultra vires review. *Lewis*, 743 F. Supp. 3d at 201; *Med. Imaging & Tech. All.*, 103 F.4th at 841 n.7. But Plaintiffs do not bring an APA claim, nor any statutory claim against Mr. Musk and DOGE. Plaintiffs' claim is that these Defendants are acting without *any basis* in law, and as such, are acting ultra vires.

## D.    Plaintiffs have properly alleged a claim under the APA.

Mr. Musk and DOGE have directed, and Agency Defendants have taken, unlawful and arbitrary and capricious agency actions. A party harmed by final agency action may seek judicial review of such action under the APA, 5 U.S.C. §§ 702, 704,[22] and if the action is arbitrary, capricious, or otherwise not in accordance with the law, the agency action at issue is set aside. 5 U.S.C. § 706. Here, Plaintiffs injured by such actions ask this Court to do just that.

Defendants make two arguments in support of their motion to dismiss Plaintiffs' APA claim. First, they essentially assert that because the Agency Defendants have engaged in *too many* allegedly illegal actions, those actions are precluded from judicial review. Mot. at 32-36. That argument finds no support in the law. Second, Defendants argue the challenged agency actions are not final. Mot. at 36-37. But Defendants describe Plaintiffs' allegations regarding Mr. Musk and DOGE, mistaking which actions Plaintiffs challenge under the APA and which they challenge

---

[22] Even unlawful non-final actions, such as preliminary or procedural actions, are not exempt from review under 5 U.S.C. § 704 here. *Yaman v. U.S. Dep't of State*, 634 F.3d 610, 613 (D.C. Cir. 2011).

under their other three claims. Plaintiffs' APA claim challenges actions such as the terminations of federal workers, contracts, and grants by Agency Defendants as directed by Mr. Musk and DOGE; such actions fall squarely within the APA's ambit as discrete, final agency actions.

### 1. The APA provides a vehicle for Plaintiffs to challenge multiple forms of agency power, including the power exercised here.

Agency action as defined under the APA "undoubtedly has a broad sweep." *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 895326, at \*13 (D. Md. Mar. 24, 2025). "[T]he word 'action[ ]' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). Covered actions need not be memorialized in an official policy document or written down. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015).

Plaintiffs challenge the terminations of employees, contracts, and grants, *see, e.g.*, Compl. ¶¶ 219, 222-227 (NPS); *id.* ¶¶ 228-30, 232 (U.S. Forest Service); *id.* ¶ 232 (BLM); *id.* ¶¶ 233, 236 (NOAA); *id.* ¶¶ 242-43, 245-46 (NIH), and such actions plainly fall within the sweep of agency action reviewable under the APA. *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("categorical funding freezes" were agency action); *Widakuswara*, 2025 WL 1166400, at \*12 (termination of grants and employees were discrete, final agency actions subject to judicial review).

Defendants' argument that they are shielded from APA review because Plaintiffs have challenged too many plainly reviewable—and allegedly illegal—actions is untenable. Mot. at 32-36. That several government entities have engaged in multiple illegal actions "across vast swaths of the federal government" does not insulate agency action from judicial review. Mot. at 32; *Widakuswara*, 2025 WL 1166400, at \*11;[23] *see also Ramirez v. ICE*, 310 F. Supp. 3d 7, 21 (D.D.C.

---

[23] As noted above, the *Widakuswara* panel's stay order was partially administratively stayed by the D.C. Circuit *en banc* in a consolidated case which is now subject to further proceedings. *Middle E. Broad. Networks, Inc. v. United States*, 2025 WL 1378735, at \*1.

2018) ("Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack.").

The APA "command[s]" a reviewing court to hold agencies accountable to the law. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398 (2024). Defendants' argument, if accepted, would allow agencies to evade judicial review simply by engaging in some undefined threshold of illegal actions that renders those actions a "program" supposedly too large for a court to review. Mot. at 32. Such a proposition would incentivize agencies to take *more* illegal actions to insulate their decision-making from judicial review under the APA.

