# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW MEXICO, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ELON MUSK, in his official capacity, *et al.*,<br><br>        Defendants. | Civil Docket No. 1:25-cv-00429-TSC |
| JAPANESE AMERICAN CITIZENS LEAGUE, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>ELON MUSK, in his official capacity, *et al.*,<br><br>        Defendants. | Civil Docket No. 1:25-cv-00643-TSC |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS JACL PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................................1

ARGUMENT......................................................................................................................................1

I.     The Court Lacks Jurisdiction..............................................................................................1

       A.     Plaintiffs Fail to Plead Article III Standing............................................................1

       B.     Plaintiffs' Claims are Precluded from Judicial Review in this Court..................6

              1.     The Court Lacks Subject-Matter Jurisdiction to Assess the Legality of
                     any Challenged Contract and Grant-Related Actions............................6

              2.     The Court Lacks Jurisdiction over Plaintiffs' Challenges to
                     Government Personnel Actions...............................................................10

II.    The Complaint Should Be Dismissed under Rule 12(b)(6) .........................................12

       A.     Plaintiffs' Appointment Clause Count Fails to State A Claim ...........................12

       B.     Plaintiffs' APA Claims Must Be Dismissed...........................................................20

       C.     The Court Should Dismiss Plaintiffs' Derivative Claims ....................................22

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*AFGE v. Sec'y of the Air Force*,
  716 F.3d 633 (D.C. Cir. 2013).............................................................................................12

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019)......................................................................................11, 12

*American Bar Ass'n v. U.S. Department of Justice*,
  --- F. Supp.3d ---, 2025 WL 1388891 (D.D.C. May 14, 2025).................................................7

*Andrade v. Regnery*,
  824 F.2d 1253 (D.C. Cir. 1987)...........................................................................................18

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022).................................................................................................3

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
  ---F. Supp. 3d--, 2025 WL 1568301 (D.D.C. June 3, 2025) .......................................22, 23, 25

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ......................................................................................................11, 12

*Baisden v. Barr*,
  2020 WL 6118181 (D.D.C. Oct. 16, 2020) ...........................................................................2, 6

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ............................................................................................................10

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ...............................................................................................................15

*Burnap v. United States*,
  252 U.S. 512 (1920) ...........................................................................................................15

*California v. Department of Education*,
  145 S. Ct. 966 (2025) .......................................................................................................6, 8

*Carter v. U.S. Dep't of Educ.*,
  No. 25-cv-0744 (PLF), 2025 WL 1453562 (D.D.C. May 21, 2025)......................................22, 25

*Centro de Trabajadores Unidos v. Bessent*,
  No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025)......................................................24

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022).............................................................................................24

*CREW v. U.S. DOGE Serv.,*
  ---F.R.D.---, 2025 WL 1392836 (D.D.C. Apr. 15, 2025) ........................................19

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
  38 F.4th 1099 (D.C. Cir. 2022)........................................................................6, 7, 8

*Ctr. for Biological Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020)........................................................................23

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................................................5

*Dalton v. Specter,*
  511 U.S. 462 (1994) ..............................................................................................22

*Edmund v. United States,*
  520 U.S. 651 (1997) ..............................................................................................16

*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) .......................................................................................10, 11, 12

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ......................................................................................3, 4, 5

*Fed. Express Corp. v. U.S. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022)..............................................................................24

*Filebark v. U.S. Dep't of Transp.,*
  555 F.3d 1009 (D.C. Cir. 2009)............................................................................10

*Flowers v. Exec. Off. of the President,*
  142 F. Supp. 2d 38 (D.D.C 2001).........................................................................23

*Freytag v. CIR,*
  501 U.S. 868 (1991) .........................................................................................15, 16

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  920 F.3d 1 (D.C. Cir. 2019)..................................................................................18

*Hispanic Affairs Project v. Acousta,*
  901 F.3d 378 (D.C. Cir. 2018)..............................................................................21

*Htet v. Trump,*
  No. 24-cv-1446 (RC), 2025 WL 522033 (D.D.C. Feb. 18, 2025) .......................24

*Kareem v. Haspel,*
  986 F.3d 859 (D.C. Cir. 2021)........................................................................23, 25

*Kidwell v. Dep't of the Army, Bd. for Corr. of Mil. Recs.,*
  56 F.3d 279 (D.C. Cir. 1995) .................................................................................................6

*Kone v. District of Columbia,*
  808 F. Supp. 2d 80 (D.D.C. 2011) ...............................................................................4, 23, 25

*Landry v. FDIC,*
  204 F.3d 1125 (D.C. Cir. 2000) ...........................................................................................14

*Lewis v. Casey,*
  518 U.S. 343 (1996) ...............................................................................................................5

*Lewis v. U.S. Parole Comm'n,*
  743 F. Supp. 3d 181 (D.D.C. 2024) .....................................................................................25

*Loughlin v. United States,*
  393 F.3d 155 (D.C. Cir. 2004) ...............................................................................................7

*Lucia v. SEC,*
  585 U.S. 237 (2018) .....................................................................................................*passim*

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...............................................................................................................1

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) .............................................................................................................21

*Marin Audubon Soc'y v. FAA,*
  121 F.4th 902 (D.C. Cir. 2024) ...........................................................................................24

*Med. Imaging & Tech. All. v. Libr. of Cong.,*
  103 F.4th 830 (D.C. Cir. 2024) ...........................................................................................25

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ...............................................................................................6

*Middle E. Broad. Networks, Inc. v. United States,*
  Nos. 25-5150, 25-5151, 25-5158, 2025 WL 1378735 (D.C. Cir. May 7, 2025),
  *dissolving stay sub nom. Widakuswara v. Lake,* 2025 WL 1521355 (D.C. Cir. May 28, 2025) .................11

*Morrison v. Olson,*
  487 U.S. 654 (1988) .............................................................................................................16

*Navab-Safavi v. Broadcasting Board of Governors,*
  650 F. Supp. 2d 40 (D.D.C. 2009) .........................................................................................7

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025) .................................................................................................21

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ..........................................................................................................20, 21

*Nw. Immigrant Rts. Project v. USCIS*,
  496 F. Supp. 3d 31 (D.D.C. 2020), *appeal dismissed*,
  2021 WL 161666 (D.C. Cir. Jan. 12, 2021) ....................................................................2

*OPM v. AFGE*,
  No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ....................................................3

*Payne v. Biden*,
  62 F.4th 598 (D.C. Cir.), *cert. granted, judgment vacated*, 144 S. Ct. 480 (2023) .........................................11

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) .....................................................................................8

*Rempfer v. Sharfstein*,
  583 F.3d 860 (D.C. Cir. 2009) ...................................................................................22

*R.I.L.-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ............................................................................21

*Ry. Lab. Executives' Ass'n v. United States*,
  987 F.2d 806 (D.C. Cir. 1993) .....................................................................................5

*Sackett v. EPA*,
  566 U.S. 120 (2012) ...................................................................................................12

*San Juan Audubon Soc'y v. Veneman*,
  153 F. Supp. 2d 1 (D.D.C. 2001) ..............................................................................21

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) .....................................................................................8

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ...................................................................................................11

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) .....................................................................................................5

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .....................................................................................................5

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ...................................................................................24

*Tucker v. CIR*,
  676 F.3d 1129 (D.C. Cir. 2012) ................................................................13, 14, 16

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
   ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025)..................................................8

*U.S. DOGE Service v. Crew,*
   605 U.S. ---, 2025 WL 1602338 (June 6, 2025)..................................................19

*United States v. Donziger,*
   38 F.4th 290 (2d Cir. 2022) ..................................................16, 20

*United States v. Fausto,*
   484 U.S. 439 (1988) ..................................................10, 11, 12

*United States v. Hartwell,*
   73 U.S. 385 (1867) ..................................................16

*United States v. Maurice,*
   26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747)..................................................15, 16, 20

*United States v. Texas,*
   599 U.S. 670 (2023) ..................................................3

*Widakuswara v. Lake,*
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)..................................................9, 11, 20, 22

