**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **STATE OF NEW MEXICO**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*,<br><br>Defendants. | No. 25-cv-429 (TSC) |
| **JAPANESE AMERICAN CITIZENS LEAGUE**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**ELON MUSK**, *et al.*,<br><br>Defendants. | No. 25-cv-643 (TSC) |

<u>**MEMORANDUM OPINION**</u>

On January 20, 2025, President Trump issued an Executive Order purporting to establish the "Department of Government Efficiency" ("DOGE"). *See* Compl. ¶ 65, No. 25-cv-643, ECF No. 1; *see also* Establishing and Implementing the President's "Department of Government Efficiency," Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025). Soon thereafter, a coalition of nonprofit organizations (collectively, "Plaintiffs" or "Nonprofit Plaintiffs")[1] filed this lawsuit, alleging that DOGE has unlawfully assumed an expansive role in the federal government—terminating grants, cutting Congressionally allocated funds, firing federal workers,

---

[1] Nonprofit Plaintiffs are the Japanese American Citizens League, OCA – Asian Pacific American Advocates, the Sierra Club, and the Union of Concerned Scientists.

and shuttering whole agencies without lawful authority to do so.  *See* Compl. ¶¶ 64, 91, 154. Defendants now move to dismiss.  *See* Defs.' Mot. to Dismiss, No. 25-cv-429, ECF No. 90 ("MTD").  For the reasons set forth below, the court will GRANT in part and DENY in part the Motion to Dismiss.

## I.    BACKGROUND

In March 2025, the court consolidated this case brought by Nonprofit Plaintiffs with a similar challenge to DOGE's activities brought by a coalition of states led by New Mexico.  *See* Min. Order (Mar. 20, 2025), No. 25-cv-643.  The court has already recounted much of the relevant background in an earlier decision granting in part and denying in part Defendants' Motion to Dismiss in the case brought by the State Plaintiffs.  *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 186–91 (D.D.C. 2025).  The following is a brief summary.

### A.  Factual Background

In his Executive Order purporting to establish DOGE, President Trump renamed the U.S. Digital Service the "United States DOGE Service" ("USDS") and created within the USDS the "U.S. DOGE Service Temporary Organization."  Compl. ¶¶ 68, 70.  The Order stated that the DOGE Service Temporary Organization "shall be dedicated to advancing the President's 18-month DOGE agenda" and "shall terminate on July 4, 2026."  90 Fed. Reg. at 8,441.  Although the Order describes a relatively limited role for DOGE, focused on modernizing the federal government's technology, *see id.*, subsequent Executive Orders have indicated that DOGE plays a more expansive role regarding the Administration's efforts to reduce the size of the federal workforce and to cut federal spending.  *See* Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025) (requiring each agency to develop a hiring plan and to make hiring decisions "in consultation with the agency's DOGE Team Lead"); Implementing the President's

"Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (directing agency heads to consult with DOGE officials to, among other things, "review all existing covered contracts and grants").

Plaintiffs claim that DOGE has vastly exceeded even the more expansive roles described by the later Executive Orders. Rather than acting as mere consultants to agency officials, DOGE officials have allegedly "direct[ed] executive departments and agencies to cancel federal grants and loans, stop payments, terminate employees, reduce the workforce, and dismantle the department or agency itself," and have directly undertaken such actions themselves. Compl. ¶ 146; *see also id.* ¶ 144. DOGE has publicly claimed that it is saving the federal government billions of dollars through "a combination of . . . contract/lease cancellations[,] grant cancellations, interest savings, programmatic changes, regulatory savings, and workforce reductions." *Id.* ¶ 159; *see also id.* ¶ 155. DOGE has also claimed credit for shuttering the U.S. Agency for International Development. *Id.* ¶¶ 192–95. Plaintiffs further allege that DOGE officials lack any lawful authority to undertake such sweeping action. *Id.* ¶¶ 117–21.

### B. Procedural History

In March 2025, Nonprofit Plaintiffs filed this lawsuit against the U.S. DOGE Service and two individuals associated with DOGE (collectively, "DOGE Defendants"), as well as sixteen federal agencies and the heads of those agencies (collectively, "Agency Defendants"). Plaintiffs' Complaint brings four claims: Count One asserts that the DOGE Defendants are acting *ultra vires*—that is, terminating grants, firing federal workers, and undertaking other action "despite lacking lawful authority." Compl. ¶¶ 322–25. Count Two alleges that the DOGE Defendants are violating the separation of powers by cancelling grants and firing workers for which Congress has provided appropriations and by otherwise "refusing to spend money appropriated by Congress." *Id.* ¶¶ 326–29. Count Three claims that Elon Musk—sued in his official capacity

as the head of DOGE—is violating the Appointments Clause by wielding the power of a principal officer without having received Senate confirmation.  *Id.* ¶¶ 330–38.  And Count Four claims that Agency Defendants have undertaken unlawful agency action in violation of the Administrative Procedure Act ("APA") by, among other things, terminating grants and firing federal workers.  *Id.* ¶¶ 339–42.  Although Elon Musk has left government, *see* Decl. of Amy Gleason, ECF No. 117-1, Plaintiffs' claims against him in his official capacity continue to run against his successor.  *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party."); *see also infra* Section III.B.c.

Defendants move to dismiss for lack of subject matter jurisdiction or, in the alternative, failure to state a claim.  For the reasons stated below, the court will GRANT Defendants' Motion with respect to Plaintiffs' separation of powers and APA claims and DENY the Motion with respect to Plaintiffs' Appointments Clause and *ultra vires* claims.

## II.    LEGAL STANDARDS

Plaintiffs bear the burden of establishing this court's jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  In evaluating whether Plaintiffs have met that burden at the pleading stage, the court is "required to 'accept as true all of the factual allegations contained in the complaint.'"  *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002)).  But the court is not limited "to the allegations of the complaint" and "may consider such materials outside the pleadings as it deems appropriate."  *Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64, 69 (D.D.C. 2021) (cleaned up).