Plaintiffs do not "seek wholesale improvement of agency management," or "wholesale reform of an agency program[,]" Mot. at 33 (quotation marks omitted), but only relief regarding specific terminations of federal employees, contracts, and grants. Specifically, Plaintiffs alleged certain cuts or actions that have already occurred at multiple agencies that purportedly stem from executive orders, *see* Exec. Orders 14,210 and 14,222 (2025), but were taken illegally at the behest of Mr. Musk and DOGE. *See* Compl. ¶¶ 204, 207-08, 210-11, 212-214 (Dep't of Education); *id.* ¶¶ 219, 222-227 (NPS); *id.* ¶¶ 228-30, 232 (USFS); *id.* ¶ 232 (BLM); *id.* ¶¶ 233, 236 (NOAA); *id.* ¶¶ 242-43, 245-46 (NIH); *id.* ¶¶ 250-53 (EPA); *id.* ¶¶ 255-257 (NSF); *id.* ¶ 258 (SAMHSA); *id.* ¶¶ 259-60 (USDA); *id.* ¶¶ 261-62 (FEMA); *id.* ¶ 263 (HUD).[24]

For this reason, Defendants' reliance on *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), is misplaced. In *Lujan*, the Supreme Court reviewed allegations regarding "actions yet to be taken" on a motion for summary judgment. *Id.* at 893. Here, Plaintiffs challenge actions that have already occurred and will use discovery to "fully flesh[]-out facts" with "greater particularity." *San Juan*

---

[24] *See supra* note 9.

*Audubon Soc'y v. Veneman*, 153 F. Supp. 2d 1, 6 (D.D.C. 2001).

The First Circuit recently rejected a similar argument from some of the same defendants that multiple actions and "broad-based relief against innumerable funding decisions at twenty-three federal agencies" were unreviewable under the APA. *New York*, 133 F.4th at 66. The court held that a challenge to twenty-three agency defendants' "broad, categorical freezes on obligated funds[,]" was a challenge to "discrete final agency actions" and a plausible APA claim. *Id*. at 67. Other courts have likewise held that multiple actions taken by one or more agencies were discrete agency actions that could be challenged by a Plaintiff under a single APA claim. *See Bessent*, 2025 WL 895326, at *15 (disclosure of private identifiable information to DOGE by multiple agencies likely violated the APA); *Rhode Island*, 2025 WL 1303868, at *8 (challenge to "adoption of a discrete, categorical policy that applies the measure 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions' across the board" was a cognizable APA claim); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018).

Separately, courts have repeatedly found that allegations of agency decision-making resulting from an unlawful process, such as decision making based upon "consideration of . . . impermissible factor[s,]" or directions from government employees acting ultra vires, constitutes particularized agency action sufficient for judicial review under the APA. *R.I.L-R*, 80 F. Supp. 3d at 184; *Veneman*, 153 F. Supp. 2d at 6.

Although Defendants claim they are unaware of a single case in which a court reviewed the types of actions challenged here under the APA, Mot. at 35, several courts have recently found the same or similar actions by some of these very Agency Defendants reviewable or unlawful under the APA. *See Woonasquatucket River Watershed Council v. USDA*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *26 (D.R.I. Apr. 15, 2025) (Dep't of Energy, EPA, HUD, Dep't

of the Interior, and Dep't of Agriculture likely violated the APA when freezing congressionally appropriated grants); *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *4 (S.D.N.Y. Mar. 28, 2025) (dismantling of federal government agency likely to violate the APA); *AFGE*, 2025 WL 1358477, at *21 (finding the same Feb. 26, 2025 OPM memo described in Plaintiffs' complaint, Compl. ¶ 181, "constitute[s] final agency action").

Defendants fleetingly claim that the challenged actions are unreviewable under the APA because the agencies are implementing executive orders and their implementation is an exercise of discretionary Presidential authority. Mot. at 33-34. This assertion is wrong for several reasons. First, Plaintiffs allege that the challenged actions were not simply implementing executive orders,[25] but rather implementing directions from a special government employee and his affiliates exercising lawless authority. *E.g.*, Compl. ¶¶ 1-3. Second, agency action on behalf of the President is only unreviewable under the APA when the agency is acting on behalf of the President exercising discretionary powers expressly granted to him by the Constitution or statute. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). Here, the President has no authority to terminate contracts and grants allocated by Congress or to terminate federal workers. And the Complaint does not allege any unlawful acts by the President or name him as a defendant. Compl. ¶¶ 36-54.