## STATUTES

2 U.S.C. § 437c..................................................15

2 U.S.C. § 437d..................................................15

2 U.S.C. § 437f..................................................15

2 U.S.C. § 437g..................................................15

2 U.S.C. § 438..................................................15

5 U.S.C. § 556..................................................16

5 U.S.C. § 3161..................................................24, 25

10 U.S.C. § 837..................................................16

10 U.S.C. § 866..................................................16

10 U.S.C. § 867..................................................16

26 U.S.C. § 7443A..................................................16

26 U.S.C. § 9008..................................................15

26 U.S.C. § 9010 ..........................................................................................................15

26 U.S.C. § 9040 ..........................................................................................................15

28 U.S.C. § 49 ..............................................................................................................16

28 U.S.C. § 592 ............................................................................................................16

28 U.S.C. § 594 ............................................................................................................16

28 U.S.C. § 596 ............................................................................................................16

28 U.S.C. § 1491 ............................................................................................................6

Inflation Reduction Act of 2022,
  Pub. L. No. 117-169, 136 Stat. 1818 ......................................................................23

## RULES

Fed. R. Crim. P. 42 ......................................................................................................16

## REGULATIONS

*Providing for the Recognition of Certain Students as Presidential Scholars,*
  Exec. Order. No. 11,155, 29 Fed. Reg. 6909 (May 23, 1964) ................................18

*Establishing & Implementing the President's "Department of Government Efficiency,"*
  Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ..........................17, 25

*Reforming the Federal Hiring Process & Restoring Merit to Government Service,*
  Exec. Order No. 14,170, 90 Fed. Reg. 8621 (Jan. 20, 2025) ................................17

## UNITED STATES CONSTITUTION

U.S. Const. art. II, § 2 ............................................................................................13, 14

## INTRODUCTION

Defendants' Motion to Dismiss showed that the Court lacks jurisdiction over Plaintiffs' sweeping Complaint because Plaintiffs' speculative and attenuated allegations of injury fail to establish Article III standing and because their challenges regarding federal contracts, grants, and employment actions are foreclosed by the Tucker Act, the Civil Service Reform Act, and related statutes. Plaintiffs failed to demonstrate otherwise in their response.

Plaintiffs also fail to state a claim on the merits. Their theory of the Appointments Clause is contrary to centuries of consistent precedent; their broad, generalized allegations constitute a programmatic challenge not cognizable under the APA; and they fail to adequately plead their derivative claims. The Complaint should be dismissed.

## ARGUMENT

## I.    The Court Lacks Jurisdiction

### A.    Plaintiffs Fail to Plead Article III Standing

Defendants' opening brief demonstrated that none of the organizational Plaintiffs can establish associational or organizational standing. In response, Plaintiffs assert that Defendants "do not challenge" their "theories of standing." ECF No. 97 at 4. That is incorrect. Plaintiffs' Complaint fails to establish standing, both because their allegations do not support their claim of injury and because their theory about the possible downstream effects of staffing changes and funding decisions is insufficiently concrete or imminent under Article III. *See* ECF No. 90 at 10–14. Indeed, Plaintiffs admit they are not government employees who have faced adverse employment actions. Nor are they personally party to any grants that have been terminated or contracts that have been breached. And they concede they are not "the object of the government action or inaction" they challenge, which makes their standing "substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Plaintiffs have failed to shoulder that heightened burden here.

**1.** The *JACL* Plaintiffs fail to plead associational standing because (1) they identify by name no member who suffered injury-in-fact; (2) their allegations as to unnamed members fail to plead a cognizable injury; and (3) their allegations of the downstream effects of certain agencies' staffing and

programmatic decisions do not suffice. ECF No. 90 at 9–13. In response, Plaintiffs submit eight declarations, asserting facts unpleaded in their Complaint. But absent a factual challenge to jurisdiction, a "sworn declaration that is attached to [Plaintiffs'] brief in opposition to the government's motion to dismiss, cannot amend [Plaintiffs'] complaint" to cure insufficient allegations of an injury. *Baisden v. Barr*, 2020 WL 6118181, at *4 (D.D.C. Oct. 16, 2020) (Jackson, J.) (ignoring evidence attached to a brief and dismissing complaint for lack of injury). So these new facts—that Plaintiffs failed to include in their Complaint—must be disregarded. Even accepting those facts, however, Plaintiffs fail to establish the elements of associational standing.

None of the Plaintiff organizations identifies by name any member with an adequate injury.[1] Five of the eight submissions are on behalf of pseudonymous declarants that Plaintiffs have refused to identify, even to career government counsel. *See* ECF No. 98 at 2 n.1; ECF No. 72 at 2. Plaintiffs cannot now rely on those unidentified members to establish their standing. *Cf. Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 51 (D.D.C. 2020) (rejecting associational standing where the complete omission of a member's identity "deprived Defendants of the ability to dispute Plaintiffs' claim of associational standing").

Regardless, none of the submitted declarations establishes injury-in-fact. The Sierra Club and JACL rely entirely on changes to park services and speculation regarding the effects of staffing changes. *See* ECF No. 97 at 4–8. The Sierra Club members' declarations assert that decreased national parks staff may lead to a diminished experience in planned future trips. Decl. of Mary Anne Kenworthy ¶ 6, Decl. of J. Doe 2 ¶ 13. But it is entirely uncertain that they will experience any effect from the alleged staffing cuts. JACL members' two declarations fare no better. One of those members was to be a chaperone on a school trip to national park sites and intended to make a similar family trip, but admits that the "parks have not closed"; the decisions to cancel the trips were made by a

---

[1] Defendants did not "accede" that Plaintiffs need not identify the party suffering injury-in-fact by name "at the motion to dismiss stage." ECF No. 97 at 5 (citing Mot. at 8 & n.3). Defendants plainly argued that "Plaintiffs' claim of associational standing necessarily fails because they nowhere identify by name any member who has supposedly suffered harm." ECF No. 90 at 8. Defendants' candor in acknowledging differing judicial conclusions is not a concession that those courts were correct.

school and the declarant. *See* Decl. of J. Doe 3 ¶¶ 7, 10. The other notes that one specific national park service project is no longer available, though her visit still went forward. Decl. of Rebecca Ozaki ¶ 16.

More fundamentally, their theory that end users of government services suffer injury any time those services change is entirely unbounded. *Cf. United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court"). That theory would permit any American dissatisfied with wait times at a government office to sue to require the government to hire additional staff. Courts have "consistently rejected" such unbounded theories of standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392 (2024). And these were the precise standing theories the Supreme Court recently rejected in *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025).

UCS submits two declarations seeking to establish that members have faced termination of "their existing federal grants." ECF No. 97 at 8. But each declarant acknowledges that the grant funding was awarded to organizations not party to this lawsuit or within UCS's membership rolls. J. Doe 4 Decl. ¶ 3; J. Doe 5 Decl. ¶ 6. Plaintiffs do not assert that those organizations are UCS members, so any injury to those third parties cannot support UCS's standing here. Even if "financial harm to grant recipients" could sometimes support standing, as this Court found in *New Mexico*, ECF No. 93 at 16, the *JACL* Plaintiffs are at least one more step removed from that kind of harm.

OCA submits a declaration from an unidentified individual asserting that an internship opportunity was terminated "due to a change in federal funding." J. Doe 6 Decl. ¶ 20. But J. Doe 6 does not attest that funding change had anything to do with Mr. Musk or USDS. Nor does the Complaint allege any such link. Compl. ¶ 20. So Plaintiffs cannot rely on it here to broadly attack a range of federal spending and staff cuts. And J. Doe 6's other "concern[]"—that the Free Application for Federal Student Aid may cease to function—is pure speculation. J. Doe 6 Decl. ¶ 28.

In sum, none of the declarations Plaintiffs submit establishes that any organization's member suffered cognizable injury. Plaintiffs' claim of associational standing should therefore be rejected.

**2.** For many of the same reasons, the Plaintiffs' assertion of organizational standing also fails.[2] As Defendants explained in their opening brief, the organizations' argument that they are injured by the downstream effects of an alleged diminution of federal government services rests on speculative and contingent allegations. ECF No. 90 at 13–14. And Plaintiffs nowhere allege that they have actually incurred monetary expenses to counteract the alleged harm. *Id.* at 14–15.