In reviewing a motion to dismiss for failure to state a claim, the court must determine whether the Complaint states "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### III.    DISCUSSION

#### A. Jurisdiction

##### a.    Subject Matter Jurisdiction

"This Court starts where it must: with jurisdiction." *Cemex, Inc. v. Dep't of Interior*, 560 F. Supp. 3d 268, 274 (D.D.C. 2021). In general, district courts have jurisdiction over claims arising under federal law, "but Congress may preclude [] jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *AFGE, AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) ("*AFGE I*"). "It rests with Congress to determine not only whether the United States may be sued, but in what courts the suit may be brought." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014) (cleaned up).

Defendants contend that this court lacks jurisdiction over Plaintiffs' claims to the extent those claims challenge the termination of federal grants and the firings of federal employees. *See* MTD at 16–25. They argue that the Tucker Act vests exclusive jurisdiction over grant-related claims with the Court of Federal Claims, and the Civil Service Reform Act ("CSRA") channels employment claims to the Merit Systems Protection Board ("MSPB"). *See* MTD at 16, 20. The court agrees that it lacks jurisdiction over past grant terminations and employment claims, but the Tucker Act does not divest this court of as much jurisdiction as Defendants assert.

### i. *Termination of Federal Grants*

To start, the court agrees with Defendants that it lacks jurisdiction over Plaintiffs' claims to the extent they directly challenge past grant terminations. The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over claims based on an "express or implied contract with the United States" for over $10,000. 28 U.S.C. § 1491(a)(1); *see also* § 1346(a)(2). And the APA's limited waiver of sovereign immunity does not extend to orders "to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The Supreme Court has recently indicated that, under these principles, district courts lack jurisdiction to adjudicate claims that directly challenge past grant terminations. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) (citing *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam)). To reinstate a grant would be "to order relief designed to enforce [an] 'obligation to pay money' pursuant to those grants." *See id.* at 2659 (majority opinion) (quoting *California*, 604 U.S. at 651). And a direct challenge to a grant termination is, in effect, "a breach of contract claim" which "must be brought in the Court of Federal Claims." *Id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part).

"Nonetheless, the Court did not go so far as to suggest that the Tucker Act precludes federal district court jurisdiction over all claims relating to grant terminations." *Council for Opportunity in Educ. v. Dep't of Educ.*, No. 25-cv-3514, 2026 WL 120984, at *7 (D.D.C. Jan. 16, 2026). As Justice Barrett made clear in her controlling concurrence in *NIH*, district courts still have jurisdiction to vacate unlawful policies concerning grant terminations. *See* 145 S. Ct. at 2661 (Barrett, J., concurring). That a policy "relate[s] to grants does not transform a challenge to [that policy] into a claim found upon contract." *Id.* (cleaned up). That is in part because

"[v]acating the guidance does not reinstate terminated grants," *id.*, meaning the relief granted would not amount to an impermissible order to pay out a contractual obligation. *See California*, 604 U.S. at 650–51. And it is in part because such relief "would not be determined by reference to the terms of the contract," but instead by reference to established principles of constitutional and administrative law. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). In sum, this court cannot review past grant terminations, but the Tucker Act does not deprive it of jurisdiction to vacate and prospectively enjoin unlawful policies concerning such terminations or decisions to cut funds appropriated by Congress—decisions which do not sound in contract.

### ii.  Firings of Federal Employees

Next, Defendants contend that the CSRA displaces this court's jurisdiction over Plaintiffs' claims insofar as they challenge DOGE's mass firings of federal workers. The CSRA "generally directs claims concerning [adverse] personnel actions [against federal employees] to the Merit Systems Protection Board," and disputes regarding federal labor-management issues to the Federal Labor Relations Authority ("FLRA"). *Lucas v. AFGE*, 151 F.4th 370, 375 (D.C. Cir. 2025). But the court must decide whether claims challenging mass firings on constitutional grounds—brought not by federal workers and their unions, but by nonprofits harmed by those firings—are "of the type Congress intended to be reviewed within" the CSRA's "statutory structure." *Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023) (cleaned up). Three considerations aid that inquiry: "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim? Next, is the claim 'wholly collateral to the statute's review provisions'? And last, is the claim 'outside the agency's expertise'?" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)). These considerations indicate that this court lacks jurisdiction over Plaintiffs' employment claims.

To start, the CSRA comprehensively "regulates virtually every aspect of federal employment." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009). It provides a "carefully constructed . . . system for review and resolution of federal employment disputes, intentionally providing—and intentionally not providing—particular forums and procedures for particular kinds of claims." *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). Plaintiffs do not dispute that a federal labor union could, for example, bring claims related to mass reductions in force before the FLRA, or that individual fired employees could bring claims before the MSPB. *See Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 8 (D.D.C. 2025). Instead, they argue that *their* claims are excluded from MSPB or FLRA review because, as nonprofit organizations, they are neither federal employees nor federal unions able to access those review mechanisms. *See* Pls.' Opp'n to MTD at 23–25, ECF No. 97 ("Pls.' Opp'n"). But "[i]n a complex scheme of this type, the omission of such a provision" allowing non-employees or non-unions to challenge federal labor decisions "is sufficient reason to believe that Congress intended to foreclose [their] participation" in these disputes and to instead leave the disputes to direct stakeholders. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984).

Second, Plaintiffs' challenges to the firings of federal employees are not wholly collateral to the CSRA's review provisions. Indeed, the Supreme Court has said that "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012). And the D.C. Circuit has indicated that a federal labor union can challenge the government's implementation of a "government-wide rule[]" by charging "that the agency had refused to bargain over mandatory matters" in violation of the CSRA. *See AFGE I*, 929 F.3d at 757. Such a challenge could be mounted against the

implementation of a mass reduction in force policy.  *See Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d at 8.  Finally, although the MSPB and the FLRA may address "nothing special about the separation of powers," *Axon Enter.*, 598 U.S. at 194, the Supreme Court has said that the CSRA's "exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee and the challenged employment action." *Elgin*, 567 U.S. at 15.  Moreover, the MSPB or the FLRA could reinstate fired workers on nonconstitutional grounds uniquely within their wheelhouse, thus "obviat[ing] the need to address the constitutional challenge." *Id.* at 22–23.  In sum, the CSRA displaces this court's jurisdiction over Plaintiffs' claims insofar as they concern employment issues.