Finally, judicial review is appropriate here because the rationale behind barring scrutiny of some agency action is inapplicable in this case. The purpose of prohibiting "programmatic attack[s]" or limiting actions that are reviewable under the APA to "final agency actions" is to

---

[25] Even assuming that Agency Defendants were implementing executive orders, when Congress has delegated power to an agency, as it has here, and "the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 104.

"protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64, 66 (2004). Here, Plaintiffs do not challenge actions lawfully delegated to agency discretion, and Defendants do not make such an assertion. Nor do Plaintiffs ask this court to arbitrate policy disagreements. "[C]ourts, not agencies, will decide all relevant questions of law arising on review of agency action, [] § 706 [] . . . and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters.*, 603 U.S. at 392 (internal quotations omitted).

### 2.    Plaintiffs have challenged final agency action.

An agency's action is final when it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotations omitted). "[E]ven where an agency does not dress its decision with the conventional procedural accoutrements of finality, its own behavior may still belie the claim that its interpretation is not final." *De La Mota v. U.S. Dep't of Educ.*, No. 02 CIV. 4276 (LAP), 2003 WL 21919774, at *6 (S.D.N.Y. Aug. 12, 2003) (cleaned up). Finality is a "flexible" and "pragmatic" inquiry. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005). The actions Plaintiffs challenge here meet both prongs of the finality test.

Plaintiffs' APA claim concerns the termination of federal workers, grants, and contracts by Agency Defendants in conjunction with Mr. Musk and DOGE. Compl. ¶¶ 339-42. Plaintiffs challenge actions that have already occurred and are not "on-going[,]" "underway[,]" or regarding "potential future events[.]" Mot. at 36-37.

Defendants do not attempt to argue that the terminations of federal workers, contracts, and

grants are nonfinal—nor could they, because the answer is clear. *See, e.g.*, *Widakuswara*, 2025 WL 1166400, at *12 (termination of grants); *Widakuswara*, 2025 WL 945869, at *4 (terminations of workers and grants). Instead, Defendants mistake which actions Plaintiffs challenge under the APA, citing allegations of injuries resulting from actions of Mr. Musk and DOGE—who are not subjects of the APA claim. Plaintiffs' APA claim is directed at the actions that Agency Defendants have taken at the behest of Mr. Musk and DOGE. These meet the finality test because there was "nothing further for the agencies to do to formalize the decisions," marking the consummation of the decision-making process, and immediately had legal consequences. *Bessent*, 2025 WL 895326, at *16; *Bennett*, 520 U.S. at 178.

The terminations of grants and contracts immediately produced legal consequences because the "grant recipients cannot access previously awarded funds." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *15. Members of UCS are no longer able to access their grant funds and their scientific research is in jeopardy based on this lack of funding. Similarly, the terminations of federal employees immediately produced legal consequences for the workers who were without a salary and employment, but also for those who benefited from or used the programming or services of agencies now forced to reduce such programming and services due to staffing shortages. In *Pub. Emps. for Env't Resp. v. NPS*, the NPS had issued a policy memorandum that directed park superintendents to designate certain trails as accessible via e-bike. No. CV 19-3629 (RC), 2021 WL 1198047, at *9 (D.D.C. Mar. 30, 2021). The court found the memorandum created legal consequences not only for the park superintendents, but "park patrons who gained the right to use e-bikes in NPS parks." *Id.*; *see also Widakuswara*, 2025 WL 945869, at *4 (the consequences of dismantling USAGM included "audiences missing the 'comprehensive' news mandated by statute"). Here, the terminations of federal workers at multiple federal agencies, such

as for example at the NPS, BLM, or USFS, created legal consequences for Plaintiffs JACL and Sierra Club who are suffering from reduced services, safety concerns, and diminished experiences when visiting national parks. Compl. ¶¶ 5-6, 15, 23, 29-31, 220-26.