In response, the organizations double down on alleged contingent harms. The Sierra Club, for example, argues that "key [park] staff" have been cut at Yosemite National Park, but cites only uncertainty about staffing and possible effects on volunteers and "increased risk of cancelations" as the effect of those terminations. ECF No. 97 at 11–12. JACL similarly argues that it must plan around changed services for trips it wants to take. *Id.* at 12–13. Absent from those arguments is any assertion that Defendants have actually prohibited the organization from undertaking a planned excursion.

Plaintiffs also fall short in alleging any consequent drain on the organizations' resources. They argue that they have diverted staff time to perform certain functions that used to be performed by the government, such as monitoring the weather, and had to change plans due to certain allegedly diminished services. *See* ECF No. 97 at 12–13. But that argument is no different from the one the Supreme Court rejected in *FDA v. Alliance for Hippocratic Medicine.* There, plaintiff associations alleged that the FDA was not "properly collecting and disseminating information about mifepristone, which the associations say in turn makes it more difficult for them to inform the public about safety risks." *All. For Hippocratic Med.*, 602 U.S. at 395. But the Court rejected that as a basis of injury, because "the associations [had] not suggested that federal law requires FDA to disseminate such information upon request by members of the public." *Id.* at 395–96. The Plaintiffs here similarly make no claim that the government was *legally required* to offer certain hours at the parks or perform the various other services they complain are lacking.

UCS's standing is similarly deficient. Plaintiffs argue that organization's programmatic changes to provide new trainings in response to the administration's spending cuts have harmed its ability to

---

[2] Plaintiffs do not argue that OCA has organizational standing and therefore concede that argument. *Kone v. District of Columbia*, 808 F. Supp. 2d 80, 83 (D.D.C. 2011).

carry out core activities. *See id.* But that argument too runs headlong into *Alliance for Hippocratic Medicine*. Just as the medical associations could not spend their way into standing by diverting resources to "better inform" their members, *All for Hippocratic Med.*, 602 U.S. at 394, UCS cannot demonstrate standing merely because it elects to train its members on data protection and political harassment to counteract government conduct it dislikes.

**3.** Plaintiffs also argue that this Court's decision that the States had adequately alleged standing means that they need not show standing at all. *See* ECF No. 97 at 4 n.2. The one-party-standing rule, however, applies when the standing of the other parties "makes no difference to the merits of the case." *Ry. Lab. Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993).

The standing of the *JACL* Plaintiffs *does* make a difference here because they press two claims not asserted by the States, challenge additional governmental conduct, name many new agency defendants, and seek distinct relief. *See generally* Compl. at 96–104. Plaintiffs' suggestion that they need not demonstrate their own standing contradicts the well-worn principle that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Because that principle remains "when there are multiple plaintiffs," the *JACL* plaintiffs must demonstrate Article III standing as to their new claims, defendants, and forms of relief. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

Even assuming the *JACL* Plaintiffs have adequately pleaded some cognizable injury flowing from specific employment decisions or grant terminations, that would not support their unbounded challenge to other government conduct. "If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course, not the law." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Because they bear the burden of pleading standing, Plaintiffs must identify which governmental conduct harms them.

Here, Plaintiffs admit they cannot allege that certain Defendants caused them harm. *See* ECF No. 97 at 18 n.9 (Defendants are named merely because "they are the parent agencies" of other

Defendants and Plaintiffs speculate that they "may be partially responsible."). Such "maybe" argument is plainly insufficient to establish that those agencies caused any cognizable harm. And Plaintiffs do not even offer *that* insufficient response as to thirteen agencies and agency heads.[3] *Compare* ECF No. 90 at 16 n.5 *with* ECF No. 97 at 18 n.9 At minimum, those agencies should be dismissed.

> **B.    Plaintiffs' Claims are Precluded from Judicial Review in this Court**

Plaintiffs' claims also fall outside this Court's subject-matter jurisdiction. Their contract and grant termination-related claims must be brought in the Court of Federal Claims and their federal employment-related claims are precluded by the comprehensive schemes contained in the Civil Service Reform Act ("CSRA") and Federal Service Labor-Management Relations Statute ("FSLMRS").

> **1.    The Court Lacks Subject-Matter Jurisdiction to Assess the Legality of any Challenged Contract and Grant-Related Actions**

In *California v. Department of Education*, the Supreme Court recently held that because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States," a District Court likely lacked jurisdiction over claims in which plaintiffs sought to "enjoin[] the government from terminating various . . . grants." 145 S. Ct. 966, 968 (2025) (quoting 28 U.S.C. § 1491(a)(1)). Plaintiffs do not contest that an action must be brought under the Tucker Act in the Court of Federal Claims if, "in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government," *Kidwell v. Dep't of the Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995), nor that this determination "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Nor do they contest that the $10,000 threshold is met here. They simply contest whether either factor set forth in *Crowley* applies.

---

[3] Plaintiffs do not dispute that they have offered no theory of injury to the agencies identified in footnote 5 of Defendant's brief other than the insufficient "parent" agency argument and a new declaration—which is deficient for the reasons discussed above and which the Court should disregard in any event—regarding an OCA member who purportedly had an internship with SAHMSA. ECF No. 97 at 10; *see Baisden,* 2020 WL 6118181, at *4; *supra* at 3.

They are wrong, and to the extent there is ambiguity, Plaintiffs' failure to plead facts that would support the Court's jurisdiction is to blame. *See Loughlin v. United States*, 393 F.3d 155, 172 (D.C. Cir. 2004) ("The court cannot act without jurisdiction and it is the complaining party's burden to plead it."). The relevant claims must be dismissed.

First, Plaintiffs contend that because they are bringing constitutional claims, they satisfy the first part of the test. But that doesn't follow. Plaintiffs cannot "avoid the jurisdictional consequences of the Tucker Act" through "creative drafting." *Crowley*, 38 F.4th at 1107 (cleaned up). It is not how Plaintiffs style their claims, but what gives rise to the *rights* at issue. The one Plaintiff, UCS, who offers a theory of injury based on grant termination, does so by alleging harm to one of its members by virtue of a grant termination related to that person's work.[4] *See* Compl. ¶¶ 315–17. UCS's standing thus is premised primarily on alleged grant termination. There would be no rights at issue for this Plaintiff to seek to vindicate if not for the grant(s) at issue, and so any such rights do not "exist prior to and apart from the rights created under the [grant]." *Crowley*, 38 F.4th at 1107. By contrast, in *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009), and *American Bar Ass'n v. U.S. Department of Justice*, --- F. Supp.3d ----, 2025 WL 1388891 (D.D.C. May 14, 2025), cited by Plaintiffs, the plaintiffs alleged First Amendment-based retaliation; in both cases, the right those plaintiffs sought to vindicate was their individual First Amendment right, not their entitlement to contractual payments. Plaintiffs identify no such individual rights at issue here; the sole injury is based in the alleged loss of contract- or grant-based funding.

Plaintiffs also argue that they "are not parties to the contracts and grants at issue," but that only weakens their case. ECF No. 97 at 21. They offer no reasoned basis why they should have standing to challenge the termination of contracts in a manner that actual parties to the contract

---

[4] Plaintiffs note that Defendants "point to no part of any contract that will be relevant to this Court's analysis." ECF No. 97 at 20. But this is because of Plaintiffs' own deficient pleading that largely fails to identify the contracts and grant terminations that they challenge. *See, e.g.*, Compl. ¶¶ 315–17. In their opposition, Plaintiffs point to paragraphs 200–34 and 254–57 of their Complaint, but they do not explain how any the termination of any contract or grant referenced in those paragraphs, to the extent any can be individually identified at all, specifically injures them or their members such that they have standing to challenge any such termination. *See supra* Part I.A.

cannot. *Crowley*, the only case Plaintiffs cite in support of this proposition, does not help them. There, it was *the defendant* who was not a party to the contract, so a judgment for the plaintiff could not have enforced a contractual obligation. *See Crowley*, 38 F.4th at 1108.[5] Here, by contrast, Plaintiffs sue sixteen federal agencies who are (presumably) parties to the contracts and grants at issue, and seek precisely to enforce the terms of the contracts and grants as part of the relief they request. *See* Compl., Prayer for Relief ¶¶ a.iii & a.iv, g, b. Because "the right to the[] payments" that Plaintiffs seek to force the government to make "is created in the first instance by the contract" and not any statute or the Constitution, their contract- and grant-related claims satisfy the first part of the test for Tucker Act jurisdiction. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (cleaned up).