> b.  <u>Standing</u>

That does not end the jurisdictional inquiry.  Defendants also contend that Plaintiffs lack Article III standing.  MTD at 7–16.  Under Article III of the Constitution, "the jurisdiction of federal courts" is limited "to 'Cases' and 'Controversies.'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).  For there to be a case or controversy, a plaintiff must have standing to sue.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

As the party invoking the court's jurisdiction, Plaintiffs "bear[] the burden of establishing" standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Notably, "the manner and degree of evidence required" to establish standing varies depending on the "stage[] of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual allegations . . . may suffice."  *Id.* (cleaned up).  The court, moreover, is not limited to allegations in the complaint.  It may also "'consider materials outside the pleadings,'" "including additional declarations or affidavits provided by a plaintiff to support standing."  *Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C. 2022) (quoting *Marsh v.*

*Johnson*, 263 F. Supp. 2d 49, 54 (D.D.C. 2003)); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, . . . it is within the trial court's power to allow . . . the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.").

Nonprofit Plaintiffs argue that they need not establish their own standing because the court has already held that the State Plaintiffs adequately plead standing. *See* Pls.' Opp'n at 4 n.2; *see also New Mexico*, 784 F. Supp. 3d at 191–98. This argument is unavailing. "[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). "At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id.* And in fashioning an injunction, the court is limited to issuing relief that is no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Thus, because each Nonprofit Plaintiff seeks injunctive relief that covers them individually and not the State Plaintiffs, each Nonprofit Plaintiff must establish their own standing. Moreover, the State Plaintiffs have since voluntarily dismissed their claims. *See* Notice of Voluntary Dismissal, ECF No. 116.

Nonprofit Plaintiffs assert associational standing to sue on behalf of their members. Pls.' Opp'n at 4–10. An association has standing if (1) at least one of its members has standing in his or her own right, (2) "the interests [that the association] seeks to protect [through the lawsuit] are germane to its purposes," and (3) it is not necessary for "an individual member [to] participate [directly] in the lawsuit." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021) (cleaned up). Defendants do not dispute that the latter two requirements are met, and the court is satisfied that they are. *See Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 53–58 (D.C.

Cir. 1988) (explaining that the germaneness requirement is "undemanding" and that requests for injunctive relief generally do "not . . . require[] the participation of any individual member"). Instead, Defendants contend that each Plaintiff fails to identify a member with standing in his or her own right. *See* MTD at 8.

### i. Standing Declarations

As an initial matter, Plaintiffs seek to establish standing using eight declarations from their members.[2] Plaintiffs have moved for leave to file five of these declarations under pseudonyms. *See* Pls.' Second Mot. for Leave to Identify Declarants by Pseudonym, ECF No. 98. The court will grant Plaintiffs' motion for purposes of deciding the Motion to Dismiss.

Although the public has a strong interest in the "openness" of judicial proceedings, the court may in "rare" cases allow parties to proceed pseudonymously. *See In re Sealed Case*, 971 F.3d 324, 326 (D.C. Cir. 2020) (cleaned up). The moving party must first demonstrate "a concrete need for such secrecy" and identify the "consequences that would likely" result should secrecy be denied. *Id.* Upon "a legitimate showing of need," the court must balance the moving party's "interest in anonymity against countervailing interests in full disclosure." *Id.*

Although the declarations do not reveal sensitive or highly personal information regarding Plaintiffs' members, Plaintiffs have demonstrated a nonspeculative danger that their members would be subjected to harassment and retaliation should their names be disclosed. *See* Am. Sealed Mot. to Proceed, ECF No. 72 at 5–7. They have also shown that their members' interest in anonymity outweighs the countervailing interests in disclosure, at least at this stage of

---

[2] *See* Ex. A, Decl. of Mary Anne Kenworthy, ECF No. 97-1; Ex. B, Decl. of J. Doe 2, ECF No. 97-2; Ex. C, Decl. of J. Doe 3, ECF No. 97-3; Ex. D, Decl. of Rebecca Ozaki, ECF No. 97-4; Ex. E, Decl. of J. Doe 4, ECF No. 97-5; Ex. F, Decl. of J. Doe 5, ECF No. 97-6; Ex. G, Decl. of J. Doe 6, ECF No. 97-7; Ex. H, Decl. of Connor McIntosh, ECF No. 97-8.

the litigation.  Although the public has a heightened interest in transparency given that this is a suit against government officials regarding an important matter of government affairs, *see Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014), the high-profile aspect cuts both ways, because it also exacerbates the risk of reprisal that the declarants face, which would involve significant and nonspeculative mental and economic harms.  Moreover, although none of the declarants are minors, that factor is not dispositive.  *See Sealed Case*, 971 F.3d at 326 (noting that this "balancing test is necessarily flexible and fact driven").

Defendants oppose the use of pseudonymous declarants to establish standing.  *See* Defs.' Reply at 2, ECF No. 104.  They point out that, to establish associational standing, an association "must specifically identify members who have suffered the requisite harm."  *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (cleaned up).  But that does not mean an association must always identify their injured members by name.  The Ninth Circuit recently held that if "a defendant does not need to know the identity of a particular member to defend" against a standing claim, then the association "does not have to" furnish names.  *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).  At the pleading stage, where general allegations of injury are accepted as true, defendants typically do not need the specific names of plaintiffs' members.  *See Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F. Supp. 3d 50, 67 (D.D.C. 2017).  The pseudonymized declarations here are detailed enough to allow Defendants to respond to Plaintiffs' standing claims for purposes of a motion to dismiss.  Defendants' "argument that the persons allegedly injured must be identified by name might have some validity if this litigation were at the summary judgment stage."  *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006).  But that is a bridge the court need not yet cross.

At least at this stage of the litigation, there is no undue prejudice to Defendants from allowing the use of pseudonymized declarations.