> **3.      Agency Defendants acted arbitrarily or capriciously or otherwise not in accordance with the law.**

As detailed *infra* and alleged in Plaintiffs' Complaint, Defendants Musk and DOGE "are lawlessly and unconstitutionally" seizing power over federal spending and the federal workforce, Compl. ¶ 1, directing terminations of federal workers, contracts, and grants at multiple federal agencies. *E.g.*, *id.* ¶¶ 204, 207-08, 210-11, 212-214 (DOE); *id.* ¶¶ 219, 222-227 (NPS); *id.* ¶¶ 228-30, 232 (USFS); *id.* ¶ 232 (BLM); *id.* ¶¶ 233, 236 (NOAA); *id.* ¶¶ 242-43, 245-46 (NIH); *id.* ¶¶ 250-53 (EPA); *id.* ¶¶ 255-257 (NSF); *id.* ¶ 258 (SAMHSA); *id.* ¶¶ 259-60 (USDA); *id.* ¶¶ 261-62 (FEMA); *id.* ¶ 263 (HUD). Plaintiffs allege Agency Defendants have followed these lawless directions, and because those resulting actions were arbitrary and capricious and otherwise not in accordance with the law, Agency Defendants have violated the APA. *Id.* ¶¶ 339-42. The agency actions challenged here are illogical and irrational; fail to acknowledge important considerations, such as consequences for public safety; fail to account for reliance interests; and depart from prior policies without reasoned explanation and were taken at the direction of government actors acting ultra vires and in violation of the Constitution. *Id.*

Defendants do not contest that such agency actions were arbitrary and capricious or otherwise not in accordance with the law. Nor do Defendants provide any reasoned analysis to support their decision-making process for the challenged actions. For example, there is no explanation for NIH's limit on grant funding to cover "indirect costs," which are necessary to support facility upkeep, clerical staff, IT support, data repositories and protect labs that handle dangerous pathogens. Compl. ¶ 242. Instead, Defendants flatly assert that the Agency Defendants

were "implementing several Executive Orders." Mot. at 36. However, "[t]his single line, devoid of data or any independent explanation, is grossly insufficient and falls far short of reasoned analysis[,]" *Widakuswara*, 2025 WL 945869, at *5, and "furthering the President's wishes cannot be a blank check for [an agency] to do as [it] please[s]." *Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *18 ("The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision.") (internal quotations omitted).[26]

"When an agency changes course," such as by revoking contracts and grants, "it must be cognizant that longstanding policies may have engendered serious reliance interests." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (internal quotations omitted). If it does not, the agency has acted "arbitrar[ily] and capricious[ly]." *Id*. Plaintiffs have plausibly alleged that Agency Defendants acted unlawfully.

## CONCLUSION

For these reasons, Defendants' motion to dismiss should be denied.

Date:  May 28, 2025

Respectfully submitted,

*/s/ Bruce V. Spiva*

Gloria D. Smith*
Sanjay Narayan*
SIERRA CLUB ENVIRONMENTAL LAW
PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5532
gloria.smith@sierraclub.org
sanjay.narayan@sierraclub.org

*Counsel for Plaintiff Sierra Club*

Bruce V. Spiva (DC Bar No. 443754)
Daniel S. Lenz**
Tara Malloy (DC Bar No. 988280)
Robert Brent Ferguson (DC Bar No. 1782289)
Katherine Hamilton (DC Bar No. 90006168)
Heather Szilagyi (DC Bar No. 90006787)
Rachel Appel (DC Bar No. 90017750)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
bspiva@campaignlegalcenter.org
dlenz@campaignlegalcenter.org

---

[26] Notably, "[r]eliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003).

tmalloy@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Counsel for Plaintiffs Japanese American Citizens League, OCA-Asian Pacific American Advocates, Sierra Club, and Union of Concerned Scientists*

*\*Application for pro hac vice forthcoming*
*\*\*Admitted pro hac vice*