Even more important than the source of the right is the type of relief sought, which may be "dispositive" of the inquiry. *See U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). In *Conference of Catholic Bishops*, the district court found it lacked jurisdiction to enter an injunction that would bar the pause or cancellation of government contracts. *Id.* at *5. It noted that "the type of relief sought" was dispositive because the nature of the relief—an order requesting that the government continue the payment of funds due under cooperative agreements—"sounds in contract." *Id.* The court explained that "[when] stripped of its equitable flair," the plaintiffs' request for an injunction to compel the payment of money due under a contract "must be resolved" by the Court of Federal Claims. *Id.* at *5; *see also id.* at *7 ("The relief the Conference seeks . . . reinstatement of contracts terminated by the Government—is beyond the power of this Court."). The Supreme Court reached a similar conclusion in *California. See* 145 S. Ct. at 968.

Plaintiffs' argument that they "seek injunctive and declaratory relief, not money damages," ECF No. 97 at 21, cannot be squared with *California* and *Catholic Bishops*. To the extent their claims are based on the termination of contracts or grants, the relief they seek is the reinstatement of those

---

[5] *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), similarly fails to help Plaintiffs. There, plaintiffs, who were minority shareholders of Fannie Mae and Freddie Mac, sued the Treasury Department, the controlling shareholder, for breach of fiduciary duties. So, unlike here, the plaintiffs were not seeking in the litigation to enforce performance of a contract or vindicate rights that existed because they or those they purportedly represent had a contract with the defendant.

contracts and grants. *See* Compl., Prayer for Relief ¶ g (seeking to "enjoin all Defendants from refusing to spend funds . . . through . . . terminating federal grants and contracts"); *id.* ¶¶ a.iii, a.iv, b (seeking declaration that various actions "have no legal effect" including "termination and cancellation of federal grants and contracts").

Instead of disputing this, Plaintiffs point to benefits that might come if they prevail on their *employment*-related claims, such as "uninterrupted access to national parks." ECF No. 97 at 22; *compare* Compl. ¶ 279 (complaining of "limited staffing at" National Park Service-run historic sites) *and* ¶ 294 (complaining of "cuts to [National Park Service" staffing and funding" because of concern with "adequate staffing at the park") *with id.* ¶ 315 (alleging "one UCS member . . . has already had a project shut down due to tens of thousands of dollars of terminated grant funding"). That they bring entirely different claims seeking additional relief (over which the Court has no jurisdiction for other reasons, *see infra* Part 1.B.2) has no bearing on the contractual nature of the relief they seek in their contract-related claims.

Nor is it relevant that "if the contracts and grants at issue are restored, Plaintiffs will receive no direct payments." ECF No. 97 at 22. To begin, Plaintiffs' members, on whose behalf they sue, potentially *would* receive such payments. *See* Compl. ¶ 315; *cf.* ECF No. 97-5, ¶ 3. But more broadly, this argument fails for the reasons explained above: As non-parties to the contracts and grants, Plaintiffs cannot plausibly claim to have rights to enforce those that the grant and contract holders themselves don't have.

Finally, Plaintiffs contend that "if relief is granted, it would not be determined by reference to the terms of the contract." ECF No. 97 at 22. But Plaintiffs fail to support that assertion, and their failure to adequately plead the specific grants and contracts at issue prevents the Court from drawing any such conclusion. The D.C. Circuit's en banc partial dissolution of the stay order in *Widakuswara* is illustrative. In that case, the primary distinction offered to the Supreme Court's decision in *California* was "that Congress appropriated specific sums for" the plaintiffs there, to be disbursed as grants, which plaintiffs alleged provided them rights "independent of and antecedent to their grant agreements." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *4 (D.C. Cir. May 3, 2025).

Plaintiffs here do not identify any statutory obligation to fund the contracts or grants at issue, and it is by no means clear from their pleading and their various claims that the terms of any contract or grant agreement would not be dispositive. *See, e.g.*, Compl. ¶¶ 341–42 (alleging that terminations of contracts and grants are unlawful because they happened "in processes that include Mr. Musk" and "are illogical and irrational" and "fail to acknowledge important aspects of the problem"). Absent Plaintiffs' failure to plead otherwise, their contract and grant-related claims remain within the Supreme Court's holding in *California*.

### 2. The Court Lacks Jurisdiction over Plaintiffs' Challenges to Government Personnel Actions

**1.** This Court also lacks jurisdiction over Plaintiffs' claims concerning federal employee terminations because the CSRA and FSLMRS establish the "exclusive means" for reviewing challenges to federal employment decisions. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012). Plaintiffs, in response, contend that this Court has jurisdiction to hear their claims because "the CSRA and [FSLMRS] are intended to channel claims by government employees, not non-governmental organizations." ECF No. 97 at 23. In other words, according to Plaintiffs, those channeling provisions are irrelevant here because Plaintiffs are not entitled to seek administrative or judicial review under the CSRA.

But that has it backwards. Plaintiffs essentially concede that if similar claims were brought by the real parties in interest—terminated federal employees—they could proceed only through CSRA review. But because Plaintiffs are not federal employees and, therefore, are excluded from the CSRA, somehow that means they occupy a superior position to the terminated employees and can challenge the government's employment decisions directly in federal court. This is not the law. To the contrary, in authorizing employees and unions to challenge employment decisions, Congress denied review to anyone else. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984); *United States v. Fausto*, 484 U.S. 439 (1988); *see also Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (recognizing that the "exclusion" of a particular class of plaintiffs or claims from the CSRA scheme reflects a "manifestation of a considered congressional judgment" that there is no statutory entitlement to review (quoting *Fausto*, 484 U.S. at 448)).

The Supreme Court has repeatedly spoken to the CSRA's effects on district court jurisdiction. *See Elgin*, 567 U.S. at 10 (citing *Fausto* and *Thunder Basin*); *Fausto*, 484 U.S. at 444. Those decisions make clear that the CSRA's comprehensive scheme—providing for specified claimants, claims, processes, and remedies—is the sort of scheme that forecloses judicial review outside its contours. Accordingly, Plaintiffs' challenge to "personnel action taken against federal employees," *Fausto*, 484 U.S. at 455, is "of the type Congress intended to be reviewed within" the CSRA's statutory structure, *see Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994))—and thus subject to the specific limitations that Congress provided. Notably, the D.C. Circuit shares that understanding: Plaintiffs' employment-related claims fall directly into the "comprehensive statutory scheme[] for adjudicating employment disputes with the federal government," which "provide[s] the exclusive procedures by which federal employees may pursue employment- and contractor-related claims." *Widakuswara*, 2025 WL 1288817, at *2 (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("*AFGE*")); *see also Payne v. Biden*, 62 F.4th 598, 603–04 (D.C. Cir.) ("In reviewing the same statutory scheme here, we apply *Elgin* and find it 'fairly discernible' that Congress intended to preclude judicial review over claims falling within the CSRA's purview."), *cert. granted, judgment vacated*, 144 S. Ct. 480 (2023). Indeed, it was precisely such an action that the D.C. Circuit recently found precluded in *Widakuswara. See* 2025 WL 1288817, at *1 (finding district court likely lacked jurisdiction to challenge United States Agency for Global Media's "plac[ing] over 1,000 employees on administrative leave"). Notably, even though the D.C. Circuit en banc subsequently vacated the portions of the panel opinion regarding grant funding, it left undisturbed the portion of the opinion concerning USAGM's personnel decisions, strongly suggesting that the full D.C. Circuit concurred that such challenges are precluded. *Middle E. Broad. Networks, Inc. v. United States*, Nos. 25-5150, 25-5151, 25-5158, 2025 WL 1378735 (D.C. Cir. May 7, 2025) , *dissolving stay sub nom. Widakuswara v. Lake*, 2025 WL 1521355 (D.C. Cir. May 28, 2025).