>    *ii.    Whether Plaintiffs' Members Would Have Standing*

The court turns now to whether the declarations show that Plaintiffs' members would have standing to sue in their own right. For a member to have standing, three elements must be met: "injury, causation, and redressability." *Nat'l Council for Adoption*, 4 F.4th at 111. When, as here, "a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381. "Allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (emphasis in original) (cleaned up). The "risk of future harm" must be "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). Still, "absolute certainty is not required." *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (quoting *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 85 (D.C. Cir. 2012)).

All four Nonprofit Plaintiffs—the JACL, Sierra Club, UCS, and OCA—have sufficiently pled associational standing at this early stage of the litigation. To start, the Complaint alleges that both JACL and Sierra Club members regularly visit parks managed by the National Park Service ("NPS"), and that these parks have already been adversely impacted by DOGE-initiated cuts to funding at national parks in ways that impair the enjoyment of JACL and Sierra Club members. *See* Compl. ¶¶ 5–6, 15, 23–24, 31, 217, 219–27. Declarations from two Sierra Club members describe specific plans to visit NPS parks at which services have already deteriorated because of DOGE cuts—harms which are ongoing until the funding is restored. *See* Decl. of Mary Anne Kenworthy ¶¶ 6, 9–13; Decl. of J. Doe 2 ¶¶ 9, 12–17. And a declaration from a JACL member who regularly chaperones school trips to national parks states that they canceled

trips because NPS staff were unavailable to offer guided tours due to the DOGE-initiated funding cuts. *See* Decl. of J. Doe 3 ¶¶ 2, 4, 7. These injuries to the recreational, aesthetic, educational, and professional interests of Plaintiffs' members are cognizable for purposes of standing. *See, e.g.*, *Ctr. for Bio. Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1158 (D.C. Cir. 2025). And the ongoing harms inflicted by DOGE-initiated cuts would be redressed by the vacatur of those cuts at parks visited by Sierra Club and JACL members. Moreover, the Complaint adequately alleges a substantial risk of future additional cuts. In particular, it claims that DOGE is actively soliciting "help from the public" in "finding and fixing waste, fraud and abuse relating to the National Park Service," *see* Compl. ¶¶ 217, 227, which forebodes a "realistic danger" that DOGE will implement further cuts to the NPS that would impact the aforementioned JACL and Sierra Club members, *see Navy Chaplaincy*, 697 F.3d at 1178.

Similarly, the Complaint alleges that UCS members work on research projects that have lost grants due to DOGE-initiated grant terminations. *See* Compl. ¶¶ 315–18. UCS has submitted declarations from two members whose research projects have been harmed by these grant terminations. *See generally* Decl. of J. Doe 4; Decl. of J. Doe 5. Although the Tucker Act displaces the court's jurisdiction to review past grant terminations, the UCS declarations assert that grant guidance issued by DOGE will affect both the future termination of existing grants and the future award of new grants to UCS members. *See* Decl. of J. Doe 4 ¶ 8; Decl. of J. Doe 5 ¶¶ 4, 10. In particular, the UCS declarants have averred that research grants continue to be terminated; that their still-existing grants are likely to be affected by ongoing terminations; and that DOGE will continue to prevent agencies from reviewing new grant applications that otherwise likely would be granted. *See* Decl. of J. Doe 4 ¶¶ 4–5; Decl. of J. Doe 5 ¶¶ 3–6. The court could redress the ongoing harms and the substantial risk of future harm by vacating

unlawful DOGE guidance and enjoining DOGE Defendants from directing more unlawful grant terminations.

A declaration from an OCA member pursuing a degree in public health avers that they lost an internship with the Substance Abuse and Mental Health Services Administration ("SAMHSA"), thus harming the member's "readiness to work in public health" following graduation. *See* Decl. of J. Doe 6 ¶¶ 17–24; *see also* Compl. ¶ 258 (adequately pleading a link between this harm and DOGE activity with respect to the SAMHSA). The OCA declarant averred that she has applied for additional federal internship opportunities that have subsequently been cut, leading her to credibly fear "that these positions will continue to be terminated." Decl. of J. Doe 6 ¶ 26. An order vacating cuts to internship programs and prospectively enjoining future cuts by DOGE officials without the authority to do so would likely redress these harms.

Finally, Plaintiffs have adequately alleged that the harms they assert are fairly traceable to the DOGE Defendants. It is well established that "Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). The Complaint adequately alleges that the cuts causing Plaintiffs harm are fairly traceable to Defendants because Defendants initiated those cuts, "[e]ven if other employees or officials at agencies technically pushed the button to halt payments" or fire staff. *New Mexico*, 784 F. Supp. 3d at 197. Because each Nonprofit Plaintiff has adequately pled associational standing, the court need not address Plaintiffs' organizational standing claims. *See Children's Health Def. v. FCC*, 25 F.4th 1045, 1049 n.2 (D.C. Cir. 2022).

c.   Mootness

After Defendants moved to dismiss, Elon Musk left government.  *See* Decl. of Amy Gleason.  The court ordered the parties to submit supplemental briefing on whether Musk's departure moots Plaintiffs' claims.  *See* Min. Order (Dec. 17, 2025).  Defendants argue only that Musk's departure mooted Count Three—the Appointments Clause claim.  Notably, Defendants do not indicate that Musk's departure has otherwise resulted in the cessation of DOGE's alleged ongoing cuts to federal programs.  *See generally* Defs.' Suppl. Br., ECF No. 117.  To the contrary, the Gleason Declaration indicates that DOGE is still up and running.  *See* Decl. of Amy Gleason ¶ 2.