**2.** Plaintiffs are also wrong that the *Thunder Basin* factors support this case continuing here. Each of the *Thunder Basin* factors favors Defendants.

First, Plaintiffs argue that the CSRA regime will not provide for meaningful judicial review if

they cannot seek relief immediately in the district court. ECF No. 97 at 24. But courts readily reject just that sort of argument, as Defendants have already explained. *See* ECF No. 90 at 23 (citing *Sackett v. EPA*, 566 U.S. 120, 130 (2012) and *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 638–39 (D.C. Cir. 2013)). Plaintiffs fail to address that point. Plaintiffs cite only *Axon* for the proposition that "preclusion of district court jurisdiction could foreclose all meaningful judicial review." ECF No. 97 at 24. But *Axon* involved a challenge to the constitutional structure of the administrative agency that was to hear its claims, whereas here Plaintiffs raise no challenge to the MSPB's constitutionality.

Second, Plaintiffs argue that their "claims are collateral to the review provisions in the CSRA and [FSLMRS] because they largely focus on Defendants' power to take the personnel actions, not 'how that power was wielded' against individual employees." *Id.* (quoting *Axon*, 598 U.S at 193). But that is just a concession that their challenges are to *personnel actions*. And because the CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees," *Fausto*, 484 U.S. at 455, Plaintiffs claims are within the heartland of CSRA review, not "wholly collateral" to it. *See Elgin*, 567 U.S. at 22.

Third, Plaintiffs argue that their "claims concern wholesale terminations and other actions intended to render agencies powerless; they are not focused on any specific 'employment relationship." ECF No. 97 at 25. But Plaintiffs' claims are based on the termination of federal employees—claims that fall squarely within the relevant agencies' expertise. *Id.* It matters not that Plaintiffs frame their claims as concerning "wholesale terminations"; the heart of this case is alleged harm flowing from the termination of government employees, which is governed by statutory provisions within the core of the agency's expertise. Accordingly, the agency's familiarity with such employment matters "is thus more than 'helpful background knowledge.' . . . It is expertise that goes to the core issues in this case." *AFGE*, 929 F.3d at 760.

## II.    The Complaint Should Be Dismissed under Rule 12(b)(6)

### A.    Plaintiffs' Appointment Clause Count Fails to State A Claim

The entirety of the Complaint rests on the contention that Mr. Musk has acted in a "lawless" manner, "with no legal authority," which Plaintiffs allege more than 40 separate times. This allegation

is incompatible with a claim that Mr. Musk's actions establish he has "significant authority" that violates the Appointments Clause, because the Appointments Clause is concerned only with authority vested "pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). If Mr. Musk has no lawful authority to take the actions complained of, as Plaintiffs contend, they have no Appointments Clause claim.

The Appointments Clause is concerned with safeguarding the legal power conferred in offices of the United States. It thus has two threshold requirements: (1) "a continuing position established by law" that is (2) vested with "significant authority pursuant to the laws of the United States." *Id.*. While both elements must independently be satisfied for an Appointments Clause to apply to a position, they must be satisfied *together*. That is, to state an Appointments Clause claim, Plaintiffs must allege that a specific continuing position is vested with significant legal authority, and that the incumbent of that position was not appointed in a manner commensurate with the degree of process required by the legal authority that position wields.

Plaintiffs fail to satisfy either requirement. Worse, their attempt to satisfy each element separately also fails in conjunction. First, they claim that the position of the USDS Administrator (which Musk concededly does not occupy) qualifies as an "office" for purposes of the Appointments Clause analysis. Then, they claim that that Mr. Musk's alleged actions—which undisputedly are not within the legal authority granted to the USDS Administrator role—are "significant." That does not work.

**1**. Defendants demonstrated in their Motion that Plaintiffs failed to allege that Mr. Musk occupied an "office" for purposes of the Appointments clause. ECF No. 90 at 26–29. Plaintiffs offer two unavailing responses, which essentially would write out the "established by law" and "pursuant to the laws of the United States," *id.*, portions of *Lucia*—the former of which is in the text of the Constitution itself, *see* U.S. Const. art. II, § 2, cl. 2. Plaintiffs also fail to respond at all to a significant portion of Defendants' argument.

First, Plaintiffs argue that a footnote in *Tucker v. CIR*, 676 F.3d 1129 (D.C. Cir. 2012), "explicitly refuted" the requirement that an office must be established by law for the Appointments

13

Clause to apply. ECF No. 97 at 26 (citing 676 F.3d at 1133 n.1). This is false. *Tucker* does not authorize an Appointments Clause claim to proceed where no formal "office" is involved. In *Tucker*, the D.C. Circuit explained that determining whether any relevant office was established by law "may but need not be the start of an Appointments Clause analysis." 676 F.3d at 1133 n.1. But far from holding that the determination that an office was "established by Law" was not an indispensable requirement under the Appointments Clause, the *Tucker* court's point was procedural: It explained that it did not need to determine whether the plaintiff's claim in that case satisfied the "established by Law" element in that case *first*, because it was sufficient to determine that the Appointments Clause claim failed for other reasons. *See id.* at 1133 ("[B]ecause we conclude below that Appeals employees do not exercise significant authority within the meaning of the Appointments Clause cases, we need not resolve whether their positions were 'established by Law' for purposes of that clause."). Thus, *Tucker* does not obviate the requirement that an office be "established by law" to implicate the Appointments Clause's substantive requirements. Nor could it. The court in *Tucker* was constrained by and did not purport to overrule the prior holding in *Landry v. FDIC* that it is "the threshold trigger for the Appointments Clause" for an office to be "established by law." 204 F.3d 1125, 1133 (D.C. Cir. 2000). But even if it had, Plaintiffs' construction of *Tucker* is inconsistent with, and could not survive, the Supreme Court's subsequent decision in *Lucia* that made "clear that an individual must occupy a 'continuing' position established by law to qualify as an officer." 585 U.S. at 245; *see also* U.S. Const. art. II, § 2, cl. 2 (providing for appointment of "Officers of the United States, whose Appointments . . . shall be established by law").

Second, Plaintiffs contend that courts determine the alleged "duties [individual government officials] actually perform," rather than the powers and constraints imposed on their *position* by law to satisfy the "significant authority" portion of *Lucia*'s standard. ECF No. 97 at 27. This contention is baseless.[6] To be sure, the duties of a position are important in determining whether the position is an

---

[6] Respectfully, the Court similarly erred in denying Defendants' motion to dismiss in *New Mexico*. *See* ECF No. 93 at 31-32. The Court appears to have taken Plaintiffs' allegations of Mr. Musk's personal activities as relevant to the analysis of "significant authority" under the Appointments Clause. *Id.* But

office. But the question is not what acts an individual government official is alleged to have performed in practice, as Plaintiffs would have it; it is the duties *vested in the position* that matter. This is self-evident in *Lucia*'s description of the test that the significant authority in question must be "pursuant to the laws of the United States," 585 U.S. at 245. Plaintiffs would have the Court read this language out of *Lucia*. It cannot do so.