In any event, Count Three is not moot.  "A case becomes moot 'only when it is *impossible* for a court to grant *any* effectual relief whatever to the prevailing party.'"  *Crowley Gov't Servs., Inc. v. GSA*, 143 F.4th 518, 526 (D.C. Cir. 2025) (quoting *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020)) (emphasis in original).  Here, if Plaintiffs prevail on their claim that Musk was not constitutionally appointed and therefore lacked authority to exercise the power of a principal officer, the court could vacate Musk-initiated policies or cuts that are causing Plaintiffs ongoing harm.  *See Collins v. Yellen*, 594 U.S. 220, 257 (2021) (indicating that actions taken by an officer who is not constitutionally appointed are void); *see also United States v. Comey*, No. 25-cr-272, 2025 WL 3266932, at *11 (E.D. Va. Nov. 24, 2025) ("When an appointment violates the Appointments Clause from the jump, the actor has exercised power that she did not lawfully possess. . . .  In such a case, the proper remedy is invalidation of the *ultra vires* actions taken by the actor." (cleaned up)).  And, in any event, the Appointments Clause claim may continue to run against whoever has replaced Musk as head of DOGE.  *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an

official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The

officer's successor is automatically substituted as a party.").

## B.  Failure to State a Claim

Defendants argue in the alternative that Plaintiffs' Complaint should be dismissed under

Rule 12(b)(6) for failure to state any claims.  *See* MTD at 25–44.  The court agrees that

Plaintiffs' APA and separation of powers claims must be dismissed but finds that Plaintiffs have

adequately stated Appointments Clause and *ultra vires* claims.

### a.  Administrative Procedure Act

Plaintiffs bring a single APA count broadly alleging that Agency Defendants' termination

of grants, contracts, and federal workers, and "dismantling of federal executive departments and

agencies" is arbitrary, capricious, and contrary to law, and must be set aside.  Compl. ¶¶ 339–42.

The court lacks jurisdiction over this claim insofar as it challenges past grant terminations or the

termination of federal workers.  *See supra* Section III.A.a.  To the extent it challenges other

DOGE action over which the court has jurisdiction, Plaintiffs' APA claim must nevertheless be

dismissed because it fails to adequately identify specific agency action.

The APA authorizes an aggrieved party to challenge "agency action" that harms them.  5

U.S.C. § 702.  The APA defines agency action by reference to "circumscribed, discrete"

examples, such as an "'agency rule, order, license, sanction [or] relief."  *Norton v. S. Utah*

*Wilderness All.*, 542 U.S. 55, 62 (2004) (quoting 5 U.S.C. § 551(13)).  Accordingly, "[u]nder the

terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that

causes it harm," and may not seek "*wholesale . . .* programmatic improvements."  *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis in original); *see also Norton*, 542 U.S. at 64

(noting that the APA "precludes . . . broad programmatic attack[s]").  The requirement that a

plaintiff identify "some concrete action" helps reduce "the scope of the controversy . . . to more manageable proportions." *Nat'l Wildlife Fed'n*, 497 U.S. at 891.

The problem with Plaintiffs' single APA claim as currently pleaded is it operates at too high a "level of generality," and fails to identify "a specific final agency action." *Nat'l Wildlife Fed'n*, 497 U.S. at 894 (cleaned up). The court does not doubt that an order to close an agency or the implementation of a directive regarding a funding freeze could be sufficiently specific to constitute discrete agency actions subject to APA review. *See, e.g.*, *Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 43 (D.D.C. 2025); *New York v. Trump*, 133 F.4th 51, 66–68 (1st Cir. 2025). The problem with Plaintiffs' Complaint is that it lumps together an assortment of actions across sixteen federal agencies into a *single* APA claim. Such broad and unbounded pleading lacks the specificity required for identifying particular actions and can only be construed as a wholesale programmatic attack. Plaintiffs' APA claim must therefore be dismissed. And because the APA claim is the only claim against the Agency Defendants, they will be dismissed from this case as well.[3]

b. <u>Separation of Powers</u>

Plaintiffs allege that the DOGE Defendants are acting "in violation of the separation of powers" by terminating grants, firing federal employees, and abolishing federal agencies that have all been "funded by congressional appropriations." Compl. ¶ 329. But under the D.C.

---

[3] The court will grant Defendants' Motion for Relief from Local Civil Rule 7(n). *See* ECF No. 87. Local Civil Rule 7(n) provides that "[i]n cases involving the judicial review of administrative agency actions," the government generally "must file a certified list of the contents of the administrative record . . . simultaneously with the filing of a dispositive motion." However, the court does not need the administrative record to decide the jurisdictional issues or the deficiency in Plaintiffs' APA claim. *See Arab v. Blinken*, 600 F. Supp. 3d 59, 65 n.2 (D.D.C. 2022) (court may waive compliance with Local Civil Rule 7(n) if "the administrative record is not necessary for the court's decision" (quoting *Connecticut v. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018))).

Circuit's decision in *Global Health Council v. Trump*, Plaintiffs "lack a cause of action to bring [this] freestanding constitutional claim." 153 F.4th 1, 17 (D.C. Cir. 2025). That is because Plaintiffs' claim is premised on Defendants' alleged violation of *statutes* appropriating funds and creating agencies. *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 792–93 (D.C. Cir. 2025) ("The assertedly constitutional claim here begins with the premise that shutting down the [agency] would violate the statutes that create the agency[.]"). And the D.C. Circuit has said that under *Dalton v. Specter*, 511 U.S. 462 (1994), such "statutory claims cannot be transformed into constitutional ones" through creative pleading. *Glob. Health*, 153 F.4th at 16; *see also Dalton*, 511 U.S. at 472 ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."). Were it otherwise, litigants could "avoid statutory limits on review by reframing any alleged statutory violation . . . as a constitutional one." *Glob. Health*, 153 F.4th at 14. In short, because Plaintiffs' separation of powers claim is "truly alleging . . . statutory violation[s]," Plaintiffs lack a freestanding constitutional cause of action. *Ass'n for Educ. Fin. & Pol'y v. McMahon*, 786 F. Supp. 3d 13, 28 (D.D.C. 2025). They must instead bring claims under those statutes.

      c.   <u>Appointments Clause</u>

Plaintiffs have, however, stated a claim under the Constitution's Appointments Clause. "That Clause specifies how the President may appoint officers who assist him in carrying out his responsibilities." *United States v. Arthrex, Inc.*, 594 U.S. 1, 10 (2021). The Supreme Court has held that the Clause requires that "[*p*]rincipal officers must be appointed by the President with

the advice and consent of the Senate, while *inferior* officers may be appointed by the President alone, the head of an executive department, or a court." *Id.* (emphasis in original).