Plaintiffs' test is also inconsistent with the Supreme Court's historical Appointments Clause analysis. *See, e.g.*, *Burnap v. United States*, 252 U.S. 512, 516 (1920) ("Whether [a federal official] is an officer or an employé is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties[,] and appointment thereto."). Each case Plaintiffs cite in support of their argument refutes their contention. To be sure, Chief Justice Marshall referred to "important duties" when analyzing the office at issue in *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747). But Plaintiffs omit that Chief Justice Marshall explicitly noted that those "important duties" were "define[d]" by "army regulations" that are "referred to in acts of congress." *Id.* In other words, the question he considered was the *legal* duties of the *position* of agent of fortifications, not the actions that Mr. Maurice claimed to have actually performed when serving in that role. The Supreme Court performed a similar analysis in *Buckley v. Valeo* and *Freytag v. CIR*, 501 U.S. 868 (1991), the two other cases Plaintiffs cite to support their argument. *See Buckley v. Valeo*, 424 U.S. 1, 109 (1976) ("The 1974 amendments to the Act . . . vest in [the FEC] primary and substantial responsibility for administering and enforcing the Act. The question that we address in this portion of the opinion is whether, in view of the manner in which . . . its members are appointed, the Commission may . . . exercise the powers conferred upon it [by the Act]."); *id.* at 109–13 (analyzing the numerous powers granted to the FEC by statute, including then-2 U.S.C. §§ 437c, 437d, 437f, 437g, & 438 and 26 U.S.C. §§ 9008, 9010, & 9040); *Freytag*, 501 U.S. at 881 ("The office of special trial

---

as Defendants further demonstrate below, this was error; the analysis of significant authority is focused on the legal authority bestowed on the office, not the individual alleged actions of a specific government official, whether or not those allegations are legally authorized powers of the role. Whether a plaintiff can state some other claim based on such allegations has no bearing on whether *the Appointments Clause* was violated.

judge is 'established by law,' . . . and the duties, salary, and means of appointment for that office are specified by statute."); *id.* at 882 (analyzing "the duties of special trial judges under subsection (b)(4)" and "subsections (b)(1), (2), and (3)" of 26 U.S.C. § 7443A).

The cases Plaintiffs cite to support their incorrect "functionalist" test, ECF No. 97 at 27–28, further confirm that the Appointments Clause is concerned with positions and the duties the law vests in those positions, not the specific tasks individuals holding a role may be alleged to perform.[7] *See Lucia*, 585 U.S. at 248–50 (noting SEC ALJ position is "created by statute, down to its 'duties, salary, and means of appointment'" and analyzing their duties under 5 U.S.C. § 556 and numerous regulations); *Tucker*, 676 F.3d at 1134 (analyzing duties and constraints on powers of IRS Appeals Office personnel under various statutes and regulations); *Edmund v. United States*, 520 U.S. 651, 662–66 (1997) (analyzing the duties and limitations on the authority of Coast Guard Criminal Appeals members set forth in 10 U.S.C §§ 837, 866 & 867); *Morrison v. Olson*, 487 U.S. 654, 660–65, 671–72 (1988) (analyzing the statutory powers and limitations on the authority of the independent counsel under 28 U.S.C. §§ 49, 592, 594, & 596); *United States v. Hartwell*, 73 U.S. 385, 394 (1867) (concluding that clerk in the office of the assistant treasurer was an officer because "[t]he General Appropriation Act of July 23d, 1866 authorized" his appointment, "his compensation was fixed by law [i.e., the July 23, 1866 act]" and established that "[h]is duties were continuing and permanent").[8]

---

[7] Plaintiffs' position that officer status would turn on the alleged actions of an individual holding a position is also squarely contrary to the well-established proposition that "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should 'continue, though the person be changed.'" *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (quoting *Maurice*, 26 F. Cas. at 1214). This centuries-old requirement would make little sense if the Clause were concerned with the individual incumbent of a position rather than the position itself.

[8] Even *Donziger*, in which there was limited direct authority governing the position in question—special prosecutors appointed by district courts pursuant to Fed. R. Crim. P. 42(a)(1)(A)—does not support Plaintiffs' contention that the Appointments Clause is concerned with the functions performed by an individual in the role, rather than of the role itself. The *Donziger* court first noted that such prosecutors' authority is limited by the statutory authority of the Attorney General to supervise and remove them. 38 F.4th at 294, 300–01. And then the court analyzed the duties of the *position* of the special prosecutor by analogy to the statutory provisions governing the independent counsel. *Id.* at 298–99. Importantly, the court never considered the actions purportedly taken by the individuals who prosecuted Donziger in his individual case—the inquiry that Plaintiffs propose the Court conduct here.

Nor can Plaintiffs save their claim by alleging that Mr. Musk is "the de facto head of DOGE," because Plaintiffs nowhere identify any legal authority vested in that role for the actions challenged in the Complaint. ECF No. 97 at 28. And it is clear that the duties vested in that role by law (which involve software modernization and consultation on federal hiring) do not constitute "significant authority," even if Mr. Musk did occupy that position. *See* Exec. Order No. 14,158 ("USDS E.O."), § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025); Exec. Order No. 14,170, § 2, 90 Fed. Reg. 8621 (Jan. 20, 2025). Thus, even if the DOGE Administrator's role were the basis for the Appointments Clause analysis (which it is not, because Mr. Musk never held that position, as Plaintiffs concede, *see* Compl. ¶ 38), the limited technological and consultative duties of that role are not those of an officer.[9]

**2**. Plaintiffs also fail to address the impracticability and broader implications of their erroneous view of the Appointments Clause. They continue to offer no explanation of how numerous powerful White House advisors, from the Chief of Staff to the White House Counsel—who *no one* contends are "officers of the United States" subject to the Appointments Clause—are any different from what they allege of Mr. Musk. And they fail to explain how a theory in which the Appointments Clause is triggered every time an individual official takes an action that some plaintiff or court deems "significant"—whatever their position or authority—could operate in practice. Can a presidential advisor be an "officer" one day because their proposals are adopted and stop being an "officer" the next if their proposals are not heeded? Plaintiffs have no answer.

This is why Plaintiffs' theory of the Appointments Clause ultimately fails. If an official occupies a position vested with certain legal powers and then takes actions that she is not legally authorized to take pursuant to that position, this would not "make a nullity of the Appointments Clause," as Plaintiffs claim. ECF No. 97 at 29. Nor does Defendants' reading of the Appointments

---

[9] Plaintiffs also distort a sentence from Defendants' opening brief noting that an Appointments Clause claim involves action taken by an official "lacking authority to do so" by taking it out of context. ECF No. 97 at 26–27 (quoting ECF No. 90 at 29). As is clear from Defendants' motion, the Appointments Clause is concerned with the powers of "a *position* that is equipped with . . . formal authority," ECF No. 90 at 28, and that Plaintiffs' concession that Mr. Musk does not have "any independent legal authority to command anyone to do anything" and failure to allege that officials with the proper authority did not "sign[] on the dotted line" necessarily dooms their claims. *Id.* at 27 n.8 and 29.

Clause "sanction unlimited executive power." ECF No. 93 at 29. For example, a validly appointed Commissioner on Presidential Scholars, *see* Exec. Order. No. 11,155, 29 Fed. Reg. 6909 (May 23, 1964), may not fire the Secretary of Health and Human Services, precisely because that authority hasn't been granted to her "pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245. But that has nothing to do with whether that Commissioner was validly appointed, and any claim regarding the validity of that action would not lie under the Appointments Clause. The problem with the action would instead be the actor's lack of legal power to do so because neither Congress nor the Constitution vested that particular power in the Commissioner's particular office. So too here. Plaintiffs may be opposed to actions they believe were taken at Mr. Musk's advice or direction, but that has no bearing on whether his role requires any particular form of appointment.

This is also the lesson of *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987). Plaintiffs mischaracterize *Andrade* as holding that "an individual's exercise of significant authority in violation of the Appointments Clause may sometimes by cured through ratification by a properly appointed individual from the same department." ECF No. 97 at 29. But *Andrade* has no such limitation and did not involve ratification.[10] *Andrade* holds that when a challenged action "was carried out by the duly appointed official in charge of the agency," a party has "suffered no injury at the hands of an official who exercised power in violation of the Appointments Clause." 824 F.2d at 1257; *see id.* ("[T]he particularized injury that permitted appellants to have standing to raise their claim was the loss of their jobs, not the mere fact that the government initiated plans that could have resulted in their demotion or termination. . . . It is the actual implementation of the RIF which we have power to redress, and

---

[10] Ratification is a specific term of law: when a decision made *in the past* by an official with a defective appointment is later *ratified* by an official with a valid appointment, that ratification "resolves [an Appointments Clause] claim on the merits by remedying the defect (if any) from the initial appointment." *See, e.g., Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) (cleaned up). By contrast, *Andrade* holds that so long as the official *authorizing* an action *in the present* when it takes effect is validly serving, *there is no Appointments Clause problem to begin with*, regardless of who planned the action. *See* 824 F.2d at 1257.

that action, it is clear, came at the hands of a duly appointed official."). [11] Plaintiffs allege that Mr. Musk has no lawful power and directed others to use theirs. Their Appointments Clause claim is thus squarely foreclosed by *Andrade*.