Plaintiffs allege that the head of DOGE is a principal officer who has not received Senate confirmation. Compl. ¶¶ 2, 332. "The Senate's advice and consent power is a critical 'structural safeguard of the constitutional scheme,'" which seeks to guard against "the appointment of unfit characters" to high public office. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)) (cleaned up); *see also Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (explaining that the Appointments Clause sought to remedy "one of the American revolutionary generation's greatest grievances against executive power," "the manipulation of official appointments" (citation omitted)); *Edmond*, 520 U.S. at 659–60 (the requirement of Senate confirmation "serves both to curb Executive abuses of the appointment power . . . and to promote a judicious choice of [individuals] for filling the offices of the union" (cleaned up)). Defendants do not claim that the Senate has confirmed the head of DOGE. Instead, they contend that the head of DOGE is not an officer of the United States, and his appointment therefore does not implicate the Appointments Clause. *See* MTD at 25–29.

The Appointments Clause is concerned only with the appointment of officers. *See New Mexico*, 784 F. Supp. 3d at 199 ("To state an Appointments Clause violation, a plaintiff must allege that an 'Officer of the United States' has not been constitutionally appointed." (quoting U.S. Const. art. II, § 2, cl. 2)). The Clause "cares not a whit" about the appointment of "non-officer employees"—the "lesser functionaries" who make up the vast bulk of "the Government's workforce." *Lucia v. SEC*, 585 U.S. 237, 245 (2018); *see also Freytag*, 501 U.S. at 880 (non-officer employees "need not be selected in compliance with the strict requirements of Article II"). But contrary to Defendants' contention, Plaintiffs have adequately pled that the head of

DOGE is an officer of the United States. "In the constitutional context, an 'officer' is someone who": (1) "'occupies a continuing position established by law,'" and (2) "'exercises significant authority pursuant to the laws of the United States.'" *Al Bahlul v. United States*, 967 F.3d 858, 869 (D.C. Cir. 2020) (quoting *Lucia*, 585 U.S. at 245). The Complaint sufficiently alleges both.

### i.    Continuing Position Established by Law

As to the first prong, Plaintiffs have adequately pled that the head of DOGE occupies a continuing position. A position is "continuing" when it (1) is "not transient or fleeting," (2) is "not personal to a particular individual," and (3) carries out duties that are "more than incidental to the regular operations of government." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). Although a continuing position cannot be transient or fleeting, it need not be permanent. *Id.* at 296. The Supreme Court has held that a special counsel's time-limited position can constitute a "continuing position," even though the role generally ends when the counsel "has completed or substantially completed any investigations or prosecutions undertaken." *Morrison v. Olson*, 487 U.S. 654, 664, 671 n.12 (1988); *accord In re Grand Jury Investigation*, 916 F.3d 1047, 1052–53 (D.C. Cir. 2019). In this case, the position will exist for at least 18 months: President Trump's Executive Order indicates that the "U.S. DOGE Service Temporary Organization," created on January 20, 2025, will not terminate until at least July 4, 2026. *See* Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025). And even if the DOGE Service Temporary Organization in fact terminates on that date, "there is no termination date for the overarching DOGE entity or its leader, suggesting permanence." *New Mexico*, 784 F. Supp. 3d at 201. Indeed, the Executive Order establishing DOGE states that the termination of the DOGE Service Temporary Organization "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." 90 Fed. Reg. at 8,441.

Accordingly, Plaintiffs have adequately alleged that the position of DOGE leader is "not transient or fleeting." *Donziger*, 38 F.4th at 297.

Plaintiffs have also sufficiently pled that "the position is not personal to a particular individual." *Donziger*, 38 F.4th at 297. Although DOGE is most closely associated with its first leader, Elon Musk, the Complaint alleges that Musk led DOGE as a special government employee, a position he was required to vacate after 130 days. *See* Compl. ¶ 36; *see also* 18 U.S.C. § 202(a) (defining a "special government employee" as "an officer or employee" who cannot serve for more than 130 days a year). Given that DOGE will exist for at least 18 months, Plaintiffs have sufficiently alleged that "the position [of DOGE's leader] is not personal to Musk" and does not disappear after he leaves government. *New Mexico*, 784 F. Supp. 3d at 201; *see also Donziger*, 38 F.4th at 297 (a position does not "depend on the identity of the person occupying it" if that individual "could be replaced without the duties of the position[] terminating"). Plaintiffs' Appointments Clause claim may thus lie against whoever succeeds Musk in leading DOGE. *See New Mexico*, 784 F. Supp. 3d at 201; *see also* Fed. R. Civ. P. 25(d).

Finally, Plaintiffs have adequately alleged that "the duties of the position" are "more than incidental to the regular operations of government." *Donziger*, 38 F.4th at 297; *see also id.* at 298 (indicating that "weighty and important" duties are not incidental (cleaned up)). As described in more detail below, the Complaint asserts that the head of DOGE is "in fact *directing* executive departments and agencies to cancel federal grants and loans, stop payments, terminate employees, reduce the workforce, and dismantle the department or agency itself." Compl. ¶ 146 (emphasis in original). Such significant authority over "core" governmental operations plainly renders the position more than incidental. *Donziger*, 38 F.4th at 298.

*ii.  Significant Authority Pursuant to the Laws of the United States*

For similar reasons, Plaintiffs have sufficiently alleged that the head of DOGE exercises significant authority.  The significant authority inquiry turns on "(1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker v. Comm'r*, 676 F.3d 1129, 1133 (D.C. Cir. 2012); *see also Lucia*, 585 U.S. at 245 (directing courts to consider "the extent of power an individual wields in carrying out his assigned functions").