Finally, Plaintiffs' attempt to contend that Mr. Musk has "significant authority" as an advisor with no legal authority, contrary to Defendants' arguments, *see* ECF No. 90 at 30–31, runs headlong into the Supreme Court's order last week in *U.S. DOGE Service v. Crew*, 605 U.S. ---, 2025 WL 1602338 (June 6, 2025). In staying a district court order authorizing discovery against USDS to determine "whether USDS wields substantial authority independent of the President and is therefore subject to FOIA," *CREW v. U.S. DOGE Serv.*, ---F.R.D.---, 2025 WL 1392836, at *1 (D.D.C. Apr. 15, 2025), the Court observed that the inquiry "cannot turn on the entity's ability to persuade." *U.S. DOGE Serv.*, 2025 WL 1602338, at *1. The same holds true under the Appointments Clause.

**3.** Plaintiffs argue that their allegation that Mr. Musk "is the de facto head of DOGE" saves their claim, because "DOGE is not a time-limited entity" and "the leader of DOGE is not term-limited." ECF No. 97 at 30. But this runs into the same problem as the rest of their argument. The only official position Plaintiffs actually identify as that of the "leader of DOGE" is the DOGE Administrator role. *Id.* And as explained above, the duties vested in that office are not those of an officer, and Plaintiffs do not base their challenge on any actions taken pursuant to the authority granted to that position in the various Executive Orders. *See supra* at 17; *see* Compl. ¶ 8 ("The executive order creating DOGE states that DOGE's purpose is updating technology."). Instead, they allege unique "lawless" authority wielded by Mr. Musk and Mr. Musk alone. *E.g., id.* ¶ 335 (Mr. Musk "wields vast, unchecked power over large swaths of the federal government"); *id.* ¶¶ 2, 8. But these allegations run squarely into the well-established rule that "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should 'continue, though the person be

---

[11] Nor does it matter whether the official who did the planning was a subordinate agency official or a White House advisor. *Contra* ECF No. 93 at 33–34. What *Andrade* establishes is that the relevant inquiry for Appointments Clause purposes is whether the official who actually "carried out" the challenged act had the authority to do so.

changed.'" *Donziger*, 38 F.4th at 297 (quoting *Maurice*, 26 F. Cas. at 1214)). And if the DOGE Administrator is not vested with the powers Plaintiffs contend Mr. Musk has "exercised," it matters not that "the role of leading DOGE must eventually fall to someone else."[12] ECF No. 97 at 30, 32.

### B.    Plaintiffs' APA Claims Must Be Dismissed

Defendants previously explained that Plaintiffs' APA claim should be dismissed because it amounts to an impermissible programmatic attack that does not identify particular final agency actions subject to judicial review. Plaintiffs' response confirms that they bring an overly generalized programmatic challenge. Indeed, Plaintiffs concede they are not challenging specific employment, grant, or contract terminations, but government conduct "wholesale." ECF No. 97 at 25. The breadth of that response underscores that Plaintiffs have failed to state a "circumscribed, discrete" APA claim. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–64 (2004). Instead, their response demonstrates that their pleading for their APA claim(s) rests on broad categorical pleading, i.e. "workers, contracts, and grants" rather than specific final agency actions. *See* ECF No. 97 at 38. This failure to plead necessary components of an APA claim warrants dismissal.

The problem is not that Plaintiffs have challenged "too many" actions. *Id.* The problem is that they cannot package together a "collection of many individual actions" and lay those actions "before the courts for wholesale correction under the APA." *Widakuswara*, 2025 WL 1288817, at *3. Yet that is what Plaintiffs attempt to do here: in one APA count they challenge numerous categories of actions pertaining to federal workers, contracts, and grants by 16 agency defendants. Where they seek to challenge worker, contract, and grant termination at 16 agencies, their Complaint needed—but failed—to plead facts about each worker, contract, and grant termination at each of the 16 agencies, as well as the final agency decision respecting each such occurrence. That is so because each action would have been taken by a different entity under its own authority and would rest upon different reasons and a different factual record. Where Plaintiffs instead challenge multiple agencies' actions involving numerous topics in one count, that is just the sort of axiomatic programmatic challenge the

---

[12] Indeed, Plaintiffs concede that, since at least as of the time they filed their Complaint, that role was occupied by Amy Gleason. Compl. ¶ 38.

Supreme Court has squarely rejected. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891–93 (1990); *Norton*, 542 U.S. at 62–64.

Plaintiffs' reference to numerous dramatically different cases that allowed APA claims to proceed does not help them. In *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025), while there were multiple named agency defendants, the gravamen of the complaint concerned a discrete issue: a single OMB directive implementing the President's executive orders. And in *Hispanic Affairs Project v. Acosta*, the D.C. Circuit considered a far more circumscribed challenge to Homeland Security's "particular" practice of habitually approving and extending H-2A visas for lengthy periods, and the statutory command that the plaintiff sought to enforce was cabined and direct. 901 F.3d 378, 388 (D.C. Cir. 2018). The same is true about Plaintiffs' reliance on *R.I.L-R v. Johnson*, where the court again considered one agency's consideration of a single factor across several agency proceedings. 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Plaintiffs here attack particularized agency action—namely, ICE's consideration of an allegedly impermissible factor in making custody determinations"); *see also San Juan Audubon Soc'y v. Veneman*, 153 F. Supp. 2d 1, 5 (D.D.C. 2001) ("the plaintiffs' claim is limited to the defendants' use of the M–44s in certain areas without referring to the statutorily required maps."). Those decisions do not provide support for extending APA review to an undifferentiated claim seeking to enjoin 16 federal agencies from terminating or cancelling any grants or contracts, terminating any federal employees, or conducting any reductions in force. *See* Compl., Prayer for Relief ¶ d.

Plaintiffs argue that they do not seek "wholesale improvement" or "wholesale reform." ECF No. 97 at 39. But Plaintiffs' argument is at odds with itself, as they elsewhere assert they are, in fact, seeking relief from "wholesale terminations and other actions." *Id.* at 25. Their prayer for relief confirms that the latter view is correct. Compl., Prayer for Relief ¶ d. And their response fails to point to specific allegations about final agency actions that are ripe for APA review. Plaintiffs likewise fail to identify "agency action" by the Defendants named in their APA claim. For example, Plaintiffs argue that paragraphs 210–14 of the Complaint state APA claims, ECF No. 97 at 39, but the first three of those paragraphs target actions allegedly taken by DOGE, against whom Plaintiffs bring no APA claim, *id.* at 37, and the fourth relates to personnel actions outside the scope of the APA as a matter

of law. *Widakuswara*, 2025 WL 1288817, at *2 ("[The D.C. Circuit] ha[s] long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions.").

Plaintiffs' claims about contract and grant termination also remain unspecified programmatic attacks. While Plaintiffs allege that certain EPA contracts were cancelled, *e.g.*, Compl. ¶¶ 250–51, they fail to plead what the contracts were, why the EPA took its action, and which Plaintiff(s) were injured by the termination. To render an APA claim plausible against any of the agencies sued here, the answers to those questions would need to be pled in the Complaint for each termination by each agency. And in no APA case are Plaintiffs entitled to "use discovery to fully flesh out facts," ECF No. 97 at 39, that should be known and pled at the time of the Complaint, *see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) ("when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," "the entire case on review is a question of law," and it "is based on [and limited to] the agency record.").

### C.    The Court Should Dismiss Plaintiffs' Derivative Claims

Plaintiffs deny that their separation of powers and *ultra vires* claims are derivative; according to them, "they are at the heart of this case." ECF No. 97 at 30. Yet Plaintiffs fail to respond to Defendants' showing that these equitable causes of action substantially overlap. ECF No. 90 at 39. Moreover, the fact that these claims are substantially derivative of their (impermissible) APA claim is reason enough to dismiss them. *E.g.*, *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, ---F. Supp. 3d---, 2025 WL 1568301, at *9 (D.D.C. June 3, 2025) ("The attempt at a constitutional claim is just a repackaging of the APA challenge."); *Carter v. U.S. Dep't of Educ.*, No. 25-cv-0744 (PLF), 2025 WL 1453562, at *14 (D.D.C. May 21, 2025) ("Defendants argue that [plaintiffs'] *ultra vires* claim essentially is a repackaging of their APA claims. The Court agrees. The basis of plaintiffs' *ultra vires* claim is identical to that of their APA claims . . .") (cleaned up).