As discussed above, the alleged powers of the head of DOGE are clearly weighty and important.  They include the power to "dismantle and shutter federal agencies," Compl. ¶ 190; direct "mass federal employee terminations," *id.* ¶ 178; "stop the disbursement of federal payments," *id.* ¶ 163; and "direct [the] cancellation of . . . federal grants, contracts, [and] leases," *id.* ¶¶ 154–55.  The Complaint alleges that the head of DOGE carries out these significant powers under the color of the President's authority, even though these powers have not been authorized by Congress.  *See id.* ¶ 266.  And in carrying out these significant powers, the head of DOGE allegedly exercises almost "unchecked" discretion and receives minimal supervision, "report[ing] only to the President of the United States" who acts largely as a "rubber stamp." *Id.* ¶¶ 191, 335; *see also id.* ¶ 110 (the leader of DOGE "answers only to the President of the United States, if anyone").  Finally, the Complaint alleges that the head of DOGE issues orders that agency officials follow.  *See id.* ¶ 146 (describing this dynamic).

Accordingly, the head of DOGE is not merely an influential advisor who counsels the President and then communicates the President's decisions to government officers.  *Contra* MTD at 28 (attempting to minimize the DOGE leader as a mere advisor with "informal influence," but no "formal authority").  As discussed above, the Complaint amply alleges that the head of

DOGE himself makes decisions and issues directives on matters as weighty as the termination of federal grants, contracts, and workers.  Compl. ¶¶ 144, 146.

### iii.  Defendants' Arguments to the Contrary

Defendants primarily argue that Plaintiffs fail to state an Appointments Clause claim because the head of DOGE "does not occupy an office" formally established by law and allegedly lacks lawful authority for the powers he is exercising.  *See* MTD at 25–28 (arguing that Plaintiffs' allegation that the DOGE leader lacks properly conferred authority is "a concession that [he] is not exercising authority vested in an office '*pursuant to the laws* of the United States'" (quoting *Lucia*, 585 U.S. at 245)).  Defendants thus urge a formalist interpretation of the Appointments Clause that "turn[s] on" (1) whether the appointed individual holds an office that has been lawfully established, and (2) "the *de jure*—not *de facto*—authority that [the individual] wields."  *Id.* at 27–28.  In other words, Defendants appear to make the extraordinary argument that an individual who holds an important office and wields immense power is not subject to the Appointments Clause so long as the office was unlawfully created, and the power was unlawfully seized.

As the court has already explained, "constitutional safeguards are not so easily evaded." *New Mexico*, 784 F. Supp. 3d at 200.  To start, Defendants' formalist interpretation is difficult to square with guidance from the D.C. Circuit, which urges a more functionalist approach.  *See Tucker*, 676 F.3d at 1133 ("[I]t would seem anomalous if the Appointments Clause were inapplicable to positions extant in the bureaucratic hierarchy, and to which Congress assigned 'significant authority,' merely because neither Congress nor the executive branch had formally created the positions.").  Moreover, the implications of Defendants' formalist interpretation are disquieting.  Under that interpretation, the President could evade Appointments Clause scrutiny

by (1) usurping Congress's power to create a principal office and assign it powers, and (2) unilaterally appointing an official to that office without Senate confirmation.  *See Myers v. United States*, 272 U.S. 52, 130 (1926) ("[T]he power of appointment and removal cannot arise until Congress creates the office and its duties and powers, and must accordingly be exercised and limited only as Congress shall in the creation of the office prescribe.").

The court will not countenance such a two-fold attack on Congress's role in our system of checks and balances.  *See Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring) ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office.").  Indeed, if the President unilaterally creates a principal office, endows it with unlawful powers, and fills it without Senate confirmation, that is more—not less—reason for Appointments Clause scrutiny. *See Freytag*, 501 U.S. at 879 (emphasizing the judiciary's role "in maintaining the constitutional plan of separation of powers") (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962))).

Defendants next argue that even if the head of DOGE directs agency officials to terminate grants and fire employees, "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." MTD at 29 (quoting *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987)).  Defendants' reliance on *Andrade* is misplaced.  That case involved a reduction-in-force program that was "conceived and planned" by an unappointed agency staffer but ratified by a properly appointed official.  *Andrade*, 824 F.2d at 1255–57.  The D.C. Circuit held that even though the unappointed staffer may have "had complete responsibility for crafting and executing the RIF," the RIF did not violate the Appointments Clause because a "duly appointed official" had "final authority" over the RIF when it was implemented.  *Id.* at 1257.  The Circuit explained that "it is an

everyday occurrence in . . . government for staff members to conceive and even carry out policies for which duly appointed or elected officials take official responsibility." *Id.* Here, however, Plaintiffs do not allege that the head of DOGE is a subordinate staffer proposing plans over which agency officials have final authority. To the contrary, Plaintiffs allege that the head of DOGE is *ordering* agency officials to carry out his plans. Compl. ¶¶ 144, 146.

In sum, Plaintiffs have sufficiently alleged that the head of DOGE is an officer of the United States, and a principal one at that. *See New Mexico*, 784 F. Supp. 3d at 199 ("A principal officer is directed and supervised only by the President." (citing *Edmond*, 520 U.S. at 663)); *see also* Compl. ¶ 110 (alleging that the head of DOGE "answers only to the President of the United States"). Because Plaintiffs further allege that this principal officer has not received Senate confirmation, they have stated an Appointments Clause claim.

### d.  *Ultra Vires*

Plaintiffs have also stated a claim that DOGE Defendants are acting *ultra vires*—that is, in excess of any lawfully conferred authority. *See* Compl. ¶¶ 117–21, 264–66, 323–25 (alleging that DOGE Defendants are directing agency officials to terminate grants, cancel payments, cut funding, and shutter agencies—and undertaking such action themselves—without lawful authority).

An executive official's power to act on the President's behalf "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "When an executive [official] acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). Judicial review of *ultra vires* executive action typically must proceed through some statutory

review mechanism.  But "the absence of an express cause of action does not necessarily foreclose all judicial review."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (cleaned up).  In some cases, a plaintiff "'may still be able to institute a non-statutory review action,' also known as *ultra vires* review," by relying on the court's equitable power to enjoin unlawful executive action.  *Id.* (quoting *Trudeau v. FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006)).  That said, a litigant "cannot . . .  invok[e]" a federal court's "equitable powers" to "circumvent" limitations that Congress places, either express or implied, on the availability of judicial review.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").  Thus, an *ultra vires* claim will lie only where (1) the executive commits an extreme legal error, (2) "there is no alternative procedure for review," and (3) equitable review is not precluded by statute.  *New Mexico*, 784 F. Supp. 3d at 206; *see also Nat'l Treasury Emps. Union*, 149 F.4th at 791.