**1.** Although Plaintiffs characterize their separation of powers claim as alleging that "Mr. Musk and DOGE have violated the separation of powers by systematically undermining and dismantling numerous programs Congress established and funded," this does not make it any less an impermissible allegation of statutory violation masquerading as a constitutional one. ECF No. 97 at 31; *see Dalton v.*

*Specter*, 511 U.S. 462, 472 (1994) (rejecting the notion "that every action by the President, or by another executive official," in excess of statutory authority is "*ipso facto* in violation of the Constitution"). Tellingly, Plaintiffs now backpedal from their Complaint's reliance on the Congressional Budget and Impoundment Control Act of 1974, arguing that they did not bring a claim under that provision, "as that statute did not include a private enforcement mechanism." ECF No. 97 at 31. Plaintiffs' attempt to retreat does not work.[13] Notably, a court in this district recently rejected precisely what Plaintiffs are trying to do here. There, the plaintiff contended that "the overall decision to shut down an agency exists outside of statutory considerations, because only Congress has the power to make a law that shutters an agency." *Ass'n for Educ. Fin. & Pol'y, Inc.*, 2025 WL 1568301, at *9. The court, however, noticed the plaintiffs' reliance on congressional statutes and thus rejected their separation of powers claim, determining that it was "truly alleging a statutory violation, not a constitutional issue," and "[t]he attempt at a constitutional claim is just a repackaging of the APA challenge," which "*Dalton* forecloses . . ." *Id.* So too here. A separation of powers claim fails where, as evident here, its theory "is based on executive officials violating *statutory* requirements . . ." *Id.*; *see Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020).

Even putting the substantive issue aside, Defendants showed that Plaintiffs' factual allegations are insufficient to state a claim because they are substantially based on bald allegations made solely on information and belief. ECF No. 90 at 39. "[S]uch allegations must also be accompanied by a statement of the facts upon which the allegations are based," which the Complaint fails to provide. *Flowers v. Exec. Off. Of the President*, 142 F. Supp. 2d 38, 47 (D.D.C 2001); *see Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021). Plaintiffs fail to respond at all regarding those allegations' sufficiency. Thus, they concede the point, *see Kone*, 808 F. Supp. 2d at 83, and their separation of powers claim fails.

**2.** Plaintiffs' *ultra vires* claim fares no better. They fail to appreciate the high bar that *ultra vires* relief imposes and fail to clear it. The D.C. Circuit has stressed "that *ultra vires* review has 'extremely

---

[13] In fact, Plaintiffs double down on statutory allegations, contending for the first time that "in the Inflation Reduction Act, Congress appropriated $500,000,000 . . . to restore staffing at [the National Park Service], only to have positions cut by Mr. Musk and DOGE." ECF No. 97 at 33 (citing Pub. L. No. 117-169, § 50223, 136 Stat. 1818, 2052.

limited scope.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022). Under D.C. Circuit precedent, an *ultra vires* claim must satisfy three requirements: "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the [Defendants] plainly act[] in excess of [their] delegated power and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). The third factor is "especially demanding," and only applies where the error "is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute." *Changji*, 40 F.4th at 722.

Plaintiffs try to escape this especially demanding standard, arguing that it applies to some *ultra vires* claims but not others. ECF No. 97 at 34–35. But that is exactly the argument that the D.C. Circuit rejected in *Fed. Express Corp.* 39 F.4th at 764. There, the Circuit confirmed that *ultra vires* challenges— of whatever stripe—require more than "routine" error and instead require a "clear" excess of authority. *Id.* at 764–65; *cf. Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420, at *5 n.2 (D.D.C. May 12, 2025) ("The plaintiffs also raise non-statutory *ultra vires* claims. The Court need not address those claims because if the plaintiff's claims would fail review under the APA, then those claims necessarily could not succeed under *ultra vires* review, which has an even narrower scope.") (citing *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)). And it reaffirmed that this test is "essentially a Hail Mary pass." *Fed. Express Corp.* 39 F.4th at 765.[14] Notably, courts in this district have continued to recognize the "heavy burden to prevail on an *ultra vires* claim" that Plaintiffs seek to evade. *See Htet v. Trump*, No. 24-cv-1446 (RC), 2025 WL 522033, at *4 (D.D.C. Feb. 18, 2025) (citing *Changji*, 40 F.4th at 722).

But Plaintiffs are not entitled to *ultra vires* relief here under any standard of review. Briefly, the temporary organization statute, 5 U.S.C. § 3161, defines a "temporary organization" as one that is "established by law or Executive order for a specific period not in excess of three years for the

---

[14] The case Plaintiffs cite, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908–15 (D.C. Cir. 2024), is inapposite because it concerns the limited question whether an entity can legally promulgate binding regulations, a question with no bearing on the issues here.

purposes of performing a specific study or other project." *Id.* § 3161(a)(1). In accordance with Section 3161, Executive Order 14,158 established the U.S. DOGE Service Temporary Organization and "dedicated" that entity "to advancing the President's 18-month DOGE agenda" and to "maximize governmental efficiency and productivity." USDS E.O. §§ 1, 3(b). As a facial matter, these purposes fall comfortably within the capacious scope of Section 3161's "other project" language. So ends the inquiry under the extremely limited scope of *ultra vires* review.

Moreover, the APA provides an alternative procedure for reviewing Plaintiffs' claims, which forecloses *ultra vires* review. *See* ECF No. 90 at 41 (citing *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830 (D.C. Cir. 2024); *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181 (D.D.C. 2024)). Plaintiffs summarily dismiss those cases as "irrelevant authority" and concede only that "*sometimes* the availability of an APA claim forecloses the availability of other relief," asserting that their claims concern "Mr. Musk and DOGE's actions" and that they cannot seek APA review of actions by non-agency defendants. ECF No. 97 at 36–37 (emphasis original). But that misses the point. Plaintiffs' *ultra vires* claim is "grounded in the same conduct as [their] APA challenges." *Ass'n for Educ. Fin. & Pol'y, Inc.*, 2025 WL 1568301, at *9. Recently, Judge Friedman similarly rejected a plaintiff's *ultra vires* claim as merely a "repackaging of their APA claims" in that the "basis of [the] *ultra vires* claim is identical to that of their APA claims." *Carter*, 2025 WL 1453562, at *14. The same is true here, where each claim challenges substantially the same conduct: grant and contract terminations, employee removals and workforce reductions, and alleged federal agency dismantling. *Compare* Compl. ¶ 342 *with id.* ¶ 324.

Finally, the same pleading defects that doom Plaintiffs' separation of powers claim also doom their *ultra vires* claim. As discussed in Defendants' opening brief, this claim substantially consists of allegations made solely on information and belief. ECF No. 90 at 41–42. As noted above, these allegations are insufficient and Plaintiffs' failure to respond to this argument concedes it. *See Kareem*, 986 F.3d at 866; *Kone*, 808 F. Supp. 2d at 83.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

Dated: June 12, 2025                    Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General

                                        DIANE KELLEHER
                                        Director, Federal Programs Branch

                                        CHRISTOPHER R. HALL
                                        Assistant Director, Federal Programs Branch

                                        _/s/ Christopher M. Lynch_____
                                        GARRY D. HARTLIEB (IL Bar. No. 6322571)
                                        CHRISTOPHER M. LYNCH
                                        (DC Bar No. 1049152)
                                        JACOB S. SILER (DC Bar No. 1003383)
                                        JAMES J. WEN (NY Bar No. 5422126)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington D.C. 20005
                                        (202) 353-4537
                                        christopher.m.lynch@usdoj.gov

                                        *Attorneys for Defendants*