Defendants first contend that Plaintiffs' *ultra vires* allegations are "bare assertions" based only on unsupported "information and belief" "that the Court need not credit."  MTD at 41.  The court disagrees.  Plaintiffs have plausibly alleged that DOGE Defendants are ordering agency officials to terminate grants and cut spending without any authority to do so.  In support of their allegations, Plaintiffs have pointed to public statements by the President, DOGE officials, and other administration officials which support their allegations that DOGE has seized an expansive role in the federal government.  *See, e.g.*, Compl. ¶¶ 133, 135, 151, 155–59, 162, 164–65, 172, 192.  For example, a DOGE official stated publicly that "DOGE just TERMINATED a $2.3 MILLION contract" and that DOGE was "shutting [USAID] down."  *Id.* ¶¶ 158, 192.  Plaintiffs

have also pointed to evidence that supports their allegations that DOGE officials issue directives to agency officials. *See, e.g.*, *id.* ¶ 146.

Defendants next contend that Plaintiffs fail to state an *ultra vires* claim because they "fail to identify any specific statute" that Defendants have violated. MTD at 43. It is true that Plaintiffs do not identify specific statutory limitations that Defendants have exceeded. But "[c]onduct in violation of specific statutory limitations 'is just one example of an *ultra vires* act—not the only example of an *ultra vires* action.'" *New Mexico*, 784 F. Supp. 3d at 206 (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)). Here, Plaintiffs contend that Defendants are exercising immense power without any grant of statutory authority whatsoever. That is the sort of "extreme legal error" that can sustain a claim for *ultra vires* review. *Nat'l Treasury Emps. Union*, 149 F.4th at 791.

Accordingly, Defendants' reliance on *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) is misplaced. Defs.' Notice of Suppl. Auth., ECF No. 105. There, the Supreme Court addressed whether a non-party to a Commission licensing proceeding could bring an *ultra vires* challenge to a licensing decision even though the Hobbs Act limited licensing challenges to parties to the proceeding. The Court rejected the non-parties' attempt to "dress up" as an *ultra vires* challenge "a typical statutory-authority argument" that the Commission's "general authority to license storage of spent nuclear fuel does not extend to the licensing of private off-site storage." *Nuclear Regul. Comm'n*, 605 U.S. at 682. The Court held that *ultra vires* review is available "only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition" in its grant of authority. *Id.* at 681. Defendants read this holding too broadly; they contend that it precludes *ultra vires* review unless Plaintiffs can demonstrate that Defendants violated a specific statutory prohibition. But the Supreme Court's

holding in *Nuclear Regulatory Commission* applies where an agency is alleged to have exceeded a grant of statutory authority.  Here, by contrast, Plaintiffs allege that Defendants are acting without *any* grant of authority whatsoever.  Nothing in *Nuclear Regulatory Commission* rules out the availability of *ultra vires* review in such extraordinary circumstances.  *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (upholding availability of *ultra vires* review because "[o]therwise, the individual [would be] left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law").

Defendants fleetingly suggest that their conduct is authorized by 5 U.S.C. § 3161, which provides that a "temporary organization" may be established by executive order "for a specific period not in excess of three years for the purposes of performing a specific study or other project."  *See* MTD at 43; *see also* Defs.' Reply at 24–25.  But it would stretch § 3161's use of the term "project" too far to find that it authorizes officials to terminate grants, fire federal workers, and shutter agencies without any other source of statutory authority.  *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (Congress does not delegate "sweeping and consequential" authority over matters of great "economic and political significance" "in so cryptic a fashion." (cleaned up)).  Thus, Defendants cannot invoke § 3161 in a last-ditch attempt to avoid *ultra vires* review.

The court is also satisfied at this early stage of the proceedings that there is no other "meaningful and adequate opportunity for judicial review" and no "clear and convincing evidence that Congress intended" to preclude Plaintiffs' *ultra vires* claim.  *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991).  Defendants do not point to some other mechanism Plaintiffs could pursue to prospectively enjoin Defendants' actions on the basis

that they lack authority to carry out such action.  Although review of past grant terminations may be available under the Tucker Act, and DOGE's other past actions may be reviewable under the APA, those review schemes do not offer Plaintiffs a mechanism for seeking prospective injunctive relief.

In sum, Plaintiffs have stated *ultra vires* and Appointments Clause claims, but they have failed to state an APA claim or a freestanding separation of powers claim.

## C. Expedited Discovery

Also before the court is the Nonprofit Plaintiffs' Motion for Expedited Discovery.  *See* No. 25-cv-643, ECF No. 11.  Because the D.C. Circuit indicated that this court must first resolve Defendants' Motion to Dismiss before it can order expedited discovery, *see In re Musk*, No. 25-5072, 2025 WL 926608, at *1 (D.C. Cir. Mar. 26, 2025), this court deferred judgment on the Motion for Expedited Discovery.  Given that the court's resolution of the Motion to Dismiss narrows the scope of the case and affects Plaintiffs' discovery requests and proposed timeline, the court will DENY the Motion for Expedited Discovery without prejudice.  Plaintiffs may refile a revised motion in light of this decision.

## IV.    CONCLUSION

For the foregoing reasons, the court will GRANT Defendants' Motion for Relief from Local Civil Rule 7(n), ECF No. 87, and Plaintiffs' Second Motion for Leave to Identify  Declarants by Pseudonym, ECF No. 98; GRANT in part and DENY in part Defendants' Motion to Dismiss, ECF No. 90; and DENY without prejudice Plaintiffs' Motion for Expedited Discovery, No. 25-

cv-643, ECF No. 11; and DENY AS MOOT the associated Motions for Leave to Identify

Declarants by Pseudonym, No. 25-cv-429, ECF Nos. 69, 72.  A separate order will follow.


Date: March 23, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge